IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Tina Wilson | § | |
| | § | |
| | § | |
| vs. | § | Case No. 24-40553-elm7 |
| | § | Chapter 7 |
| | § | |
| Jacob Cannon, Jr. | § | |

## **APPENDIX A**

Exhibit 1: Original Petition from Tina Wislon v. Jacob Cannon, Cause No. CC-21-02654-D, County Court at Law No. 4, Dallas County, Texas

Exhibit 2: Final Judgment from Tina Wislon v. Jacob Cannon, Cause No. CC-21-02654-D, County Court at Law No. 4, Dallas County, Texas

Exhibit 3: Unsworn Declaration of Jonathan Wharton

Exhibit 4:Reporter's Record from Tina Wilson v. Jacob Cannon, Cause No. CC-21-02654-D, County Court at Law No. 4, Dallas County, Texas

Cause No. CC-21-02654-D

| | | |
|---|---|---|
| TINA WILSON | § | IN THE COUNTY COURT |
| | § | |
| | § | |
| VS. | § | AT LAW NO.4 |
| | § | |
| | § | |
| | § | |
| JACOB CANNON | § | DALLAS COUNTY, TEXAS |

## FINAL JUDGMENT

BE IT REMEMBER that, on October 11, 2023, came on to be heard the above-entitled and numbered cause. Plaintiff TINA WILSON appeared by and through her attorney Jonathan Wharton and announced ready. Defendant JACOB CANNON appeared by and through his attorney Okwy Maduforo and announced ready.

A jury was not requested, and a bench trial proceeded. The Court has considered the pleadings and official records, exhibits and arguments of the parties on file in this cause and is of the opinion that judgment should be rendered for the Plaintiff.

It is therefore ORDERED, ADJUDGED, and DECREED that Plaintiff is entitled to a judgment, pursuant to Texas law, it is further, ORDERED, ADJUDGED, and DECREED that Plaintiffs TINA WILSON shall recover from Defendant, JACOB CANNON the following sums:

$500,000 in past pain and suffering;
$6,000,000 in past mental anguish;
$1,000,000 in future mental anguish; and
$750,000 in punitive damages.



CC-21-02654-D
COJ
ORDER - JUDGMENT
2771631

This is a Final JUDGMENT DISPOSING OF ALL ISSUES AND ALL PARTIES, AND this judgment is appealable.

SIGNED on this 15th day of October 2023.

JUDGE PRESIDING

2  Final Judgement – CC-21-02654-D

3

FILED
7/1/2021 3:30 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

CAUSE NO. <u>CC-21-02654-D</u>

| | | |
|---|---|---|
| **TINA WILSON** | § | **COUNTY COURT AT LAW NO. ___** |
| | § | |
| | § | |
| **VS.** | § | **IN AND FOR** |
| | § | |
| | § | |
| **JACOB CANNON** | § | **DALLAS COUNTY, TEXAS** |

<u>**ORIGINAL PETITION**</u>

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW TINA WILSON, Plaintiff, and files this Original Petition against Defendant, JACOB CANNON, and for cause of action would respectfully show the Court as follows:

## VENUE AND JURISDICTION
### I.

Venue is appropriate in Dallas County pursuant to Section 15.002(2) of the Texas Civil Practice & Remedies Code, as the Defendant resides in this county.

The Court has jurisdiction over the controversy because the damages are in excess of the minimum jurisdictional limits of the Court. The Plaintiff seeks only monetary relief over $1,000,000.

## DISCOVERY CONTROL PLAN
### II.

This suit may proceed under Discovery Level 3.

## PARTIES AND SERVICE
### III.

Defendant JACOB CANNON may be served at 925 W. Bear Creek Rd., Glenn Heights, TX 75154.

## FACTS
### IV.

Jacob Cannon is Tina Wilson's stepfather. From the ages of nine to sixteen, Tina Wilson was repeatedly raped and impregnated by Jacob Cannon. Despite multiple miscarriages and forced abortions, she had a child by him.

## LIABILITY
### V.

Jacob Cannon is liable for assault (continuous sexual abuse of a child).

## DAMAGES
### VI.

The Plaintiff may recover past and future pain and suffering; past and future mental anguish; past and future medical expenses; and past and future loss of enjoyment of life. The Plaintiff may also recover punitive damages.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendant Jacob Cannon be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for damages in amount within the jurisdictional limits of the Court; together with pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by low; post-judgment interest at the legal rate; costs of court; and for such other and further relief, general and special, at law or in equity, to which Plaintiff may show herself to be justly entitled.

Respectfully submitted,

BRAD THOMAS LAW OFFICE, PLLC
P.O. Box 472027
Fort Worth, TX 76147

Tel.: (903) 931-3616
Fax: (903) 900-4727
E-mail: jon@bradthomaslawoffice.com


BY: ___/s/ Jonathan Wharton_____

JONATHAN WHARTON
STATE BAR NO. 24075764
ATTORNEY FOR PLAINTIFF,
TINA WILSON

1                    REPORTER'S RECORD

2              VOLUME 1 OF 1 VOLUME        FILED IN
                                        5th COURT OF APPEALS
3           APPELLATE NO. 05-23-01185-CV  DALLAS, TEXAS
                                          1/3/2024 4:39:45 PM
4        TRIAL COURT CAUSE NO. CC-21-026Ruben Morin
                                           Clerk
5  TINA WILSON                   ) IN THE COUNTY COURT
            Plaintiff,           )
6                                )
   VS.                           ) AT LAW NO. 4
7                                )
   JACOB CANNON                  )
8          Defendant.            ) DALLAS COUNTY, TEXAS

9

10     _____

11                 TRIAL BEFORE THE COURT

12     _____

13      On the 12th day of October, 2023, the following

14  proceedings came on to be heard in the above-titled and

15  numbered cause before the Honorable Dianne K. Jones,

16  Judge Presiding, held in Dallas, Dallas County, Texas.

17      Proceedings reported by computerized stenotype

18  machine.

19          VEARNEAS W. FAGGETT, TEXAS CSR #3129

20              Official Court Reporter

21              County Court at Law No. 4

22                  214.779.7034

23

24

25

1                    A P P E A R A N C E S

2  FOR THE PLAINTIFF:
        Mr. Jonathan Wharton
3        Texas State Bar No. 24075764
        jonwhartonlaw@gmail.com

4

5        The Law Office of Jonathan W. Wharton
        P. O. Box 472027
6        Forth Worth, Texas  76147
        Tel: 903.931.3616
7        Fax: 214.462.6401

8

9

10 FOR THE DEFENDANT:
        Mr. Okwy C. Maduforo
11       Texas State Bar No. 24047703
        ocmaduforo@outlook.com

12

13       Law Offices of Maduforo & Osimiri, PLLC
        1111 W. Mockingbird Ln., Ste. 1410 650
14       Dallas, Texas  75247
        Tel: 214.267.0103

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2     OCTOBER 12, 2023                                    PAGE   VOL

3     Proceedings ....................................    5     1

4     Defense Motion for Continuance ................     5     1

5     Court's Ruling .................................    6     1

6     Plaintiff's Opening Statements ................     7     1

7     Defense's Opening Statements ..................     8     1

8     PLAINTIFF'S WITNESS     DIR    CROSS   REDIR   RECROSS     VD

9     Wilson, Tina            12     42      50                  1

10    Plaintiff Rests ...............................    70     1

11    Defense Motion for Instructed Verdict .........    70     1

12    Court's Ruling ................................    72     1

13    DEFENSE'S WITNESS      DIR    CROSS   REDIR   RECROSS     VD

14    Wilson, Birdie         72     87      94                  1

15    Defense Rests .................................    96     1

16    PLAINTIFF'S WITNESS     DIR    CROSS   REDIR   RECROSS     VD

17    Jones, Roderick        97     104     108                 1

18    Reporter's Certificate ........................   112     1

19    Disclosure ....................................   113     1

20

21

22

23

24

25

<u>E X H I B I T   I N D E X</u>

| <u>Description</u> | <u>Offered</u> | <u>Admitted</u> | <u>Vol</u> |
|---|---|---|---|
| Plaintiff's No. | | | |
| 1 - Jacob Cannon, Jr. Depo | 10 | 11 | 1 |
| 2 - Sharon Jackson George Depo | 10 | 11 | 1 |
| 3 - Gerald Miller Depo | 10 | 11 | 1 |
| 4 - Gerald Wayne Wilson, Jr. Depo | 10 | 11 | 1 |
| 5 - Photo | 110 | 110 | 1 |

1                  P R O C E E D I N G S

2              (October 12, 2023; 9:59 a.m.)

9:59AM   3              THE COURT:  This is Cause Number

9:59AM   4   CC-21-02654-D, Tina Wilson versus Jacob Cannon.

9:59AM   5              MR. WHARTON:  Jon Wharton for the

9:59AM   6   Plaintiff, Your Honor.

9:59AM   7              MR. MADUFORO:  Okwy C. Maduforo, for the

9:59AM   8   Defendant Jacob Cannon.

9:59AM   9              THE REPORTER:  Can you spell your last

9:59AM   10  name?

9:59AM   11             MR. MADUFORO:  Sure.  M-A-D-U-F-O-R-O.

9:59AM   12  Thank you.

9:59AM   13             THE COURT:  Okay.  And what's the basis of

9:59AM   14  your continuance?

9:59AM   15             MR. MADUFORO:  Your Honor, it's just a

9:59AM   16  couple of things.  One of them is already taken care of

9:59AM   17  and I appreciate your patience with me.  I had a prior

9:59AM   18  scheduled hearing in Denton County, just rushing down

9:59AM   19  from there this morning.

9:59AM   20             And then, too, the former attorney who

9:59AM   21  recently officially withdrew from the case and now I'm

9:59AM   22  here with Mr. Jacob.  And I reached out to plaintiff's

10:00AM  23  counsel to see probably if we can find a way to engage in

10:00AM  24  some collaborative maybe proceedings to see if we can

10:00AM  25  resolve this, or some of the other issues maybe that we

| | | |
|---|---|---|
| 10:00AM | 1 | have in this case.  Because we haven't had a chance to do |
| 10:00AM | 2 | that. |
| 10:00AM | 3 | And being that I'm still new pursuant to |
| 10:00AM | 4 | the withdrawal of the previous attorney, I wanted to see |
| 10:00AM | 5 | if I could have a little more attorney prep time and |
| 10:00AM | 6 | ultimately we might be able to resolve this. |
| 10:00AM | 7 | THE COURT:  Well, I'm going to deny your |
| 10:00AM | 8 | motion.  This case was filed on July 1st, 2023.  This is |
| 10:00AM | 9 | October the 12th -- I'm sorry -- October 12th, 2023. |
| 10:00AM | 10 | This was filed on July 1st, 2020.  It's been set for |
| 10:00AM | 11 | several months in this courtroom and your motion for |
| 10:00AM | 12 | continuance wasn't even filed until two days ago.  I |
| 10:01AM | 13 | don't know when you took over the case but I guess you |
| 10:01AM | 14 | took over the case two days ago... |
| 10:01AM | 15 | MR. MADUFORO:  I was not aware, I think, |
| 10:01AM | 16 | up until I believe late last month by Mr. Shawn Laney was |
| 10:01AM | 17 | on the case, I believe. |
| 10:01AM | 18 | THE COURT:  But your client represented to |
| 10:01AM | 19 | the Court that you were the original attorney on this |
| 10:01AM | 20 | case. |
| 10:01AM | 21 | MR. MADUFORO:  Until I was fired and then |
| 10:01AM | 22 | rehired. |
| 10:01AM | 23 | THE COURT:  Right, which means you're very |
| 10:01AM | 24 | familiar with the case, so we will proceed at this time. |
| 10:01AM | 25 | MR. MADUFORO:  Thank you, Judge. |

| | | |
|---|---|---|
| 10:01AM | 1 | THE COURT:  Does anybody want to do an |
| 10:01AM | 2 | opening statement? |
| 10:01AM | 3 | MR. WHARTON:  Yes, Your Honor. |
| 10:01AM | 4 | MR. MADUFORO:  Yes, Your Honor. |
| 10:01AM | 5 | THE COURT:  Mr. Wharton, you may proceed |
| 10:01AM | 6 | first. |
| 10:01AM | 7 | PLAINTIFF'S OPENING STATEMENTS |
| 10:01AM | 8 | MR. WHARTON:  Thank you, Your Honor. |
| 10:02AM | 9 | This is a sexual assault of a minor case. |
| 10:02AM | 10 | So, Tina Wilson, when she was a child, |
| 10:02AM | 11 | beginning at the age of about nine, she was living with |
| 10:02AM | 12 | her mother's husband, Jacob Cannon, and he had sex with |
| 10:02AM | 13 | her for years.  He impregnated her multiple times.  She |
| 10:02AM | 14 | had a series of abortions. |
| 10:02AM | 15 | Ultimately, at the age of 12, she carried |
| 10:02AM | 16 | one of those children to term.  That child is named |
| 10:02AM | 17 | Jaquita, after Jacob; Jaquita Cannon. |
| 10:02AM | 18 | Mr. Cannon has been deposed.  He pled the |
| 10:02AM | 19 | Fifth for every question relating to sexual contact with |
| 10:03AM | 20 | Tina Wilson or the parentage of Jaquita. |
| 10:03AM | 21 | We have depositions from Ms. Wilson's |
| 10:03AM | 22 | brother as well as her father and her stepmother, |
| 10:03AM | 23 | basically her -- so, they never -- there's no evidence on |
| 10:03AM | 24 | the other side.  They have no defense, as far as I can |
| 10:03AM | 25 | tell.  They've never produced any evidence.  There's no |

| | | |
|---|---|---|
| 10:03AM | 1 | witnesses.  They have -- there's nothing. |
| 10:03AM | 2 | So the Court will be hearing from |
| 10:03AM | 3 | Ms. Wilson.  Unfortunately, I sort of anticipated this |
| 10:03AM | 4 | might go through a different way, but she is going to |
| 10:03AM | 5 | have to testify.  And, you know, that's what we'll be |
| 10:03AM | 6 | doing primarily.  And I'll be introducing the depositions |
| 10:03AM | 7 | from the witnesses.  And the way that I would prefer to |
| 10:04AM | 8 | do that is just in writing to make this as brief -- this |
| 10:04AM | 9 | part as brief as possible. |
| 10:04AM | 10 | As far as damages, what we'll be asking |
| 10:04AM | 11 | for, it doesn't really I don't think in a practical sense |
| 10:04AM | 12 | make much difference whether it's 5 million or |
| 10:04AM | 13 | 500 million or whatever.  I don't think on a practical |
| 10:04AM | 14 | level it's going to make much difference. |
| 10:04AM | 15 | The value of Tina's mental anguish for |
| 10:04AM | 16 | going through that for years, for living with that, is |
| 10:04AM | 17 | beyond anything that money could possibly change. |
| 10:04AM | 18 | So I don't think that -- well, we'll get |
| 10:04AM | 19 | through it.  Thank you, Your Honor. |
| 10:04AM | 20 | THE COURT:  Counselor. |
| 10:04AM | 21 | DEFENSE'S OPENING STATEMENTS |
| 10:04AM | 22 | MR. MADUFORO:  Your Honor, thank you. |
| 10:04AM | 23 | This case, as unfortunate as it sounds, is |
| 10:05AM | 24 | not about an actual incident that occurred.  It's about |
| 10:05AM | 25 | what can I get from my stepfather.  It's about do this |

10:05AM  1  for me or else.

10:05AM  2              Testimony from Mr. Cannon will show what a

10:05AM  3  loving, caring, and straightforward human being he is.

10:05AM  4              Testimony from Mr. Cannon will show to the

10:05AM  5  point where the petitioner in this case, plaintiff in

10:05AM  6  this case, I'm sorry, left the house after threatening,

10:05AM  7  if you don't give me XYZ amount of money and build a

10:05AM  8  house for me, I'll make your life a living hell, for lack

10:05AM  9  of a better word.  This is about what we can get and not

10:06AM  10  actually what happened.

10:06AM  11              You will never hear testimony that an

10:06AM  12  incident like this occurred, that there was any part of

10:06AM  13  investigation, police report, CPS issues alleged that it

10:06AM  14  happened while she was still a minor.  That never

10:06AM  15  happened.

10:06AM  16              And, by the way, Mr. Cannon's beloved wife

10:06AM  17  used to work for the County.  She is very much aware of

10:06AM  18  the process.  This is her biological child.  That

10:06AM  19  complaint was never, never, it never came -- be put in

10:06AM  20  words a series of abuse unfortunately to the plaintiff by

10:06AM  21  her dads' relatives, by the cousin.

10:07AM  22              You will not hear testimony from Mr. Jacob

10:07AM  23  that this occurred.  You will not hear testimony that

10:07AM  24  there was an investigation.  You will not hear testimony

10:07AM  25  that this man was convicted by any chance of these

```
10:07AM    1   events.

10:07AM    2              You will not hear testimony that his wife

10:07AM    3   threatened to divorce him or leave him because he was

10:07AM    4   abusing her biological child.

10:07AM    5              At the end of the day, Your Honor, we are

10:07AM    6   asking that judgment be awarded against them and they

10:07AM    7   don't take nothing from the plaintiff -- I mean

10:07AM    8   respondent in this case.  Thank you.

10:07AM    9              THE COURT:  Please call your first

10:07AM   10   witness, Mr. Wharton.

10:07AM   11              MR. WHARTON:  Yes, Your Honor.  And I

10:07AM   12   would like to begin by just introducing the four

10:07AM   13   depositions.  So these, for streamlining the process, it

10:08AM   14   will be easier than reading them or playing them.

10:08AM   15              THE COURT:  I'm supposed to read them or

10:08AM   16   play them sometime later?

10:08AM   17              MR. WHARTON:  Yes, Your Honor.

10:09AM   18              THE COURT:  So any objections?

10:09AM   19              MR. MADUFORO:  Yes, Your Honor.  Is this

10:09AM   20   all one exhibit?

10:09AM   21              MR. WHARTON:  There are four different

10:09AM   22   ones, four depositions.

10:09AM   23              MR. MADUFORO:  So I don't have objection

10:09AM   24   or objections on three of those.  But I do have -- on one

10:10AM   25   I don't see a certification of the transcript by the
```

| | | |
|---|---|---|
| 10:10AM | 1 | transcriber.  Okay, I see here it is signature.  I don't |
| 10:10AM | 2 | see any -- |
| 10:10AM | 3 | THE COURT:  Mr. Wharton? |
| 10:10AM | 4 | MR. WHARTON:  I have the certification |
| 10:10AM | 5 | here, electronically, and physically I can show Your |
| 10:10AM | 6 | Honor what we're looking at.  May we approach? |
| 10:10AM | 7 | THE COURT:  Sure. |
| 10:10AM | 8 | MR. WHARTON:  So this is the deposition |
| 10:10AM | 9 | and this is the certification page.  It looks like she |
| 10:10AM | 10 | didn't fill the date out on that one. |
| 10:10AM | 11 | THE COURT:  But she signed. |
| 10:10AM | 12 | MR. WHARTON:  Yeah, and then I have the |
| 10:10AM | 13 | date on here. |
| 10:10AM | 14 | THE COURT:  Well, admitted.  It goes to |
| 10:11AM | 15 | the weight, so all four exhibits are admitted. |
| 10:11AM | 16 | MR. WHARTON:  We'll label them 1 through |
| 10:11AM | 17 | 4, Your Honor. |
| 10:11AM | 18 | (Plaintiff's Exhibits 1 - 4 admitted.) |
| 10:11AM | 19 | MR. WHARTON:  We call Tina Wilson. |
| 10:11AM | 20 | THE COURT:  Please raise your right hand, |
| 10:11AM | 21 | ma'am. |
| 10:11AM | 22 | Do you swear or affirm to tell the truth, |
| 10:11AM | 23 | the whole truth, and nothing but the truth so help you |
| 10:11AM | 24 | God? |
| 10:11AM | 25 | THE WITNESS:  Yes, I do. |

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:11AM | 1 | TINA M. WILSON, |
| 10:11AM | 2 | was called as a witness by the Plaintiff, having been |
| 10:11AM | 3 | first duly sworn, testified as follows: |
| 10:11AM | 4 | DIRECT EXAMINATION |
| 10:11AM | 5 | BY MR. WHARTON: |
| 10:11AM | 6 | Q.   State your name for the record, please. |
| 10:12AM | 7 | A.   Tina Marie Wilson. |
| 10:12AM | 8 | THE COURT:  Mr. Wharton, I need you to sit |
| 10:12AM | 9 | down and speak into the microphone. |
| 10:12AM | 10 | MR. WHARTON:  Yes, Your Honor. |
| 10:12AM | 11 | Q.   (By Mr. Wharton)  State your name for the |
| 10:12AM | 12 | record, please. |
| 10:12AM | 13 | A.   Tina Marie Wilson. |
| 10:12AM | 14 | Q.   And let's start with how you came to live in |
| 10:12AM | 15 | Jacob Cannon's house. |
| 10:12AM | 16 | A.   My mother and Jacob were dating.  I moved in |
| 10:12AM | 17 | shortly after they started dating, around the age of nine |
| 10:12AM | 18 | or ten. |
| 10:12AM | 19 | Q.   What was Jacob like initially? |
| 10:13AM | 20 | A.   He was real nice.  He was -- he was just really |
| 10:13AM | 21 | nice at first until things started happening. |
| 10:13AM | 22 | Q.   Okay.  Tell me about that.  What things started |
| 10:13AM | 23 | happening? |
| 10:13AM | 24 | A.   Around the same age of nine or ten, I was in -- |
| 10:13AM | 25 | we were staying in Wildflower Apartments in Midland, |

Direct Examination by Mr. Wharton

10:13AM  1   Texas.  I was in the bathtub.  I believe I was crying.

10:13AM  2   He walked in.  He asked me was I okay.  I said yes.  I

10:13AM  3   got out of the bathtub.  We had a water bed at the time.

10:13AM  4   I got out of the bathtub and I was drying off, and that's

10:13AM  5   when I noticed him looking at me.

10:13AM  6           He, himself, told me that's what attraced him

10:14AM  7   to me.  And shortly after that, around -- my first time

10:14AM  8   ever having a miscarriage, I was 11 years old.  I had my

10:14AM  9   first miscarriage at 11, had my first abortion at 11, and

10:14AM  10  I got pregnant and had -- I got pregnant several times

10:14AM  11  and I had a total of two abortions and five -- I'm sorry,

10:14AM  12  I apologize -- I had two miscarriages and five abortions

10:14AM  13  by Jacob until I turned the age of 14.  And at the age of

10:14AM  14  14, I got pregnant with my daughter Jaquita Cannon.

10:14AM  15       Q.   And how did you name Jaquita?

10:14AM  16       A.   Jacob named Jaquita.  Jaquita means Jacob in

10:14AM  17  African Hebrew form.  It means the same as Jacob the

10:14AM  18  father.

10:14AM  19       Q.   Why did your mother never intervene?

10:15AM  20       A.   I feel like my mother stayed with Jacob based

10:15AM  21  on money.  I feel like my mother allowed these things to

10:15AM  22  happen.  My mother was also very abusive to me.  I

10:15AM  23  believe she did it because Jacob has money.

10:15AM  24           THE COURT:  Well, let me stop you.  If you

10:15AM  25  are going to prove your case, you are going to need to

10:15AM   1   prove your case.  I was a child abuse prosecutor for a

10:15AM   2   year and a half and so far I haven't heard anything.

10:15AM   3            MR. WHARTON:  Yes, Your Honor.

10:15AM   4       Q.   (By Mr. Wharton)  So, going through it, the

10:15AM   5   first time that Jacob initiated sexual contact with you,

10:15AM   6   and again in detail, can you tell the Court what exactly

10:15AM   7   happened?

10:15AM   8       A.   The first time Jacob tried to penetrate me, he

10:15AM   9   said that I was too tight.  He used a toothbrush.  He

10:15AM   10  used Q-tips, anything to try to basically open me up.

10:16AM   11            I didn't understand it at first.  Now that I'm

10:16AM   12  older I do.  He told me -- it was several occasions where

10:16AM   13  he told me we were married.  Just like in a lot of black

10:16AM   14  marriages you have to jump over the broom.  I had to jump

10:16AM   15  over a broom.  My last name was then changed from Wilson

10:16AM   16  to Cannon.  He told me that we were married and that

10:16AM   17  everything was okay.

10:16AM   18      Q.   Let's go through in detail for these -- the

10:16AM   19  actual sexual experiences.  Did you kiss Jacob?  Did Jacob

10:16AM   20  kiss you?

10:16AM   21      A.   Yes.

10:16AM   22      Q.   Did he touch you?

10:16AM   23      A.   Yes.

10:16AM   24      Q.   Okay.  Where did he touch you?

10:16AM   25      A.   He touched me all over.  He touched my breasts,

Direct Examination by Mr. Wharton

10:16AM   1   he touched my vagina.  He touched me all over.  He would

10:17AM   2   basically do it before -- my mom, she -- she worked for

10:17AM   3   the school district.  She would have to leave for work

10:17AM   4   early in the morning and that's a lot of times when it

10:17AM   5   would start, around 6 or 6:30 in the morning.

10:17AM   6        Q.   Your brother described y'all as -- and Jacob in

10:17AM   7   particular, as acting like puppy love, like a lot of

10:17AM   8   playing?

10:17AM   9        A.   Yes.

10:17AM   10       Q.   Is that how he would initiate sexual contact

10:17AM   11  with you?

10:17AM   12       A.   Yes.

10:17AM   13       Q.   How regularly would he have sexual relations

10:17AM   14  with you, like penetration?

10:17AM   15       A.   I can't really just give you like how many

10:17AM   16  times a week, but it was a lot.  It was a lot.  I thought

10:17AM   17  that was something regular before I went to school.  I

10:18AM   18  was literally only in the fourth or fifth grade when this

10:18AM   19  started.  I didn't know any better.

10:18AM   20       Q.   How many years did it last for?

10:18AM   21       A.   It lasted, I would say, up until almost my

10:18AM   22  senior year of high school.

10:18AM   23       Q.   What time of day did the actual sex itself most

10:18AM   24  commonly occur?

10:18AM   25       A.   Early in the morning.

Direct Examination by Mr. Wharton

10:18AM   1       Q.   Where was your mother at this time?

10:18AM   2       A.   Sometimes she would be at work.

10:18AM   3            On one occasion I remember it was a big

10:18AM   4  altercation between my mom and Jacob.  He locked her

10:18AM   5  outside of the house.  He called me in his bedroom.  I

10:18AM   6  don't know how my mom end up getting in the house but she

10:18AM   7  actually walked in on him on top of me.  She then -- she

10:19AM   8  shut the door and walked away.

10:19AM   9       Q.   Is this an incident involving marks on your

10:19AM  10  neck?  Did this ever leave marks on your neck?

10:19AM  11       A.   No.

10:19AM  12       Q.   Okay.  When did that incident occur?

10:19AM  13       A.   That incident occurred on one occasion when I

10:19AM  14  actually tried to fight Jacob off and Jacob got angry.

10:19AM  15  He -- we were actually laying on the floor.  When he did

10:19AM  16  have -- when he did touch me while my mother was there,

10:19AM  17  she would either be in her room or she would be in

10:19AM  18  another part of the house.

10:19AM  19            Our houses were not small houses.  Our houses

10:19AM  20  were big houses.  And he would tell me to lay on the

10:19AM  21  threshold of between my bed and the hallway, and he

10:19AM  22  would -- so that way he could see when she was coming.

10:19AM  23            And the one time that I did try to fight Jacob

10:19AM  24  back, that's when he got physical.  And I remember coming

10:20AM  25  home after school that day and him apologizing and him

Direct Examination by Mr. Wharton

10:20AM 1   telling me he was wrong, he won't never do that again.

10:20AM 2   But it was always he was sorry, I won't do it again.  And

10:20AM 3   it still happened.

10:20AM 4       Q.   Do you know of any incident where your mother

10:20AM 5   ended up getting marks on her neck?

10:20AM 6       A.   No.

10:20AM 7       Q.   Okay.  Are -- were there any other times where

10:20AM 8   Jacob physically forced you, was physically violent with

10:20AM 9   you?

10:20AM 10      A.   When you say physically violent, do you mean

10:20AM 11  like where he struck me and hit me and made me do it?

10:20AM 12      Q.   Yes.

10:20AM 13      A.   No.  He would just -- he told me that this was

10:20AM 14  natural and this was his way of showing me that he loved

10:20AM 15  me and that he didn't -- he didn't -- he was with my mom

10:20AM 16  because of me and that he really wanted to be with me.

10:20AM 17          And once I got older and I was able to move

10:21AM 18  out, he started acting strange.  He did weird things.

10:21AM 19  Like he would -- I was messing with someone, my little

10:21AM 20  girl's father.  He would leave bras in his car or --

10:21AM 21  because my little girl's father did have a girlfriend at

10:21AM 22  that time.  He would leave bras in his car.  He would

10:21AM 23  come to my house late at night.  He would tell me that I

10:21AM 24  broke his heart, that -- you know, things of that nature.

10:21AM 25  It was just all -- it was all weird.

Direct Examination by Mr. Wharton

10:21AM  1              THE COURT:  So who's your little girl's

10:21AM  2  father?

10:21AM  3              THE WITNESS:  My oldest daughter, Jacob.

10:21AM  4              THE COURT:  You were talking about your

10:21AM  5  little girls.

10:21AM  6              THE WITNESS:  No, I have three children.

10:21AM  7  I have two girls.  My youngest daughter, Iceland, her

10:21AM  8  father, when I started dating him.

10:21AM  9      Q.   (By Mr. Wharton)  Who is her father?

10:21AM  10      A.   His name is Corey Haynes.

10:21AM  11      Q.   How -- how did Jacob sexually -- when he began

10:22AM  12  having sex with you, how did he do it?  Did he kiss and

10:22AM  13  touch you?

10:22AM  14      A.   Yes.

10:22AM  15      Q.   Okay.  Did he engage in oral sex with you?

10:22AM  16      A.   No.

10:22AM  17      Q.   All right.  Did you engage in oral sex with him?

10:22AM  18      A.   Yes.

10:22AM  19      Q.   How often did that happen?

10:22AM  20      A.   That happened maybe two or three times.

10:22AM  21      Q.   Can you tell me in detail about those incidents?

10:22AM  22      A.   Jacob just had a way of manipulating the

10:22AM  23  situation.  Jacob had a way of using his money to get

10:22AM  24  what he wanted.  So, whatever was popular for kids then,

10:23AM  25  I always got it.  Whatever outfits were out then, I

10:23AM  1  always got it.  I had more jewelry on my body than most

10:23AM  2  women had on their fingers from them -- from their

10:23AM  3  husbands buying them.  For every finger I had a piece of

10:23AM  4  jewelry on my finger.  And that was his way of saying,

10:23AM  5  hey, I got you something, now you give me something.

10:23AM  6      Q.  Can you tell me in detail -- I know this is

10:23AM  7  uncomfortable -- can you tell me in detail about the

10:23AM  8  incidents where there was actual oral sex occurring?

10:23AM  9      A.  I never forget it.  One time we were living on

10:23AM  10  County Road 56.  He told me he wanted me to try something

10:23AM  11  different.  He did it.  He ejaculated in my mouth and

10:23AM  12  that was basically the end of it.

10:23AM  13      After every sexual occurrence, like I said, I

10:24AM  14  would get something.  Even before, most of the time I

10:24AM  15  would get something.

10:24AM  16      I was in the fifth and sixth grade getting my

10:24AM  17  nails done every two weeks.  I was like -- it wasn't

10:24AM  18  nothing that I couldn't ask for.  It was times where if

10:24AM  19  it was my turn to wash the dishes, he would be the one in

10:24AM  20  there washing the dishes and telling me, okay, I'll wash

10:24AM  21  the dishes as long as you come play with me.

10:24AM  22      Q.  When did you first have a normal boyfriend?

10:24AM  23      A.  I didn't.  I didn't.  The boyfriend that I

10:24AM  24  liked his name was Roderick Jones but Jacob even paid him

10:24AM  25  to say that he was Jaquita's father.  To this day, I've

Direct Examination by Mr. Wharton

10:24AM 1  never ever had sex with that young man.

10:24AM 2     Q.   Tell me about going to get the first abortion.

10:25AM 3     A.   It was shortly after a custody battle between

10:25AM 4  my mom and my dad.  That was one of the times that my

10:25AM 5  last -- my whole name was changed.  And the only part of

10:25AM 6  the name that I remember was Talley (phonetic).  It was

10:25AM 7  here in Dallas.  After that, the other abortions happened

10:25AM 8  in Odessa.

10:25AM 9     Q.   And did you give a fake name?

10:25AM 10     A.   I don't know what name they gave.  I never

10:25AM 11  filled out the paperwork.

10:25AM 12             THE COURT:  Who is "they"?

10:25AM 13             THE WITNESS:  My mom and Jacob.

10:25AM 14     Q.   (By Mr. Wharton)  Tell me about getting an

10:25AM 15  abortion.  Walk me through arriving at the clinic and how

10:25AM 16  it actually occurred.

10:25AM 17     A.   One of the abortions that I remember most

10:25AM 18  vividly, Jacob was actually in the room with me.  He held

10:25AM 19  my hand during the whole abortion process.  The man told

10:26AM 20  me that I was pregnant with a little boy.  That one stuck

10:26AM 21  out the most to me because I actually knew the gender of

10:26AM 22  the baby.  I actually knew -- okay, this is not just me

10:26AM 23  bleeding on my bedroom floor and me calling my mom and

10:26AM 24  telling her, hey, something is not right.  It means I

10:26AM 25  just said, hey, this is just me laying on the floor.  I

10:26AM  1   actually had a kid and I actually knew the sex of my

10:26AM  2   child.  So, for me, that stuck out the most and he sat

10:26AM  3   there and he held my hand during that whole process.  So

10:26AM  4   the abortions were hard.

10:26AM  5          It put -- everybody -- everybody thought, well,

10:26AM  6   Tina has everything.  Tina is spoiled.  Tina gets

10:26AM  7   whatever she wants.  But Tina was the meanest kid that

10:27AM  8   you could ever run into.  Tina was a bully.  Tina was

10:27AM  9   hurting inside because everybody that Tina turned to,

10:27AM 10   nobody believed me.

10:27AM 11          So, after awhile, you just learn to shut up and

10:27AM 12   you deal with it.  You put on that fake smile and you

10:27AM 13   just roll with the punches.  Then you wonder why your

10:27AM 14   mother hates you.

10:27AM 15      Q.  Can you describe the room you were in when Jacob

10:27AM 16   was there with you for that abortion?

10:27AM 17      A.  He sat in the corner.  It was a white room just

10:27AM 18   like any OB/GYN.  White room.  The doctor, he was a white

10:27AM 19   guy, bald head.  He had a beard.

10:27AM 20          I remember his head.  He wasn't just bald where

10:27AM 21   you know you could see his hair trying to grow back.  He

10:28AM 22   had a clean, waxy-type cut to it.  I say the doctor

10:28AM 23   probably was maybe 5' 11".  He wasn't quite six foot

10:28AM 24   tall.  He wasn't fat but he was kind of medium built.

10:28AM 25          This doctor gave -- besides the abortion that I

Direct Examination by Mr. Wharton

10:28AM  1    came to Dallas to have, he gave me every one of my

10:28AM  2    abortions after this -- after the one in Dallas.

10:28AM  3            THE COURT:  How old were you?

10:28AM  4            THE WITNESS:  When I had the abortion?

10:28AM  5    The first one, I was 11.  The first miscarriage I was 11.

10:28AM  6    The second miscarriage I was 12.  Second abortion I was

10:28AM  7    12.

10:28AM  8            I had literally had an abortion every year

10:28AM  9    up until the age of 14, when that same doctor told them I

10:28AM  10   cannot give this kid another abortion.

10:28AM  11       Q.   (By Mr. Wharton)  And I believe I misspoke

10:28AM  12   earlier and said that you were 12 when you were pregnant

10:28AM  13   with Jaquita.  How old were you when you were pregnant

10:28AM  14   with Jaquita?

10:28AM  15       A.   I got pregnant with Jaquita October the 14th.

10:29AM  16   And the reason I know I got pregnant with Jaquita October

10:29AM  17   the 14th is because that is my aunt's birthday.  On that

10:29AM  18   particular night --

10:29AM  19       Q.   Hold on.  How old were you?

10:29AM  20       A.   I got pregnant when I was 14 and I had her when

10:29AM  21   I was 15.

10:29AM  22       Q.   And so tell me about the night that happened.

10:29AM  23       A.   On that particular night, it was my first time

10:29AM  24   ever, you know, ever trying to cook.  I cooked a steak

10:29AM  25   that was not the best steak in the world.  It was

Direct Examination by Mr. Wharton

10:29AM  1    basically raw.  Jacob had told me that my mom had went to

10:29AM  2    go check on my aunt because she was in the hospital.

10:29AM  3    That's the story he had told me at that time.  They were

10:29AM  4    actually going out to eat for my aunt's birthday.

10:29AM  5             Jacob then, he started touching me, had sex

10:29AM  6    with me, and then he got up and he said, well, now I have

10:29AM  7    to go meet your mom and check on your Aunt Maime and he

10:29AM  8    left.  He left the house.  Because my mom wasn't there

10:30AM  9    that night.

10:30AM  10       Q.   Can you tell me are there any other incidents

10:30AM  11   that really stick out in your mind in terms of just the

10:30AM  12   details of what occurred?

10:30AM  13       A.   That was basically how I remember that night.

10:30AM  14       Q.   Okay.  Are there any other incidents, any other

10:30AM  15   nights, that really stick out in your memory?

10:30AM  16       A.   He would just basically try to wait until my

10:30AM  17   mom went to work.  She worked in the cafeteria at Lamar

10:30AM  18   Elementary.  And whenever she would leave for work, he

10:30AM  19   would come in my room.  He was the one responsible for

10:30AM  20   taking me to and from school.  Sometimes I would ride the

10:30AM  21   school bus, but majority of the time Jacob took me to

10:30AM  22   school.

10:30AM  23       Q.   How did Jacob avoid prosecution for this?

10:31AM  24       A.   One of the reasons is because I remember when I

10:31AM  25   was in the sixth grade, I went to Dr. McAffee (phonetic).

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:31AM | 1 | He was the school principal at Peace Elementary.  Me and |
| 10:31AM | 2 | my mom had -- me and my mom, growing up, we didn't have |
| 10:31AM | 3 | the best relationship.  She was very abusive as well. |
| 10:31AM | 4 | I told Dr. McAffee.  Dr. McAffee then told me, |
| 10:31AM | 5 | he said -- he went -- he got out of his office and he |
| 10:31AM | 6 | went in where the main part of the office was and he told |
| 10:31AM | 7 | them, he said, don't believe nothing this child has to |
| 10:31AM | 8 | say.  Her mother says she's a compulsive liar. |
| 10:31AM | 9 | I even told my grandmother at one time.  She |
| 10:31AM | 10 | told me, Honey, don't you love seeing your mom happy? |
| 10:31AM | 11 | One time I did lie to my mom and I told her |
| 10:32AM | 12 | that it was a guy in a park that touched me.  Then she |
| 10:32AM | 13 | drove me -- it was me, her, and my Aunt Othalene was |
| 10:32AM | 14 | driving us around Emerson Elementary looking for that |
| 10:32AM | 15 | guy. |
| 10:32AM | 16 | She took me back home and she said, I'm gonna |
| 10:32AM | 17 | beat the hell out of you if you don't tell me the truth. |
| 10:32AM | 18 | Jacob was sitting right there and I told her. |
| 10:32AM | 19 | I said, it's no guy, it's actually Jacob. |
| 10:32AM | 20 | My mom -- we stayed in between Midland and |
| 10:32AM | 21 | Odessa.  My mom beat me all the way to my grandmother's |
| 10:32AM | 22 | house and told me that I was lying.  Told me that I was |
| 10:32AM | 23 | trying to ruin her relationship. |
| 10:32AM | 24 | Even as an adult, when we moved to DeSoto, the |
| 10:32AM | 25 | conversation came back up and she told me, I don't care |

Direct Examination by Mr. Wharton

10:32AM 1 about what happened.  I am never going to leave him, so

10:32AM 2 just deal with it.

10:32AM 3         When you have somebody like that and nobody

10:32AM 4 believes you, you learn to shut up.  You learn to be

10:32AM 5 quiet.

10:33AM 6     Q.   Okay.  Did your father know?

10:33AM 7     A.   I don't know.  I can't -- I can't just answer

10:33AM 8 that, but I do know that his ex-wife, she was very vocal

10:33AM 9 about it.  She went to CPS about it.  She told me she

10:33AM 10 went to CPS about it.

10:33AM 11         But at the time her story that when she went to

10:33AM 12 CPS, it wasn't about me.  It was about my daughter,

10:33AM 13 Jaquita.  So I wasn't -- I was more upset with her by

10:33AM 14 saying that I touched my daughter.  And I was like, no,

10:33AM 15 this is not -- this is not -- this is not the truth.

10:33AM 16     Q.   And what is her name?

10:33AM 17     A.   My step-mom?

10:33AM 18     Q.   Yes.

10:33AM 19     A.   Sharon Jackson.

10:33AM 20     Q.   Okay.  Sharon Jackson George?

10:33AM 21     A.   Yes.

10:33AM 22     Q.   Okay.  We have her deposition.

10:33AM 23     A.   Uh-huh.

10:33AM 24     Q.   Your father, what is his name?

10:33AM 25     A.   Gerald Miller.

Direct Examination by Mr. Wharton

10:33AM  1      Q.   And your brother, what is his name?

10:34AM  2      A.   Gerald Wilson, Junior.

10:34AM  3      Q.   Gerald Miller, Junior?

10:34AM  4      A.   No.  My brother has -- we don't have our

10:34AM  5  father's last name.  We have our mom's last name.

10:34AM  6      Q.   So he goes by Gerald Wilson, Junior?

10:34AM  7      A.   Yes.

10:34AM  8      Q.   When the defense lawyer was talking about you

10:34AM  9  demanding a house, do you know what he's referring to?

10:34AM 10      A.   Back when we were staying in Midland, if you

10:34AM 11  know me I'm not -- before I met my husband, I wasn't good

10:34AM 12  at paying nobody's bills.  Jacob then came to me, he

10:34AM 13  said, I'm tired of you getting evicted from apartments.

10:34AM 14  I'm going to build you and the kids a house.  I said,

10:34AM 15  great.  He built that house.  He sold that house.  It was

10:34AM 16  still in his name.  I didn't go to him and I didn't ask

10:34AM 17  him to build me anything.

10:34AM 18      Q.   How old were you when that happened?

10:35AM 19      A.   I'd say around maybe 29, 30 years old.  I'm not

10:35AM 20  really for sure.

10:35AM 21      Q.   All right.  How old are you right now?

10:35AM 22      A.   I am 42.

10:35AM 23      Q.   What is your date of birth?

10:35AM 24      A.   March 26 of 1981.

10:35AM 25      Q.   Tell me about the effect this has had on your

Direct Examination by Mr. Wharton

10:35AM  1   life.

10:35AM  2       A.   When I first moved down there, I was -- I've

10:35AM  3   been living in Dallas eight years.  I really thought I

10:35AM  4   was okay.  I really thought I was fine, until you have

10:35AM  5   triggers.

10:35AM  6           You know, I met someone that was basically in

10:35AM  7   the same boat that I was.  And then I started looking at

10:36AM  8   my family.  My cousin Tamika, my uncle Jay, they started

10:36AM  9   asking questions.  Me and my uncle Jay had a conversation

10:36AM  10  before.  He said, I don't know why your mama didn't do

10:36AM  11  nothing; but, niece, you have to get through it.  You

10:36AM  12  have to get over it.

10:36AM  13          And it started a process in my head that I have

10:36AM  14  a whole bunch of hypocrites in my family that are willing

10:36AM  15  to tell me to get over something that they never had to

10:36AM  16  heal from.  I have a bunch of people in my family that

10:36AM  17  are willing to sell me down the drain just so they can be

10:36AM  18  able to borrow money from Jacob.  Just so they can still

10:36AM  19  have their sister in their life.

10:36AM  20          This mentally has not been good for my health,

10:36AM  21  but mentally it has made me stronger.  It has made me be

10:36AM  22  willing to speak up for myself and give other little

10:37AM  23  girls a voice, other little girls that don't have nobody

10:37AM  24  to speak up for them.

10:37AM  25      Q.   Tell me how this has affected you in terms of

Direct Examination by Mr. Wharton

10:37AM  1   depression.

10:37AM  2        A.   I have nightmares.  I have most -- most of my

10:37AM  3   nightmares sometimes is about my mom's physical abuse.

10:37AM  4   Sometimes I wake up and I think somebody is touching me

10:37AM  5   when they're not.  I think that every guy that sees me

10:37AM  6   wants to have sex with me, wants to touch me.

10:37AM  7        I feel like sometimes that a lot of my

10:37AM  8   emotional problems I take them out on my husband and I

10:37AM  9   try not to.  I sometimes ask myself why did my mom not

10:37AM  10  stand up for me.  Why did my mama not say, hey, you don't

10:37AM  11  go to parties, you don't go to dances, you don't have a

10:37AM  12  boyfriend.  How are you coming up pregnant?

10:37AM  13        Why didn't my mama stand up for me?  Why wasn't

10:38AM  14  she the mother that I would definitely be for my kids?

10:38AM  15  Why wouldn't she be the mother that I would be for a

10:38AM  16  stranger's kid?  Why did my mother fail me?  Why did that

10:38AM  17  man do that to me?

10:38AM  18        Q.   Does that make you feel worthless or insecure?

10:38AM  19        A.   At this moment, no, it does not.  Before, it

10:38AM  20  did.  I think the whole process of -- from the point that

10:38AM  21  I decided to sue Jacob, that even though we had to go

10:38AM  22  through this process from 2020 to now, I think that God

10:38AM  23  has given me strength for this day.

10:38AM  24        I think that the way I view things and the way

10:38AM  25  I see things are totally different.  I feel like if I

10:38AM 1   could tap into that little girl, I would tell her to

10:38AM 2   fight.  I would tell her to keep screaming.  I would tell

10:38AM 3   her to keep telling.  I would tell her not to give up.  I

10:38AM 4   would tell her to prosecute.  Go to the police and both

10:39AM 5   prosecute her mother and Jacob.

10:39AM 6       Q.   As far as your internal pain, your discomfort,

10:39AM 7   the daily disruption to your life, how has this

10:39AM 8   affected -- I mean, obviously it occurred so early that

10:39AM 9   it's hard to say what your life would have been like

10:39AM 10  otherwise, but tell me how this has affected your daily

10:39AM 11  life.  How does it affect the way you feel on a daily

10:39AM 12  basis?

10:39AM 13      A.   I used to didn't think God loved me.  Because

10:39AM 14  shortly after I got out of my parents' house, I was a

10:39AM 15  side chick for 13 and a half years because that man was

10:39AM 16  the first man to tell me that I was pretty.  That man was

10:39AM 17  the first man to tell me that he loved me.  So I

10:39AM 18  gravitated to it.  I said okay.  Because I never heard

10:39AM 19  those words before.

10:39AM 20          When you are growing up and either you're being

10:40AM 21  name called or when certain people come -- when Jacob's

10:40AM 22  family came around, my mom turned into a whole different

10:40AM 23  person.  She acted like she didn't like me.

10:40AM 24      Q.   Let's focus on your life after this occurred,

10:40AM 25  the affect this had on you emotionally.

10:40AM   1        A.   I think I traumatized my children.  I think I

10:40AM   2   traumatized my children because every bad thing that

10:40AM   3   happened to me, I thought about that.  I think that I

10:40AM   4   should have got my children out of these peoples' lives.

10:40AM   5   I think I should have ran away with my children and not

10:40AM   6   allowed them to see their mother in that state.

10:40AM   7        I think I should have been strong enough -- I

10:40AM   8   wish I could have been strong enough for my children

10:40AM   9   even -- especially my oldest daughter and took her away

10:40AM   10   from them where they didn't have to raise her, and said

10:40AM   11   just because this happened to me, doesn't mean that I

10:40AM   12   have to continue to be a victim and be victimized by it.

10:41AM   13        It doesn't mean that because the rest of my

10:41AM   14   family are going -- every event that we have is literally

10:41AM   15   at their house.  So I should have learned how to separate

10:41AM   16   myself from them and become my own person instead of

10:41AM   17   living a lie.

10:41AM   18        Q.   And here what I am asking you is about your

10:41AM   19   personal feelings from this, not -- you know, these

10:41AM   20   questions aren't really -- this part isn't for, you know,

10:41AM   21   how you could have lived your life differently or the

10:41AM   22   regrets and all that.  I'm looking for just your personal

10:41AM   23   anguish.

10:41AM   24        Obviously, you're crying here today, right?

10:41AM   25        A.   Uh-huh.

Direct Examination by Mr. Wharton

10:41AM  1       Q.   Have you cried before about this?

10:41AM  2       A.   Yes.

10:41AM  3       Q.   Okay.  How often were you crying?

10:41AM  4       A.   Several times.  Several times.  It was times

10:41AM  5   where I couldn't go to sleep because I was asking myself

10:41AM  6   why.  It was times where I thought what could I have done

10:42AM  7   different to be that perfect little girl.

10:42AM  8            It was times where I asked myself what was

10:42AM  9   wrong with me.  What made a person want to do this to me.

10:42AM 10   Why didn't nobody stand up for me.  Why didn't my mama

10:42AM 11   come hold me and tell me that it was going to be okay,

10:42AM 12   that that man is not going to touch you no more.

10:42AM 13            And I really can't answer that question because

10:42AM 14   every time I look back at it, if you know me, if you know

10:42AM 15   the essence of me, Tina is the most forgiving and loving

10:42AM 16   person ever.

10:42AM 17            Yes, I can be mean.  Yes, I can be a little

10:42AM 18   dramatic.  But all I wanted was them two people to love

10:42AM 19   me.  I didn't care about how much money he got.  I don't

10:42AM 20   care about the cars he drive.  All I wanted was them two

10:43AM 21   people to love me, especially my mama.

10:43AM 22       Q.   Did you suffer on a daily basis from these

10:43AM 23   feelings?

10:43AM 24       A.   Excuse me.  I'm sorry.

10:43AM 25       Q.   Have you suffered on a daily basis from these

10:43AM  1  feelings?

10:43AM  2       A.   Yes, I have.

10:43AM  3       Q.   Okay.  Since it occurred until now, obviously?

10:43AM  4       A.   Yes.

10:43AM  5       Q.   And there's no -- I mean, obviously, you've done

10:43AM  6  some counseling and so forth, right?

10:43AM  7       A.   Yes.

10:43AM  8       Q.   Has it helped at all?

10:43AM  9       A.   Yes, it has.  It has helped a lot.

10:43AM  10      Q.   You are still obviously having these feelings,

10:43AM  11  right?

10:43AM  12      A.   Yes, I do.  I just -- I believe that when you

10:43AM  13  go through something like that, when you think you are

10:43AM  14  over it, something can trigger it.  When you think you

10:44AM  15  are over it, you can hear somebody else's story or watch

10:44AM  16  the wrong movie and you can think that, hey, that

10:44AM  17  happened to me.

10:44AM  18           And if you've ever watched the movie Precious

10:44AM  19  or the movie, Tyler Perry, Family Reunion, you have

10:44AM  20  watched my life.  Because that was my life.

10:44AM  21           Imagine your mother being completely jealous of

10:44AM  22  you.  Imagine your mother hating you.  Imagine a man ten

10:44AM  23  times bigger than you on top of you and there's nothing

10:44AM  24  you can do about it.  So you just learn to lay there.

10:44AM  25      Q.   How old -- by the way, how old is Jacob?

10:44AM  1      A.   I want to say he might be 65.  I'm not for

10:44AM  2  sure.  I know he's in his 60s.

10:45AM  3      Q.   Were you familiar with the incident with Gerald

10:45AM  4  Wilson, Junior, where he ended up running away bloody from

10:45AM  5  the house?

10:45AM  6      A.   Yes.

10:45AM  7      Q.   Tell me about that incident.

10:45AM  8      A.   Because he walked in on Jacob on top of me.

10:45AM  9  Himself and Jacob had words.  My brother is very

10:45AM 10  overprotective of me.  My brother doesn't like anybody to

10:45AM 11  touch me.  My brother doesn't like anybody -- if you --

10:45AM 12  my brother -- at the time he was a big kid.  And he's

10:45AM 13  very strong and he can get very violent.

10:45AM 14          And when that happened, guns were pulled and my

10:45AM 15  brother ran across the street.  We were all looking for

10:45AM 16  him.  We were all in front of the house.  Because we

10:45AM 17  lived in the country.  From our house to the mailbox

10:45AM 18  seemed like 3 miles.  You see what I am saying?

10:45AM 19          So, from our house to the city limits, if you

10:46AM 20  walk, you are going to be walking for like five or six

10:46AM 21  hours.

10:46AM 22          So he went across the street.  And I remember

10:46AM 23  the neighbor across the street leaving, but we don't talk

10:46AM 24  to that guy, we didn't know if my brother was in that car

10:46AM 25  and he's the one who took my brother to my Aunt Brenda's

Direct Examination by Mr. Wharton

10:46AM  1    house and that's how that happened.

10:46AM  2        Q.   All right.  Is there anything -- any other major

10:46AM  3    memories that you have about the abuse itself?

10:47AM  4        A.   I have -- a lot of it comes from -- when I

10:47AM  5    would tell Jacob no and I would fight against him, he

10:47AM  6    would make up a story to my mom, and I would get beat

10:47AM  7    when she came home.

10:47AM  8             I still have a scar on my forehead where she

10:47AM  9    hit me upside my head with a skillet.  When I would defy

10:47AM 10    Jacob, he would make sure that my mom beat me.

10:47AM 11             If I gave in and I gave him what he wanted,

10:47AM 12    Tina had jewelry, Tina had the nicest clothes.  I had

10:47AM 13    every, every pair of shoes to match the outfit.  I had

10:47AM 14    everything until I decided to move out.

10:47AM 15        Q.   And when did that happen?

10:47AM 16        A.   When I was around 20, 21 years old.

10:47AM 17        Q.   And what happened then?

10:48AM 18        A.   Jacob started -- he would -- with Corey Haynes,

10:48AM 19    one night Corey, like I said, he had a girlfriend.  He

10:48AM 20    wasn't supposed to be spending the night at my house.

10:48AM 21    But he ended up spending the night at my house, and the

10:48AM 22    next morning he woke up and there was a bra in his car.

10:48AM 23             Jacob even went so far as to tell Corey's

10:48AM 24    girlfriend that me and Corey was messing around.  Jacob

10:48AM 25    told -- he actually started crying to me telling me how I

Direct Examination by Mr. Wharton

10:48AM  1  broke his heart and how he wished that I would move back

10:48AM  2  in.

10:48AM  3          And I think that over the years he finally just

10:48AM  4  got over it.  I'm not going to say that from that point

10:48AM  5  to this point -- I actually -- I've asked Jacob several

10:48AM  6  times for an apology.  I asked Jacob for -- I told him

10:48AM  7  all I want from you is an apology.

10:49AM  8          Before I decided to sue Jacob, I called Jacob.

10:49AM  9  And at that time I wasn't even welcome at their house

10:49AM  10  because me and my mom had got into it.  She told me the

10:49AM  11  furthest I could come was to that gate.

10:49AM  12          And he said, I don't know why you can't --

10:49AM  13  actually, I was calling him to check on my oldest

10:49AM  14  daughter.  She didn't answer her phone and she was

10:49AM  15  staying with them at the time.  And I asked him, I said,

10:49AM  16  is Jaquita there?  He said, yeah, she's in her room,

10:49AM  17  she's working.  He said, why don't you come over and see

10:49AM  18  her?  I said, no, because I was told not to come back

10:49AM  19  over there.

10:49AM  20          And the statement, he said, I don't know what's

10:49AM  21  going on with you and your mama.  Your family say that

10:49AM  22  you've always been like this.  And I asked him, I said,

10:49AM  23  you don't know why?  And he said, no, tell me.  I said,

10:49AM  24  it's because of you.  I said, it's because of what you

10:49AM  25  did.  And he hung up in my face.

10:49AM  1        And in that moment, all of those feelings came

10:49AM  2  rushing back.  I felt like he was telling me that I

10:50AM  3  deserved it.  I felt like for years that I have to

10:50AM  4  forgive two people that never had the audacity to tell me

10:50AM  5  that they're sorry.

10:50AM  6        And I am tired of forgiving people, two people

10:50AM  7  that I loved the most, because I don't hate Jacob, I

10:50AM  8  don't.  I actually love the guy because he has helped me

10:50AM  9  with my children.  He has done things for me.  All I

10:50AM  10  asked him for was an apology, a genuine, sincere apology

10:50AM  11  and all of us go to counseling and we fix the dysfunction

10:50AM  12  in our relationship.

10:50AM  13        This is bigger than me.  This is about breaking

10:50AM  14  generational curses.  This is about showing my children

10:50AM  15  that they finally get to see their mother happy.  And

10:50AM  16  this is about making people take accountability for what

10:50AM  17  they have done to me.

10:50AM  18            THE COURT:  Can I ask a question?

10:50AM  19            MR. WHARTON:  Yes, Your Honor.

10:50AM  20            THE COURT:  So you're saying that Jaquita

10:51AM  21  lives with him.

10:51AM  22            THE WITNESS:  Not anymore.  She's 27 years

10:51AM  23  old.  She has her own apartment.  At that time when I did

10:51AM  24  call Jacob and ask him about -- when me and him had that

10:51AM  25  conversation, yes, she was staying there with him.

10:51AM 1              THE COURT:  How many years did she live

10:51AM 2     with him?

10:51AM 3              THE WITNESS:  They raised Jaquita.

10:51AM 4              THE COURT:  Okay.  And so you are saying

10:51AM 5     you were sexually abused but you left your daughter in

10:51AM 6     the house with them?

10:51AM 7              THE WITNESS:  Yes, I did.

10:51AM 8              THE COURT:  Okay.

10:51AM 9              Keep going.

10:51AM 10        Q.   (By Mr. Wharton)  And has Jaquita ever had a

10:51AM 11    paternity test, DNA test?

10:51AM 12        A.   No.

10:51AM 13        Q.   All right.  And based on your understanding, is

10:51AM 14    it now impossible to force a DNA test?

10:51AM 15        A.   When it comes to this case, I really just want

10:51AM 16    my kids to stay out of it.  I've asked that from day one.

10:52AM 17    Me and my daughter Jaquita just recently just started

10:52AM 18    talking again because of this case.

10:52AM 19        Q.   Do you know whether or not you can force Jaquita

10:52AM 20    as an adult --

10:52AM 21        A.   I don't want to.

10:52AM 22        Q.   I understand you don't want to now, but do you

10:52AM 23    know can you force --

10:52AM 24        A.   No, I can't.  She's an adult.  I can't force

10:52AM 25    her to do anything she doesn't want to do.

Direct Examination by Mr. Wharton

10:52AM  1      Q.   All right.  And obviously Jaquita has struggled

10:52AM  2  with this fact about her life, right?

10:52AM  3      A.   Yes, she has.

10:52AM  4      Q.   All right.  And how did she respond to it?

10:52AM  5      A.   Jaquita was very angry.  Jaquita, she called me

10:52AM  6  when I guess Jacob showed her the letter that you had

10:52AM  7  sent to him.  She called me and she was very angry.  She

10:52AM  8  told me that -- go ahead.

10:52AM  9      Q.   I'm sorry to interrupt.  When I sent a letter to

10:52AM  10  Jacob about this, Jaquita responded?

10:52AM  11      A.   Yes.

10:53AM  12           THE COURT:  Can we clarify what the letter

10:53AM  13  said?

10:53AM  14           THE WITNESS:  It was a letter saying that

10:53AM  15  I was suing Jacob.  The letter, I guess, that my attorney

10:53AM  16  sent to Jacob about him being sued.

10:53AM  17           THE COURT:  Was she ever told that he was

10:53AM  18  her father supposedly?

10:53AM  19           THE WITNESS:  Yes, she's been told that,

10:53AM  20  yes, ma'am.  I told Jaquita that when she was I want to

10:53AM  21  say 11 years old, when she came to me and she asked me

10:53AM  22  why does other kids have a dad and not me.

10:53AM  23           I had never went -- I don't feel like I

10:53AM  24  should ever go into full detail with my children about

10:53AM  25  what I just spoke about in this court, but I did tell

| | | |
|---|---|---|
| 10:53AM | 1 | Jaquita how I got pregnant with her. |
| 10:53AM | 2 | THE COURT:  You may proceed. |
| 10:53AM | 3 | Q.  (By Mr. Wharton)  So the letter to Jacob ended |
| 10:53AM | 4 | up in Jaquita's hands? |
| 10:53AM | 5 | A.  He showed it to her, because he said is this |
| 10:53AM | 6 | some type of joke?  This is -- her telling me this, is |
| 10:53AM | 7 | this some type of joke?  Call your mom and see if she |
| 10:54AM | 8 | being funny. |
| 10:54AM | 9 | Q.  And so you were -- I interrupted you earlier. |
| 10:54AM | 10 | You can go on.  What were you saying about your |
| 10:54AM | 11 | conversation with Jaquita? |
| 10:54AM | 12 | A.  Oh, when she called me she was very angry.  She |
| 10:54AM | 13 | told me that, if I pursue this case, she wasn't never |
| 10:54AM | 14 | going to talk to me again. |
| 10:54AM | 15 | MR. MADUFORO:  Your Honor, I would object |
| 10:54AM | 16 | to that as hearsay. |
| 10:54AM | 17 | THE COURT:  Sustained. |
| 10:54AM | 18 | Q.  (By Mr. Wharton)  But at this point you are |
| 10:54AM | 19 | talking to Jaquita.  Without going into what you said, you |
| 10:54AM | 20 | are talking with Jaquita? |
| 10:54AM | 21 | A.  Yes. |
| 10:54AM | 22 | Q.  Has anyone ever acknowledged her -- or claimed |
| 10:54AM | 23 | her paternity of her? |
| 10:54AM | 24 | A.  Jacob has. |
| 10:54AM | 25 | Q.  And how did he do that? |

10:54AM  1      A.   Like me and him have had conversations about

10:54AM  2  it.  He knows that he's her father.

10:55AM  3      Q.   And how old were you when Jacob and your mother

10:55AM  4  were raising Jaquita as their child, basically?

10:55AM  5      A.   I was 15.  I was still living in their house.

10:55AM  6  I was a minor.

10:55AM  7      Q.   When you left, why did you not take Jaquita with

10:55AM  8  you?

10:55AM  9      A.   Because he told me he would take custody of my

10:55AM 10  daughter from me.  And I don't have money.  I didn't have

10:55AM 11  money at all.  He told me that this was the best place

10:55AM 12  and that he would take me to court.

10:55AM 13      Q.   As far as you're aware, has Jacob ever abused

10:55AM 14  Jaquita?

10:55AM 15      A.   No.

10:55AM 16      Q.   Did you have a concern that Jacob was going to

10:55AM 17  abuse Jaquita?

10:55AM 18      A.   I've asked all three of my children before on a

10:55AM 19  regular basis has he ever touched them.  They all said

10:56AM 20  no.  I sat down and I talked to them and I asked them.

10:56AM 21  You know, they said no.  They all -- at one point they

10:56AM 22  all laughed at me and said my papa wouldn't do nothing

10:56AM 23  like that to us, mama.  We understand what he did to you.

10:56AM 24  Our papa wouldn't touch us like that.

10:56AM 25                  MR. WHARTON:  All right.  Pass the

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:56AM | 1 | witness. |
| 10:56AM | 2 | THE COURT:  Counsel?  Mr. Maduforo? |
| 10:56AM | 3 | MR. MADUFORO:  Thank you, Judge. |
| 10:56AM | 4 | THE COURT:  Actually, let's take a few |
| 10:56AM | 5 | minutes break, if anybody needs to go to the rest room or |
| 10:56AM | 6 | anything.  If you want to step down and take a break, |
| 10:56AM | 7 | ma'am. |
| 10:56AM | 8 | MR. WHARTON:  Yes, Your Honor. |
| 10:56AM | 9 | (Recess taken.) |
| 10:56AM | 10 | CROSS-EXAMINATION |
| 10:56AM | 11 | BY MR. MADUFORO: |
| 11:12AM | 12 | Q.   Ms. Wilson, just a few questions to clarify your |
| 11:12AM | 13 | initial testimony, okay. |
| 11:12AM | 14 | You did testify that Mr. Cannon, Jacob, abused |
| 11:12AM | 15 | you.  When was the first time that this happened? |
| 11:12AM | 16 | A.   Around the age of nine or ten. |
| 11:12AM | 17 | Q.   Around the age of nine? |
| 11:12AM | 18 | A.   Or ten. |
| 11:12AM | 19 | Q.   Okay.  Or ten, okay. |
| 11:12AM | 20 | And tell the Court who all was living in the |
| 11:12AM | 21 | house then. |
| 11:12AM | 22 | A.   Me, my mom, and Jacob. |
| 11:12AM | 23 | Q.   And you say you got pregnant the first time at |
| 11:12AM | 24 | what age? |
| 11:12AM | 25 | A.   Eleven. |

Elm v. Elm 06/12/2023
Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:12AM | 1 | Q.   Eleven years old.  And you had an abortion or |
| 11:12AM | 2 | miscarriage? |
| 11:12AM | 3 | A.   I had a miscarriage. |
| 11:12AM | 4 | Q.   You had a miscarriage. |
| 11:12AM | 5 | And who took you to abort the baby? |
| 11:12AM | 6 | A.   My mom and Jacob. |
| 11:13AM | 7 | THE COURT:  Who took you what? |
| 11:13AM | 8 | MR. MADUFORO:  Who took you to abort the |
| 11:13AM | 9 | child? |
| 11:13AM | 10 | THE COURT:  Well, she said she had a |
| 11:13AM | 11 | miscarriage. |
| 11:13AM | 12 | THE WITNESS:  The first time I had -- when |
| 11:13AM | 13 | I was 11 -- |
| 11:13AM | 14 | THE COURT:  Hold on. |
| 11:13AM | 15 | MR. MADUFORO:  I'll withdraw that |
| 11:13AM | 16 | question. |
| 11:13AM | 17 | Q.   (By Mr. Maduforo)  So you had a miscarriage |
| 11:13AM | 18 | around 11? |
| 11:13AM | 19 | A.   Uh-huh. |
| 11:13AM | 20 | Q.   Okay.  And you had abortion when? |
| 11:13AM | 21 | A.   At the same age, 11. |
| 11:13AM | 22 | Q.   Eleven.  Okay.  Now the question then is who |
| 11:13AM | 23 | took you to abort that baby? |
| 11:13AM | 24 | A.   Every abortion I was taken to was by my mom and |
| 11:13AM | 25 | Jacob. |

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:13AM | 1 | Q.    How many abortions have you had? |
| 11:13AM | 2 | A.    Four to five abortions and two miscarriages. |
| 11:13AM | 3 | Q.    Four to five abortions? |
| 11:13AM | 4 | A.    Yes. |
| 11:13AM | 5 | Q.    Okay. |
| 11:13AM | 6 | A.    And two miscarriages. |
| 11:13AM | 7 | Q.    Do you recall the place that they took you to? |
| 11:13AM | 8 | A.    The miscarriages, when I had my first |
| 11:13AM | 9 | miscarriage, I was actually bleeding on my bedroom floor. |
| 11:13AM | 10 | My mom came in.  That was the first time she -- the first |
| 11:13AM | 11 | time when I had the miscarriage she was initially |
| 11:14AM | 12 | concerned.  After that, she -- it was during the custody |
| 11:14AM | 13 | battle with my dad and -- |
| 11:14AM | 14 | THE COURT:  Ma'am, he asked you where did |
| 11:14AM | 15 | they take you. |
| 11:14AM | 16 | THE WITNESS:  The first time I had my |
| 11:14AM | 17 | first initial abortion was here in Dallas County.  The |
| 11:14AM | 18 | other ones were in Odessa, Texas. |
| 11:14AM | 19 | Q.    (By Mr. Maduforo)  Okay.  And where were you |
| 11:14AM | 20 | living then? |
| 11:14AM | 21 | A.    With my -- with Jacob and my mom. |
| 11:14AM | 22 | Q.    Where? |
| 11:14AM | 23 | A.    In their house. |
| 11:14AM | 24 | Q.    I know in the house.  What city? |
| 11:14AM | 25 | A.    In Midland, Texas. |

Appendix W Page 50 of 199 12/2023
Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:14AM | 1 | Q.   Okay.  So in Midland, Texas, they brought you |
| 11:14AM | 2 | down to Dallas for the abortion? |
| 11:15AM | 3 | A.   Uh-huh. |
| 11:15AM | 4 | Q.   And when you had the miscarriage, do you recall |
| 11:14AM | 5 | your parents then taking you to see a doctor out of |
| 11:14AM | 6 | concern? |
| 11:14AM | 7 | A.   What do you mean a doctor out of consent? |
| 11:14AM | 8 | Q.   You had a miscarriage.  You were bleeding. |
| 11:14AM | 9 | A.   The first miscarriage, I was taken to Midland |
| 11:14AM | 10 | Memorial Hospital. |
| 11:14AM | 11 | MR. WHARTON:  He said "concern" by the |
| 11:14AM | 12 | way.  He said "out of concern." |
| 11:14AM | 13 | THE WITNESS:  Like, I'm not understanding |
| 11:14AM | 14 | what you are saying. |
| 11:15AM | 15 | THE COURT:  Ma'am, the question was when |
| 11:15AM | 16 | you had a miscarriage, where did you go.  You said |
| 11:15AM | 17 | Midland Memorial Hospital. |
| 11:15AM | 18 | Okay.  Ask another question, please. |
| 11:15AM | 19 | MR. MADUFORO:  Thank you, Judge. |
| 11:15AM | 20 | Q.   (By Mr. Maduforo)  Now, did your mom report this |
| 11:15AM | 21 | issue to the police? |
| 11:15AM | 22 | A.   No, she did not. |
| 11:15AM | 23 | Q.   Did she make any report to the CPS? |
| 11:15AM | 24 | A.   No, she did not. |
| 11:15AM | 25 | Q.   Did she make any report to your teacher, your |

11:15AM   1   principal, your priest by any chance?

11:15AM   2       A.   The only thing she told my principal was that I

11:15AM   3   was a compulsive liar.

11:15AM   4                 MR. MADUFORO:  Objection, Your Honor,

11:15AM   5   nonresponsive.

11:15AM   6                 THE COURT:  Okay.  It's overruled.  He

11:15AM   7   asked her did your mom tell the police.

11:15AM   8                 THE WITNESS:  No.

11:15AM   9                 THE COURT:  Can I ask a question?

11:15AM   10                 MR. MADUFORO:  Yes, Your Honor.

11:15AM   11                 THE COURT:  So, ma'am, you went to a

11:15AM   12   hospital.  Did anybody call CPS from the hospital?

11:15AM   13                 THE WITNESS:  No, ma'am.

11:16AM   14                 THE COURT:  Okay.  Keep going.

11:16AM   15                 MR. MADUFORO:  Thank you.

11:16AM   16       Q.   (By Mr. Maduforo)  And just a few questions

11:16AM   17   regarding when the actual time this started.  You said

11:16AM   18   your mom worked then at the school district?

11:16AM   19       A.   She worked at the school district, yes.

11:16AM   20       Q.   Do you recall what school or what district

11:16AM   21   office she worked at?

11:16AM   22       A.   She worked at Lamar Elementary in the

11:16AM   23   cafeteria.

11:16AM   24       Q.   Okay, in the cafeteria.  What time did she go to

11:16AM   25   work?

11:16AM  1        A.    She would leave around 5:30 or 6 in the

11:16AM  2   morning.

11:16AM  3        Q.    And is that the same elementary school you go

11:16AM  4   to?

11:16AM  5        A.    I did not attend Lamar Elementary.

11:16AM  6        Q.    That's not the same elementary school?

11:16AM  7        A.    No, I did not attend that school.

11:16AM  8        Q.    Okay.  And what time would you go to school at

11:16AM  9   that point?

11:16AM 10        A.    I would have to be at school at around, I would

11:16AM 11   say, 8:30, 8 o'clock.  I'm not really for sure.

11:16AM 12        Q.    Is that 8:30 or are you not really for sure?

11:17AM 13        A.    It was around the 8 o'clock hour.

11:17AM 14        Q.    Then you lived with Mr. Cannon and your mom up

11:17AM 15   until what age?

11:17AM 16        A.    Until I moved out.  I was, I want to say,

11:17AM 17   around 20.

11:17AM 18        Q.    Did you have any other child or children before

11:17AM 19   you moved out?

11:17AM 20        A.    No.  I had my son after I moved out.

11:17AM 21        Q.    And did you move back in afterwards?

11:17AM 22        A.    I did my six weeks of post partum at their

11:17AM 23   house.  Yes, I did.

11:17AM 24        Q.    Okay.  And you were taken care of by your

11:17AM 25   parents?

11:17AM  1        A.    What do you mean taken care of?

11:17AM  2        Q.    You did your post partum at their house.

11:17AM  3        A.    Yes, because I had a C-section.

11:17AM  4        Q.    Okay.  And your mom was helping you then?

11:17AM  5        A.    Yes.

11:17AM  6        Q.    Was Jacob helping you at that point also?

11:17AM  7        A.    No.

11:18AM  8        Q.    Okay.  Let's go back to where you have lived.

11:18AM  9   Take me back to where you have lived in the past 10 years.

11:18AM  10  Have you, by chance, lived with Mr. Cannon and your mom in

11:18AM  11  the past 10 years?

11:18AM  12       A.    Yes, I did.

11:18AM  13       Q.    When was the last time you actually moved out of

11:18AM  14  their house?

11:18AM  15       A.    When I first moved to Dallas County, I had a

11:18AM  16  hysterectomy and they had sent for my youngest daughter

11:18AM  17  because I couldn't -- when I had the hysterectomy, the

11:18AM  18  doctor cut my kidney.  I didn't work for two years.

11:18AM  19             So I didn't want to just send all three of my

11:18AM  20  kids down here.  I did move in with them.  I stayed with

11:18AM  21  them maybe up until my mom put me out, maybe I'd say

11:18AM  22  about three months.

11:18AM  23             After that, I lived in my car until my

11:18AM  24  boyfriend found out and he told me to come stay with him.

11:18AM  25  And I been -- I been with my now husband ever since then.

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:19AM | 1 | And I've been living in Dallas for the past eight years. |
| 11:19AM | 2 | Q.  So are you saying that the past eight years, |
| 11:19AM | 3 | that's the last time you lived with them? |
| 11:19AM | 4 | A.  Yes. |
| 11:19AM | 5 | Q.  Okay.  And does any of your children live -- |
| 11:19AM | 6 | apart from Jaquita, does any of your other children live |
| 11:19AM | 7 | with your parents? |
| 11:19AM | 8 | A.  Yes. |
| 11:19AM | 9 | Q.  What is the name of -- |
| 11:19AM | 10 | A.  Mark and Iceland. |
| 11:19AM | 11 | Q.  Mark and Iceland.  Two of your children live |
| 11:19AM | 12 | currently with them? |
| 11:19AM | 13 | A.  Yes. |
| 11:19AM | 14 | Q.  So they raised those children? |
| 11:19AM | 15 | A.  No.  My son is an adult.  My son is 21 years |
| 11:19AM | 16 | old.  He is not a minor.  Iceland just graduated out of |
| 11:19AM | 17 | school.  Iceland moved in with them because Iceland got |
| 11:19AM | 18 | in trouble.  I told Iceland she can come back home.  She |
| 11:19AM | 19 | did not want to come back home.  I have repeatedly told |
| 11:19AM | 20 | Iceland to come back home because of the way that they |
| 11:19AM | 21 | treat her at their house. |
| 11:19AM | 22 | And so Iceland is the one who refuses to come |
| 11:19AM | 23 | back home.  It's not because I put my children out or |
| 11:19AM | 24 | that I could not take care of my children.  She is the |
| 11:20AM | 25 | one who refused to come back home.  She's 18. |

Cross-Examination by Mr. Maduforo

11:20AM  1      Q.   Okay.  And when was the first time, the initial
11:20AM  2  time she started living with the Cannons, how old was
11:20AM  3  Iceland and Mark?
11:20AM  4      A.   Mark -- okay, mark moved down here with them
11:20AM  5  when they came and they asked me because Mark was getting
11:20AM  6  in a lot of trouble at school and --
11:20AM  7              MR. MADUFORO:  Objection, Your Honor,
11:20AM  8  nonresponsive.
11:20AM  9              THE COURT:  What was the question?  Hold
11:20AM 10  on.  What was the question?
11:20AM 11      Q.   (By Mr. Maduforo)  The question is how old were
11:20AM 12  those children when the first time they started living
11:20AM 13  with them?
11:20AM 14      A.   Mark was 11 years old.
11:20AM 15      Q.   Okay.
11:20AM 16      A.   And Iceland moved in with them her senior year.
11:20AM 17      Q.   Fifteen, 16?
11:20AM 18      A.   Iceland graduated when she was 18 years old, so
11:20AM 19  it was around 17.
11:20AM 20      Q.   And they still live with them?
11:20AM 21      A.   Uh-huh.
11:20AM 22      Q.   Okay.  All right.
11:20AM 23           And you testified initially that before you
11:21AM 24  filed this lawsuit, you talked to Jacob, correct?
11:21AM 25      A.   Yes.

11:21AM  1        Q.    Okay.  And after this lawsuit have you -- if you

11:21AM  2   recall, have you ever lived with them?  Have you ever gone

11:21AM  3   over there to see them?

11:21AM  4        A.    After this lawsuit?

11:21AM  5        Q.    Yes.

11:21AM  6        A.    No.

11:21AM  7        Q.    You have never been?

11:21AM  8        A.    When I -- I go to their fence to pick up my

11:21AM  9   daughter.  I have to take her something to eat almost on

11:21AM 10   a regular basis.  I pick her up if she has to go to the

11:21AM 11   doctor's appointment.  I pick her up.  If she needs to

11:21AM 12   go -- when she was working, I had to take her to work.

11:21AM 13   That's -- I do not communicate with Jacob.  I do not have

11:21AM 14   any -- I haven't spoken with Jacob.

11:21AM 15                     THE COURT:  How old is she?

11:21AM 16                     THE WITNESS:  She's 18.

11:21AM 17                     THE COURT:  And you have to take food to

11:21AM 18   her and pick her up?

11:21AM 19                     THE WITNESS:  Yes, because they won't feed

11:21AM 20   her.

11:21AM 21                     THE COURT:  Is she out of school?

11:21AM 22                     THE WITNESS:  Yes.  As far as high school,

11:21AM 23   yes, ma'am.

11:21AM 24        Q.    (By Mr. Maduforo)  You just testified that you

11:22AM 25   asked your children if Jacob and your mom were taking care

56

11:22AM 1  of them and the answer was yes.

11:22AM 2      A.   I did not testify to that.  I was asked has he

11:22AM 3  ever touched my children.  That's what I was asked.  I

11:22AM 4  did not testify that -- that they have never taken care

11:22AM 5  of them.  That's what I was asked.

11:22AM 6      Q.   Okay.  So do you trust, then, Jacob and your mom

11:22AM 7  to take care of the children?

11:22AM 8      A.   Do I trust them to take care of my children?

11:22AM 9  In what manner?

11:22AM 10     Q.   In any manner.

11:22AM 11     A.   If I have to take my children food every day

11:22AM 12 and I have to take care of my child, my child just

11:22AM 13 resides with them.  I take care of my daughter.

11:22AM 14     Q.   Okay.  You testified there was an incident

11:22AM 15 involving Gerald Williams?

11:22AM 16     A.   Wilson.

11:22AM 17     Q.   Gerald Wilson.  And who is Gerald Wilson?

11:22AM 18     A.   My brother.

11:22AM 19     Q.   Your brother.  And there was a physical

11:22AM 20 altercation to the point of scratches on Jacob's bottom

11:22AM 21 when he caught Jacob on top of you; is that correct?

11:22AM 22     A.   I did not testify to that.  What I testified

11:22AM 23 was that they had a -- my brother walked in on Jacob and

11:23AM 24 it was a physical altercation.  I never said that it was

11:23AM 25 bruises or anything.  All I said that it was a physical

Cross-Examination by Mr. Maduforo

11:23AM  1    altercation.

11:23AM  2            My brother then walked across the street to the

11:23AM  3    neighbor's house, got in the neighbor's car and the

11:23AM  4    neighbors took him to my Aunt Brenda's house.  That's

11:23AM  5    what I testified.  I never said that there was any

11:23AM  6    bruises.  I never said any of that.

11:23AM  7        Q.    Okay.  So he walked in on Jacob doing what?

11:24AM  8        A.    He was on top of me.

11:23AM  9        Q.    Okay.  All right.  Did he call the cops?

11:23AM  10       A.    No.  He told my dad.

11:23AM  11               THE COURT:  Did you have clothes on or

11:23AM  12   clothes off?

11:23AM  13               THE WITNESS:  No.  My clothes were halfway

11:23AM  14   off.

11:23AM  15       Q.    (By Mr. Maduforo)  Let me ask you this.  You

11:23AM  16   were in that household for some time when all of this

11:23AM  17   alleged abuse was going on.  Do you know who your

11:23AM  18   neighbors were?

11:23AM  19       A.    No, I don't.

11:23AM  20       Q.    Okay.  Do you ever recall a police officer

11:23AM  21   living next door to you guys then?

11:23AM  22       A.    No, they never did.

11:24AM  23       Q.    You never did or they never did?

11:24AM  24       A.    They never did.

11:24AM  25       Q.    Okay.  But -- do you recall how old you were at

58

Brenda Wilson - 9/12/2023
Cross-Examination by Mr. Maduforo

11:24AM 1  that point?

11:24AM 2      A.   At what point?

11:24AM 3      Q.   At the point -- the very day of the physical

11:24AM 4  altercation --

11:24AM 5      A.   No, I don't.

11:24AM 6      Q.   Okay.  Did you tell anybody else about Jacob

11:24AM 7  abusing you that day and the fact that your brother caught

11:24AM 8  him on top of you, got mad and started fighting with him?

11:24AM 9      A.   No, I did not.

11:24AM 10             THE COURT:  I think guns were pulled.

11:24AM 11             THE WITNESS:  Yes.  Jacob pulled a gun out

11:24AM 12  on my brother.

11:24AM 13     Q.   (By Mr. Maduforo)  I'm sorry.  Gerald Wilson?

11:24AM 14     A.   Gerald Wilson.  Yes, on Gerald.

11:24AM 15     Q.   Yes.  Did you tell anybody about that incident?

11:24AM 16     A.   My mother was there.  I was still -- I was

11:24AM 17  still a minor.  My mother was there.

11:24AM 18     Q.   Okay.  What if anything did your mom did?

11:24AM 19     A.   She didn't do anything.

11:24AM 20     Q.   Okay.  Let me ask you this.  You are a mom,

11:24AM 21  correct?

11:24AM 22     A.   Yes.

11:24AM 23     Q.   You love your children?

11:24AM 24     A.   Very much.

11:25AM 25     Q.   And you come back in the house, you saw -- I

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:25AM | 1 | don't care what man it is, your husband, your kids' |
| 11:25AM | 2 | stepfather, somebody else, a stranger on top of your |
| 11:25AM | 3 | children, on top of your daughter, tell me what if |
| 11:25AM | 4 | anything would you do? |
| 11:25AM | 5 | A.   I'm speaking for on my behalf, not my mother's, |
| 11:25AM | 6 | right? |
| 11:25AM | 7 | Q.   Yes.  You are speaking on your behalf. |
| 11:25AM | 8 | A.   He would be dead. |
| 11:25AM | 9 | Q.   He would be dead.  Okay.  All right. |
| 11:25AM | 10 | Did you ever ask your mom when all of these |
| 11:25AM | 11 | things were happening, did you for one day -- apparently |
| 11:25AM | 12 | this happened over a period of time.  Did you for one day |
| 11:25AM | 13 | ask your mom, mom, why are you not protecting me? |
| 11:25AM | 14 | A.   Yes, I did. |
| 11:25AM | 15 | Q.   What, if anything, was said? |
| 11:25AM | 16 | A.   All my mom told me at one point, we were |
| 11:25AM | 17 | sitting in the kitchen, she told me that -- it's nothing |
| 11:26AM | 18 | really that I can do, but I am sorry that you had to go |
| 11:26AM | 19 | through all those abortions. |
| 11:26AM | 20 | Q.   Okay.  She never called the police? |
| 11:26AM | 21 | A.   No. |
| 11:26AM | 22 | Q.   She never reported it to CPS? |
| 11:26AM | 23 | A.   No. |
| 11:26AM | 24 | Q.   She never reported it to any of her relatives? |
| 11:26AM | 25 | A.   No. |

55

12/12/2023

Cross-Examination by Mr. Maduforo

11:26AM  1      Q.   She never confronted Jacob about it?

11:26AM  2      A.   No.

11:26AM  3      Q.   You don't think it's kind of weird?

11:26AM  4      A.   Not -- for her?  I don't know.  You would have

11:26AM  5  to ask her that.  I can't speak for her.

11:26AM  6      Q.   You are familiar with Jacob's house; am I

11:26AM  7  correct?

11:26AM  8      A.   I didn't understand the question.

11:26AM  9      Q.   You are familiar with Jacob's house?

11:26AM 10      A.   Yes.

11:26AM 11      Q.   His current house?

11:26AM 12      A.   Yes.

11:26AM 13      Q.   Does it have cameras in that house?

11:26AM 14      A.   I couldn't tell you what he has in his house.

11:26AM 15      Q.   Would it surprise you by any chance if there's

11:26AM 16  footage of you in that house two days ago?

11:26AM 17      A.   Yeah, it would.

11:26AM 18      Q.   So you are saying you did not go over there --

11:26AM 19      A.   I have not -- like I said, the furthest that I

11:27AM 20  have went over Jacob's house is just the front of his

11:27AM 21  gate and I probably never even get out of my car, not

11:27AM 22  unless I'm handing Iceland her food.

11:27AM 23          I did drop Iceland off -- what is today? --

11:27AM 24  Tuesday after going to -- taking her to Sam's and taking

11:27AM 25  her grocery shopping.  And she got out of the car -- in

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:27AM | 1 | fact, Birdie was behind me, and -- on Monday and on |
| 11:27AM | 2 | Tuesday when I took my child back over there. |
| 11:27AM | 3 | Q.   Let's go back -- I'm sorry.  Let's go back to |
| 11:27AM | 4 | how you were affected by this issue.  Have you sought any |
| 11:27AM | 5 | kind of counseling? |
| 11:27AM | 6 | A.   Yes, I have. |
| 11:27AM | 7 | Q.   Did you submit that to your lawyer? |
| 11:27AM | 8 | A.   I didn't think that I had to. |
| 11:27AM | 9 | Q.   Okay.  Have you shared that with your lawyer? |
| 11:27AM | 10 | A.   Yes, I have. |
| 11:27AM | 11 | Q.   Okay.  All right.  And we are supposed to |
| 11:27AM | 12 | believe you that you went to counseling. |
| 11:27AM | 13 | A.   I don't know if you are supposed to or not. |
| 11:27AM | 14 | You just asked me a question. |
| 11:27AM | 15 | Q.   Do you know the name of the counselor you went |
| 11:27AM | 16 | to? |
| 11:27AM | 17 | A.   Yes.  Her name is Daphne Sims. |
| 11:28AM | 18 | Q.   And how many times do you go to her? |
| 11:28AM | 19 | A.   I see her -- I don't -- first of all, I don't |
| 11:28AM | 20 | see her.  I Zoom call her. |
| 11:28AM | 21 | Q.   Okay.  How many times whichever way? |
| 11:28AM | 22 | A.   Probably close to like this year alone, maybe |
| 11:28AM | 23 | seven or eight times. |
| 11:28AM | 24 | Q.   This year alone? |
| 11:28AM | 25 | A.   Yes. |

Cross-Examination by Mr. Maduforo

11:28AM   1        Q.   Okay.  So all this way you have not done

11:28AM   2   until --

11:28AM   3        A.   No, I just said this year alone.

11:28AM   4        Q.   When was the first time you started --

11:28AM   5        A.   The first time that I initially seen Daphne was

11:28AM   6   maybe two weeks after I filed the lawsuit.

11:28AM   7        Q.   Okay.  Whose name is on Jaquita's birth

11:28AM   8   certificate?

11:28AM   9        A.   Mine.

11:28AM   10       Q.   Whose name is on your son's birth certificate?

11:28AM   11       A.   Mine.

11:28AM   12       Q.   Whose name is on your last daughter's, Iceland?

11:28AM   13       A.   All three of my children only have my name only

11:29AM   14   on their birth certificates.

11:29AM   15       Q.   Okay.  And your name is Tina Wilson, correct?

11:29AM   16       A.   Yep, it is.

11:29AM   17       Q.   When did you change to Tina Wilson?

11:29AM   18       A.   Jacob had my mother change my name when I was

11:29AM   19   in sixth grade to Cannon.

11:29AM   20              MR. MADUFORO:  Nonresponsive, Your Honor.

11:29AM   21   I'm sorry, objection.  Nonresponsive, sorry.

11:29AM   22              THE COURT:  Okay.  Sustained.

11:29AM   23       Q.   (By Mr. Maduforo)  So let's go back.  Do you

11:29AM   24   recall the name on your birth certificate?

11:29AM   25       A.   My name?

Cross-Examination by Mr. Maduforo

11:29AM  1        Q.    Yes.

11:29AM  2        A.    My name is Tina Marie Cannon at that time.

11:29AM  3        Q.    That was the name on your birth certificate?

11:29AM  4        A.    At that time.

11:29AM  5              On my birth certificate?

11:29AM  6        Q.    Yes.

11:29AM  7        A.    It has Tina Marie Wilson because that is my

11:29AM  8 birth certificate.

11:29AM  9              Now, on my children's birth certificate, is

11:29AM 10 that what you are asking me?

11:29AM 11        Q.    No.  I asked you the name on your birth

11:29AM 12 certificate.

11:29AM 13        A.    On my birth certificate, my personal birth

11:29AM 14 certificate, it says Tina Marie Wilson.

11:30AM 15        Q.    Have you had other names apart from Tina Marie

11:30AM 16 Wilson?

11:30AM 17        A.    Yes, I have.

11:30AM 18        Q.    Which names?

11:30AM 19        A.    Tina Marie Cannon.

11:30AM 20        Q.    When was the name changed?

11:30AM 21        A.    Sixth grade.

11:30AM 22        Q.    Sixth grade?

11:30AM 23        A.    Yes.

11:30AM 24        Q.    Okay.  And when did you change the name back to

11:30AM 25 Wilson?

Cross-Examination by Mr. Maduforo

11:30AM   1       A.    I changed my name back to Wilson shortly after
11:30AM   2   I had my son.  So that was back in 2021, '22.
11:30AM   3       Q.    All right.  It's a good thing that you are
11:30AM   4   speaking to a counselor.
11:30AM   5             Did you speak to any other person about this
11:30AM   6   incident beyond the counselor?
11:30AM   7       A.    I spoke to several people about it.
11:30AM   8       Q.    Your relatives?
11:30AM   9       A.    Yes.
11:30AM   10      Q.    And is any of them in this courtroom?
11:30AM   11      A.    No.
11:30AM   12      Q.    Is any of them testifying on your behalf?
11:30AM   13      A.    No.
11:30AM   14      Q.    Did you tell any of them that you filed this
11:30AM   15  lawsuit?
11:30AM   16      A.    Yes, I did.
11:30AM   17      Q.    And did you ask any of them to come and be a
11:31AM   18  witness for you?
11:31AM   19      A.    I asked one person.
11:31AM   20      Q.    Okay.
11:31AM   21            You were quite emotional when you described
11:31AM   22  Jacob.  You even at one point said that you love him.
11:31AM   23  And how has he -- I mean, you did testify that he would
11:31AM   24  buy you things.  Now in your adult --
11:31AM   25      A.    I didn't testify that he would buy me things.

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:31AM | 1 | I testified that he built me a house.  That's what I |
| 11:31AM | 2 | testified.  Now you are putting words in my mouth.  I |
| 11:31AM | 3 | never testified that -- |
| 11:31AM | 4 | THE COURT:  Ma'am, ma'am, calm down.  You |
| 11:31AM | 5 | testified that you had all kinds of clothes, jewelry |
| 11:31AM | 6 | and -- |
| 11:31AM | 7 | THE WITNESS:  Yes, as a child. |
| 11:31AM | 8 | Q.   (By Mr. Maduforo)  And as an adult was he still |
| 11:31AM | 9 | buying you things besides building a house for you? |
| 11:31AM | 10 | A.   No. |
| 11:31AM | 11 | Q.   So he built you a house.  Are you living in that |
| 11:32AM | 12 | house? |
| 11:32AM | 13 | A.   No, I'm not. |
| 11:32AM | 14 | Q.   Okay.  And when did you move out of that house? |
| 11:32AM | 15 | A.   In 2014. |
| 11:32AM | 16 | Q.   In 2014 you moved out of the house he built for |
| 11:32AM | 17 | you.  How long did you live in that house before you moved |
| 11:32AM | 18 | out? |
| 11:32AM | 19 | A.   Maybe three to four years. |
| 11:32AM | 20 | Q.   While you were living in that house, were you -- |
| 11:32AM | 21 | apparently, he built it.  So, if there was any mortgage, |
| 11:32AM | 22 | he's paying it; am I correct?  Were you paying -- |
| 11:32AM | 23 | A.   It wasn't a mortgage on the house. |
| 11:32AM | 24 | Q.   Were you paying any rent? |
| 11:32AM | 25 | A.   At first I was and then he told me I didn't |

11:32AM   1    have to.

11:32AM   2         Q.    And were you paying utilities?

11:32AM   3         A.    Yes.

11:32AM   4         Q.    Okay.  And when he asked you to move out of the

11:32AM   5    house, what was your feeling?

11:32AM   6         A.    He didn't never ask me to move out of the

11:32AM   7    house.

11:32AM   8         Q.    You moved out on your own?

11:32AM   9         A.    Yes, I did.

11:32AM   10        Q.    Okay.  All right.

11:32AM   11              But you said he built you a house.  You moved

11:32AM   12   out of the house?

11:32AM   13        A.    Okay.  When I got sick and I had to move down

11:32AM   14   here, the house is in Midland County, I can't bring the

11:33AM   15   house with me.

11:33AM   16        Q.    So what did you do with your property then if

11:33AM   17   you --

11:33AM   18        A.    He sold it.  The house was in his name.  The

11:33AM   19   house wasn't never legally mine.

11:33AM   20        Q.    Okay.  So is it fair to assume that he asked you

11:33AM   21   to live in the house?

11:33AM   22        A.    I'm sorry.  Repeat that.

11:33AM   23        Q.    Is it fair to assume that he asked you to live

11:33AM   24   in the house?

11:33AM   25        A.    He asked me to live in it?

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:33AM | 1 | Q.   Yes.  Stay in the house. |
| 11:33AM | 2 | A.   Yes. |
| 11:33AM | 3 | Q.   Okay.  All right. |
| 11:33AM | 4 | And has he helped you financially? |
| 11:33AM | 5 | A.   He built the house.  I guess that's... |
| 11:33AM | 6 | Q.   Have you asked him for financial favors -- |
| 11:33AM | 7 | A.   No. |
| 11:33AM | 8 | Q.   -- in your adult life? |
| 11:33AM | 9 | A.   Yes, I have. |
| 11:33AM | 10 | Q.   Okay.  Before you filed this lawsuit, did you |
| 11:33AM | 11 | ask him to give you a certain amount of money? |
| 11:33AM | 12 | A.   No, I did not. |
| 11:33AM | 13 | Q.   Did you ask him to go get you another house? |
| 11:33AM | 14 | A.   No, I did not. |
| 11:34AM | 15 | Q.   Okay.  Was there any conversation about doing |
| 11:34AM | 16 | favors for you? |
| 11:34AM | 17 | A.   No. |
| 11:34AM | 18 | Q.   Okay.  So I have not been a victim of sexual |
| 11:34AM | 19 | assault.  Apparently, you're alleging that you have, that |
| 11:34AM | 20 | you are.  But I want to know how is it that someone that |
| 11:34AM | 21 | did something entirely wrong to you, that you entrusted |
| 11:34AM | 22 | your children in his care and by extension your mother's |
| 11:34AM | 23 | care? |
| 11:34AM | 24 | A.   How can I trust him with my children? |
| 11:34AM | 25 | Q.   How is it that you did, because your children |

11:34AM  1  lived with them, still lives with them?

11:34AM  2      A.   Nine times out of ten, I was around him with my

11:34AM  3  children.  I just didn't -- my children just didn't -- I

11:34AM  4  didn't just drop my kids off and I was a dead-beat

11:34AM  5  mother.  I've always been active in my children's life.

11:34AM  6  Even when my children came to stay down here, I was

11:34AM  7  always active in my children's life.

11:35AM  8      Q.   Okay.  The question is someone that wronged you,

11:35AM  9  someone that did something that actually offends you so

11:35AM 10  bad, how is it that you let your children stay with those

11:35AM 11  or that individual in this case?

11:35AM 12      A.   I guess a lot of times when you're -- I'm not

11:35AM 13  going to speak for anybody else.  In my case, like I told

11:35AM 14  my attorney, I lived a false narrative most of my life.

11:35AM 15  I thought that everything -- like, as long as I brushed

11:35AM 16  it up under the rug, what I went through and the things

11:35AM 17  that I went through, it wouldn't never happen to my

11:35AM 18  children.

11:35AM 19          I've always questioned my children and asked my

11:35AM 20  children the appropriate questions.  And that's a lot of

11:36AM 21  things that I regret because my children have also asked

11:36AM 22  me that same question.

11:36AM 23      Q.   Okay.  You are currently married, right?

11:36AM 24      A.   Yes.

11:36AM 25      Q.   When did you get married?

| | | | |
|---|---|---|---|
| 11:36AM | 1 | A. | In 2018. |
| 11:36AM | 2 | Q. | Did you have any ceremony? |
| 11:36AM | 3 | A. | No. |
| 11:36AM | 4 | Q. | Okay.  Were there witnesses when you got |
| 11:36AM | 5 | married? | |
| 11:36AM | 6 | A. | Yes. |
| 11:36AM | 7 | Q. | Where did you get married? |
| 11:36AM | 8 | A. | In Lancaster, Texas. |
| 11:36AM | 9 | Q. | In the courthouse? |
| 11:36AM | 10 | A. | Yes. |
| 11:36AM | 11 | Q. | Okay.  And who all was there when you got |
| 11:36AM | 12 | married? | |
| 11:36AM | 13 | A. | It was Jacob, it was my three children, and it |
| 11:36AM | 14 | was my best friend.  My mother was invited but she didn't | |
| 11:36AM | 15 | come. | |
| 11:36AM | 16 | Q. | Who was your husband's best man at that wedding? |
| 11:36AM | 17 | A. | My husband didn't have one. |
| 11:36AM | 18 | Q. | And did Jacob go up to the judge's bench with |
| 11:36AM | 19 | you when you -- | |
| 11:36AM | 20 | A. | No, he did not. |
| 11:36AM | 21 | Q. | Okay.  You would consider a wedding as something |
| 11:36AM | 22 | very important in one's life, right? | |
| 11:36AM | 23 | A. | A wedding? |
| 11:36AM | 24 | Q. | Yes. |
| 11:36AM | 25 | A. | Yes. |

Cross-Examination by Mr. Maduforo

11:36AM   1      Q.   Yours was very important to you?

11:37AM   2      A.   Yes.

11:37AM   3      Q.   Now, why would you invite someone that inflicted

11:37AM   4   pain on you --

11:37AM   5      A.   I invited my whole family and --

11:37AM   6      Q.   Okay.

11:37AM   7      A.   And in that time and even now, Jacob's with --

11:37AM   8   he's with my mother.  So, if I invited her, I invited

11:37AM   9   him.

11:37AM   10     Q.   Okay.

11:37AM   11          Was there any prior allegation of sexual

11:37AM   12   assault against you by some other people?

11:37AM   13     A.   Against me?

11:37AM   14     Q.   Yes.

11:37AM   15     A.   No.

11:37AM   16     Q.   You never alleged that your cousin from your

11:37AM   17   dad's side tried to assault you sexually?

11:37AM   18     A.   No, I did not.

11:37AM   19     Q.   Okay.  All right.  You never alleged that

11:37AM   20   your -- that somebody else, another man besides Jacob

11:37AM   21   tried to sexually assault you?

11:37AM   22     A.   In the testimony that I just gave to my

11:37AM   23   attorney, when my attorney asked, I did say that when my

11:38AM   24   mother -- when I first tried to tell my mother, I did lie

11:38AM   25   to my mother and tell her that a man at the school when I

11:38AM  1   was -- I think I was like in the fourth or fifth grade,

11:38AM  2   she then took me riding around the school.  She told me

11:38AM  3   that there's nobody here.

11:38AM  4          She took me back home and she said if you don't

11:38AM  5   tell me the truth about who touched you, then I am -- she

11:38AM  6   said she's going to beat the hell out of me.  I said

11:38AM  7   Jacob was also in the room when me and her were having

11:38AM  8   this discussion and I told her it was Jacob.

11:38AM  9       Q.   So, first of all, you told her it was somebody

11:38AM 10   else and then finally --

11:38AM 11       A.   Yes, I did.

11:38AM 12       Q.   Okay.  All right.

11:38AM 13          And when you got pregnant do you recall your

11:38AM 14   mother making an appointment to get a DNA test to find

11:38AM 15   out --

11:38AM 16       A.   She never did that.

11:38AM 17       Q.   She never did that.

11:38AM 18          Then on three of your children, they do not

11:38AM 19   have the names of their fathers on the birth

11:39AM 20   certificates?

11:39AM 21       A.   Correct.

11:39AM 22       Q.   Only your name?

11:39AM 23       A.   Yes.

11:39AM 24       Q.   And -- but you are alleging that Jacob is the

11:39AM 25   father of Jaquita.

11:39AM 1       A.   He is.  I'm -- he is.

11:39AM 2       Q.   Okay.  Who is the father of your two other

11:39AM 3  children?

11:39AM 4       A.   One is Andre Turner is the father of my son

11:39AM 5  Mark Anthony.  Corey Haynes is the father of my daughter

11:39AM 6  Iceland Haynes.

11:39AM 7       Q.   Why did you not put the names of these men in

11:39AM 8  your life and the lives of your children --

11:39AM 9       A.   Because when I got pregnant --

11:39AM 10           THE COURT:  You both can't talk at the

11:39AM 11  same time.  And I didn't understand.  What was your

11:39AM 12  question and how is this relevant?

11:39AM 13      Q.   (By Mr. Maduforo)  So why did you not put their

11:39AM 14  names on the birth certificates?

11:39AM 15      A.   Why didn't I put -- because they weren't there.

11:40AM 16      Q.   Okay.  All right.

11:40AM 17           Do you mind telling the Court again the last

11:40AM 18  names of your two children besides Jaquita?

11:40AM 19      A.   Mark Anthony, my son's last name is Cannon, and

11:40AM 20  my daughter's last name is Haynes.

11:40AM 21      Q.   Okay.  All right.  Just to be straight, you

11:40AM 22  never complained to the cops about this abuse, you never

11:40AM 23  went to CPS?  You never reported to --

11:40AM 24      A.   I was a minor.  I told you when I went to

11:40AM 25  Dr. McAffee, what Dr. McAffee, the school principal of

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:40AM | 1 | Peace Elementary did.  I was in the sixth grade. |
| 11:40AM | 2 | I also went to my grandmother.  She thought |
| 11:40AM | 3 | that -- she didn't do anything. |
| 11:40AM | 4 | Q.   And did you tell a teacher in high school? |
| 11:40AM | 5 | A.   Those are the two people that I told. |
| 11:40AM | 6 | Q.   Okay.  All right. |
| 11:41AM | 7 | And you started going to psychological |
| 11:41AM | 8 | evaluation just recently after the lawsuit -- |
| 11:41AM | 9 | A.   A psychological evaluation or therapy? |
| 11:41AM | 10 | Q.   The counselor -- I'm sorry. |
| 11:41AM | 11 | A.   Yes, I started going through therapy. |
| 11:41AM | 12 | MR. MADUFORO:  Okay.  I'll pass the |
| 11:41AM | 13 | witness, Your Honor. |
| 11:41AM | 14 | THE COURT:  Can I ask some questions? |
| 11:41AM | 15 | MR. WHARTON:  Yes, Your Honor. |
| 11:41AM | 16 | THE COURT:  Okay.  Ma'am, you said you had |
| 11:41AM | 17 | a hysterectomy and you moved down here because they cut |
| 11:41AM | 18 | your kidney? |
| 11:41AM | 19 | THE WITNESS:  Yes, ma'am. |
| 11:41AM | 20 | THE COURT:  Then you said three months |
| 11:41AM | 21 | later your mother put you out.  Why did she put you out? |
| 11:41AM | 22 | THE WITNESS:  We had an argument about |
| 11:41AM | 23 | this. |
| 11:41AM | 24 | THE COURT:  Okay.  So then you said |
| 11:41AM | 25 | you-all had family get-togethers and everything was at |

| | | |
|---|---|---|
| 11:41AM | 1 | their house.  What shifted that caused you to file this |
| 11:41AM | 2 | lawsuit? |
| 11:41AM | 3 | THE WITNESS:  All of my life I basically |
| 11:41AM | 4 | been asking why.  All I wanted to do -- was an apology. |
| 11:41AM | 5 | I wanted them to take accountability for what they -- for |
| 11:41AM | 6 | what my mom allowed him to do and what he did.  I wanted |
| 11:41AM | 7 | them to take accountability for it, instead of always |
| 11:42AM | 8 | hanging up in my face, always telling me that I deserved |
| 11:42AM | 9 | it or telling me that she wasn't going to leave him or -- |
| 11:42AM | 10 | or all of that. |
| 11:42AM | 11 | THE COURT:  What year did you have the |
| 11:42AM | 12 | hysterectomy? |
| 11:42AM | 13 | THE WITNESS:  I had the hysterectomy in |
| 11:42AM | 14 | 2014.  From 2014 to 2015, I had nine surgeries due to the |
| 11:42AM | 15 | doctor cutting my kidney. |
| 11:42AM | 16 | THE COURT:  Okay.  So when did you move |
| 11:42AM | 17 | down here in -- |
| 11:42AM | 18 | THE WITNESS:  In September of 2015. |
| 11:42AM | 19 | THE COURT:  So September 2015 you moved |
| 11:42AM | 20 | down here and that's when you stayed with them? |
| 11:42AM | 21 | THE WITNESS:  I'm sorry, Your Honor.  I |
| 11:42AM | 22 | take that back.  It was August 2015. |
| 11:42AM | 23 | THE COURT:  Okay.  And when did your |
| 11:42AM | 24 | mother put you out of the house? |
| 11:42AM | 25 | THE WITNESS:  It was the same year.  I |

| | | |
|---|---|---|
| 11:42AM | 1 | want to say around November, because it was a little bit |
| 11:42AM | 2 | before Christmas. |
| 11:42AM | 3 | THE COURT:  Of 2015? |
| 11:42AM | 4 | THE WITNESS:  Yes, ma'am. |
| 11:42AM | 5 | THE COURT:  Okay.  Thank you. |
| 11:42AM | 6 | Go ahead, Mr. Wharton. |
| 11:42AM | 7 | MR. WHARTON:  Nothing further, Your Honor. |
| 11:42AM | 8 | THE COURT:  Ma'am, you may step down. |
| 11:43AM | 9 | Do you have any other evidence? |
| 11:43AM | 10 | MR. WHARTON:  At this time, we rest our |
| 11:43AM | 11 | case, Your Honor. |
| 11:43AM | 12 | THE COURT:  Okay.  Thank you. |
| 11:43AM | 13 | What says the Defense? |
| 11:43AM | 14 | MR. MADUFORO:  Your Honor, I am going to |
| 11:43AM | 15 | move for a Motion for Instructed Verdict.  The plaintiff |
| 11:43AM | 16 | has stated -- |
| 11:43AM | 17 | THE COURT:  Let me just stop you.  I |
| 11:43AM | 18 | understand -- I got four transcripts I've got to read. |
| 11:43AM | 19 | So I can't really make a ruling at this point. |
| 11:43AM | 20 | MR. MADUFORO:  Okay. |
| 11:43AM | 21 | THE COURT:  I mean, you can put it on the |
| 11:43AM | 22 | record, but I've got to read four transcripts that have |
| 11:43AM | 23 | been admitted. |
| 11:43AM | 24 | MR. WHARTON:  Yes, Your Honor.  I -- you |
| 11:43AM | 25 | know, and given that this is a bench trial, I think we |

| | | |
|---|---|---|
| 11:43AM | 1 | can handle this at the end probably. |
| 11:43AM | 2 | THE COURT:  Okay.  You may proceed. |
| 11:43AM | 3 | MR. MADUFORO:  Okay, Judge.  I will go |
| 11:43AM | 4 | ahead and put this on the record.  I will make a Motion |
| 11:43AM | 5 | for Instructed Verdict on this case. |
| 11:43AM | 6 | Plaintiff has not -- I know you just told |
| 11:44AM | 7 | me that some transcripts that the Court will read.  But |
| 11:44AM | 8 | we don't have any kind of substantial evidence besides |
| 11:44AM | 9 | the oral testimony as alleged on the plaintiff's petition |
| 11:44AM | 10 | regarding the alleged abuse. |
| 11:44AM | 11 | A mere allegation without any kind of |
| 11:44AM | 12 | evidence is not going to suffice, especially in this kind |
| 11:44AM | 13 | of cases. |
| 11:44AM | 14 | This is a child molestation that we are |
| 11:44AM | 15 | talking about.  No CPS report, not from her biological |
| 11:44AM | 16 | mother that lives with the dad, with Ms. Cannon when this |
| 11:44AM | 17 | happened, her stepfather. |
| 11:44AM | 18 | No police report.  No prosecution of |
| 11:44AM | 19 | Mr. Cannon.  No medical report of any sort.  And |
| 11:45AM | 20 | plaintiff wants the Court to believe that she has |
| 11:45AM | 21 | undergone this kind of abuse. |
| 11:45AM | 22 | I do not think that the Court is -- not |
| 11:45AM | 23 | speaking for the Court -- is going to just take a mere |
| 11:45AM | 24 | allegation without substantial documentation or |
| 11:45AM | 25 | evidence into the account and rule in favor of the |

| | | |
|---|---|---|
| 11:45AM | 1 | plaintiff. |
| 11:45AM | 2 | That being said, I'm asking that the |
| 11:45AM | 3 | plaintiff's petition be stricken and she takes nothing |
| 11:45AM | 4 | out of this.  Thank you, Judge. |
| 11:45AM | 5 | THE COURT:  So do you have any other |
| 11:45AM | 6 | evidence?  Your -- whatever you just argued is denied. |
| 11:46AM | 7 | MR. MADUFORO:  Okay. |
| 11:46AM | 8 | Your Honor, we'll call Ms. Tina Wilson. |
| 11:46AM | 9 | I'm sorry.  Birdie Wilson. |
| 11:46AM | 10 | THE COURT:  Where is she? |
| 11:46AM | 11 | Come on up.  You can take the stand. |
| 11:46AM | 12 | Can you please raise your right hand. |
| 11:46AM | 13 | Do you swear or affirm to tell the truth, |
| 11:47AM | 14 | the whole truth, and nothing but the truth so help you |
| 11:47AM | 15 | God? |
| 11:47AM | 16 | THE WITNESS:  Yes. |
| 11:47AM | 17 | THE COURT:  You can be seated and speak |
| 11:47AM | 18 | loud into the microphone.  You might need to take your |
| 11:47AM | 19 | mask off to talk. |
| 11:47AM | 20 | You may proceed. |
| 11:47AM | 21 | MR. MADUFORO:  Thank you, Judge. |
| 11:47AM | 22 | BIRDIE LEE WILSON, |
| 11:47AM | 23 | was called as a witness by the Defense, having been |
| 11:47AM | 24 | first duly sworn, testified as follows: |
| 11:47AM | 25 | DIRECT EXAMINATION |

Direct Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:47AM | 1 | BY MR. MADUFORO: |
| 11:47AM | 2 | Q.   Please tell the Court your name. |
| 11:47AM | 3 | A.   Birdie Lee Wilson. |
| 11:47AM | 4 | Q.   Ms. Wilson, I just have a few questions for you |
| 11:47AM | 5 | regarding your daughter Tina Wilson's petition against |
| 11:47AM | 6 | your husband.  Do you recall the first time you started |
| 11:47AM | 7 | living together with Tina and your husband? |
| 11:47AM | 8 | A.   I'm trying to think. |
| 11:47AM | 9 | THE REPORTER:  Pull your microphone down. |
| 11:47AM | 10 | THE WITNESS:  Probably -- I'm trying to |
| 11:47AM | 11 | think.  '93 -- '92, '93. |
| 11:48AM | 12 | Q.   (By Mr. Maduforo)  Okay.  And that's when you |
| 11:48AM | 13 | married Jacob or when you got together with him? |
| 11:48AM | 14 | A.   We were still dating. |
| 11:48AM | 15 | Q.   Okay.  And you moved in with Tina and -- |
| 11:48AM | 16 | A.   It was Tina and my son. |
| 11:48AM | 17 | Q.   Two of your children? |
| 11:48AM | 18 | A.   And Jacob. |
| 11:48AM | 19 | Q.   And Jacob.  Okay. |
| 11:48AM | 20 | And just, if you can, please describe the |
| 11:48AM | 21 | relationship Jacob had at that point with the children. |
| 11:48AM | 22 | A.   When I met Jacob, just when I met him, I was |
| 11:48AM | 23 | living with my mom in Midland on Mineola Street.  And at |
| 11:48AM | 24 | the time when I met him, no, I did not bring my kids. |
| 11:48AM | 25 | And we all moved in, it was probably a year and a half to |

11:48AM  1   two years after I met Jacob or going on three years after

11:48AM  2   we were dating and my kids lived with me.

11:49AM  3         Tina was in elementary and she was probably in

11:49AM  4   the sixth getting ready to go to junior high.  Tina's

11:49AM  5   birthday put her -- like, she's born March the 26th,

11:49AM  6   1981.  And so that would put her -- she's probably about

11:49AM  7   11 -- 10, 11, somewhere off in there when we moved

11:49AM  8   together.

11:49AM  9       Q.   Okay.  Thank you.

11:49AM  10        And I'll go straight to the point.  So did you

11:49AM  11  suspect any sort of abuse of any kind from Jacob against

11:49AM  12  any of your children?

11:49AM  13      A.   No.

11:49AM  14      Q.   I'll ask you the same question specifically

11:49AM  15  against Tina.

11:49AM  16      A.   No.

11:49AM  17      Q.   Are you aware of Jacob sexually assaulting Tina?

11:50AM  18      A.   No.

11:50AM  19      Q.   Did that ever come to your knowledge?

11:50AM  20      A.   No.

11:50AM  21      Q.   Did you take Tina to have an abortion?

11:50AM  22      A.   No.

11:50AM  23      Q.   Are you aware of Tina having a miscarriage when

11:50AM  24  she was younger?

11:50AM  25      A.   Yes.

Direct Examination by Mr. Maduforo

11:50AM  1        Q.   And do you recall what age she was?

11:50AM  2        A.   Let's see.  She was probably in junior high.  I

11:50AM  3  can recall the day that this happened.  Jacob, myself and

11:50AM  4  Tina was out, had been working outside doing some

11:50AM  5  Mesquite bushes.

11:50AM  6           And Tina started having really bad pain in her

11:50AM  7  stomach.  And it was -- I mean, it was awful.  I didn't

11:50AM  8  know what was going on.  And so taking Tina to -- I'd

11:50AM  9  taken Tina -- Jacob and myself taken Tina to Midland

11:51AM  10  Memorial Hospital.  And they did an examination on Tina.

11:51AM  11  And that's when I found out that she was pregnant and she

11:51AM  12  had a miscarriage.

11:51AM  13           And they called -- they did call in the CPS

11:51AM  14  people because she was a minor.  And at that time I'm

11:51AM  15  asking Tina, who did this to you?  And went on and -- I

11:51AM  16  was in totally shock.

11:51AM  17           And went on for hours trying to figure out how

11:51AM  18  did this happen.  And that's when she told me that her --

11:51AM  19  her step-mom's son had did this.  And that's when the CPS

11:51AM  20  investigation came in that rendered -- when they got

11:51AM  21  through with their investigation, that Tina, the children

11:51AM  22  that was there, left at the home by themselves, and at

11:51AM  23  this time the boy, Adrian Jackson, which is Niecy

11:51AM  24  Jackson's son, was a minor.  Both of them were minors.

11:52AM  25  And that's what was told to me.  Never was it told to me

Direct Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:52AM | 1 | that Jacob had did these things. |
| 11:52AM | 2 | And did I ask, as a mom, have you been touched |
| 11:52AM | 3 | inappropriately?  Yes.  Not only to her; her, my son. |
| 11:52AM | 4 | You know, just asking of because the inappropriacy (sic) |
| 11:52AM | 5 | that had happened. |
| 11:52AM | 6 | Niecy and Gerald Miller, which is Tina's |
| 11:52AM | 7 | father, was told that those kids cannot be left alone |
| 11:52AM | 8 | from their investigation, you know, unsupervised.  Now, |
| 11:52AM | 9 | CPS was called in on that case. |
| 11:52AM | 10 | Q.   Okay.  And they did their own investigation? |
| 11:52AM | 11 | A.   They did their own investigation.  And only |
| 11:52AM | 12 | thing I can say is what she had told me, that that's who |
| 11:52AM | 13 | did that.  And I have the right as the parent.  And did |
| 11:53AM | 14 | the CPS people come into the hospital?  Yes, they did, |
| 11:53AM | 15 | because it was a minor involved. |
| 11:53AM | 16 | Q.   Okay.  All right. |
| 11:53AM | 17 | Besides this particular incident, was there |
| 11:53AM | 18 | other incidents about Tina being sexually assaulted? |
| 11:53AM | 19 | A.   Tina have been -- it was another case before -- |
| 11:53AM | 20 | this happened before I met Jacob.  And she had told me |
| 11:53AM | 21 | that her dad's cousin, which is -- we call him Sonny. |
| 11:53AM | 22 | His name is Daniel Washington.  I can't -- that his whole |
| 11:53AM | 23 | name.  That he had touched her. |
| 11:53AM | 24 | And we had taken -- again, I had taken her to |
| 11:53AM | 25 | the hospital and they did an examination on her and to |

Direct Examination by Mr. Maduforo

11:53AM  1  see had she been penetrated or something like that.  And

11:53AM  2  at that time they came in and investigated and there was

11:54AM  3  no -- nothing found in those -- in that investigation.

11:54AM  4         And in all these things that -- I mean, and

11:54AM  5  her -- her step-mom having CPS coming into my life, it

11:54AM  6  didn't have anything to do with Jacob.  They were saying

11:54AM  7  that I had sexual assaulted my stepson Justin and

11:54AM  8  Jaquita, which was Tina's daughter.

11:54AM  9         That's the allegations that her step-mom kept

11:54AM  10 bringing up into the courts and having me -- like

11:54AM  11 Thanksgiving, I would be having dinner and the CPS people

11:54AM  12 came up, you know, like having family time and the CPS

11:54AM  13 people coming up and investigating me.

11:54AM  14        And at that time, Justin, Jacobs's middle son,

11:54AM  15 he lived with us also by then.  And I told the lady, I

11:55AM  16 said, there's Justin.  I hadn't even spoken to her about

11:55AM  17 what she was there for.  I said, questions that you are

11:55AM  18 asking me, ask him, and I would walk off.

11:55AM  19        You know, just saying this is wrong.

11:55AM  20 Nothing -- I hadn't spoken to him.  He didn't have the

11:55AM  21 slightest idea who the lady was at the door.  And the CPS

11:55AM  22 talked to Justin.

11:55AM  23        Justin -- Justin started laughing, like

11:55AM  24 Birdie -- he called me Birdie.  I'm his step-mom.  He

11:55AM  25 said, she did what?  She ain't never did nothing like

Direct Examination by Mr. Maduforo

11:55AM 1  that.

11:55AM 2          And at that time Jaquita was in the daycare.

11:55AM 3  And they were saying that I was the one who was having

11:55AM 4  sex with the children.

11:55AM 5      Q.   Okay.  So let's go back to Jaquita.  Now has

11:55AM 6  Tina ever mentioned who the father of Jaquita is?

11:55AM 7      A.   No, she did not.

11:55AM 8      Q.   Okay.

11:55AM 9      A.   And -- and -- go ahead, I'm sorry.

11:56AM 10     Q.   When she got pregnant with Jaquita, did you --

11:56AM 11 what did you do as the mother?

11:56AM 12     A.   I'd taken her to the doctor and got her checked

11:56AM 13 out, asking her who the father was, and she saying -- she

11:56AM 14 told me Roderick Jones or whatever his name was.  I'm

11:56AM 15 asking -- I even asked her questions like, how did you --

11:56AM 16 where did y'all do these things at?

11:56AM 17         Because I worked at Midland Correctional at

11:56AM 18 that time when she was pregnant with Jaquita.  She was in

11:56AM 19 the ninth grade.  And I worked at -- and he also would

11:56AM 20 catch the bus where I worked at the elementary.  I knew

11:56AM 21 Roderick.

11:56AM 22         And that's -- and he -- I'm asking him, I even

11:56AM 23 asked him myself, you the father of this baby?  And he

11:56AM 24 said, yes.  I still have the little glass shoes that he

11:56AM 25 brought to the hospital, where he had arrangements,

Direct Examination by Mr. Maduforo

```
11:56AM    1    sitting in my washroom right now at the house that he

11:57AM    2    brought to the hospital 27 years ago when Jaquita was

11:57AM    3    born.

11:57AM    4                    THE COURT:  What does Roderick look like?

11:57AM    5                    THE WITNESS:  He's dark complected,

11:57AM    6    probably about 5' 7", if he's that tall.  I haven't seen

11:57AM    7    him in years.

11:57AM    8                    THE COURT:  What complexion is Jaquita?

11:57AM    9                    THE WITNESS:  She light skinned.  She's

11:57AM   10    your skin color and Jacob's.

11:57AM   11                    THE COURT:  Keep going.

11:57AM   12                    THE WITNESS:   That's what she had told me.

11:57AM   13        Q.   (By Mr. Maduforo)  And the presumed father of

11:57AM   14    Jaquita, was he a minor or adult?

11:57AM   15        A.   He was a minor.  His mom at the time brought

11:57AM   16    him to -- would bring him -- brought him -- that we were

11:57AM   17    having a DNA.  And she was bringing him and he never

11:57AM   18    came.  Roderick came to the hospital when Jaquita was

11:57AM   19    born.

11:57AM   20        Q.   Okay.  So you insisted on DNA to find out who

11:57AM   21    the actual father of the baby was at that time?

11:57AM   22        A.   Yes.

11:58AM   23        Q.   And that didn't happen?

11:58AM   24        A.   That didn't happen.

11:58AM   25        Q.   Okay.  And it was maybe not because of your
```

Direct Examination by Mr. Maduforo

11:58AM 1   fault?

11:58AM 2        A.   Not my fault.

11:58AM 3        Q.   Okay.  And take me to the next time -- when was

11:58AM 4   that child born; when y'all were still living together or

11:58AM 5   when she has moved out?

11:58AM 6        A.   Tina had -- she had moved to an apartment but

11:58AM 7   she had came back and lived with us.

11:58AM 8        Q.   Okay.

11:58AM 9        A.   That was Mark.

11:58AM 10       Q.   Do you recall how old she was when she had the

11:58AM 11  second child?

11:58AM 12       A.   I believe she was 20, 21.

11:58AM 13       Q.   So she was an adult at that point.  Okay.  All

11:58AM 14  right.

11:58AM 15            So is it fair to assume that as a mom, you had

11:58AM 16  a teenage child that got pregnant and you the mom at that

11:58AM 17  point did everything you could to figure out how it

11:59AM 18  happened?

11:59AM 19       A.   Yes.

11:59AM 20       Q.   Okay.  And the only reason you did not discover

11:59AM 21  this was because it was a minor?

11:59AM 22       A.   Yes.  And the reason why, because I -- I'm

11:59AM 23  asking my daughter, you know, several times, who's the

11:59AM 24  father?  And she -- you getting older, you 15, 16 years

11:59AM 25  old, still telling me the same thing.  Even in your 20s,

Direct Examination by Mr. Maduforo

11:59AM   1   30s.

11:59AM   2          And I get home the day of this letter that Jake

11:59AM   3   had received was served from attorney -- however.  I work

11:59AM   4   in Red Oak.  However it was served.  And it was telling

11:59AM   5   me that he was having -- where we at today, this court.

11:59AM   6   That's what it was about.

12:00PM   7          Q.   Okay.

12:00PM   8          A.   And that's when I got the -- okay, you the

12:00PM   9   father?  Yeah.  I was like, what?  I was in total

12:00PM  10   disbelief.

12:00PM  11          My thing is -- Tina, the day before these

12:00PM  12   papers was served, Tina was at my house in my room with

12:00PM  13   the kids.  Say the papers were served today, she was at

12:00PM  14   my house yesterday, in my house, inside of my house, and

12:00PM  15   with the kids.

12:00PM  16          And her and Iceland, going back to -- just

12:00PM  17   getting -- Iceland has lived -- Mark -- I done raised all

12:00PM  18   three of my grandkids, basically.  Iceland lived with us

12:00PM  19   her senior year.  She had just left a year and a half

12:00PM  20   before then.  Tina had left her there.  And I would tell

12:00PM  21   Tina, you need to come and get Iceland.

12:00PM  22          Iceland lived with me when she was -- when Tina

12:01PM  23   moved here, she was in the fifth grade, sixth grade.  She

12:01PM  24   left probably seventh and came back eighth.  And she

12:01PM  25   just -- and she at my house now, her, and her mom.

Direct Examination by Mr. Maduforo

12:01PM   1            If I did all of these horrible things and I'm

12:01PM   2   doing all of this abuse, why you leave your kids there?

12:01PM   3   They still there.

12:01PM   4            I have a 13-year-old little boy there I'm

12:01PM   5   raising.  I've been having him -- my son, whose son today

12:01PM   6   or whatever, I been having his baby since he was three

12:01PM   7   months old.  I have full custody of him.

12:01PM   8            And my thing, if I'm that bad of a person why

12:01PM   9   those kids at 18 and 21 -- Jaquita been gone away from

12:01PM   10   home probably about three years.  And when Tina moved

12:01PM   11   here, she had the rights.  I did not have any custody.

12:01PM   12            I made her pay me child support for Mark

12:01PM   13   because he hasn't paid.  And she paid child support.

12:02PM   14            She ain't never paid nothing for Iceland.

12:02PM   15   Iceland just graduated this past school year.  And you

12:02PM   16   can come get your children.

12:02PM   17       Q.   Okay.  So, along that route, do you and Jake

12:02PM   18   support Tina?

12:02PM   19       A.   Yes.  Jake bought Tina a car probably -- she

12:02PM   20   didn't have transportation.  We do a lot of things for

12:02PM   21   Tina.  Not because of Tina; trying to make sure that

12:02PM   22   those kids are taken care of.

12:02PM   23            I mean, since she been in Dallas he went and

12:02PM   24   got her a car, a little SUV something.  I can't think of

12:02PM   25   the model it was but he got it.

| 12:02PM | 1 | When she had her Honda, she couldn't pay the |
|---|---|---|
| 12:02PM | 2 | car note; he helped pay for it. |
| 12:02PM | 3 | Q.   Okay.  And when you and Jake -- you said he |
| 12:03PM | 4 | helps to pay for her car note.  Do you guys give her |
| 12:03PM | 5 | money?  Do you guys buy her other things? |
| 12:03PM | 6 | A.   Yeah, he give her money.  She would come to the |
| 12:03PM | 7 | house and he would be out there on the property working. |
| 12:03PM | 8 | Oh, I need 20.  I don't care if it's 20, $30, a hundred. |
| 12:03PM | 9 | He would give her money.  I would give -- I mean, we |
| 12:03PM | 10 | helped her. |
| 12:03PM | 11 | THE COURT:  Sir, you got ten more minutes |
| 12:03PM | 12 | and the other side is going to have 15 minutes and we're |
| 12:03PM | 13 | going to stop at 12:30. |
| 12:03PM | 14 | Q.   (By Mr. Maduforo)  And when was the last time |
| 12:03PM | 15 | Tina was in the house? |
| 12:03PM | 16 | A.   At my house? |
| 12:03PM | 17 | THE COURT:  The day before this happened. |
| 12:03PM | 18 | Before he got served. |
| 12:03PM | 19 | MR. WHARTON:  I guess I'll start objecting |
| 12:03PM | 20 | to that. |
| 12:03PM | 21 | THE COURT:  That was her testimony.  The |
| 12:03PM | 22 | day before he got served -- |
| 12:03PM | 23 | THE WITNESS:  She was at my house.  And |
| 12:03PM | 24 | she comes -- I don't know if y'all -- to me, she comes to |
| 12:03PM | 25 | my house all the time, even to pick up the children. |

12:03PM   1              THE COURT:  Now you can ask if she's been

12:03PM   2   there since then, sir.

12:03PM   3       Q.   (By Mr. Maduforo)  Has she been in the house

12:03PM   4   since this lawsuit was filed?

12:03PM   5       A.   No, not that I know of.

12:04PM   6       Q.   Okay.  All right.

12:04PM   7            Tina obviously did not tell you about this

12:04PM   8   incident.  Did she tell you that she was seeking any

12:04PM   9   counseling?

12:04PM  10       A.   No.  She --

12:04PM  11              THE COURT:  The answer was yes or no.

12:04PM  12              THE WITNESS:  No.

12:04PM  13              I want to say --

12:04PM  14              THE COURT:  Ma'am, you don't -- wait for

12:04PM  15   another question, please.

12:04PM  16              THE WITNESS:  Okay.

12:04PM  17       Q.   (By Mr. Maduforo)  In your own experience with

12:04PM  18   your husband Jake, Jacob Cannon, and this whole

12:04PM  19   allegation, what do you think this is all about?

12:05PM  20       A.   Greed, money, anger, hatred.

12:05PM  21              THE COURT:  And why does she have greed,

12:05PM  22   money, anger, hatred towards Jacob?

12:05PM  23              THE WITNESS:  I just don't understand it

12:05PM  24   because up until then we were -- I mean, we were -- she

12:05PM  25   was at my house.  We spent holidays together, even since

| | | |
|---|---|---|
| 12:05PM | 1 | she done got married and right -- the Christmas before we |
| 12:05PM | 2 | got -- he got served, I got pictures of her and her |
| 12:05PM | 3 | husband at our house. |
| 12:05PM | 4 | And I'm just trying to -- and even like |
| 12:06PM | 5 | she have told me, if she could not -- she wants me |
| 12:06PM | 6 | instead of him.  If she could take anybody to jail, she |
| 12:06PM | 7 | would rather have me in jail. |
| 12:06PM | 8 | THE COURT:  So why does she want you in |
| 12:06PM | 9 | jail? |
| 12:06PM | 10 | THE WITNESS:  Just what I said.  I guess |
| 12:06PM | 11 | angry.  I mean, I went from being called mama to being |
| 12:06PM | 12 | called by my first name.  I got text messages I got on my |
| 12:06PM | 13 | phone being called bitches and hoes. |
| 12:06PM | 14 | I ain't did nothing to her but try to help |
| 12:06PM | 15 | her take care of her kids.  And I'm still doing it.  And |
| 12:06PM | 16 | I'm 61 and I'm tired.  But what I do?  I can't put them |
| 12:06PM | 17 | outside. |
| 12:06PM | 18 | THE COURT:  How old is the youngest one? |
| 12:06PM | 19 | THE WITNESS:  Her youngest one just turned |
| 12:06PM | 20 | 18.  She'll be 19 December the 3rd.  The youngest one I |
| 12:06PM | 21 | take care of is my grandson.  He's 13 now.  Yeah, I'm |
| 12:07PM | 22 | tired. |
| 12:07PM | 23 | THE COURT:  Thank you. |
| 12:07PM | 24 | Do you have any other questions? |
| 12:07PM | 25 | Q.   (By Mr. Maduforo)  One last question.  Did you |

Direct Examination by Mr. Maduforo

12:07PM   1   abuse Tina when she was a minor?

12:07PM   2       A.   When she was a minor?

12:07PM   3       Q.   Yes.

12:07PM   4       A.   No.  Did I give spank -- give Tina whippings,

12:07PM   5   yes, being disrespectful, yes.  But just going around

12:07PM   6   what you call abusing kids or hitting her for no apparent

12:07PM   7   reason or just throwing her out on the street or leaving

12:07PM   8   her without things or anything, like -- like I'm taking

12:07PM   9   care of her kids and making sure they eat every day.  I

12:07PM   10  treated Tina -- I've taken care of her the same way.

12:07PM   11      Q.   Was anybody abusive to her when she was a minor

12:07PM   12  that you know of --

12:07PM   13      A.   No.

12:07PM   14      Q.   -- in your household?

12:07PM   15      A.   No.

12:07PM   16      Q.   Okay.

12:07PM   17           MR. MADUFORO:  Pass the witness, Your

12:07PM   18  Honor.

12:07PM   19           THE COURT:  You may proceed.

12:07PM   20           MR. WHARTON:  Thank you, Your Honor.

12:08PM   21           Just for a brief, you know, background on

12:08PM   22  this, the Defense never disclosed, never sent a

12:08PM   23  Disclosure.  We're not objecting to the witness being

12:08PM   24  called.  I'm just alerting the Court to where we are as

12:08PM   25  far as how we are approaching this.  There was never a

| | | |
|---|---|---|
| 12:08PM | 1 | Disclosure. |
| 12:08PM | 2 | THE COURT:  Okay. |
| 12:08PM | 3 | CROSS-EXAMINATION |
| 12:08PM | 4 | BY MR. WHARTON: |
| 12:08PM | 5 | Q.   All right.  How tall is Jaquita? |
| 12:08PM | 6 | A.   She about 5'8", 5'7".  She about my height. |
| 12:08PM | 7 | Q.   And how tall is Jacob? |
| 12:08PM | 8 | A.   Jacob is probably about 5' 11", 6-foot tall. |
| 12:08PM | 9 | Q.   And, by the way, are you married to Jacob? |
| 12:08PM | 10 | A.   He's my husband. |
| 12:08PM | 11 | Q.   All right.  And when the CPS calls were made, |
| 12:08PM | 12 | when CPS came to the house and talked with y'all, did they |
| 12:09PM | 13 | ever figure out who the father of Jaquita is? |
| 12:09PM | 14 | A.   They were not there for the father of Jaquita. |
| 12:09PM | 15 | Q.   Now, you're saying that Tina had at least one |
| 12:09PM | 16 | miscarriage, right? |
| 12:09PM | 17 | A.   I know she did. |
| 12:09PM | 18 | Q.   And then abortions? |
| 12:09PM | 19 | A.   She had -- I haven't taken Tina on no five or |
| 12:09PM | 20 | six abortions.  Tina was having sex.  Yes, she had an |
| 12:09PM | 21 | abortion. |
| 12:09PM | 22 | Q.   How many abortions do you know of? |
| 12:09PM | 23 | A.   Probably two. |
| 12:09PM | 24 | Q.   And how old was she? |
| 12:09PM | 25 | A.   I think one when she was 16, and I believe the |

Cross-Examination by Mr. Wharton

| | | |
|---|---|---|
| 12:09PM | 1 | other one was when she was probably 17. |
| 12:09PM | 2 | Q. So you -- how do you know those were happening? |
| 12:10PM | 3 | A. I'd taken her. |
| 12:10PM | 4 | Q. So you took her for those abortions? |
| 12:10PM | 5 | A. Yes. |
| 12:10PM | 6 | Q. And you don't know who the father is? |
| 12:10PM | 7 | A. No. Tina was -- I take one of them back. She |
| 12:10PM | 8 | was having sex with some -- with some boy that lived over |
| 12:10PM | 9 | there by her dad's house. You have to ask Tina. |
| 12:10PM | 10 | Q. Is that who you are claiming is Roderick Jones? |
| 12:10PM | 11 | A. No. |
| 12:10PM | 12 | Q. So who's this other one? |
| 12:10PM | 13 | A. You have to ask Tina. |
| 12:10PM | 14 | THE COURT: He's asking you. We're in |
| 12:10PM | 15 | trial. |
| 12:10PM | 16 | THE WITNESS: I don't -- I don't know who. |
| 12:10PM | 17 | I know she was pregnant, and I wasn't ready to take care |
| 12:10PM | 18 | of another baby, and she had an abortion. |
| 12:10PM | 19 | Q. (By Mr. Wharton) All right. So -- okay. Now, |
| 12:10PM | 20 | you were testifying earlier about a Niecy Jackson. Is |
| 12:10PM | 21 | that Sharon Jackson? |
| 12:10PM | 22 | A. Yes, George. She was -- her maiden name is |
| 12:11PM | 23 | Jackson. She was known as Sharon Jackson Miller George. |
| 12:11PM | 24 | Q. Right. And I'm under the impression that y'all |
| 12:11PM | 25 | have not seen her deposition. Is that right? |

Cross-Examination by Mr. Wharton

12:11PM   1        A.    I have not.

12:11PM   2        Q.    Okay.  Do you know why Sharon Jackson George

12:11PM   3   would testify that Tina's version of events is true and

12:11PM   4   not yours?

12:11PM   5        A.    Will you repeat that again, please?

12:11PM   6              THE COURT:  Don't ask -- ask a better

12:11PM   7   question.  Be specific, since she doesn't know...

12:11PM   8              MR. WHARTON:  Yes, Your Honor.

12:11PM   9        Q.   (By Mr. Wharton)  Now, your story with Sharon

12:11PM   10   Jackson George is not that she was calling about Tina, but

12:11PM   11   that she was calling on you specifically, right?

12:12PM   12              Do you understand my question?

12:12PM   13        A.    No.

12:12PM   14        Q.    You testified earlier that Sharon Jackson George

12:12PM   15   did call CPS, right?

12:12PM   16        A.    Yes.

12:12PM   17        Q.    And your testimony was that Sharon Jackson

12:12PM   18   George called CPS about you, not about Jacob?

12:12PM   19        A.    Yes.

12:12PM   20              Let me --

12:12PM   21              THE COURT:  No, you can't say anything.

12:12PM   22   You have to wait until he asks a question.

12:12PM   23        Q.   (By Mr. Wharton)  And your lawyer can ask any

12:12PM   24   question you need.

12:12PM   25              You're saying that CPS came and then you were

12:12PM   1   there while CPS talked to Tina.

12:12PM   2        A.    No, I did not testify to that.

12:12PM   3        Q.    Okay.  Do you know if CPS talked to Tina

12:12PM   4   independently?

12:12PM   5        A.    No, I do not.  What I testified to, that CPS

12:12PM   6   came to my house and they were saying, allegedly saying,

12:12PM   7   that I had had sex with my stepson Justin and saying that

12:13PM   8   I was fondling Jaquita, which is Tina's daughter.

12:13PM   9        Q.    Did you say fundling or fondling?

12:13PM   10              THE COURT:  She said fondling.  I'm making

12:13PM   11   the ruling.  I remember the testimony.

12:13PM   12              MR. WHARTON:  I just didn't hear the word.

12:13PM   13   I'm sorry.  My apologies, Your Honor.

12:13PM   14              THE COURT:  That's what her testimony was,

12:13PM   15   that the allegations were against her regarding those two

12:13PM   16   children.

12:13PM   17        What do you want to ask her about

12:13PM   18   Ms. Sharon Jackson Miller George's statement?

12:13PM   19              MR. WHARTON:  Yes, Your Honor.

12:13PM   20        Q.    (By Mr. Wharton)  So you're saying that CPS came

12:13PM   21   because you were -- because the allegation was that you

12:13PM   22   were fondling Jaquita?

12:13PM   23        A.    I want to make sure.  It was Jaquita and

12:13PM   24   Justin.

12:13PM   25        Q.    Jaquita and Justin.

12:13PM   1          And so they -- you're saying they were not

12:14PM   2   called ever about any allegation involving Tina?

12:14PM   3      A.   No.  We had several -- okay, I'm sorry.

12:14PM   4               THE COURT:  Go ahead.  You had several

12:14PM   5   what?

12:14PM   6               THE WITNESS:  We had -- the calls that

12:14PM   7   Niecy, Sharon or whatever, it was several times that she

12:14PM   8   have had the CPS come to my house.  And it was always

12:14PM   9   about -- it was always saying that I had did something to

12:14PM   10  the children.  It was -- it was allegedly that she was

12:14PM   11  saying that Birdie Lee Wilson, that's me.

12:14PM   12              THE COURT:  Okay.  Thank you.

12:14PM   13     Q.   (By Mr. Wharton)  All right.  And what about

12:14PM   14  during the custody trial with Gerald Miller; was CPS

12:15PM   15  called during that trial?

12:15PM   16     A.   Yeah, about the children.

12:15PM   17     Q.   About the other children?

12:15PM   18     A.   About all the children.

12:15PM   19              THE COURT:  Okay.  Hold on.

12:15PM   20              Ma'am, who is Gerald Lee Miller?

12:15PM   21              MR. WHARTON:  Gerald Miller is --

12:15PM   22              THE COURT:  Her father?

12:15PM   23              MR. WHARTON:  Her father, yes.

12:15PM   24              THE COURT:  You can't -- go ahead.  You're

12:15PM   25  talking about a custody case?

| | | |
|---|---|---|
| 12:15PM | 1 | MR. WHARTON:  Yes.  There was a trial |
| 12:15PM | 2 | involving -- |
| 12:15PM | 3 | THE WITNESS:  Okay.  Me and my kids' dad, |
| 12:15PM | 4 | Tina's father, he had got custody -- he did not want |
| 12:15PM | 5 | custody of Tina.  He just wanted custody of Gerald. |
| 12:15PM | 6 | That's the son.  Gerald Wilson is my son.  Gerald Miller |
| 12:15PM | 7 | is the father of my two children. |
| 12:15PM | 8 | Q.   (By Mr. Wharton)  Right. |
| 12:15PM | 9 | A.   Okay.  And the custody case was between me and |
| 12:16PM | 10 | him. |
| 12:16PM | 11 | Q.   And did they call CPS -- |
| 12:16PM | 12 | A.   That's when she was calling CPS -- |
| 12:16PM | 13 | THE COURT:  Hold on.  Let him ask the |
| 12:16PM | 14 | question. |
| 12:16PM | 15 | Q.   (By Mr. Wharton)  During that trial, did they |
| 12:16PM | 16 | call CPS?  You can say yes or no. |
| 12:16PM | 17 | MR. MADUFORO:  Your Honor -- |
| 12:16PM | 18 | THE COURT:  No.  She's yet to answer the |
| 12:16PM | 19 | question.  Because her response was that it was about the |
| 12:16PM | 20 | children and that the CPS case between a husband and wife |
| 12:16PM | 21 | has to do with their own children. |
| 12:16PM | 22 | So, ma'am, did they call CPS regarding |
| 12:16PM | 23 | custody or anything during that custody case? |
| 12:16PM | 24 | THE WITNESS:  Not that I know of, that I |
| 12:16PM | 25 | can recall of. |

12:16PM   1        Q.   (By Mr. Wharton)  And what year was that?  You

12:16PM   2   don't have to give me the exact date.

12:17PM   3        Let me ask you this.  Was that occurring before

12:17PM   4   Jaquita was born?

12:17PM   5        A.   The custody case?  Yes.

12:17PM   6        Q.   So, if CPS was being called during the custody

12:17PM   7   case, it could not have been about you abusing Jaquita in

12:17PM   8   some way, right?

12:17PM   9        A.   The custody case is a different -- what I'm

12:17PM  10   testifying to --

12:17PM  11             THE COURT:  Ma'am, I'm going to interrupt

12:17PM  12   you.  The question is, was CPS called during the custody

12:17PM  13   case between you and your husband?  That's the question.

12:17PM  14             THE WITNESS:  Yes.

12:17PM  15             THE COURT:  And how old were the kids at

12:17PM  16   the time of that case?  If you don't know the year, how

12:17PM  17   old were they?

12:18PM  18             THE WITNESS:  Tina probably was -- I don't

12:18PM  19   know.

12:18PM  20             THE COURT:  Try real hard.  Because I

12:18PM  21   would hate for you to have to come back and remember a

12:18PM  22   week from now.  I'm not going to be here tomorrow.

12:18PM  23             THE WITNESS:  Maybe 10, 11.  I don't know.

12:18PM  24             THE COURT:  Thank you.

12:18PM  25             Now, Mr. Wharton, ask your next question.

Redirect Examination by Mr. Maduforo

12:18PM   1              MR. WHARTON:  Thank you, Your Honor.

12:18PM   2       Q.   (By Mr. Wharton)  And do you know, how did --

12:18PM   3  how did Tina get that scar on her forehead?

12:18PM   4       A.   Oh, Tina got that scar on the forehead because

12:18PM   5  I was in the kitchen cooking, and she came in going to

12:18PM   6  hit me and I hit her.  It did not have anything to -- me

12:18PM   7  being her mother and she going to hit me?  Yeah, I hit

12:18PM   8  her.

12:18PM   9       Q.   And how did that leave a scar, a permanent scar?

12:18PM  10       A.   I hit her with a skillet.  Because I was in the

12:18PM  11  kitchen, she picked up the skillet to hit me and she had

12:19PM  12  it like this and I did it like that (indicating).

12:19PM  13       Q.   Did you ever find Tina in her room bleeding on

12:19PM  14  the floor?

12:19PM  15       A.   No, sir.

12:19PM  16       Q.   So there's no event where she was miscarrying,

12:19PM  17  bleeding on the floor?

12:19PM  18       A.   No.

12:19PM  19              MR. WHARTON:  I'll pass the witness.

12:20PM  20              THE COURT:  Anything?

12:20PM  21              MR. MADUFORO:  Just one or two questions.

12:20PM  22                   REDIRECT EXAMINATION

12:20PM  23  BY MR. MADUFORO:

12:20PM  24       Q.   Just to be clear, when you took Tina to the

12:20PM  25  abortion clinic, did she ever mention that Jacob was the

Redirect Examination by Mr. Maduforo

| | | |
|---|---|---|
| 12:20PM | 1 | father? |
| 12:20PM | 2 | A.   No. |
| 12:20PM | 3 | Q.   And the last question will be, you are aware |
| 12:20PM | 4 | that Jacob was deposed regarding this case, correct? |
| 12:20PM | 5 | A.   He was what? |
| 12:20PM | 6 | Q.   He went for a deposition on this case? |
| 12:20PM | 7 | A.   To a deposition, yes. |
| 12:20PM | 8 | Q.   Yes.  Do you know if Jacob was informed of the |
| 12:20PM | 9 | following individuals being deposed:  Sharon Jackson |
| 12:20PM | 10 | George, Gerald Miller, and Gerald Wayne Wilson, Junior? |
| 12:20PM | 11 | A.   No. |
| 12:20PM | 12 | Q.   Okay. |
| 12:20PM | 13 | MR. MADUFORO:  Pass the witness, Your |
| 12:20PM | 14 | Honor. |
| 12:20PM | 15 | MR. WHARTON:  Nothing further, Your Honor. |
| 12:20PM | 16 | THE COURT:  Okay. |
| 12:20PM | 17 | MR. MADUFORO:  Nothing further from the |
| 12:20PM | 18 | Defense. |
| 12:20PM | 19 | THE COURT:  I have a question. |
| 12:21PM | 20 | Now, you said she had two abortions.  And |
| 12:21PM | 21 | where did -- said you took her to both abortions. |
| 12:21PM | 22 | THE WITNESS:  Yes, in Odessa. |
| 12:21PM | 23 | THE COURT:  Did Jacob go? |
| 12:21PM | 24 | THE WITNESS:  No. |
| 12:21PM | 25 | THE COURT:  Anything else? |

| | | |
|---|---|---|
| 12:21PM | 1 | MR. MADUFORO:  Nothing further. |
| 12:21PM | 2 | MR. WHARTON:  No, Your Honor. |
| 12:21PM | 3 | THE COURT:  You may step down, ma'am. |
| 12:21PM | 4 | MR. MADUFORO:  Defense rests, Your Honor. |
| 12:21PM | 5 | MR. WHARTON:  And we are making an effort |

12:21PM   6   to get Roderick Jones available by telephone if the Court

12:21PM   7   will permit him to testify remotely.

12:21PM   8              THE COURT:  Who's Roderick Jones?

12:21PM   9              MR. WHARTON:  Roderick Jones is the young

12:21PM  10   boy at the time that they were alleging was the father --

12:22PM  11   was the one getting Tina Wilson pregnant.

12:22PM  12              THE COURT:  Okay.  We're going to recess

12:22PM  13   until 1:30.  And if you can get him by 1:30, I'll allow

12:22PM  14   him to testify as a rebuttal witness.

12:22PM  15              MR. WHARTON:  Thank you, Your Honor.

12:22PM  16              THE COURT:  So we'll see y'all at 1:30.

12:22PM  17              MR. WHARTON:  To be clear, I think he

12:22PM  18   lives in another state.

12:22PM  19              THE COURT:  No, I understand.  He can

12:22PM  20   testify by phone if you can get him here by 1:30.

12:22PM  21              MR. WHARTON:  Thank you, Your Honor.

12:22PM  22              THE COURT:  If not, we're going to end

12:22PM  23   this case.

12:22PM  24              (Lunch recess.)

1:27PM   25              MR. WHARTON:  We call Roderick Jones.

1:27PM 1          THE COURT:  Mr. Jones, please raise your

1:27PM 2    right hand.

1:27PM 3          Do you swear or affirm to tell the truth,

1:27PM 4    the whole truth and nothing but the truth, so help you

1:27PM 5    God?

1:27PM 6          THE WITNESS:  Yes, ma'am, I do.

1:27PM 7          THE COURT:  Okay.  You may proceed.

1:27PM 8                    RODERICK JONES,

1:27PM 9    was called as a witness by the Plaintiff, having been

1:27PM 10   first duly sworn, testified as follows via Zoom:

1:27PM 11               DIRECT EXAMINATION

1:27PM 12   BY MR. WHARTON:

1:27PM 13       Q.   Can you state your name for the record, please.

1:27PM 14       A.   Hold on.  Okay.  Yes.  My name is Roderick

1:27PM 15   Jones, for the record.

1:27PM 16       Q.   And, Mr. Jones, how did you come to know Tina

1:28PM 17   Wilson?

1:28PM 18       A.   How did I know Tina Wilson?

1:28PM 19       Q.   Yes.

1:28PM 20       A.   I first met her at a Mr. Gatti's, a pizza hall,

1:28PM 21   back when we were like teens.  And then from there on we

1:28PM 22   went to the same school together.  And that's how I know

1:28PM 23   her, from that.

1:28PM 24       Q.   Were y'all boyfriend and girlfriend?

1:28PM 25       A.   You know, we were just girlfriend and

Direct Examination by Mr. Wharton

1:28PM  1  boyfriend.  Nothing intimate or nothing like that.

1:28PM  2      Q.   Okay.  So, to be clear, for this case, you never

1:28PM  3  had actual sex with her?

1:28PM  4      A.   No.  No.  Never.  Never.  Still to this day,

1:28PM  5  never.

1:28PM  6      Q.   Did Jacob Cannon or Birdie Wilson ever ask you

1:28PM  7  to say that you fathered Tina Wilson's child?

1:29PM  8      A.   Oh, yeah.  Man, yeah, they did.  They did that

1:29PM  9  back long when we were dating, man.  Just to -- really to

1:29PM  10  say -- like to take the heat off of him.  You know, he

1:29PM  11  knew that that was his baby, regardless.

1:29PM  12         So, meaning that me and Ms. Wilson was -- Tina

1:29PM  13  Wilson was, you know, how you could say, courting each

1:29PM  14  other during our younger teen age.  And he figured that

1:29PM  15  he could throw that in and say it like, as long as you

1:29PM  16  claiming saying this baby here is yours, you don't have

1:29PM  17  to want for nothing.  Yeah, that was...

1:29PM  18      Q.   So did he offer you money or gifts?

1:29PM  19      A.   Oh, yeah.  Like -- like he tried to offer me --

1:29PM  20  he gave me so-called, if you want to call it giving it

1:29PM  21  money, he giving gifts, if he want to so-called say that.

1:29PM  22         But, I mean, like, yeah, he just really wanted

1:29PM  23  me to take the fall for being the baby's father.

1:30PM  24         I mean, we even went to the extreme that, you

1:30PM  25  know, my mom, let her rest in peace, she was like, hey,

1:30PM  1   if this is your baby, cool.  If this is your baby, you

1:30PM  2   know, we gonna be involved and all this, it's cool.  All

1:30PM  3   right, then, I just need to know for myself.  Let's take

1:30PM  4   a DNA.

1:30PM  5        We all met up at the store, all except the baby

1:30PM  6   and Ms. Wilson.  Me, my mom, Birdie, and Jacob showed up

1:30PM  7   at the store out there in Midland, Texas.  And showed up,

1:30PM  8   said he'll agree to take this DNA test.  Cool.  My mom

1:30PM  9   went on and did it.  I took it.  He never showed up,

1:30PM  10  never heard nothing else ever again.

1:30PM  11       Q.   So he just didn't show up for this DNA test?

1:30PM  12       A.   Yes, sir.  He did not show up.

1:30PM  13       Q.   Did you ever see him acting inappropriately with

1:31PM  14  Tina Wilson?

1:31PM  15       A.   Oh, yeah.  Yeah.  Like -- like, it's crazy,

1:31PM  16  man.  It's crazy.  That's not how no father, no

1:31PM  17  stepfather or however you put it should be acting like

1:31PM  18  that inappropriate with no child.

1:31PM  19       Q.   Can you be as specific as you can, as possible?

1:31PM  20  Can you give details?

1:31PM  21       A.   Oh, yeah.  Like, for instance, like going to --

1:31PM  22  like, we have a mall like everybody else.  You have a

1:31PM  23  mall there.  You know what I'm saying?  Like, be like

1:31PM  24  this.  Birdie would be pushing the baby and he would be

1:31PM  25  like holding hands, like, you know, like boyfriend and

Direct Examination by Mr. Wharton

1:31PM    1   girlfriend at the time.  I'm like, huh-uh.  Man, I

1:31PM    2   ain't -- to see that, you know, to actually see it from

1:31PM    3   my own eyes, I was like -- because they already knew he

1:31PM    4   was already listening to our phone calls when we would be

1:32PM    5   talking on the phone.  He would pick up -- this is way

1:32PM    6   before cellphones.

1:32PM    7          He would pick up.  You could hear the other

1:32PM    8   phone in the other room.  He be sitting there listening

1:32PM    9   to me and Tina Wilson talking on the phone.  We know

1:32PM   10   that.  We know that.

1:32PM   11       Q.   Could you hear --

1:32PM   12       A.   Then coming in her room -- and going in there

1:32PM   13   in her room at like three, four, five -- not three, four,

1:32PM   14   but two or 3 o'clock in the morning, just to have a talk?

1:32PM   15   What?  You know.  Okay.  Okay.

1:32PM   16               THE COURT:  Now, sir, let me stop you.

1:32PM   17   How --

1:32PM   18               THE WITNESS:  Okay.

1:32PM   19               THE COURT:  Listen to me.  How did you

1:32PM   20   know he was coming in the room at 2 or 3 o'clock in the

1:32PM   21   morning?

1:32PM   22               THE WITNESS:  Because after -- you know,

1:32PM   23   coming in on that part, you know, that was -- like I

1:32PM   24   said, we would be on the phone talking.  You know, what

1:32PM   25   teens do, sit up on the phone and talk when we ain't

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 1:32PM | 1 | supposed to be talking and get off the phone. |
| 1:32PM | 2 | And I'd be like, what's wrong?  She was |
| 1:32PM | 3 | like, he came into the room and wants to have a talk.  I |
| 1:33PM | 4 | was like, a talk?  And this is probably like a little 45 |
| 1:33PM | 5 | minutes and then she would have to sneak back up on the |
| 1:33PM | 6 | phone and call me again. |
| 1:33PM | 7 | Then it would go to the fact like they |
| 1:33PM | 8 | would have people come up to ask me if I was the baby's |
| 1:33PM | 9 | father, just to like prove -- like just to say, yeah, |
| 1:33PM | 10 | yeah, he the one.  But I'm sorry, ma'am, Court -- |
| 1:33PM | 11 | THE COURT:  Let me ask you this.  What did |
| 1:33PM | 12 | the baby look like? |
| 1:33PM | 13 | THE WITNESS:  Man, just like Jacob Cannon, |
| 1:33PM | 14 | when it first came out.  I'm sorry, y'all.  I'm dark. |
| 1:33PM | 15 | Ms. Tina Wilson is dark.  Her mama is dark.  That baby -- |
| 1:33PM | 16 | if we came apart (sic) to have sex and that baby was from |
| 1:33PM | 17 | me, I'm sorry, that baby would be dark complected.  This |
| 1:33PM | 18 | baby is light skinned. |
| 1:33PM | 19 | I'm sorry.  It look just like Mr. Cannon. |
| 1:33PM | 20 | I'm sorry.  I'm sorry.  You don't need no court to prove |
| 1:33PM | 21 | that.  I'm sorry.  Hands down, you don't. |
| 1:33PM | 22 | Q.   (By Mr. Wharton)  And nothing personal, but how |
| 1:34PM | 23 | tall a man are you?  Just curious. |
| 1:34PM | 24 | A.   I'm 5'4".  Jacob is like -- he probably |
| 1:34PM | 25 | somewhere -- somewhere 5'6" -- about 5'9", 5'8". |

1:34PM  1           MR. MADUFORO:  Objection, Your Honor.

1:34PM  2           THE COURT:  Sir, he objected.  So wait for

1:34PM  3  another question.  You answered the question.  He asked

1:34PM  4  how tall you were.

1:34PM  5           THE WITNESS:  5'4".

1:34PM  6           THE COURT:  Let him ask another question.

1:34PM  7           THE WITNESS:  My bad.

1:34PM  8           MR. WHARTON:  That's okay.

1:34PM  9      Q.   (By Mr. Wharton)  How tall is Jacob Cannon,

1:34PM 10  approximately?

1:34PM 11      A.   Taller than me, sir.  Approximately, like I

1:34PM 12  said, like about 5 -- he look like from the range of

1:34PM 13  5'7", five up, stocky.

1:34PM 14      Q.   Significantly taller than you are, anyway.

1:34PM 15           Did he ever try to intimidate you?

1:34PM 16      A.   Oh, yeah, he did.  He did.  He tried to

1:34PM 17  intimidate me, you know, and saying -- once he seen my

1:35PM 18  mama had my back, he tried to back off.  You know what

1:35PM 19  I'm saying?  It wasn't like, sorry, you know.

1:35PM 20           I just had one of them mamas, like I said.  She

1:35PM 21  said, if this was my baby, we was going to be there.  I

1:35PM 22  was going to take care of it, be the man, the father or

1:35PM 23  whatever I needed to be to this child.

1:35PM 24           And he used to try to give me looks, stares,

1:35PM 25  you know what I'm saying, all of that kind of stuff.

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 1:35PM | 1 | That ain't do nothing. |
| 1:35PM | 2 | THE COURT: Okay. Thank you. |
| 1:35PM | 3 | Do you have any other questions, sir? |
| 1:35PM | 4 | Q. (By Mr. Wharton) Are there any other facts or |
| 1:35PM | 5 | details that highlight that Jacob -- that this happened, |
| 1:35PM | 6 | that Jacob Cannon molested Tina Wilson when she was a kid? |
| 1:35PM | 7 | Is there anything else I'm missing? |
| 1:35PM | 8 | A. If I'm not mistaken, man, see, like I say, you |
| 1:35PM | 9 | know, Ms. Wilson told me some stuff, you know. That like |
| 1:35PM | 10 | I guess like the brother used to stay there. She had a |
| 1:35PM | 11 | brother that stayed there. |
| 1:36PM | 12 | And like, I guess, he knew it or something. |
| 1:36PM | 13 | They had got into it and he had -- he pretty much he got |
| 1:36PM | 14 | kicked out. You know what I'm saying? So that's -- he |
| 1:36PM | 15 | would be the other one that would know -- that would know |
| 1:36PM | 16 | that was happening. I could just go off -- you know, |
| 1:36PM | 17 | that he say, you know, she say. But -- |
| 1:36PM | 18 | Q. I got you. |
| 1:36PM | 19 | A. I have seen this man act inappropriate toward |
| 1:36PM | 20 | her like no father -- like I said, no father, stepfather |
| 1:36PM | 21 | should not be acting. |
| 1:36PM | 22 | And then, I mean, come on, my mama used to say |
| 1:36PM | 23 | what's did in the dark come to the light. You have this |
| 1:36PM | 24 | child right here that looks just like you, man. And you |
| 1:36PM | 25 | trying to say that's me? I'm sorry. No. I'll take a |

1:36PM   1    DNA test right now if you want me to.  It'll come back

1:36PM   2    zero.

1:36PM   3         Q.   Yes, sir.

1:36PM   4              MR. WHARTON:  We'll pass the witness.

1:36PM   5              THE COURT:  Counselor?

1:36PM   6              MR. MADUFORO:  Just a few questions.

1:36PM   7              MR. WHARTON:  Just use the mic.  You have

1:36PM   8    to use the mic for the Zoom.

1:36PM   9                    CROSS-EXAMINATION

1:36PM  10    BY MR. MADUFORO:

1:37PM  11         Q.   Just a few questions, Mr. Roderick.  Can you

1:37PM  12    hear me okay?

1:37PM  13              MR. WHARTON:  You have to speak into the

1:37PM  14    mic.

1:37PM  15         Q.   (By Mr. Maduforo)  Just a few questions for you,

1:37PM  16    Mr. Roderick.

1:37PM  17         A.   Okay.

1:37PM  18         Q.   All right.  So you just testified that Mr. Jacob

1:37PM  19    bought you some things and gave you money so that you will

1:37PM  20    keep quiet about being the father of Jaquita?

1:37PM  21              THE COURT:  That's not what he said.

1:37PM  22    Rephrase the question.

1:37PM  23         Q.   (By Mr. Maduforo)  Okay.  I'm sorry.  I'll

1:37PM  24    rephrase the question.

1:37PM  25              So how did Mr. Jacob convince you about not --

1:37PM   1   about being the father of Jaquita when you said you were

1:37PM   2   not?

1:37PM   3               THE COURT:  Rephrase -- he didn't say that

1:37PM   4   either.

1:37PM   5               THE WITNESS:  How can I -- ma'am -- ma'am,

1:38PM   6   I can answer it.  If you want to know how, he came and he

1:38PM   7   talked to me, out of his own mouth, the horse's mouth

1:38PM   8   that he said it.

1:38PM   9       Q.  (By Mr. Maduforo)  Okay.

1:38PM   10       A.  If you don't understand that, I don't know what

1:38PM   11   else to tell you.

1:38PM   12       Q.  Okay.  And you agreed?

1:38PM   13       A.  Yeah.  You know what I'm saying?  I don't know,

1:38PM   14   I was young.  I was a young teenager.  You know what I'm

1:38PM   15   saying?  Anything that -- I was just trying to stay close

1:38PM   16   to the chick.  You know what I'm saying?  Because we had

1:38PM   17   a relationship outside of what he was doing.

1:38PM   18       Q.  Okay.  And you mentioned you told your mom.  Did

1:38PM   19   you tell any of your friends what was going on at that

1:38PM   20   point?

1:38PM   21       A.  Man, I didn't even have to tell no friends or

1:38PM   22   no parents or nobody.  You know what I'm saying?  At that

1:38PM   23   point, I mean, it's like I said, there it is.  You have

1:38PM   24   this little girl.  You have this little girl.  What else

1:39PM   25   you need to know, man?  You have this little girl right

| | | |
|---|---|---|
| 1:39PM | 1 | there.  That's -- |
| 1:39PM | 2 | THE COURT:  Okay, I'm sorry. |
| 1:39PM | 3 | THE WITNESS:  That's enough in itself. |
| 1:39PM | 4 | THE COURT:  Mr. Jones, I need you to stop |
| 1:39PM | 5 | because I'm totally not clear now. |
| 1:39PM | 6 | Can you clarify?  Are you saying that you |
| 1:39PM | 7 | told people you were the father? |
| 1:39PM | 8 | THE WITNESS:  Did I tell people I was the |
| 1:39PM | 9 | father? |
| 1:39PM | 10 | THE COURT:  Yes. |
| 1:39PM | 11 | THE WITNESS:  At the time, yeah.  Yes. |
| 1:39PM | 12 | That's when the DNA came in.  When my mama said, okay, if |
| 1:39PM | 13 | this is your child, then we'll -- then let's see a DNA |
| 1:39PM | 14 | test.  When I took the DNA test, Mr. Jacob never showed |
| 1:39PM | 15 | up, so therefore I could not claim no baby. |
| 1:39PM | 16 | Q.   (By Mr. Maduforo)  You took a DNA test and the |
| 1:39PM | 17 | DNA test returned negative that you are not the father of |
| 1:39PM | 18 | Jaquita.  Is that what you are telling the Court? |
| 1:39PM | 19 | A.   I'm telling the Court that he didn't never show |
| 1:39PM | 20 | up to take the DNA test.  They took my sample of blood. |
| 1:40PM | 21 | He kept giving some all kind of excuses or something. |
| 1:40PM | 22 | Oh, well, I did my part. |
| 1:40PM | 23 | Q.   And what was the results? |
| 1:40PM | 24 | A.   How you going to get results if you ain't got |
| 1:40PM | 25 | the other person's DNA to check it? |

1:40PM 1    Q.   So we are assuming that you do not know what the

1:40PM 2    result is?

1:40PM 3    A.   Whatever.  Yeah.  The child is not mine.  Like

1:40PM 4    I said, if you didn't understand me clearly, I took the

1:40PM 5    DNA test.  Whatever they did after that, he was supposed

1:40PM 6    to be present and the baby was supposed to be present at

1:40PM 7    the same time and it wasn't.

1:40PM 8    Q.   That's fine.  We'll leave that part alone.

1:40PM 9         I have one last question for you.  You were

1:41PM 10   apparently speaking to Ms. Tina Wilson when you guys were

1:41PM 11   dating as Tina has said, to the point of talking to her

1:41PM 12   in your own words or testimony sometime 2 a.m. to 3 a.m.

1:41PM 13   in the morning; is that correct?

1:41PM 14   A.   That we would talk?  Yeah, we would talk summer

1:41PM 15   time.  We talk on the phone at all times of the night.

1:41PM 16   Daytime too.

1:41PM 17   Q.   Okay.  Within any of those times, did you hear

1:41PM 18   or heard Ms. Tina Wilson crying for help that Mr. Jacob

1:41PM 19   Cannon was at that point talking to her inappropriately or

1:41PM 20   physically abusing her or sexually assaulting her?

1:41PM 21   A.   No, man.  Didn't nobody hear that.  He hung up

1:41PM 22   the phone.  We was off the phone at that time.  Any other

1:42PM 23   time when we talked, it was about us, our relationship.

1:42PM 24   Q.   Okay.  So have you witnessed Jacob Cannon

1:42PM 25   sexually assaulting Ms. Tina Wilson?

1:42PM  1        A.   If you want to consider what I told the Court

1:42PM  2   earlier, seeing a father --

1:42PM  3                MR. MADUFORO:  Objection, Your Honor,

1:42PM  4   nonresponsive.

1:42PM  5                MR. WHARTON:  I want to object --

1:42PM  6                THE COURT:  Overruled.  You can answer it.

1:42PM  7   Go ahead and answer it.

1:42PM  8                THE WITNESS:  Okay.  Like I said before I

1:42PM  9   was interrupted, no father, stepfather, boyfriend or

1:42PM  10  however you put it to be up inappropriate with a child

1:42PM  11  like that.  Hugging all close like boyfriend and

1:42PM  12  girlfriend?  No, man.  And even kissing?  Come on, man.

1:42PM  13  Come on.

1:42PM  14                What's the next question, sir?

1:43PM  15                MR. MADUFORO:  I pass the witness, Your

1:43PM  16  Honor.

1:43PM  17                REDIRECT EXAMINATION

1:43PM  18  BY MR. WHARTON:

1:43PM  19       Q.   Sir, did you see kissing?

1:43PM  20       A.   Yeah, even though this dude, he used to try to

1:43PM  21  have this vehicle that tried to have the tinted windows,

1:43PM  22  but it wasn't like tint because you could see at the

1:43PM  23  front.  You know what I'm saying?  You could see -- I

1:43PM  24  don't even kiss my kids mouth to mouth.  I don't even let

1:43PM  25  them kiss me mouth to mouth.  That's sickening, man.  I'm

| | | |
|---|---|---|
| 1:43PM | 1 | just sick.  I really am. |
| 1:43PM | 2 | MR. WHARTON:  All right.  Nothing further. |
| 1:43PM | 3 | THE COURT:  Okay.  Is he free to go? |
| 1:43PM | 4 | MR. MADUFORO:  Yes, Your Honor. |
| 1:43PM | 5 | THE COURT:  Okay.  Mr. Jones, thank you |
| 1:43PM | 6 | for coming.  You are free to go. |
| 1:43PM | 7 | THE WITNESS:  Thank you. |
| 1:43PM | 8 | THE COURT:  Any argument?  You have five |
| 1:43PM | 9 | minutes. |
| 1:43PM | 10 | MR. WHARTON:  If by agreement we can do it |
| 1:44PM | 11 | by writing, I would agree to that. |
| 1:44PM | 12 | MR. MADUFORO:  Your Honor, yes, we can -- |
| 1:44PM | 13 | I agree to that. |
| 1:44PM | 14 | THE COURT:  What, you are going to submit |
| 1:44PM | 15 | your arguments in writing? |
| 1:44PM | 16 | MR. WHARTON:  Yes, I believe, Your Honor, |
| 1:44PM | 17 | I would prefer that. |
| 1:44PM | 18 | THE COURT:  Okay.  All right.  I'm going |
| 1:44PM | 19 | to be out of town next week so I'm not going to be |
| 1:44PM | 20 | available until after that.  So what is your deadline to |
| 1:44PM | 21 | get me your stuff? |
| 1:44PM | 22 | MR. WHARTON:  I am actually out of town |
| 1:44PM | 23 | myself starting tonight.  But end of next week?  Would |
| 1:44PM | 24 | that be okay? |
| 1:44PM | 25 | THE COURT:  That's fine. |

| | | |
|---|---|---|
| 1:44PM | 1 | Do we have exhibits 1, 2, 3, and 4? |
| 1:44PM | 2 | MR. MADUFORO:  Yes, Your Honor. |
| 1:44PM | 3 | MR. WHARTON:  There's just one other thing |
| 1:44PM | 4 | we've got, which is a rebuttal photo of Jaquita Cannon. |
| 1:44PM | 5 | THE COURT:  Can I see it now, and then you |
| 1:44PM | 6 | can text it to me -- or you can mail it to -- you can |
| 1:44PM | 7 | e-file it to the court.  You can just put it on the Elmo. |
| 1:45PM | 8 | It's coming up. |
| 1:45PM | 9 | All right.  And you can just produce that. |
| 1:45PM | 10 | You can give it to the court reporter.  That will be |
| 1:45PM | 11 | Exhibit 5? |
| 1:45PM | 12 | MR. MADUFORO:  Yes, Your Honor.  No |
| 1:45PM | 13 | objection. |
| 1:45PM | 14 | THE COURT:  We'll stand in recess.  Thank |
| 1:45PM | 15 | you. |
| 1:45PM | 16 | MR. MADUFORO:  Thank you, Judge. |
| 1:45PM | 17 | THE COURT:  If you-all can include in your |
| 1:45PM | 18 | arguments, if the Court rules on either side's favor, |
| 1:45PM | 19 | whatever the financial judgment should be, the requested |
| 1:45PM | 20 | relief financially. |
| 1:45PM | 21 | MR. MADUFORO:  Okay. |
| 1:45PM | 22 | THE COURT:  If I rule that way, I need to |
| 1:45PM | 23 | know.  I don't even have an idea what we're asking for |
| 1:45PM | 24 | here. |
| 1:45PM | 25 | MR. WHARTON:  Yes, Your Honor. |

| | | |
|---|---|---|
| 1:45PM | 1 | (Proceedings concluded.) |
| 1:45PM | 2 | -o-0-o- |
| 1:45PM | 3 | |
| | 4 | |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

112

```
 1   STATE OF TEXAS              &

 2   COUNTY OF DALLAS            &

 3        I, Vearneas W. Faggett, Official Court Reporter in

 4   and for County Court at Law No. 4 of Dallas County, State

 5   of Texas, do hereby certify that the above and foregoing

 6   contains a true and correct transcription of all portions

 7   of evidence and other proceedings requested in writing by

 8   counsel for the parties to be included in this volume of

 9   the Reporter's Record in the above-styled and numbered

10   cause, all of which occurred in open court or in chambers

11   and were reported by me.

12        I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if

14   any, offered by the respective parties.

15        I further certify that the total cost for the

16   original preparation of this Reporter's Record has been

17   be paid for by Defendant, Mr. Jacob Cannon.

18        WITNESS MY OFFICIAL HAND this the 3rd day of

19   January, A.D., 2024.

20                    VEARNEAS W. FAGGETT, CSR# 3129
                      Official Court Reporter
21                    County Court at Law No. 4
                      George Allen Courts Building
22                    600 Commerce Street
                      Dallas, Tx  75202
23                    Telephone:  214.653.7468
                      Expiration:  01/31/2024
24                    vearneas.faggett@dallascounty.org
                      vwfreporting@gmail.com
25
```

1:45PM

118

```
1:45PM  1
1:45PM  2          D I S C L O S U R E
1:45PM  3    Note:  Supreme Court Rule Adopted and Promulgated in
1:45PM  4           Conformity with Chapter 52 of the Government
1:45PM  5           Code, V.T.C.A.
1:45PM  6
1:45PM  7          Please be advised that pursuant to Supreme Court
1:45PM  8    Rule IV, B.5., with regards to disclosure, I, to the best
1:45PM  9    of my knowledge, have no existing or past financial,
1:45PM  10   business, professional, family or social relationships
1:45PM  11   with any of the parties or their attorneys which might
1:45PM  12   reasonably create an appearance of partiality, except as
1:45PM  13   follows:  NONE.
1:45PM  14
1:45PM  15
1:45PM  16
1:45PM  17                     _____
1:45PM  18                     VEARNEAS W. FAGGETT, CSR #3129
1:45PM  19                     Expiration:  01/31/24
1:45PM  20                     County Court at Law No. 4
                              George Allen Courts Building
                              600 Commerce Street
                              Dallas, Tx 75202
1:45PM  21
1:45PM  22
1:45PM  23
1:45PM  24
1:45PM  25
```

113

1

2

3

4                     Plaintiff's Exhibit No. 1

5                Deposition of Jacob Cannon, Jr.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jacob Cannon                                        April 04, 2022

```
 1                   CAUSE NO. CC-21-02654-D

 2     TINA WILSON                 )  IN THE COUNTY COURT
                                   )
 3     vs.                         )  AT LAW NO. 4
                                   )
 4     JACOB CANNON                )  DALLAS COUNTY, TEXAS

 5

 6     ************************************************************

 7               ORAL AND VIDEOTAPED DEPOSITION OF

 8                       JACOB CANNON, JR.

 9                         APRIL 4, 2022

10     ************************************************************

11          ORAL AND VIDEOTAPED DEPOSITION OF JACOB CANNON,

12     JR., produced as a witness at the instance of the

13     Plaintiff, and duly sworn, was taken in the above-styled

14     and numbered cause on the 4th day of April, 2022, from

15     10:08 a.m. to 10:29 a.m., before Julie C. Brandt, RMR,

16     CRR, and CSR in and for the State of Texas, reported by

17     machine shorthand at 420 Throckmorton Street, Suite 200,

18     Fort Worth, Texas, pursuant to the Texas Rules of Civil

19     Procedure and any provisions stated on the record or

20     attached hereto.

21

22

23

24

25
```





PLAINTIFF'S
EXHIBIT

121

Jacob Cannon

April 04, 2022
Pages 2 to 5

Page 2

1                 APPEARANCES
2
3  FOR THE PLAINTIFF:
4     Jonathan Wharton
5     BRAD THOMAS LAW OFFICE, PLLC
6     P.O. Box 472027
7     Fort Worth, Texas 76147
8     jon@bradthomaslawoffice.com
9
10  FOR THE DEFENDANT:
11     Shawn C. Laney
12     UDESHI LAW FIRM
13     2201 Main Street, Suite 1250
14     Dallas, Texas 75201
15     shawn@udeshilawfirm.com
16
17  COURT REPORTER:
18     Julie C. Brandt, TX CSR, RMR, CRR
19     Magna Legal Solutions
20
21  VIDEOGRAPHER:
22     Jeremy Rovny
23     Magna Legal Solutions
24
25

Page 3

1                 INDEX
2                          PAGE
3  Appearances....................................  2
4  Proceedings....................................  4
5
6  JACOB CANNON, JR.
7     Examination by Mr. Wharton................  4
8
9  Signature and Changes..........................  14
10  Reporter's Certificate.........................  16
11
12
13            (No exhibits.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              P R O C E E D I N G S
2           THE VIDEOGRAPHER: We are now on record
3  for the video deposition of Jacob Cannon on April 4,
4  2022, at 10:08 a.m.
5           Would counsel state your appearances for the
6  record.
7           MR. WHARTON: Jonathan Wharton for the
8  plaintiff.
9           MR. LANEY: Shawn Laney for defendant.
10          THE VIDEOGRAPHER: And would the court
11  reporter please swear in the witness.
12              JACOB CANNON, JR.
13  having been first duly sworn, testified as follows:
14              EXAMINATION
15  BY MR. WHARTON:
16     Q.  Can you state your name for the record,
17  please?
18     A.  Jacob Cannon, Jr.
19     Q.  Okay.  So who is Jacquetta Cannon's father?
20     A.  I take the Fifth on that one.
21     Q.  Okay.  Have you ever had sex with a minor?
22     A.  I take the Fifth on that one.
23     Q.  Have you ever had sex with Tina Wilson?
24     A.  I take the Fifth on that one.
25     Q.  Have you ever been involved with Tina Wilson

Page 5

1  having an abortion?
2     A.  I take the Fifth on that one.
3     Q.  Do you know who Roderick Jones is?
4     A.  Roderick Jones.  I've heard of that name
5  before.  But I don't know who he is.  I don't know
6  anything.
7     Q.  Did Tina Wilson ever have boyfriends when she
8  was a child, when she was under 18?
9     A.  Yes, she did.
10    Q.  Who was her boyfriend?
11    A.  I could not tell you.
12    Q.  All right.  How many boyfriends did she have?
13    A.  I could not tell you.
14    Q.  Did she ever have sex with her boyfriends?
15    A.  I could not tell you.
16    Q.  Have you ever taken a DNA test related to
17  Jacquetta Cannon?
18    A.  No, I haven't.
19    Q.  Do you know if Jacquetta Cannon has ever taken
20  a DNA test?
21    A.  No, I don't.
22    Q.  Who is Jacquetta Cannon's father?
23    A.  I take the Fifth on that.  I don't know.
24    Q.  All right.  How old is Jacquetta?
25    A.  Jacquetta?  Right off the top of my head, I



Jacob Cannon                                                     April 04, 2022
                                                                Pages 6 to 9

Page 6

1  couldn't tell you. I couldn't tell you.
2      Q.  Now you received a letter from me about this,
3  right, before it was filed?
4      A.  Right.
5      Q.  And Jacquetta called me. Are you familiar
6  with that?
7      A.  No.
8      Q.  You didn't know that?
9      A.  Not that I -- she called you?
10     Q.  That's right. She called me.
11     A.  I don't know anything about that.
12     Q.  So the letter that went to you, you did
13  receive it. Right?
14     A.  I received it.
15     Q.  Okay. And then did you give that letter to
16  Jacquetta?
17     A.  Unless -- I can't recall. I'm like -- I don't
18  know.
19     Q.  Okay. Jacquetta called me and said that Tina
20  had been hiring a series of fake lawyers or been
21  pretending to hire lawyers before. Is that something
22  you're familiar with?
23     A.  No, not familiar with none of that.
24     Q.  Okay. So is this the first letter you've
25  received that at least appears to be from a lawyer

Page 7

1  related to Tina Wilson?
2      A.  When I -- that -- when I got it, that was it.
3  I mean, that was it. That's all I know.
4      Q.  That was the first time you've ever received a
5  letter that appeared to be from a lawyer related to Tina
6  Wilson. Is that right?
7      A.  Right.
8      Q.  Okay. Jacquetta on that phone call claimed
9  that had been happening. Do you have any idea why?
10  That you had been receiving fake letters from lawyers?
11     A.  I'm not -- I couldn't tell you. I couldn't
12  tell you nothing about that.
13     Q.  Have you ever been involved in a CPS case
14  involving Tina Wilson?
15     A.  No.
16     Q.  Did CPS ever --
17     A.  CPS. CPS. State what you mean by "CPS."
18     Q.  Child -- Children's Protective Services. It's
19  a state agency.
20     A.  It's been so long. I don't know. I couldn't
21  tell you.
22     Q.  Okay. Were you -- do you know whether Tina
23  Wilson has ever been involved in a CPS case?
24     A.  Wow, that question would be for somebody else.
25  I wouldn't know. I don't know.

Page 8

1      Q.  Do you --
2      A.  It's been so long. I mean --
3      Q.  So, obviously, you've hired -- there are two
4  different law firms that you had hired in this case.
5  Before this case, what attorneys have you ever -- have
6  ever represented you?
7      A.  In this case right here?
8      Q.  Not in this case. So, obviously, you have two
9  law firms in this case. Before this case -- before this
10  case, what attorneys --
11     A.  No, I haven't. No, no.
12     Q.  None?
13     A.  Pertaining to this case?
14     Q.  No, not pertaining to this case. So before
15  this case, so --
16     A.  Oh, yeah. Yeah, it's a long time ago. I
17  mean, you know, it's --
18         Is it pertaining to this case or some other
19  case or what?
20     Q.  Not pertaining -- not pertaining to this case
21  where I'm representing Tina.
22     A.  Right.
23     Q.  Before this case, so before this case, not
24  related to this case. Other than this case, where
25  you've had two law firms in this case -- other than this

Page 9

1  case, what attorneys have represented you?
2      A.  In Midland, Texas, I had one.
3      Q.  Okay. And who was that?
4      A.  I would have to look it up. It's been a
5  while. It's been a while.
6      Q.  All right. What kind of attorney is that?
7      A.  It's a child support case.
8      Q.  Okay. Any other attorneys that have
9  represented you?
10     A.  Not that I can think of.
11     Q.  All right. And so that case was for child
12  support for what child?
13     A.  My three boys.
14     Q.  All right. Have you ever kissed Tina Wilson
15  on the mouth?
16     A.  I'll take the Fifth on that one.
17     Q.  All right. Have you ever had any other kind
18  of sexual relationship with Tina Wilson?
19     A.  I'll take the Fifth on that one.
20     Q.  All right. Has Tina Wilson, has she ever had
21  an abortion that you know of?
22         MR. LANEY: Objection to form.
23     Q.  (BY MR. WHARTON) And you can answer.
24     A.  You say -- you said I can answer?
25     Q.  Yeah. So when he -- when he objects, when he



Jacob Cannon

April 04, 2022
Pages 10 to 13

Page 10

1  objects to form, you can answer. If he doesn't want you
2  to answer a question, he will tell you not to answer the
3  question.
4      A.  I couldn't -- I don't know nothing about all
5  that. That's -- that's -- I wouldn't know anything
6  about all that. I take the Fifth on that. I don't know
7  anything about that.
8      Q.  Who took -- well,.yeah. Who took Tina Wilson
9  to get her abortions?
10     A.  I take the Fifth on that.
11     Q.  Has Tina Wilson ever gone by any kind of
12  alias?
13     A.  Alias?
14     Q.  Yeah. Like an alternate name.
15     A.  Alias what?
16     Q.  Has she ever used a fake name?
17     A.  I'll take the Fifth on that. I don't know.
18     Q.  Did she ever get abortions using a fake name
19  as a child?
20     A.  I'll take the Fifth on that. I don't know
21  nothing about that.
22     Q.  Did -- have you ever talked to Tina Wilson
23  about the accusations that are involved in this case?
24     A.  No, I haven't talked to Tina about nothing
25  like this.

Page 11

1      Q.  What witnesses do you intend to have for this
2  case?
3      A.  I'll take -- I'll take -- I don't know.
4      Q.  All right. What evidence do you intend to use
5  to defend yourself in this case?
6      A.  I'll take the Fifth.
7      Q.  When did you first meet Tina Wilson?
8      A.  I couldn't tell you. I really couldn't.
9      Q.  How old was she?
10     A.  I could not tell you.
11     Q.  Would you be willing to take a DNA test for
12  Jacquetta?
13     A.  I'll take the Fifth on that one.
14     Q.  Have you ever emailed with Tina Wilson? Have
15  you ever exchanged emails with her?
16     A.  Not that I recall.
17     Q.  When was the last time you text messaged with
18  her?
19     A.  The dates or whatever, I couldn't tell you.
20     Q.  Can you give me a year, a ballpark?
21     A.  Maybe a year and a half.
22     Q.  And what were those texts about?
23     A.  Picking up her kid from school.
24     Q.  Which kid?
25     A.  Iseland. Because she would text message me

Page 12

1  all the time about doing that.
2      Q.  How many times did Tina Wilson have sex when
3  she was a child, when she was under 18?
4      A.  I couldn't tell you nothing about that.
5      Q.  Are you pleading the Fifth or saying you don't
6  know?
7      A.  I'm pleading the Fifth.
8      Q.  When did --
9          (Cell phone ringing.)
10         THE WITNESS: Sorry about that. I'll cut
11  that off.
12         MR. WHARTON: You might want to just
13  press the red button to hang up that one.
14         THE WITNESS: No, I got it. Oh, okay.
15  Thank you.
16     Q.  (BY MR. WHARTON) At what age did Tina Wilson
17  first have sex?
18     A.  I couldn't tell.
19     Q.  You couldn't tell me or you're pleading the
20  Fifth?
21     A.  I plead the Fifth.
22     Q.  At what age did Tina Wilson first become
23  pregnant?
24     A.  I couldn't tell you. I plead the Fifth.
25     Q.  How many times did Tina Wilson get pregnant as

Page 13

1  a child?
2      A.  I couldn't tell you. I plead the Fifth.
3          MR. WHARTON: Let's take a short break.
4          THE VIDEOGRAPHER: Okay. We're going off
5  the record. The time is 10:23 a.m.
6          (Break from 10:23 a.m. to 10:28 a.m.)
7          THE VIDEOGRAPHER: We are back on the
8  record. The time is 10:28 a.m.
9      Q.  (BY MR. WHARTON) Sir, were you ever
10  investigated by CPS?
11     A.  It's been so long. I don't know. I take the
12  Fifth on that one.
13     Q.  Do you remember the name of the lawyer that
14  you had in Midland?
15     A.  I couldn't tell you. It's been so long.
16     Q.  Have you ever talked to the police about Tina
17  Wilson?
18     A.  Not that I know of. I take the Fifth.
19         MR. WHARTON: All right. I will pass the
20  witness.
21         MR. LANEY: No questions.
22         THE VIDEOGRAPHER: Okay. We're going off
23  the record. The time is 10:29 a.m.
24         (Proceedings ended at 10:29 a.m.)
25



Jacob Cannon

April 04, 2022
Pages 14 to 17

### Page 14

```
1              CHANGES AND SIGNATURE
2    WITNESS NAME:  JACOB CANNON, JR.
3    DATE OF DEPOSITION:  APRIL 4, 2022
4    PAGE   LINE    CHANGE        REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

### Page 15

```
1         I, JACOB CANNON, JR., have read the foregoing
     deposition and hereby affix my signature that same is
2    true and correct, except as noted above.
3
4
5                   JACOB CANNON, JR.
6
7    THE STATE OF _____)
     COUNTY OF _____)
8
          Before me, _____, on
9    this day personally appeared JACOB CANNON, JR., known to
     me (or proved to me under oath or through
10   _____) (description of identity
     card or other document) to be the person whose name is
11   subscribed to the foregoing instrument and acknowledged
     to me that they executed the same for the purposes and
12   consideration therein expressed.
          Given under my hand and seal of office this
13   _____ day of _____, _____.
14
15
16                   NOTARY PUBLIC IN AND FOR
                     THE STATE OF _____
17                   COMMISSION EXPIRES: _____
18
19
20
21
22
23
24
25
```

### Page 16

```
1                 CAUSE NO. CC-21-02654-D
2    TINA WILSON             )  IN THE COUNTY COURT
                             )
3    vs.                     )  AT LAW NO. 4
                             )
4    JACOB CANNON            )  DALLAS COUNTY, TEXAS
5
6
7
8              REPORTER'S CERTIFICATION
9        VIDEOTAPED DEPOSITION OF JACOB CANNON, JR.
10                    APRIL 4, 2022
11
12
13        I, Julie C. Brandt, Certified Shorthand Reporter in
14   and for the State of Texas, hereby certify to the
15   following:
16        That the witness, JACOB CANNON, JR., was duly sworn
17   by the court reporter and that the transcript of the
18   oral deposition is a true record of the testimony given
19   by the witness;
20        That the deposition transcript was submitted on
21   _____ to the witness or the attorney for
22   the witness for examination, signature and return to me
23   by _____;
24        That the amount of time used by each party at the
25   deposition is as follows:
```

### Page 17

```
1    Jonathan Wharton.....00 HOURS:16 MINUTE(S)
2    Shawn C. Laney.....00 HOURS:00 MINUTE(S)
3        That pursuant to information given to the
4    deposition officer at the time said testimony was taken,
5    the following includes counsel for all parties of
6    record:
7    FOR THE PLAINTIFF:
8        Jonathan Wharton
9        BRAD THOMAS LAW OFFICE, PLLC
10       P.O. Box 472027
11       Fort Worth, Texas 76147
12       jon@bradthomaslawoffice.com
13   FOR THE DEFENDANT:
14       Shawn C. Laney
15       UDESHI LAW FIRM
16       2201 Main Street, Suite 1250
17       Dallas, Texas 75201
18       shawn@udeshilawfirm.com
19       I further certify that I am neither counsel for,
20   related to, nor employed by any of the parties or
21   attorneys in the action in which this proceeding was
22   taken, and further that I am not financially or
23   otherwise interested in the outcome of the action.
24       Further certification requirements pursuant to Rule
25   203 of TRCP will be certified to after they have
```



Jacob Cannon

April 04, 2022
Pages 18 to 19

**Page 18**

```
 1   occurred.
 2        Certified to by me _____, 2022.
 3
 4            Julie C. Brandt
 5            _____
 6            Julie C. Brandt, RMR, CRR, CSR
             Texas CSR No. 4018
             Expiration Date: 10/31/23
 7
 8            MAGNA LEGAL SERVICES
             Firm Registration No. 633
 9            1635 Market Street
             8th Floor
             Philadelphia, PA 19103
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 19**

```
 1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2        The original deposition was/was not returned to the
 3   deposition officer on _____;
 4        If returned, the attached Changes and Signature
 5   page contains any changes and the reasons therefor;
 6        If returned, the original deposition was delivered
 7   to Jonathan Wharton, Custodial Attorney;
 8        That $_____ is the deposition officer's
 9   charges to the Plaintiff for preparing the original
10   deposition transcript and any copies of exhibits;
11        That the deposition was delivered in accordance
12   with Rule 203.3, and that a copy of this certificate was
13   served on all parties shown herein on and filed with the
14   Clerk.
15        Certified to by me this _____ day of
16   _____, 2022.
17
18
19        _____
             Julie C. Brandt, RMR, CRR, CSR
20            Texas CSR No. 4018
             Expiration Date: 10/31/23
21
             MAGNA LEGAL SERVICES
22            Firm Registration No. 633
             1635 Market Street
23            8th Floor
             Philadelphia, PA 19103
24
25
```



Jacob Cannon

April 04, 2022
Index: 10:08..hang

## 1

**10:08** 4:4
**10:23** 13:5,6
**10:28** 13:6,8
**10:29** 13:23,24
**1250** 2:13
**14** 3:9
**16** 3:10
**18** 5:8 12:3

## 2

**2** 3:3
**2022** 4:4
**2201** 2:13

## 4

**4** 3:4,7 4:3
**472027** 2:6

## 7

**75201** 2:14
**76147** 2:7

## A

**a.m.** 4:4 13:5,6,8,23,24
**abortion** 5:1 9:21
**abortions** 10:9,18
**accusations** 10:23
**age** 12:16,22
**agency** 7:19
**alias** 10:12,13,15
**alternate** 10:14
**appearances** 2:1 3:3 4:5
**appeared** 7:5

**appears** 6:25
**April** 4:3
**attorney** 9:6
**attorneys** 8:5,10 9:1,8

## B

**back** 13:7
**ballpark** 11:20
**Box** 2:6
**boyfriend** 5:10
**boyfriends** 5:7,12,14
**boys** 9:13
**BRAD** 2:5
**Brandt** 2:18
**break** 13:3,6
**button** 12:13

## C

**call** 7:8
**called** 6:5,9,10,19
**Cannon** 3:6 4:3,12,18 5:17,19
**Cannon's** 4:19 5:22
**case** 7:13,23 8:4,5,7,8,9,10,13,14,
  15,18,19,20,23,24,25 9:1,7,11 10:23
  11:2,5
**cell** 12:9
**Certificate** 3:10
**child** 5:8 7:18 9:7,11,12 10:19 12:3
  13:1
**Children's** 7:18
**claimed** 7:8
**counsel** 4:5
**court** 2:17 4:10
**CPS** 7:13,16,17,23 13:10
**CRR** 2:18
**CSR** 2:18
**cut** 12:10

## D

**Dallas** 2:14
**dates** 11:19
**defend** 11:5
**defendant** 2:10 4:9
**deposition** 4:3
**DNA** 5:16,20 11:11
**duly** 4:13

## E

**emailed** 11:14
**emails** 11:15
**ended** 13:24
**evidence** 11:4
**Examination** 3:7 4:14
**exchanged** 11:15
**exhibits** 3:13

## F

**fake** 6:20 7:10 10:16,18
**familiar** 6:5,22,23
**father** 4:19 5:22
**filed** 6:3
**FIRM** 2:12
**firms** 8:4,9,25
**form** 9:22 10:1
**Fort** 2:7

## G

**give** 6:15 11:20

## H

**half** 11:21
**hang** 12:13



Jacob Cannon

happening 7:9

head 5:25

heard 5:4

hire 6:21

hired 8:3,4

hiring 6:20

---

**I**

idea 7:9

INDEX 3:1

intend 11:1,4

investigated 13:10

involved 4:25 7:13,23 10:23

involving 7:14

Iseland 11:25

---

**J**

Jacob 3:6 4:3,12,18

Jacquetta 4:19 5:17,19,22,24,25 6:5,16,19 7:8 11:12

Jeremy 2:22

jon@bradthomaslawoffice.com 2:8

Jonathan 2:4 4:7

Jones 5:3,4

Jr 3:6 4:12,18

Julie 2:18

---

**K**

kid 11:23,24

kind 9:6,17 10:11

kissed 9:14

---

**L**

Laney 2:11 4:9 9:22 13:21

law 2:5,12 8:4,9,25

lawyer 6:25 7:5 13:13

lawyers 6:20,21 7:10

Legal 2:19,23

letter 6:2,12,15,24 7:5

letters 7:10

long 7:20 8:2,16 13:11,15

---

**M**

Magna 2:19,23

Main 2:13

meet 11:7

message 11:25

messaged 11:17

Midland 9:2 13:14

minor 4:21

mouth 9:15

---

**O**

Objection 9:22

objects 9:25 10:1

OFFICE 2:5

---

**P**

P.O. 2:6

pass 13:19

pertaining 8:13,14,18,20

phone 7:8 12:9

Picking 11:23

plaintiff 2:3 4:8

plead 12:21,24 13:2

pleading 12:5,7,19

PLLC 2:5

police 13:16

pregnant 12:23,25

press 12:13

pretending 6:21

proceedings 3:4 13:24

Protective 7:18

---

**Q**

question 7:24 10:2,3

questions 13:21

---

**R**

recall 6:17 11:16

receive 6:13

received 6:2,14,25 7:4

receiving 7:10

record 4:2,6,16 13:5,8,23

red 12:13

related 5:16 7:1,5 8:24

relationship 9:18

remember 13:13

reporter 2:17 4:11

Reporter's 3:10

represented 8:6 9:1,9

representing 8:21

ringing 12:9

RMR 2:18

Roderick 5:3,4

Rovny 2:22

---

**S**

school 11:23

series 6:20

Services 7:18

sex 4:21,23 5:14 12:2,17

sexual 9:18

Shawn 2:11 4:9

shawn@udeshilawfirm.com 2:15

short 13:3



Jacob Cannon

**Signature** 3:9

**Sir** 13:9

**Solutions** 2:19,23

**state** 4:5,16 7:17,19

**Street** 2:13

**Suite** 2:13

**support** 9:7,12

**swear** 4:11

**sworn** 4:13

---
**T**

**talked** 10:22,24 13:16

**test** 5:16,20 11:11

**testified** 4:13

**Texas** 2:7,14 9:2

**text** 11:17,25

**texts** 11:22

**THOMAS** 2:5

**time** 7:4 8:16 11:17 12:1 13:5,8,23

**times** 12:2,25

**Tina** 4:23,25 5:7 6:19 7:1,5,14,22 8:21 9:14,18,20 10:8,11,22,24 11:7,14 12:2,16,22,25 13:16

**top** 5:25

**TX** 2:18

---
**U**

**UDESHI** 2:12

---
**V**

**video** 4:3

---
**W**

**Wharton** 2:4 3:7 4:7,15 9:23 12:12,16 13:3,9,19

**Wilson** 4:23,25 5:7 7:1,6,14,23 9:14,18,20 10:8,11,22 11:7,14 12:2,16,

**22,25** 13:17

**witnesses** 11:1

**Worth** 2:7

**Wow** 7:24

---
**Y**

**year** 11:20,21



| 1:45PM | 1 | |
| 1:45PM | 2 | Plaintiff's Exhibit No. 2 |
| 1:45PM | 3 | |
| 1:45PM | 4 | Deposition of Sharon Jackson George |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1

CAUSE NO. CC-21-02654-D

TINA WILSON                    ) COUNTY COURT AT LAW NO. 4
                              )
                              )
                              )
VS.                           ) IN AND FOR
                              )
                              )
JACOB CANNON                  ) DALLAS COUNTY, TEXAS


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

SHARON JACKSON-GEORGE

OCTOBER 18, 2022

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


    ORAL AND VIDEOTAPED DEPOSITION OF SHARON

JACKSON-GEORGE, produced as a witness at the instance of

the Plaintiff, and duly sworn, was taken in the

above-styled and numbered cause on the 18th day of

October, 2022, from 4:36 p.m. to 5:09 p.m., before Karen

Morris, Certified Shorthand Reporter, in and for the State

of Texas, reported by Stenographic Method, the witness

being duly sworn remotely via Zoom Video Communications,

Inc., in accordance with the Texas Rules of Civil

Procedure.

PLAINTIFF'S
EXHIBIT
131
PENGAD 800-631-6989

Sharon Jackson-George
October 18, 2022

**2**

1  
2   **APPEARANCES**
3   **FOR THE PLAINTIFF:**
       MR. JONATHAN WHARTON
4      SBN 24075764
       BRAD THOMAS LAW OFFICE, PLLC
5      ATTORNEYS AT LAW
       P.O. BOX 472027
6      FORT WORTH, TEXAS 76147
7      (903) 931-3616
8      JON@BRADTHOMASLAWOFFICE.COM
9
10  **ALSO PRESENT:**
       VIDEOGRAPHER CORY LAWRENCE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1   STIPULATIONS
2   FOR THE DEPOSITION OF SHARON JACKSON-GEORGE, taken on the
    18th day of October, 2022.
3
4   We, the attorneys here representing the parties
    listed herein, pursuant to the Texas Rules of Civil
5   Procedure, stipulate and agree to each of the following
    items, to-wit:
6
7   THIS DEPOSITION SHALL BE TAKEN PURSUANT TO:
8      NOTICE:
9
    STIPULATIONS REGARDING OBJECTIONS:
10
    Make objections in accordance with the Texas Rules of
11  Civil Procedure;
12
    STIPULATIONS REGARDING SIGNATURE OF THE WITNESS:
13
    Signature of witness is waived.
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1        **INDEX**
                        **PAGE**
2
    CAPTION............................................  1
3
    APPEARANCES...................................  2
4
    STIPULATIONS.................................  4
5
    **WITNESS:**
6
       SHARON JACKSON-GEORGE
7
    EXAMINATION BY MR. WHARTON.......................  5
8
9   REPORTER'S CERTIFICATE.............................  26
10
        **EXHIBITS**
11
    NO.   DESCRIPTION            PAGE
12
    NO EXHIBITS MARKED OR OFFERED.
13
14
15
16
17
18
19
20
21
22
23
24
25

**5**

1        (Deposition commenced at 4:36 p.m.)
2        THE VIDEOGRAPHER: Today's date -- today's
3   date is October 18th, 2022. The time is 4:36 p.m. We are
4   on the record beginning the deposition of Sharon
5   Jackson-George.
6        Will counsel please identify themselves for
7   the record?
8        MR. WHARTON: Jonathan Wharton for the
9   plaintiff. And the defense counsel has not shown up.
10       THE VIDEOGRAPHER: Does counsel agree that
11  this deposition can be taken by video conference, and the
12  court reporter can swear the witness remotely?
13       MR. WHARTON: Yes, but I think we're going
14  to skip the video.
15       THE VIDEOGRAPHER: Oh, yeah. Sorry.
16       MR. WHARTON: Yes.
17       THE VIDEOGRAPHER: Will the court reporter
18  please swear in the witness?
19       THE COURT REPORTER: Ma'am, would you raise
20  your right hand to be sworn?
21       (Witness sworn.)
22           SHARON JACKSON-GEORGE,
23  having been first duly sworn, testified as follows:
24            EXAMINATION
25  BY MR. WHARTON:

2  (Pages 2 to 5)

Sharon Jackson-George
October 18, 2022

---

6

1    Q. All right. Ma'am, can you state your name for
2  the record, please?
3    A. Sharon Denise Jackson-George.
4    Q. And what is your relationship to Tina Wilson?
5    A. Tina Wilson is my stepdaughter. I was married to
6  Tina's father for over 20 years.
7    Q. And when did you first meet Tina?
8    A. I first met Tina in 1989.
9    Q. Okay. And was that --
10   A. I'm sorry. 1988.
11   Q. Okay. And was that before or after she started
12 living with Jacob Cannon?
13   A. I beg your pardon? Was that --
14   Q. Was that before or after she started living --
15   A. That was before she started living with Jacob
16 Cannon.
17   Q. All right. When did she begin living with Jacob
18 Cannon?
19   A. I do believe she started living with Jacob Cannon
20 in 1988.
21   Q. So later that year?
22   A. Yeah, later in that year.
23   Q. And how did that come to happen? How did she
24 come to live with Jacob Cannon?
25   A. Her mom and Jacob Cannon were dating, and so a --

---

7

1  the -- her mom was living with Jacob Cannon.
2    Q. And what's -- what's the name of Tina Wilson's
3  dad?
4    A. Tina Wilson's dad is Charles Wayne Miller.
5    Q. Okay. And so how did -- were you involved in the
6  custody fight between Gerald Miller and Tina's mother?
7    A. That -- the custody battle between -- in 1988,
8  and it seems as though when Gerald and I started dating,
9  and when we became -- when we got married there was
10 issues with where the kids were going to live, so they --
11 we started going to court to try to get petition for the
12 kids.
13       It started when one -- his son came home and
14 told us that he went in the bedroom and saw Tina in the
15 bed with the mom -- I mean, I'm sorry, in the bed with the
16 dad, with Jacob Cannon, and so that's when John started --
17 Gerald Wilson -- Gerald -- Gerald Miller started going to
18 court to try to get these kids.
19   Q. And why was he unsuccessful?
20   A. I do believe that we ran out of money. And not
21 just that we ran out of money, the kids not -- not saying
22 the kids, but Tina was brainwashed. They started buying
23 her all of these gifts. They started taking her on all of
24 these trips. Doing things for her. I would say that she
25 was brainwashed.

---

8

1    Q. And so at the time -- and how -- how old was Tina
2  at that time in 1988?
3    A. In 1988 she would have been, like, 12.
4    Q. And do you know when Jacob started having sex
5  with her?
6    A. Jacob started having sex with Tina when she was
7  nine years old.
8    Q. And how do you know that?
9    A. Tina's brother, Gerald Wilson -- we call him
10 Muka.
11       THE COURT REPORTER: You called him what?
12   A. He lived in the home with us --
13   Q. (BY MR. WHARTON) Hold on. Hold on.
14   A. -- with myself and my husband. And so he went to
15 visit his mom and Jacob Cannon. And he observed Jacob
16 getting out of the bed with Tina.
17   Q. And how do you spell Muka?
18   A. M-U-K-A.
19   Q. So Muka, or Gerald Wilson, told you-all, I saw
20 Jacob in bed with Tina Wilson?
21   A. That was correct.
22   Q. Is there any other source of your knowledge for
23 that?
24   A. To Jacob, no, there was no other source that we
25 had --

---

9

1    Q. Okay.
2    A. -- that Tina -- Tina --
3    Q. How old was --
4    A. Tina would never tell us if it was true or not.
5  And then probably about a year, maybe so later, she came
6  up pregnant. She might have been 13 years old at that
7  time.
8        And when she came up pregnant, they came to
9  us, and came to my husband and I, and said that -- this is
10 my -- my son, I had a 12-year-old son at the time. And so
11 they blamed it and say it was my son's baby. Tina was
12 pregnant with my son's baby.
13   Q. And what's your son's name?
14   A. Adren, A-D-R-E-N, Jackson.
15   Q. All right. And so who told you that the baby was
16 Adren's?
17   A. Berty (phonetic) Wilson told her -- that Tina had
18 told her that she and my son Adren had been having sex.
19   Q. Did you talk to Adren about that?
20   A. Of course. So I took Adren to the -- to the
21 doctor, because he told me he was -- there was no way that
22 he'd been having sex with Tina. Okay. His words was, I
23 -- I've not been having sex with that black dog.
24       And -- but I took him to the doctor, and the
25 doctor did an exam on him. And I kept those papers until

---

3 (Pages 6 to 9)

Sharon Jackson-George
October 18, 2022

10

1  I moved out here to Nebraska, and that's been over 20-plus
2  years ago, and I don't even know what happened to those
3  papers.
4      Q. And what -- what do you -- what did Adren mean
5  when he said black dog?
6      A. He was just referring to her color, her skin
7  color.
8      Q. Is --
9      A. And that he did not -- wasn't sleeping with her.
10  He was, I guess, just talking down about her.
11      Q. I gotcha. And was -- and -- and you can say it
12  verbatim. Did he use the word dog or did he use a
13  different word like a curse word?
14      A. No, he used the word dog.
15      Q. He said dog? Okay. And so after -- after she
16  got pregnant, did you know about her abortions?
17      A. I knew about the first one, because right after
18  they came and said that my son got her pregnant, then all
19  of a sudden this baby just vanished, then she wasn't
20  pregnant anymore. Because I told -- we met up in church
21  at my husband's father's church, and I told them, you
22  know, I have these papers, and then all of a sudden she
23  just -- she didn't -- she's not pregnant anymore.
24      But I told my husband whoever was having
25  sex with Tina, they were going to keep on doing it, and

11

1  she was -- she was going to come up pregnant again.
2      Q. Did she come up pregnant again?
3      A. Yes, she did.
4      Q. And how do you know -- how'd you find out about
5  that?
6      A. I -- she came up -- we had moved to Nebraska.
7  Jacob kept harassing my husband. He would come on his
8  job, because he was -- Tina was skipping school. He was
9  going and checked Tina out of school, and take her home
10  and have sex with her. And so my husband found out about
11  all of the truancies, and all of the tardies, and
12  absences. So he approached the school, and the school
13  told him that my husband -- that Jacob was the one that
14  was taking her out of school.
15      And so we went to the police, went and got
16  an attorney, and Jacob was still coming at my husband
17  trying to -- I mean, was done -- fighting, trying to fight
18  with him, and all of that. So we ended up moving to
19  Nebraska.
20      And one of my friends called me up and she
21  was like, I see your -- your stepdaughter in the mall with
22  Jacob, and I didn't know she was pregnant. Well, neither
23  did my husband.
24      And so come to find out Tina was, I think,
25  14 years old at that time, and she was pregnant. She's

12

1  already had so many abortions they couldn't give her
2  anymore abortions. So she -- that's when she had Kweta --
3  Jaquita (phonetic).
4      Q. And if could spell that for the court reporter?
5      A. Jaquita, J- -- is -- I'm -- I'm not sure how
6  Jaquita's name's spelled. I don't want to even mess it
7  up.
8      Q. Okay. Fair enough.
9      And so did you see Jacob getting violent and
10  aggressive with your husband at other times? Did you see
11  that happening?
12      A. On many a times. There was a -- altercations
13  where they approached me. Came to the door and threatened
14  me, because I called Child Protective Services on several
15  occasions. And I'm just appalled. I mean, it just blows
16  me away that we're here today, because I've been trying to
17  do something about this for over 20 years.
18      Q. And what would happen with the CP- --
19      A. (Inaudible response.)
20      Q. I'm sorry. What -- what would happen with the
21  CPS investigations?
22      A. When the CPS got involved, they went to school
23  and tried to talk to Tina. And like I said, she was --
24  she was brainwashed. She was getting stuff that any other
25  kid her age and her -- in her community wasn't -- wasn't

13

1  getting, she was getting. Polo coats. Polo boots. You
2  know, stuff back in the '80s and the '90s, those -- those
3  were big deals I guess to kids, and so he was buying her.
4      Q. And --
5      A. I mean, he kept on to where we got her -- bought
6  her a car. She started doing things. She started going
7  out dating, because she -- this guy was her mom's man, so
8  she started going out dating, and he actually put sugar in
9  her gas tank.
10      Q. He what now with her gas tank?
11      A. He put sugar in the gas tank of the car that he
12  (sic) purchased for her.
13      Q. He destroyed the car?
14      A. Yeah.
15      Q. Did you ever find out more about Tina Wilson's
16  relationship with Jacob? Was there ever -- ever any
17  additional information that you received about that?
18      A. Well, Tina had already had Jacob -- I mean, I'm
19  sorry. Tina had already had Jaquita, and my husband and I
20  had moved back to Midland, Texas, because my mother was
21  dieing from cancer.
22      And so Tina moved in the house with us, and
23  Jacob would come by the house and pick her up from our
24  house, and, you know, they would go do whatever, and -- so
25  I -- I don't know.

4  (Pages 10 to 13)

14

1  Q. And did you — I mean, so did you know what they
2  were doing, or did you just sort of at that point, you
3  know, believe what was going on? Did you — did you see
4  anything that would tell you this is happening?
5  A. I didn't see anything. I didn't — I just saw
6  her after the baby was born. Jaquita looked just like
7  Jacob. After the second baby was born, Mark Cannon, I
8  just saw that he looked just like Jacob, as well. I have
9  never seen any physical sexual anything going on.
10  Q. Did anyone else report that to you other than
11  that one time with Gerald, with Gerald Wilson? Did
12  anybody other than Gerald Wilson ever tell you, hey, I saw
13  something going — physical going on with them?
14  A. No.
15  Q. Do you ever hear any rumors about that?
16  A. Oh, yeah, there was rumors all around our town.
17  People had just seen them checking in and out of hotels,
18  would come and tell my husband.
19     The school was telling us that he was
20  checking them — checking her out of school. There was
21  all kind of people coming and telling us stories.
22     My sister had witnessed those guys being
23  together, but just — I've never seen them be physically
24  sexual together.
25  Q. Have you ever talked to Jaquita about all of

15

1  this?
2  A. Vaguely. She came to me and told me to stop
3  lying about her grandfather, Jacob Cannon. And told me
4  that if that was what was going on why I didn't do
5  anything to help, because her mom was a — a young girl at
6  the time. And I told her I had done everything in my
7  power to help, and — and get this thing resolved, because
8  I wanted to see him go to jail.
9  Q. Did you ever talk to Jacob about it?
10  A. I've never had any kind of conversation with
11  Jacob.
12  Q. Did you ever talked to Tina's mom about it?
13  A. Oh, yes. Tina's mom and I have had all kind of
14  altercations about this situation. I have talked to her
15  in rude, rude manners. I just couldn't believe that she
16  sold her daughter. I've — I — we've had multiple
17  conversations. We've shared text messages.
18     Yeah. This has been going on for 20-plus
19  years. And this has been — this is a situation that has
20  been like dear to my heart, because I lost a child, and to
21  see that Tina is just being sexually abused and — and
22  misused by her own mama, it just — I don't know, it just
23  did something to me.
24     I continued calling child CPS, which caused
25  me and my husband to have problems, because he kept

16

1  telling me, let the Lord handle it. And I would say the
2  Lord has been using me. And he'd say, let the Lord handle
3  it. Let the Lord handle it.
4     To this day, this is one of the reasons that
5  we are not together. I'm recently — I'm recently married
6  five years now. But his thing was the Lord was going to
7  handle it.
8  Q. So Tina stayed with Jacob Cannon for — for
9  years, right?
10  A. Yes.
11  Q. When did she end up deciding to tell what
12  happened?
13  A. When did she decide to tell her dad?
14  Q. Just — yeah, to tell on him. To tell everybody,
15  hey, you know, I — I — you know, I was raped by Jacob?
16  A. She — Tina has — has come out several times and
17  tried to say something, but the way people looked at her,
18  she — she kept on back — backing and didn't want to
19  fully tell the story. So she will cut her hair out of
20  shame. She wore her hair like bald, bald. I mean, just
21  out of shame for what she — what she done.
22     I think it was probably back in 2014, they
23  had the worst play, I think, and her mom pulled the gun on
24  her, and she didn't have nowhere to go.
25     And she started dating this guy, and I think

17

1  she confined in that guy to tell — to come out to tell
2  the truth. But she'd been trying to come out, and I think
3  she just needed somebody to be down with her, to be on her
4  side.
5     I never thought her dad was really on her
6  side. I — I just felt like he — he felt like she was
7  getting things that he couldn't provide for her, because
8  at the age of 20 or maybe 21, Jacob built her a house from
9  the ground up, and so he boasted about it. Her father
10  boasted about it. He walked around telling me and whoever
11  wanted to listen, my daughter has a house built up from
12  the ground up. And then I would say, well, how did she
13  get it? Like, she had to lay on her back to get that
14  house, which is so bad.
15  Q. I hear you.
16  A. So that —
17  Q. So is there anything else you remember about the
18  whole situation you haven't — you haven't told us,
19  anything important?
20  A. Oh, there's a lot of stories that came with the
21  situation. I seriously thought that the — the movie
22  purchased — somebody had got ahold of her story and told
23  her story.
24     There are situations where Jacob beat up his
25  brother Muka, and sent him to the hospital. Their — they

Sharon Jackson-George
October 18, 2022

---

18

1  were all fighting, because Tina felt like Jacob was her
2  man at first. And the mamma and Tina fighting because she
3  caught Jacob and Tina together. And I'm, like, she's just
4  a child. She's only 16 years old. What do you mean you
5  caught them together? He should be in jail.
6       It's -- it's a lot to the story.
7  Q. I hear you.
8  A. They should be in jail. The mamma and Jacob
9  should be in jail. Seriously, they should be in jail.
10 Q. Tell me about the time that Muka got beat up.
11 A. What was that?
12 Q. Tell -- tell me about the time that Muka got beat
13 up.
14 A. The Muka -- we all took Muka out down to Midland
15 for the summer, and Tina was about maybe seven or
16 eight months pregnant at the time. And they got into a
17 big altercation when he got -- he got in the middle,
18 because he was trying to help his mom and his sister, and
19 he ended up in the hospital. Tina ended up in the
20 hospital.
21      I don't recall most about that incident, but
22 that we did have to send my husband's sister to the
23 hospital to check on Muka, because he ended up going to
24 the hospital during that time. And my sister's -- my
25 husband's sister's name is Brenda Haven.

---

19

1  Q. How did you find out about the fight and the
2  cause of it?
3  A. Brenda Haven had called us. Muka, while he was
4  there at the hospital, he ended up getting ahold of her, I
5  believe. I'm not sure how we -- how we -- how -- that's
6  been many years ago. I'm not sure how we found out.
7  Q. Okay. And but the -- but the -- the -- what
8  you're saying is that Muka got in between an argument
9  between Jacob and Tina about their relationship, or
10 whatever?
11 A. Yep. And he pulled a gun on them, like --
12 Q. On Muka?
13 A. Yep, Jacob did.
14 Q. All right. Are there any other major incidents
15 that you can recall that sort of centered around Jacob's
16 sexual relationship with Tina?
17 A. Hum. There was so many incidents. They just
18 sound like TV.
19      There was incidents where they came to the
20 mall, after they found out that I called child CPS. And I
21 saw them pull up, and so I locked the door. And then they
22 literally tried to break the door to get in.
23 Q. Sort of like kicking the door?
24 A. And -- and pulling on it. The -- the glass
25 screen door, yeah.

---

20

1  Q. And who's they, was it Jacob and someone else?
2  A. Jacob and Berty Wilson. He didn't do anything.
3  It was -- it was Berty, and he stood in the yard and
4  watched.
5  Q. Okay. How -- how big is Jacob, would you say?
6  A. I would say Jacob is maybe 6'4", 200 and maybe 50
7  pounds, maybe.
8  Q. And so was -- was he the one kind of pulling --
9  you're saying it was not him that was pulling on the door,
10 it was -- it was Berty?
11 A. It was Berty.
12 Q. Were there other times that you saw -- and,
13 actually, let me ask you this. How did that incident end
14 up? What ended up happening?
15 A. I ended up calling the police. Hello?
16 Q. Yes, ma'am. We're still here.
17 A. Okay. I ended up calling the --
18 Q. You say you ended up calling the police?
19 A. I still made -- I still made a police report.
20 Q. Okay. And they just didn't really do anything?
21 A. They didn't really do anything. And sounds
22 like -- because my husband ended up in court a lot, you
23 know, trying to get custody of his kids. And I felt
24 like -- my husband was suing the city of Midland for
25 discrimination, and so I felt like because of him suing

---

21

1  the city of Midland, they was taking everything like --
2  you know, like a joke. Like he was saying all of these
3  things because Jacob made more money than he did, and Jacob
4  had his ex -- the -- I don't -- I don't know. My belief
5  is that he was suing the city, and that they didn't do
6  nothing.
7       He was calling the police. He had went and
8  got an attorney. And we were in and out of courts trying
9  to get custody of these kids, because they were in a bad
10 situation, and there was nothing that we could do.
11 Q. And tell me, are there any other major incidents
12 you can think of where you saw -- that sort of centered
13 around Jacob's relationship with Tina? Just anything you
14 can think of. Just any of the stories that sort of focus
15 on that.
16 A. We were in court going through custody hearings,
17 and Jacob and Tina were sitting out in the -- in the
18 waiting room, and she was sitting there rubbing up and
19 down on his legs. He was -- had her wrapped up under --
20 wrapped in his arms like -- like this was his woman.
21 Q. Okay.
22 A. Other incidents, I don't know. I kept myself
23 away from all of this. I was in Nebraska, and Tina
24 remained in Texas with Jacob and her mom. So as far as
25 seeing anything other than what I saw was only during the

---

6 (Pages 18 to 21)

Sharon Jackson-George
October 18, 2022

| 22 |
| --- |

1   times if I was out there during the summers.
2          There was a time that they had put Tina
3   out -- when I say they, Jacob and Betty Wilson had put
4   Tina out of the house, because they found out she had a
5   boyfriend. She came up with condoms in her glove box in
6   her -- in her car, and so they put her out. He beat her
7   up and put her out of the house, and she started living
8   with my husband's mother. And that was a time that I -- I
9   could recall that he end up jumping on her, because he
10  found the condoms in the car.
11         But as far as me ever seeing them together
12  like a couple, I've never seen it.
13     Q. How -- how did you find out about the incident
14  with the condoms?
15     A. Her mom -- my husband's mother called us and told
16  us, because Tina ended up at her house. And so she told
17  my husband's mother the situation, what had happened. My
18  husband's mother told us what had happened. And my
19  husband's mother -- my husband's father was a bishop, so I
20  had no reason to think that she was lying to -- to us
21  about any of it.
22     Q. I gotcha. And a -- let's see. Is there anything
23  else you can think of? Just -- you know, I know you might
24  not remember everything, but is there any -- is there
25  anything that's like, you know, just fresh in your memory

| 23 |
| --- |

1   that says, hey, you know, these are memories of them
2   having a relationship?
3     A. No. And I don't -- and -- and I'm not going to
4   be caught lying, because I've never -- I've never seen
5   them --
6     Q. You've never seen it yourself?
7     A. -- hurt -- because I've not seen that part,
8   knowing that what I know, but I've not seen -- not seen
9   that.
10    Q. Okay. Fair enough. And I know that you'd like
11  to come to trial, if possible. You do understand that
12  we're -- we're taking this video deposition where, I
13  guess, at this point it's not really videotaped, but we're
14  taking your deposition with the idea that if for some
15  reason, due to a scheduling conflict you cannot show up,
16  that this deposition will be read instead; is that fair?
17    A. That's fair.
18    Q. Okay. All right. I appreciate your time.
19         MR. WHARTON: And I'll pass the witness.
20         THE COURT REPORTER: Excuse me. I do have
21  something I need to say, as far as a court reporter goes.
22  I forgot to ask the witness what state and what city
23  you're located in?
24         THE WITNESS: I live in Lincoln, Nebraska.
25         THE COURT REPORTER: Thank you. And I just

| 24 |
| --- |

1   needed counsel to stipulate to her identity. Can you do
2   that?
3          MR. WHARTON: Yes, ma'am. Yes, this is --
4   yeah, this is Sharon Jackson-George.
5          THE COURT REPORTER: Okay. I'm sorry. We
6   started so quickly.
7          MR. WHARTON: No worries.
8          THE COURT REPORTER: Okay.
9          MR. WHARTON: We had a little snafu here and
10  there, but we got through it.
11         THE COURT REPORTER: Thank you.
12         THE VIDEOGRAPHER: All right. Mr. Wharton,
13  you said you passed the witness?
14         MR. WHARTON: Yes, sir.
15         THE VIDEOGRAPHER: Just making sure.
16         All right. We are off the record at
17  5:09 p.m. Ending the deposition of Shannon (sic)
18  Jackson-George -- Sharon Jackson-George.
19         THE WITNESS: Sharon.
20         THE VIDEOGRAPHER: Yeah, Sharon. Sorry.
21         THE COURT REPORTER: Do we need to read and
22  sign? Or how do you want to handle that, Mr. Wharton?
23         MR. WHARTON: I mean, I -- I don't know how
24  you'd possibly transcribe that accurately, but --
25         THE COURT REPORTER: I'm going to try.

| 25 |
| --- |

1          MR. WHARTON: Yeah, I hear you. I hear you.
2          Sharon, do you want to -- so what read and
3   sign means is you have the right to receive a copy of the
4   transcript, so you can read it and see if it's accurate to
5   what you said. You can fix any errors that are in it, if
6   you want to. Do you want to do that?
7          THE WITNESS: Um.
8          MR. WHARTON: You don't have to, it's
9   just -- it's just up to you.
10         THE WITNESS: No, I don't really want to.
11         MR. WHARTON: Okay. I hear you. All right.
12  Then we'll waive.
13         THE COURT REPORTER: Thank you.
14         (Final recess at 5:10 p.m.)
15
16
17
18
19
20
21
22
23
24
25

7 (Pages 22 to 25)

Sharon Jackson-George
October 18, 2022

26

1          CAUSE NO. CC-21-02654-D
2    TINA WILSON          ) COUNTY COURT AT LAW NO. 4
3                         )
                          )
4    VS.                  ) IN AND FOR
                          )
5                         )
     JACOB CANNON         ) DALLAS COUNTY, TEXAS
6
7          REPORTER'S CERTIFICATION
           DEPOSITION OF SHARON JACKSON-GEORGE
8          OCTOBER 18, 2022
9    I, Karen Morris, Certified Shorthand Reporter in
10   and for the State of Texas, hereby certify to the
11   following:
12         That the witness, Sharon Jackson-George was duly
13   sworn by the officer and that the transcript of the oral
14   deposition is a true record of the testimony given by the
15   witness;
16         That examination and signature of the witness to
17   the deposition transcript was waived by the witness and
18   agreement of the parties at the time of the deposition.
19         That the amount of time used by each party at the
20   deposition is as follows:
21         MR. JONATHAN WHARTON, Attorney for the Plaintiff,
22   0 hour (s), 33 minute(s).
23         That $      is the deposition officer's
24   charges to the PLAINTIFF for preparing the original
25   deposition transcript and any copies of exhibits;

27

1          That pursuant to information given to the
2    deposition officer at the time said testimony was taken,
3    the following includes counsel for all parties of record:
4          MR. JONATHAN WHARTON, Attorney for the Plaintiff.
5          That a copy of this certificate was served on all
6    parties shown here on the      day of        2022, and
7    filed with the Clerk pursuant to Rule 203.3.
8          I further certify that I am neither counsel for,
9    related to, nor employed by any of the parties or
10   attorneys in the action in which this proceeding was
11   taken, and further that I am not financially or otherwise
12   interested in the outcome of the action.
13         Certified to by me this 31st day of October,
14   2022.
15
16
17         Karen Morris, Texas CSR 334
           Expiration date: 04/30/2023
18         SLS LITIGATION SERVICES, LLC
           322 SPRING HILL DRIVE, A700
19         SPRING, TEXAS 77386
           FIRM REGISTRATION NO. 761
20
21
22
23
24
25

8 (Pages 26 to 27)

| | | |
|---|---|---|
| 1:45PM | 1 | |
| 1:45PM | 2 | **Plaintiff's Exhibit No. 3** |
| 1:45PM | 3 | |
| 1:45PM | 4 | **Deposition of Gerald Miller** |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1

NO. CC-21-02654-D

| TINA WILSON | ) | COUNTY COURT AT LAW NO. 4 |
| | ) | |
| VS. | ) | IN AND FOR |
| | ) | |
| JACOB CANNON | ) | DALLAS COUNTY, TEXAS |

---

ORAL AND VIDEOTAPED DEPOSITION OF GERALD MILLER
Taken October 18, 2022

---

ORAL AND VIDEOTAPED DEPOSITION OF GERALD
MILLER, produced as a witness at the instance of the
Plaintiff and duly sworn, was taken in the above styled
and numbered cause on October 18, 2022, from 10:28 a.m.
to 10:55 a.m., at the offices of Permian Court
Reporters, 605 W. Texas Avenue, Midland, Texas, before
Cathy Cummins, Certified Shorthand Reporter Number 5837
in and for the State of Texas, reported by computerized
stenotype, pursuant to the Texas Rules of Civil
Procedure (and the provisions stated on the record or
attached therein).

PLAINTIFF'S
EXHIBIT
PENGAD 800-631-6989
140

1                        A P P E A R A N C E S:

2

3     FOR THE PLAINTIFF:
      (via Zoom)
4                        MR. JONATHAN WHARTON
                         Brad Thomas Law Office
5                        P.O. Box 472027
                         Fort Worth, Texas   76147
6                        (903) 931-3616
                         jon@bradthomaslawoffice.com
7

8     THE VIDEOGRAPHER:

9                        MS. EMILY DAW

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2                                                              PAGE
    Appearances......................................  2
3
    GERALD MILLER
4   EXAMINATION BY MR. WHARTON.........................  4

5
    Reporter's Certificate............................ 26
6

7

8

9

10                          EXHIBITS

11  NO.          DESCRIPTION                          PAGE

12                     (None Marked)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE VIDEOGRAPHER:  We are on the record.

2   Today is October 18th, 2022.  The time is 10:28.

3        Would the court reporter please swear in

4   the witness?

5                    GERALD MILLER,

6   having been first duly sworn, testified as follows:

7                    EXAMINATION

8   BY MR. WHARTON:

9        Q.   All right, sir.  Could you state your name for

10  the record, please?

11       A.   Gerald W. Miller.  Gerald, G-e-r-a-l-d,

12  W-a-y-n-e, Miller, M-i-l-l-e-r.

13       Q.   All right.  Thank you.

14            And what's your relationship to Tina

15  Wilson?

16       A.   She's my daughter.

17       Q.   Okay.  And tell me, how did Tina Wilson end up

18  living with Jacob Cannon?

19       A.   The Courts gave him custody of her.

20       Q.   Okay.  And tell me a little bit more about

21  that.  Did -- did you -- did you get to meet Jacob

22  Cannon in those -- you know, when you were going through

23  the court process?

24       A.   Yes, sir, I met him several -- on several

25  occasions.  I guess Midland County courthouse is what

1  gave him custody of my daughter, Birdie Wilson, Tina's

2  mother.  And at the time, Birdie and Jacob were staying

3  together, and I met -- had several run-ins with Jacob.

4      Q.   Okay.  Tell me about those run-ins.

5      A.   Well, one incident, he had -- I guess he

6  actually had jumped on my son.  My son was, at that

7  time, maybe like 9 or 10 years old.  And so me and him

8  had some words behind that.

9           And so what led to him hitting my son, I

10 think that my son had -- my son had told me that he had

11 seen Tina -- Jacob getting off top of Tina, pulling his

12 pants up.  And he told Jacob he was going to go and tell

13 his dad.  And so we went to court behind that incident,

14 as well, about him hitting my son.

15     Q.   Got you.

16          So your son -- your son was reporting that

17 he seen Jacob inappropriately acting with your daughter,

18 and so Jacob hit your son; is that right?

19     A.   I think -- yeah, I think that's what -- the way

20 it went.  It's been so long ago.  But I can remember

21 Muka -- my son, we call him Muka Gerald, Jr. -- excuse

22 me -- we call him Muka Gerald, Jr.  And at the time,

23 Jacob and Birdie, they lived, like, maybe 10 miles or 12

24 miles out in the country away from where I lived at.

25          And that night he jumped on little Gerald,

1    I think Gerald was 10 years old.  And he ran and -- he
2    was running into town to try to get some help and get to
3    me, his dad, for safety.  And a white gentleman picked
4    him up and came to court and told the Court that he seen
5    my son running through the night out in the wilderness.
6    Anybody could have picked him up and maybe killed him.
7    But he was able to tell him -- show him where he lived
8    at.

9             And so he brought my son to me, and my son
10   had bloody clothes on him.  And I immediately alerted my
11   attorney the next morning, and we went to court behind
12   that, as well.  And he told about Jacob had beat him up
13   and Jacob had -- was messing with his sister Tina, seen
14   him being inappropriate with her.

15        Q.   So how did that play out in court?  What
16   happened in court?

17        A.   They took my son from me -- I mean -- I'm
18   sorry.  They had taken my son from Birdie, the mother,
19   and gave me custody of my son and gave Birdie full
20   custody of Tina.  And the man just kept molesting my
21   daughter.

22             And I would -- I would drive the school
23   buses at the time, and some kids on the bus told me they
24   seen Jacob and Tina kissing.  I think at the time, Tina
25   might have been 7 years old.  I'm sorry, sir.  I'm

1    sorry.  At the time, Tina might have been in 7th grade.

2    And some kids told me they seen them on the bus kissing.

3              And so I never did say anything to Birdie

4    or Tina about it, but I told my attorney that Jacob is

5    still fumbling with my daughter.  So he said that he

6    will set up another court hearing.  And I don't know.

7    We might have went to court again.  I'm not for sure.

8    I'm kind of confused about some things right now.  It's

9    been so long.  Everything is court record, on court

10   records, how many times we've been to court.  Maybe

11   three or four times fighting for custody for the kids.

12   And Jacob was molesting my daughter, a clear picture

13   he's molesting my daughter.

14        Q.   All right.  Understood.

15             And did the Courts ever actually get Tina

16   Wilson out of that situation?

17        A.   For a short period of time, I'm thinking they

18   gave me back custody of Tina.  They kept playing with my

19   kids.  They was taking them from me, giving them to

20   Birdie, taking them from Birdie, giving them to me.

21   Clearly, I was the safest one for them to stay with, and

22   I kept trying to prove that to the Court.

23             And I think -- at the last, my attorney's

24   name was Tom Morgan, who was representing me through

25   this whole time, this custody battle, he told me that

**8**

1    the judge told him to tell me that if I come back to

2    court again with this mess, about Jacob raping my

3    daughter, they was going to put me in jail.  And he --

4    my attorney also said, "Well, you plan on moving to

5    Nebraska.  If I was you, I would take your son and get

6    the hell out of Midland."  And I did do that.

7              But at the same time this was taking place

8    with my daughter, I was suing the City of Midland for

9    discriminating.  I won the case.  And I feel like the

10   Court failed to help my daughter because I was suing the

11   City of Midland.  And later, I won the case.  It was

12   during the same time.  All this stuff was going on about

13   the same time.

14             And it's pretty heartbreaking to me to see

15   this going on with a little baby.  And the man was

16   sleeping with the momma, and he's going to sleep with

17   the daughter.  He whipped the momma's ass.  He whipped

18   the daughter's ass.  He whipped the son's ass.  And I

19   done everything I could do to try to save my daughter,

20   but the Court failed me.  It failed us.

21             Now, I've got a 25-year-old granddaughter.

22   And she had two or three abortions behind this man.

23   They tried to cover it up.  And it's pretty bad.

24        Q.    Okay.  How did you find out about the

25   abortions?

1    A.    Well, Tina told me.  She told me when she told

2    everyone on Facebook.  I never -- I tried to get Tina to

3    talk to the people -- to the Court, but she loved her

4    momma so much, she didn't want nothing to happen to her

5    mother.  And her mother brainwashed her.

6              And later on down the line with everybody

7    else, I guess maybe seven or eights months ago, she got

8    on Facebook, and she just started telling the whole

9    story about all the abortions they gave her and

10   everything.

11             At the time -- I'm going to back up for a

12   minute.  At the time, my stepson was 12 years old, maybe

13   11 years old.  They tried to make -- they had made this

14   remark that Tina was raped by him.  Tina was the same

15   age he was.  And they had to drop that lie immediately

16   because of the boy wasn't even in puberty to produce any

17   kind of baby.  I think that's her first abortion.  But

18   we knew then it was Jacob.  We knew it, you know.  It's

19   just -- it's a -- it's a mess.

20   Q.    Got you.

21             And we'll -- we have -- we'll have his

22   testimony.  You're talking about Robert Jones, right?

23   A.    Who?

24   Q.    The boy you're talking about.

25   A.    No.  His name is -- his name is Adrian Jackson.

1   He's a grown man now.  He was my stepson, and his

2   mother's name is -- Adrian's mother's name is -- oh,

3   man.  My head has gone crazy -- Sharon Denise Jackson.

4   She's my ex-wife.  I've been married to her 26 years.  I

5   couldn't think of her name.

6       Q.   Sharon Jackson-Jordan?

7       A.   Sharon Denise Jackson.  That's her full name.

8       Q.   Got you.

9       A.   And she can -- I might have a phone number for

10   y'all if y'all want a phone number.  I think it might

11   help.

12       Q.   No.  We have her set up -- we have her set up

13   for a deposition, as well.

14       A.   Okay.  Good.  Thank you.

15       Q.   Yeah.

16       A.   Thank you.

17       Q.   No problem.

18            Okay.  And so when you -- you know, after

19   this all happened, did you ever see the effect that it

20   had on Tina?

21       A.   No.  I lived in Nebraska.  And thank God that I

22   didn't see none of this, sir, besides the incident with

23   Jacob.  I can remember one time Jacob came up on my bus.

24   I had bought my daughter some $75 Fila shoes that came

25   out.  And --

1      That's the thing.  They never wanted me to

2 do anything for my daughter, because they know if they

3 could keep me away from my daughter, the story wouldn't

4 come out.

5      So I happened to buy her some Fila shoes

6 one day.  And she was getting on the school bus, and she

7 was giving my shoes back to me.  She said, "Dad, I can't

8 take these shoes because Jacob don't want me to have

9 them.  He said that if I keep these shoes, that he's

10 going to do something to you or something."  I'm not for

11 sure what it was.

12      But it caused a big commotion, because --

13 I told her to keep the shoes, and she said, "No, Dad.

14 I'll just keep them at school.  I'll wear them at

15 school.  I'll take them off before I go home."

16      So anyway, Jacob came up on the school bus

17 one day, and he was threatening to beat me up, "Get off

18 the bus."  Jacob was a way bigger man than I was.  I was

19 afraid of Jacob.  But I was trying to get off the bus to

20 fight him, because the kids kept telling me, "Mr. Bus

21 Driver, please don't get off the bus."  They was holding

22 on me, "Don't get off the bus, Mr. Bus Driver, please."

23 And I was calling for the bus barn -- to my bosses and

24 telling them to get there as soon as possible, because I

25 was just panicking.  I was scared that this big man is

GERALD MILLER

**12**

1    fixing to jump on me.

2            Right after that, I started going on the

3    school bus with a gun, because I just knew he was going

4    to come again and try to attack me.  It's a bad

5    situation, man.  These people failed to help us.  They

6    just left us in harm's way.

7        Q.   I hear you.  I hear you.  If you need a minute,

8    just let me know.

9            (Pause)

10       A.   Jacob seemed to be a pretty -- pretty violent

11   man, you know.  One day, the Court gave me custody of my

12   kids and told me to go pick my kids up at Jacob's place.

13   I didn't want to go do it.  I kept telling them that I

14   don't want to go do it because the man was pretty

15   violent, seemed to be pretty violent, you know.

16           And sure enough, the sheriff had to come

17   out there and go get my son out of the house, because

18   Jacob was trying to fight me then.  He was making sure

19   that I wouldn't be around Tina because he didn't want

20   the story to get out.  He was doing everything to cover

21   his mess up.

22           Tina went to the school here in town and

23   told the school that this man was raping her.  They

24   failed to notify Child Protective Services.  My attorney

25   knew of this.  He failed to notify us -- to know -- to

1  let the police and Child Protective Services know, you

2  know, all the legal things that he could have done to

3  try to help this little baby from being helped.

4           And by her being black in the face and her

5  daddy, they was calling niggers here in this town, they

6  failed to render us any kind of aid.  They just didn't

7  care about us.  Now look at all the mess that's going on.

8           And, you know, they try to say, you

9  know -- you know, Attorney, they try to say I'm a bad

10  man.  But look at my record.  Still clean.  And all this

11  that my daughter has been through, I haven't done

12  nothing to no one.  (Indiscernible) God help us.

13     Q.   Were you relying on your attorney to tell you

14  what to do in this kind of situation?  Were you relying

15  on --

16     A.   Huh?

17     Q.   Were you relying on your attorney to tell you

18  whether to call the cops or whether to call CPS or who

19  to report it to properly?

20     A.   I was doing everything.  He knew what to do.

21  And he knew -- I was paying him money to represent us.

22  And later on, I found out through Tina that he also

23  represented Jacob.  Conflict of interest.  Dirty man.

24  Dirty man.  He done that to himself.  I had nothing to

25  do with none of that.  He was taking my money.

1    Q.    Did CPS ever investigate?

2    A.    Not to my knowledge.  I don't even know.  When

3    I went to Nebraska, my way of functioning was to try to

4    just keep praying like my mother told me and let God

5    bring it out.  That's the only way I could have dealt

6    with this.  And I done what she asked me to do.  And my

7    daughter paid the price.

8    Q.    Okay.  And so did you keep in touch with Tina

9    while you were in Nebraska?

10   A.    No.  I may have talked to her maybe once or

11   twice a year.  Not very -- not like she was here in town

12   with me, because I was -- I was with her all the time.

13   They wouldn't -- they made sure I would -- because she

14   would have came -- she would have told me.  We wouldn't

15   be in this situation right now.  It would have been a

16   badder situation.  I'm telling you.

17            I haven't seen her on Facebook talking

18   about this story, but my family and friends have

19   all everybody talking about it, and they're just telling

20   me all -- but I don't want to see my baby sitting there

21   crying.  I can see this big man getting up off top of

22   her.  Oh, boy.

23   Q.    When you talked to Tina, you know --

24   A.    I don't even -- go ahead.  I'm sorry.

25   Q.    Okay.  When you talked to Tina, you know,

1  through the years, did she ever tell you about this?

2      A.   I couldn't -- she never mentioned it to me.

3  No, sir.  She just didn't want to see me acting out.

4  And I guess she didn't want to hurt me.  She just kept

5  it in.  And then she went out on Facebook and told the

6  story.

7      Q.   And so you had been seeing -- you had been

8  hearing about these incidents through other people?

9      A.   Yes, sir.

10     Q.   Okay.  And then your direct relationship with

11 Jacob at the time also told you what kind of guy he was?

12     A.    Oh, man.  His wife told me.  I met with his

13 wife one day at the 7-Eleven store.  And this was -- but

14 this -- well, it was a meeting between me and her,

15 because me and this man have gotten into it so many

16 times, and I was just trying to find out who this man

17 was related to so I could ask them to please tell him to

18 leave me alone, because I didn't want to get killed and

19 I didn't want to kill him.  I'm just begging for help.

20          And I -- my son told me, she said -- he

21 said, "Dad, she work at Channel 9 news station, Jacob's

22 wife do."  And I was able to contact her.

23          And I met with her at a store and -- at a

24 7-Eleven store.  And at the time, he was still molesting

25 Tina.  And when I met with her, I told her the story,

1    that -- about everything that Jacob was putting my kids

2    through and I think that he's molesting my daughter.

3                  And she said, "Well, let me tell you

4    something, Mr. Miller.  Jacob have a past."

5                  I said, "He have a past?"

6                  She said, "Yes, ma'am."  I -- she said,

7    "Yes, sir."

8                  And I said, "Well, what is it?"  She

9    wouldn't tell me.

10                  At that time, Jacob showed up at the

11   7-Eleven store.  And I said, "What are you doing showing

12   up here?"

13                  She said, "I don't know."

14                  I said, "Did he know we was going to be

15   here at this time?  This is just a meeting between me

16   and you."

17                  She said, "I don't know."

18                  I said, "Well, if he gets out of that

19   truck and come over here, I'm going to defend myself."

20   I said, "I don't have no other choice, you know."

21                  She said, "Oh, well, he don't know we're

22   supposed to be here meeting."  But she told me that he

23   had a past, but she never told me what it was.

24       Q.   What -- so what did that mean to you?  Did you

25   ever find out?

1    A.   Well, when Tina spoke with me maybe two or
2    three months ago about something -- the situation over
3    the phone, she told me that -- I think one of Jacob's
4    family members said that Jacob was messing with one of
5    the girls in the family.

6         I don't know anything about it to go into
7    details about anything.  I was just kind of like, "Oh,
8    okay.  Well" -- so that might be something you need to
9    look into.  I don't know.

10   Q.   Well, what does -- what does it mean when she
11   says he has a pass?  Do you have any idea what that
12   means?

13   A.   Well, I don't know if she was saying being
14   violent or messing with little girls.  I didn't -- I
15   don't know.

16   Q.   Oh, a past, p-a-s-t.

17   A.   Yeah, past.  Yes, sir.

18   Q.   Oh, okay.  I've got you.  I thought you said
19   p-a-s-s, pass.

20   A.   Yeah.

21   Q.   Okay.  He has a past.  Okay.  So he might have
22   a history of doing this with other people?

23   A.   Yes, sir.

24   Q.   Got you.  Okay.

25   A.   Oh, I got a phone call from Tina's mother one

1 | day, and she told me to tell Tina -- I was here in
2 | town -- to talk to Tina and tell Tina to leave Jacob
3 | alone, because she is the one that goes with Jacob. The
4 | momma is the one going with Jacob, not her.
5 | And I said, "Well, y'all got that mess
6 | stirred up. Whatever y'all got going on, you know it's
7 | not right. I'm not going to tell Tina anything," you
8 | know. "Let her -- let her come out with whatever she
9 | has got to come out with." And I was very serious about
10 | that, because I thought that if she loved this man so
11 | much, she ought to protect him by going to the law and
12 | reporting him for what he was doing, if she loved him so
13 | much.
14 | Not our daughter, because she clearly
15 | should have done that also, but she didn't. She was so
16 | afraid of this man, I'm thinking. I seen cat marks
17 | around her neck when he got ahold of her, so I guess she
18 | was afraid of him, the momma with the cat marks.
19 | Q. Okay. So you had seen her with, you said, cat
20 | marks?
21 | A. Cat marks. Where he scratched up around her
22 | neck fighting her. And I told her, I said, "Boy, you've
23 | got cat marks on your neck already, huh?"
24 | Q. So you think he was -- he was beating her up?
25 | A. Oh, yeah. Yeah. Yeah. Yeah. He was a

1   violent man.  He whipped -- he whipped the momma,

2   whipped the daughter, whipped my son, go lay up with the

3   momma, go lay up with the daughter.  The man was a bad

4   man.

5        Q.   Did you -- so how many times did you see them

6   with marks on their bodies?

7        A.   Well, never Tina, because I never would have

8   made it to the courtroom.  But Birdie, one time.

9   Uh-huh.  That's right after she caught herself leaving

10  me for him.  And I was teasing her about the cat marks

11  she had around her neck.  I said, "He don't want you no

12  more, huh?"

13       Q.   And then how about your son?  How many times

14  did he have marks on him?

15       A.   Well, he come home with a bloody nose and a

16  bloody shirt, all -- blood all over his shirt where he

17  had been bleeding.  And he said Jacob had hit him in the

18  nose.  And --

19       Q.   And is that the time that he ran -- he ran

20  through the woods and got picked up?

21       A.   Yeah.  Yeah.  There was nothing out there but

22  just a two-way road and just out in the wilderness.

23  Nothing but coyotes and whatever else could have been

24  out there could have got ahold of my son, or maybe some

25  murderer, because they have found bodies out there in

1  the past.

2            And I just thank God he was smart enough

3  to know how to come home.  You should have seen where he

4  had come from, to know where he stayed, that the man

5  came to court and said he knew exactly where he stayed

6  at.  This kid, man, was -- you know, there was just

7  nothing out there but maybe -- Jacob lived in a big

8  mansion.  Him and two or three other people live out

9  there in a big mansions, you know, and that was the only

10  thing out there.

11      Q.   How old was your son at that time?

12      A.   Oh, he could have been like 9 -- between 9 and

13  11 years old at that time.  I'm not for sure.  I can't

14  remember exactly.

15      Q.   Oh, that's okay.  I mean, how many years ago

16  are we talking here?

17      A.   Oh, he's 40 years old now, so you're talking at

18  least about 30 years.

19      Q.   Okay.  And when --

20      A.   My granddaughter is 26 years old, I think, and

21  I know for a fact she's Jacob's if they just take a

22  blood test.  And Tina might have been 15 when she had

23  the baby.  So, you know, that's still a good picture

24  again this man is molesting this little girl.

25      Q.   How do you -- how do you know that that -- that

1   your granddaughter is Jacob's?

2      A.   Oh, she looks just like him and everything.

3   Tina told me that that's her baby, everybody -- told

4   everybody in the family, you know.  We all know.

5          The girl -- from my understanding, the

6   girl and Tina had a run-in maybe four months ago behind

7   this situation.  She couldn't understand why her mother

8   was going after her grandfather, but it's her dad.  And

9   so the family is torn up.  The kids -- all the kids --

10  Tina's kids are torn up behind their granddaddy and Tina

11  telling the story.  And so -- that it caused Tina some

12  hardship.

13         And Tina called me up and told me, "My son

14  was telling me some things."  And I was saying, "Well,

15  that's going to happen, you know, now all truth is

16  coming out now.  That's what's going to happen," you

17  know.  And she knows Jacob's her daddy.  And I was told

18  that the boy might be even Jacob's, my son -- my

19  grandson might even be Jacob's.  But Tina hasn't said

20  that, though.

21     Q.   When did you find out that your granddaughter

22  is Jacob's?

23     A.   When she had him.

24     Q.   All right.  At the time?

25     A.   When she had the baby, I knew it.  Yeah, I knew

1    it.  I knew it was Jacob's baby then.  Tina didn't have

2    to tell me that.

3        Q.    How did you know?

4        A.    Well, they've been screwing since she was

5    probably about 10 or 11 years old.  She wasn't allowed

6    to have no boyfriends, no friends.  He was always

7    covering her.  People was telling me around town that

8    they seen them kissing and all that.  You know, I'm

9    just -- just know, you know.  I --

10            Go get the baby now, give her a blood

11   test.  There's some -- I mean, you know, there's ways of

12   finding out the truth.  If he's in denial, it's only to

13   save his ass.  That's all, you know.  And they --

14   everybody gave him cover in town because he's got money.

15   Now, they're all running now because the truth done came

16   out.  They've been running behind this rapist, working

17   for this rapist, child molester, murderer.  He's a

18   murderer.

19            Anybody that gave this girl abortions is a

20   murderer.  That's what going on right now.  You're

21   talking about two or three abortions.  This is stuff

22   that's serious here, and they are running.  They're

23   scared.  They're trying to save their hiney.  Even

24   attorneys, my attorney.  The people that gave her the

25   abortion should be at the table right now speaking.

1    Everybody -- the State of Texas.

2        Q.    I hear you.

3        A.    Yeah.  It's coming out.

4        Q.    For -- let's see here.  So you were saying that

5    you had heard -- you had heard word about town about

6    Jacob and her kissing.  Is there any other -- is there

7    any other -- is there anything else you heard or saw

8    that let you know at that time that it was going on?

9        A.    No, because I had went on to Nebraska.  I left,

10   went to Nebraska.  I was -- had to get out of here.  The

11   town was being pretty rude to me.

12                Like I said, I was -- I had sued twice

13   here for discriminating.  I won both cases against an

14   oil company discriminating, called me black ass,

15   niggers, black motherfuckers, and all that kind of

16   stuff; then the second case, I won against the City of

17   Midland, the same thing going on.  And I won that case.

18   I settled that case in '97.  This is -- back it up two

19   or three years, Tina was getting raped at that time.

20                It was just really -- didn't want to

21   really know any to know one, besides just cover up their

22   dirty deeds.  And if I wouldn't have got out of town, I

23   would probably be a dead man some way or another.

24                And there's some stuff going on now with

25   me that the law is looking into, I've got the Feds

1   looking into.  It's -- it's serious.  It's people -- I'm

2   making some serious allegations here.  I'm talking about

3   attempted murder, people being held responsible.  And

4   I'm talking about attempted murder on my part, but

5   murder on my daughter's part.  It's important stuff

6   going on right now.  Do I fear for my life?  No.  When

7   you're walking with Jesus, you don't have to worry.

8        Q.   All right.  I hear you.

9        A.   Yeah, faith.

10       Q.   So is there anything else that you saw or heard

11  anytime that lends weight or suggests that this was

12  happening?  Even if Jacob denies it, is there anything

13  else that we haven't talked about that supports what

14  you're saying?

15       A.   No.  At this time, I've done said pretty well

16  what I wanted to say.  But I just want to say this to

17  you.  And thank you all for everything you're doing for

18  my baby, and I'm sorry that y'all had to be into this.

19            Tina come from a great family on my side.

20  We have six celebrities in this family, and one of them

21  is a war hero that I'm wearing his picture right now on

22  the front of my shirt.  And for her to be treated like

23  this is terrible.

24            And I just want the truth to come out, and

25  those that are responsible, pay for what they've done.

1  And I want to thank you for everything you've done for

2  my baby.  If you need me, call me.  And I told y'all the

3  truth.

4      Q.   Okay.  I appreciate it.  And I -- and I --

5  just, for the record, your intention is to show up for

6  trial if you're able, right?

7      A.   Oh, man, I would do it.  I will do it on the

8  flick of a dime if I have to.

9      Q.   Okay.  And then just in case, we've got this

10  video, right?

11     A.   Yes, sir.

12     Q.   Just in case?  Okay.  Got you.

13          MR. WHARTON:  All right.  I appreciate

14  your time, and I will pass the witness.  That means

15  we're done.

16          THE WITNESS:  Okay.  Thank you.

17          THE VIDEOGRAPHER:  This concludes the

18  video record.  The time is 10:55.

19                    (WITNESS EXCUSED)

20

21                    (SIGNATURE WAIVED)

22

23

24

25

1                           NO. CC-21-02654-D

2    TINA WILSON                    ) COUNTY COURT AT LAW NO. 4
                                    )
3                                   )
                                    )
4    VS.                            ) IN AND FOR
                                    )
5                                   )
                                    )
6    JACOB CANNON                   ) DALLAS COUNTY, TEXAS

7

8
                        COURT REPORTER'S CERTIFICATE
9               ORAL DEPOSITION OF GERALD MILLER
                        Taken October 18, 2022
10

11

12          I, Cathy Cummins, Certified Shorthand Reporter

13   Number 5837 in and for the State of Texas, hereby

14   certify to the following:

15          That the witness, GERALD MILLER, was duly sworn

16   by the officer and that the transcript of the oral

17   deposition is a true record of the testimony given by

18   the witness;

19          That examination and signature of the witness

20   to the deposition transcript was waived by the witness

21   and agreement of the parties at the time of the

22   deposition;

23          That the amount of time used by each party at

24   the deposition is as follows:

25                   MR. JONATHAN WHARTON - 0:26

1          That pursuant to information given to the

2     deposition officer at the time said testimony was taken,

3     the following includes all parties of record:

4     FOR THE PLAINTIFF:

5                    MR. JONATHAN WHARTON
                     Brad Thomas Law Office
6                    P.O. Box 472027
                     Fort Worth, Texas   76147
7                    (903) 931-3616
                     jon@bradthomaslawoffice.com
8

9     FOR THE DEFENDANT:

10                   MR. OKWUOMA C. MADUFORO
                     Maduforo & Osimiro Law Office
11                   1111 W. Mockingbird Lane, Suite 800
                     Dallas, Texas   75247
12                   (214) 267-0103

13

14

15          I further certify that I am neither counsel

16    for, related to, nor employed by any of the parties or

17    attorneys in the action in which this proceeding was

18    taken, and further that I am not financially or

19    otherwise interested in the outcome of the action.

20

21          Further certification requirements pursuant to

22    Rule 203 of TRCP will be certified to after they have

23    occurred.

24

25



1          Certified to by me this 24th day of October,

2    2022.

3

4                                    _____
                                     Cathy Cummins
5                                    CSR No. 5837 - Exp. 7/31/24
                                     Firm Registration No. 155
6                                    Permian Court Reporters, Inc.
                                     605 W. Texas
7                                    Midland, Texas 79701
                                     (432) 683-3032
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              FIRM'S CERTIFICATION UNDER RULE 203, TRCP

2

3              The original deposition was delivered in

4   accordance with Rule 203.3 to Mr. Jonathan Wharton,

5   Custodial Attorney;

6              $_____ is the deposition officer's

7   charges to Plaintiff for preparing the original

8   deposition transcript and any copies of exhibits;

9              A copy of the Reporter's Certificate and this

10  certificate were served on all parties shown herein and

11  filed with the Clerk.

12             Certified to by me this ___ day of _____,

13  2022.

14

15

16

17                              _____
                                Permian Court Reporters, Inc.
18                              Firm Registration No. 155
                                Expires:  12/31/22
                                605 W. Texas
19                              Midland, Texas 79701
                                (432) 683-3032

20

21

22

23

24

25

| | | |
|---|---|---|
| 1:45PM | 1 | |
| 1:45PM | 2 | Plaintiff's Exhibit No. 4 |
| 1:45PM | 3 | |
| 1:45PM | 4 | Deposition of Gerald Wayne Wilson, Jr. |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1

1                   Cause No. CC-21-02654-D

2   TINA WILSON,              *   COUNTY COURT AT LAW
                                  *

3   VS.                     *   NO. 4 IN AND FOR
                                  *

4   JACOB CANNON              *   DALLAS COUNTY, TEXAS

5

6

7   ********************************************************

8               ORAL AND VIDEOTAPED DEPOSITION OF

9                  GERALD WAYNE WILSON, JR.

10                  Taken November 7, 2022

11  ********************************************************

12              ORAL AND VIDEOTAPED DEPOSITION of GERALD

13  WAYNE WILSON, JR., produced as a witness at the instance

14  of the Plaintiff, and duly sworn, was taken in the

15  above-styled and numbered cause on Monday, November 7,

16  2022, from 10:02 a.m. to 10:25 a.m., in the offices of

17  Permian Court Reporters at 605 West Texas, Midland,

18  Texas, before Stephanie J. Blair, Certified Shorthand

19  Reporter Number 6819 in and for the State of Texas,

20  pursuant to the Texas rules of Civil Procedure (and the

21  provisions stated on the record or attached therein).

22

23

24

25

PLAINTIFF'S
EXHIBIT
4
170

Case 24-04034-elm    Doc 24-1    Filed 01/28/26    Entered 01/28/26 18:21:03    Desc
Appendix    Page 171 of 199
GERALD WAYNE WILSON, JR.

2

1                    A P P E A R A N C E S

2    For the Plaintiff (appearing via Zoom):

3        Mr. Jonathan Wharton
         Brad Thomas Law Office, PLLC
4        P.O. Box 472027
         Fort Worth, Texas 76147
5        (903) 931-3616
         jon@bradthomaslawoffice.com

6

7    Also Present:  Martin Lilly, Videographer

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

I N D E X

Witness:                                                           Page

GERALD WAYNE WILSON, JR.

     Examination by Mr. Wharton                      4

     Reporter's Certificate                         23

**4**

1          THE VIDEOGRAPHER:  We are on the record
2     at 10:02.
3          Would the court reporter please swear in
4     the witness.
5          GERALD WAYNE WILSON, JR.,
6     having been first duly sworn by the Certified Court
7     Reporter, testified as follows:
8          EXAMINATION
9     BY MR. WHARTON:
10         Q.   All right.  Good morning.  My name is Jonathan
11    Wharton.  I represent Tina Wilson.
12         And you understand you're here today to
13    give a deposition for potential use at trial.
14         A.   Yes, sir.
15         Q.   Okay.  Now, I -- we -- you know, just
16    depending on the date, the time, all that, I know that
17    you're interested in appearing live at trial.  Do you
18    understand that if we -- if that is just for whatever
19    reason not feasible, we will be using this video?
20         A.   Yes, sir.
21         Q.   Okay.  So let's start.
22         Just state your name for the record,
23    please.
24         A.   My name is Gerald Wayne Wilson, Jr.
25         Q.   And where are you from?

GERALD WAYNE WILSON, JR.

5

```
 1        A.    I'm from Midland, Texas.
 2        Q.    And what is your relationship to Tina
 3   Wilson?
 4        A.    She's my sister.
 5        Q.    Now, when -- who -- let me ask you this.
 6              Who is your father?
 7        A.    My father is Gerald Miller.
 8        Q.    And you were raised by Jacob Cannon for many
 9   years.  Is that right?
10        A.    Yes, sir.  I rai- -- I was raised with my mom
11   and Jacob off and on until I moved to Nebraska, and then
12   when I came back to Texas, I stayed with my mom.  But
13   like I always came down -- like I moved to Nebraska when
14   I was in seventh grade and I always came back down for
15   like summer, Christmas, and holidays and things like
16   that, but like during the summertime, I stayed with my
17   mom.
18        Q.    When did you first meet Jacob Cannon?
19        A.    Probably like -- I'd say I's probably like in
20   second grade, first grade.
21        Q.    And how did you -- how did you meet him?
22        A.    My mom was going with him.
23        Q.    And wh- -- at what point did you move in and
24   start living with -- with your mom and Jacob Cannon?
25        A.    Instantly like -- because if -- like back then
```

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix   Page 175 of 199
GERALD WAYNE WILSON, JR.

6

1   my mom and my dad, they -- they didn't have a legal --
2   they -- they didn't -- like my dad didn't have custody
3   of me and so my mom -- like they shared time with me, I
4   would say.  And then like when -- my dad got full
5   custody of me when I was in sixth grade.  Then that's
6   when I moved with my dad full time.
7       Q.   So in between -- when you were -- when you
8   were living with Jacob, tell me about that.  What was
9   that like?
10      A.   Man, like -- I don't even really know where to
11  start, you know what I'm saying.  It's still affecting
12  me today because they got my son.  Like my mom and my
13  stepdad, they have my son so it's been -- it's been
14  tumultuous to say the least.
15      Q.   I hear you.  I understand that.
16           Let's -- let's start before we get into
17  all of it with just what Jacob is like in general.
18      A.   I would say he's -- as a person he's -- he
19  comes off like as a good person, you know what I'm
20  saying.  He comes off as a good person.  He's
21  well-mannered.  He has, like I said, good mannerisms and
22  things of that nature, but like behind the doors, he's
23  somebody totally different, like he's jac- -- like
24  multiple personalities like far as like you -- what you
25  see is not what you get behind closed doors.

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix   Page 176 of 199
GERALD WAYNE WILSON, JR.

7

1      Q.   And describe that to me.   I mean what --

2  when -- when did you first realize that Jacob was kind

3  of a different person in private?

4      A.   Well, like Jake, he used to -- like bi- --

5  when -- when I was little, you know what I'm -- when I

6  was second, third grade, I stayed with my mom and them,

7  and he was -- he was okay.   Like we always used to go to

8  his softball games and they'd take us around the country

9  like to go to AstroWorld and Six Flags and things of

10 that nature.   And so it looked like that -- like on the

11 outside that like we were pretty, you know what I'm

12 saying, well taken care of, you know what I'm saying,

13 but on the inside it was a whole bunch of things going

14 on.

15           But like far as him as a person, like

16 he's -- he's all right.   I -- I can't really just -- I

17 won't just -- because he -- he raised my -- my -- my

18 son.   He got my mom but -- like I think he took care of

19 my mom.   He didn't -- took care of my sister, took care

20 of me to a degree.   So it's hard for me to just sit

21 there and be like I dislike the guy, but due to the

22 things that he done and has done and doing, like I'm not

23 just the greatest fan of him because he pre- -- he was a

24 manipulator.   He was a manipulator.

25     Q.   Fair enough.

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix    Page 177 of 199
GERALD WAYNE WILSON, JR.

8

1       And -- and so tell me about times when

2   Jacob has been violent.  Was he ever violent?

3       A.   Oh, yeah, like, Man, several times.  I

4   remember one time he threw me through a wall.  He threw

5   me through a wall and I came out of the wall and I hit

6   him with a vase and it was like he was just -- you know

7   what I'm saying.  And it was because we were playing

8   basketball and I's beating his sons and I'm very

9   competitive and he -- I guess he didn't like what was

10  going on and -- like and -- you know what I'm saying, he

11  became like real aggressive with me.

12      But like he'd chunk rocks at me.  We

13  stayed in country.  They used to -- they'd chunk rocks

14  at me.  I ran from the country barefooted back to

15  Midland hiding in the bushes and stuff like that.  Like

16  he pulled a gun on me.

17      Q.   How -- how old were you when these things were

18  happening?

19      A.   Like when -- when I got threw through the

20  wall, I'd say I was probably like -- around like 11

21  years old because I -- like 11, 12 years old.  I wasn't

22  out of Midland yet.  And then when he pulled a gun on

23  me, it was like probably when I was just coming out of

24  high sch- -- col- -- college.  I was like 19, 20 years

25  old.  And it's just been like -- you know what I'm

Case 24-04034-elm Doc 24-1 Filed 01/28/26 Entered 01/28/26 18:21:03 Desc
Appendix Page 178 of 199
GERALD WAYNE WILSON, JR.

9

1  saying, when he was throwing rocks at me, I was probably

2  like nine, 10 years old, you know, and --

3      Q.    So going through those, why did he pull a gun

4  on you?

5      A.    Well, we [sic] pulled a gun on me because my

6  sister and him was getting into a altercation and --

7  they was arguing and he was trying to chastise my niece,

8  Jaquita, and that's supposed to be my n- -- my

9  niece's -- that's -- that's why -- that's -- that's --

10 that's his qui- -- this is her dad, you know. It's all

11 crazy, Man. Like they was getting into a altercation

12 and -- and I was like, "Why are you always trying to

13 jump in between my sister disciplining her child and you

14 don't want to take responsibility of being -- saying

15 that -- claiming that this is your daughter," you know

16 what I'm saying. And so like he got mad at the things

17 that was I saying and, you know what I'm saying, like he

18 went back and he grabbed a pistol out of the closet.

19 And my mom tried to hold him, my sister, and I took off

20 running out the house and...

21     Q.    So wa- -- was it more that he was trying to

22 cover up -- like he was mad that you mentioned --

23     A.    Like I think he was mad because like I stepped

24 out of place like far as being -- not -- you know what

25 I'm saying, not like -- I'm a bo- -- I'm a kid to him

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix   Page 179 of 199
GERALD WAYNE WILSON, JR.

10

1    and -- and, you know what I'm saying -- and then like me

2    throwing that in his face, like telling him about

3    hisself [sic] probably, too.  I can't really just -- I

4    can't speak to his mind, but that's what I would say.

5         Q.   And -- okay.  So how do you -- how do you know

6    that Jaquita is the daughter of Jacob Cannon?

7         A.   Well, like just by the name.  Like her name is

8    Jaquita and like -- you know what I'm saying, like my

9    dad is Gerald.  I have my dad's first name, but like he

10   doesn't have -- that's just part of it.  Like Jaquita is

11   half name for Jacob.  And then like just the skin tone,

12   the -- you know what I'm saying, like the things like

13   her DNA makeup.  But far as DNA test, I know that my

14   sister has never had a DNA test to say that that's her

15   dad -- that's my niece's dad.

16        Q.   When you say complexion, I mean my -- my

17   memory is that Jacob's lighter skin.  Is that right?

18        A.   Yes, he's very fair complected.

19        Q.   Okay.  He's fair.

20             And then -- and then yo- -- and then your

21   fa- --

22        A.   My niece is very --

23        Q.   -- you and your father --

24        A.   -- fair complected.

25        Q.   -- are dark.  Right?

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix    Page 180 of 199
GERALD WAYNE WILSON, JR.

11

     A.   Yeah, me and my sister and my da- -- my -- my

sister and my dad's are dar- -- we're dark.

     Q.   Okay.  And Jacob's a -- a pretty big guy.

Right?

          How -- how tall is he, do you know?

     A.   Probably like 6-1, 6-2.  Probably like --

he's -- he's 280 pounds, 300 pounds in his -- in his

day --

     Q.   (Indiscernible.)

     A.   -- really back in his -- in his prime.

     Q.   Yeah.  Did he play sports or anything?

     A.   Like he -- I think he played football back

in -- back in his day and shot put and track and things.

They -- he played softball when was I little.  So, yeah,

he was athletic guy.

     Q.   And he was getting violent with you when you

were pretty young.  Your dad was telling me about a time

when you showed up out of the woods --

     A.   Yeah.

     Q.   -- covered in blood.

     A.   Yeah, I was hiding in the woods.  Like they

were throwing rocks at me -- Jacob and my mom, they was

throwing rocks at me.  Like I said, we stayed in the

country and so there was plenty of rocks everywhere and

so it was like -- I don't -- they -- like they were

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix     Page 181 of 199
GERALD WAYNE WILSON, JR.

12

1   coming and so I had to hide off into the mesquite, you

2   know what I'm saying, run barefooted, I didn't have no

3   shoes on or nothing, and tried to hide.  And like I see

4   them driving up and down the street looking for me and

5   I'd be hiding in the dirt and -- and in -- in the

6   mesquite, yeah.  And so when my -- arrived to my dad

7   house, I probably did look like somebody running from

8   something.

9        Q.   Yeah.

10            So what -- so who's "they"?  Who was

11   throwing the rocks?

12        A.   My mom and my dad -- my mom and my stepdad.

13        Q.   So your mom was throwing the rocks, too.

14        A.   Yeah.  Yeah.

15        Q.   And why were they doing this?

16        A.   I -- I believe it was about a game or

17   something like that.  Like it was a game, a basketball

18   game or something to that degree, and like we had

19   like -- we had a section in the house where we had a

20   basketball court outside the house, like a nice little

21   court where his shop was at.  And so we were out there

22   playing, and I think he heard -- his sons a little -- a

23   little younger than me.  Like one of them was like a

24   year and a half younger than me, and the other one was

25   like two, three years.  And therefore -- and so I guess

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix     Page 182 of 199
GERALD WAYNE WILSON, JR.

13

1   he thought I was bullying his sons or things of that

2   nature and -- you know what I'm saying, and he didn't

3   like it.

4       Q.   All right.  And so were there any other kind

5   of events -- violent events with Jacob that stand out to

6   you?

7       A.   Oh, like, shoot, me walking in when my mom's

8   gone in the room seeing him with my sister, always

9   seeing him creeping around corners and doors and things

10  of that nature.  Like me and his sons be off in the

11  living room watching TV and you'll see him like --

12  like a -- you know, creeping around corners, peeping

13  around corners to see what we're doing to like go to my

14  sister's room and stuff like that.

15      Q.   So you -- you actually saw him with her.

16      A.   Yeah, I walked in before.  Like my si- -- my

17  mom left and went to work.  I walked into the room, you

18  know what I'm saying.  Because I already knew at that

19  age like what was -- like what sex was like way -- when

20  I was young, you know what I'm -- I knew what sex was

21  and so I knew -- when I walked in the room, you know

22  what I'm saying, I already had idea like every time my

23  mom leaves to work, he'll -- he'll -- you know what I'm

24  saying, he'll come out and be tipping around.

25               Because at that time my mom went to work

**GERALD WAYNE WILSON, JR.**

**14**

1   and I catch the bus to school and my mom wo- -- my mom

2   worked -- worked at the school and so she'll leave early

3   to go -- like to go to work, you know what I'm saying,

4   and me and my sister be at the house by ourself [sic].

5       Q.   So you would -- you -- you kind of knew that

6   it was going on already.  How did you know that?

7       A.   Just walking in and -- walking in and just

8   putting one and one together, like me just knowing

9   like -- like, you know what I'm saying, like what sex is

10  and seeing the manipulation, seeing how like he fa- --

11  gave her -- like gave my sister favor and like bought

12  her things and stuff like that and when it came to me, I

13  wouldn't get the same favor.

14              And then I told my -- told my dad and

15  them back then about what was going on way back when

16  and -- and then I think that lost a lot of favor with me

17  with Jacob, too, because I was -- kind of dropped the

18  ball when I was a kid about what was going on.

19      Q.   So who did you -- were you -- I guess you were

20  telling your father about it.

21      A.   Yeah, I was telling my father, my mom and

22  them, people that was around me, you know what I'm

23  saying.

24      Q.   Did -- did the cops or did CPS ever get

25  involved?

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix     Page 184 of 199
GERALD WAYNE WILSON, JR.

15

1   A.   Let's -- let me -- like there was so much
2   stuff going on back then.  Like I don't know if the --
3   did the cops get invo- -- I know my dad went to the --
4   to the CPS and things of that nature, to the -- you
5   know, and like I think at one point in time they were
6   trying to blame -- to my -- another guy for one of my
7   sister's -- like for being pregnant by Jacob and -- you
8   know what I'm saying, and like -- so I don't -- there
9   was so much going on when I was a kid and so like more
10   than likely the cops -- CPS were involved in the
11   situation.
12   Q.   Did they ever interview you?
13   A.   No.
14   Q.   So do you know how that -- how they managed to
15   miss that?
16       Do you -- do you know whether Jacob
17   intervened or --
18   A.   Like it's so much like -- like, you know what
19   I'm saying, like being in Midland, I don't know who
20   knows who or what goes on with -- you know what I'm
21   saying, and -- and like, you know what I'm -- I know he
22   has a lot of connections by business and selling houses
23   and things of that nature and so I don't -- I can't
24   really -- you know, I don't know what be going on behind
25   the scenes and...

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix   Page 185 of 199
**GERALD WAYNE WILSON, JR.**

**16**

1     Q.    Yeah.

2     A.    Like -- but like -- but like dealing with him,

3     it makes me like -- you know what I'm saying, like I see

4     manipulation and stuff.  I see how people can use

5     systems and things of that nature to get favor or people

6     with money have -- have influence on people who don't

7     have money.

8     Q.    And so you saw -- you saw that with Jacob.

9     A.    Yeah, I see -- yes.  Yes, sir.

10     Q.    All right.  How -- just give me any specifics,

11     any just --

12     A.    Oh, like my --

13     Q.    -- an example.

14     A.    -- like my -- my family, my -- my granny, my

15     aunties, my uncles, they all accept money from him, but

16     like when it come to me like going to college or doing

17     anything, my mom -- they wouldn't support me at all, you

18     know what I'm saying.  He wouldn't support nothing I --

19     nothing I did.

20             I played high -- football from when I was

21     in -- down -- when I stayed in Midland from when I was

22     sixth grade, fifth grade and high school and college.

23     My mom never came to none of my games.  I have

24     stepbrothers that's like his age [sic], and my mom went

25     to his games and colleges and everywhere, you know what

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix    Page 186 of 199
GERALD WAYNE WILSON, JR.

17

1    I'm saying.

2                So, you know what I'm saying, like I just

3    see like him -- I know the difference.  Like -- like my

4    aunties and uncles, they could get -- get stuff from him

5    and I could ask for -- for a favor or need something

6    and, "No.  No."  He'll be like, "Let me kick it over and

7    I'll think about it," and never respond.

8        Q.    Is that still going on like say with Jaquita

9    or --

10       A.    Oh, Man, shew -- excuse me?  Is what going on,

11   I'm sorry?

12       Q.    Mo- -- more of the same.

13               But I -- if you were thinking of saying

14   something, go ahead.

15       A.    Oh, yeah, like far as -- like my mom just had

16   a birthday two weeks ago in Dallas and my -- my aunt and

17   my mom birthday staggers each other.  I think my aunt's

18   birthday's on the 15th and my mom's is on the 18th.  And

19   my mo- -- my aunt stays in Midland and she has -- her

20   son stay here and we have lot of family that stays here,

21   and they all traveled to Dallas and threw my mom a

22   surprise birthday party, and the only person didn't know

23   about it was me.  And my sister didn't go, of course,

24   but me, I didn't have no earthly idea about it until I

25   got on Facebook.

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix     Page 187 of 199
GERALD WAYNE WILSON, JR.

18

1    Q.   And is he still doing similar types of things

2    with Jaquita?

3    A.   Like -- like I'm not around.  They stay in

4    Dallas and I don't -- they -- I don't get invited to no

5    functions or anything.

6            You know, they have my son.  They raising

7    my son, and I like -- I barely get to see -- like my mom

8    just came down here this weekend and Jacob just came

9    down here this weekend for a funeral.  My son, he's in

10   seventh grade.  They didn't bring him.  They left him.

11   They always -- I only get to see my son like parts of --

12   like one year out of the last five summers.

13   Q.   How do they have your son?

14   A.   Because I got in trouble back in 2012 and they

15   granted my mom temporary rights of my son when I was in

16   prison and -- but when I got out, my mom moved to Dallas

17   and took my son and I didn't have the resources to go

18   get my son, fight for my son.  And I already -- like all

19   the stuff that was going on with me, my family, I'm not

20   really too fond on going to court behind my mom and

21   like -- like tal- -- talking about my mom or -- or

22   Jacob.  I'm not really -- I ain't into that really.

23   Like that's not my -- you know what I'm saying, I rather

24   settle -- settle things just talking instead having to

25   go those steps.

**GERALD WAYNE WILSON, JR.**

**19**

1    Q.    Well, and you -- and you haven't -- and y'all

2    haven't had much success is my understanding going

3    against them --

4    A.    Huh-uh.

5    Q.    -- in general.  Like your father and everybody

6    else --

7    A.    None.

8    Q.    -- is basically --

9    A.    Because like we don't -- like we don't have

10    the same resources that he's allocated, you -- you know.

11    He's -- he's pretty wealthy.  He's done good for hisself

12    in life.  And so we don't have the same resources that

13    he has and -- and lack of resources like far as me

14    getting attorney and going through all those things to

15    get my son, I just -- I don't have -- like then I got a

16    heart problem.  I don't ha- -- probably don't have the

17    energy.  I don't have the energy to go through all

18    that.

19    Q.    Okay.  Tell me -- tell me about Tina and the

20    way this has all affected her.

21    A.    Man, like I just can only imagine not being

22    able to raise your kids because they raised -- took

23    her -- her two oldest kids from her and they pretty much

24    raised her and -- you know what I'm saying, and raised

25    her kids.  So I just know that as a mom, that's got to

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix    Page 189 of 199
GERALD WAYNE WILSON, JR.

20

1   be tearing her up on the inside because just you -- your

2   oldest daughter, she's against you like -- and she

3   goes -- she -- she takes Jake's side and they haven't

4   been communicating ever since all this been taking place

5   and so I just know that just breaks her down like...

6        Q.   Okay.  Is there anything else that kind of

7   jumps into your mind about this that you -- that you can

8   think of as far as your memory of it?

9        A.   Just like -- like I know -- I was around,

10  Jacob's sons was around, but like I don't think that

11  they probably -- they're not like -- ever since

12  everything came out like -- like was transpiring,

13  whatever, like they haven't -- I haven't really talked

14  to them at all, haven't -- like so they -- I can only

15  imagine they grow up with their dad or whatnot, but

16  they -- I know before their relationship with their dad

17  wasn't spectacular at all.  Like they -- they were

18  knowing like since -- like me, they don't pretty much

19  mess with their father at all neither and so -- but at

20  the end of the day, that's their dad so I don't think

21  that they're willing to speak out against their dad.

22        Q.   I gotcha.

23             How many times did you see like directly

24  Tina with Jacob?

25        A.   Man, like --

Case 24-04034-elm    Doc 24-1    Filed 01/28/26    Entered 01/28/26 18:21:03    Desc
Appendix    Page 190 of 199
GERALD WAYNE WILSON, JR.

21

1    Q.    Is that once?

2    A.    Like -- well, like you -- I seen them like

3  just sexually one time, but like as far as like -- you

4  know what I'm saying, like the games and stuff that --

5  like him -- her sitting on his lap and things of that

6  nature and playing like -- like puppy love like when

7  you're in like school -- grade school, like boys and

8  girls chasing around -- each other around the house.

9              Majority of the time my mom would be gone

10  and -- and then that's when the games would start, you

11  know what I'm saying.  That's when all the -- the crazy

12  stuff would start like, you know what I'm saying.  Like

13  my mom wouldn't be there and then all the crazy stuff

14  would start, but then you -- like you could see the fuel

15  between my mom and my sister, me raising up in the house

16  with them and being in the house with them, that like,

17  you know what I'm saying, like -- it was like they were

18  competing over Jacob.  To me, you know, it was weird,

19  you know, but like -- like -- (descriptive sound).  I'm

20  like this is crazy.

21    Q.    It is crazy.  Yeah.

22              Do you have any other memories of any

23  other specifics you can -- just kind of details of it?

24    A.    Not offhand.

25    Q.    Okay.  Fair enough.  Well, that's it.

GERALD WAYNE WILSON, JR.

22

1          MR. WHARTON:  I'll pass the witness.  So

2    that means this is done.

3          THE VIDEOGRAPHER:  All right.  We're off

4    the record at 10:25.

5          (Deposition concluded.)

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix    Page 192 of 199
GERALD WAYNE WILSON, JR.

23

CHANGES AND SIGNATURE

WITNESS NAME:  GERALD WAYNE WILSON, JR.

DEPOSITION DATE:  November 7, 2022

PAGE LINE    CHANGE OR CORRECTION  REASON FOR CHANGE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

_____ - _____ - _____ - _____

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix    Page 193 of 199
GERALD WAYNE WILSON, JR.

24

1          I, GERALD WAYNE WILSON, JR., have read

2    the foregoing deposition and hereby affix my signature

3    that the same is true and correct, except as noted

4    above.

5                              _____

6                              GERALD WAYNE WILSON, JR.

7    THE STATE OF TEXAS )

8    COUNTY OF _____)

9

10

11          Before me, _____, on

12   this day personally appeared GERALD WAYNE WILSON, JR.,

13   known to me (or proved to me under oath through

14   _____) (description of identity card or other

15   document) to be the person whose name is subscribed to

16   the foregoing instrument and acknowledged to me that

17   he/she executed the same for the purposes and

18   consideration therein expressed.

19               Given under my hand and seal of office

20   this _____ day of _____, _____.

21

22                              _____

23                              NOTARY PUBLIC

24                              My Commission expires: _____

25

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix     Page 194 of 199
GERALD WAYNE WILSON, JR.

25

1                     Cause No. CC-21-02654-D

2

3    TINA WILSON,                *   COUNTY COURT AT LAW
                                 *

4    VS.                       *   NO. 4 IN AND FOR
                                 *

5    JACOB CANNON             *   DALLAS COUNTY, TEXAS

6

7                    REPORTER'S CERTIFICATE

8            DEPOSITION OF GERALD WAYNE WILSON, JR.

9                Taken November 7, 2022

10

11           I, Stephanie J. Blair, Certified

12   Shorthand Reporter in and for the State of Texas, do

13   hereby certify to the following:

14           That the witness, GERALD WAYNE WILSON,

15   JR., was duly sworn by the officer and that the

16   transcript of the oral deposition is a true record of

17   the testimony given by the witness;

18           That the amount of time used by each

19   party at the deposition is as follows:

20     Mr. Jonathan Wharton -  23 minutes;

21           That pursuant to information given to the

22   deposition officer at the time said testimony was taken,

23   the following includes counsel for all parties of

24   record:

25

Case 24-04034-elm   Doc 24-1   Filed 01/28/26   Entered 01/28/26 18:21:03   Desc
Appendix     Page 195 of 199
GERALD WAYNE WILSON, JR.

26

```
 1    FOR THE PLAINTIFF:

 2         Mr. Jonathan Wharton
           Brad Thomas Law Office, PLLC
 3         P.O. Box 472027
           Fort Worth, Texas 76147
 4         (903) 931-3616
           jon@bradthomaslawoffice.com

 5

 6              I further certify that I am neither

 7    counsel for, related to, nor employed by any of the

 8    parties or attorneys in the action in which this

 9    proceeding was taken, and further that I am not

10    financially or otherwise interested in the outcome of

11    the action.

12              Further certification requirements

13    pursuant to Rule 203 of the Texas Rules of Civil

14    Procedure will be certified to after they have occurred.

15              Certified to by me this 15th day of

16    November, 2022.

17

18

19              _Stephanie Blair_

20              _____
                Stephanie J. Blair
21              CSR No. 6819, Expires 10/31/23
                Firm Registration No. 155
22              Permian Court Reporters, Inc.
                605 W. Texas
23              Midland, Texas 79701
                (432) 683-3032

24

25
```

**GERALD WAYNE WILSON, JR.**

**27**

1         FIRM'S CERTIFICATION UNDER RULE 203, TRCP

2               The deposition transcript was submitted

3 on November 15, 2022 to the witness at 932 N. Baird,

4 Midland, TX 79701, for examination, signature and

5 return to me by December 7, 2022.

6               The original deposition (was/was not)

7 returned to the deposition officer;

8               If returned, the attached Changes and

9 Signature page contains any changes and the reasons

10 therefor;

11             If returned, the original deposition was

12 delivered in accordance with Rule 203.3 to MR. JONATHAN

13 WHARTON, Custodial Attorney, and $_____ is the

14 deposition officer's charges to MR. JONATHAN WHARTON

15 for preparing the original deposition transcript and

16 any copies of exhibits;

17             A copy of the Reporter's Certificate and

18 this certificate were served on all parties shown herein

19 and filed with the Clerk.

20             Certified to by me this _____ day of

21 _____, _____.

22

          _____

23          Permian Court Reporters, Inc.
           Firm Registration No. 155
           Expires 12-31-2022

24          605 W. Texas
           Midland, Texas 79701

25          (432) 683-3032

| | | |
|---|---|---|
| 1:45PM | 1 | |
| 1:45PM | 2 | **Plaintiff's Exhibit No. 5** |
| 1:45PM | 3 | |
| 1:45PM | 4 | **Photo** |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

PLAINTIFF'S
EXHIBIT
5
PENGAD 800-631-6989



## UNSWORN DECLARATION OF JONATHAN WHARTON

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

"My name is Jonathan Wharton. I am of sound mind and over 21 years of age, and I have personal knowledge of all matters described herein.

I represent the Plaintiff, Tina Wilson, in *Tina Wilson v. Jacob Cannon, Jr.*, Case No. 24-40553-elm7 in the United States Bankruptcy Court for the Northern District of Texas, as well as in *Tina Wilson v. Jacob Cannon*, Cause No. CC-21-02654-D in the County Court at Law No. 4 of Dallas County, Texas, and the appeal from that state court case, Jacob Cannon, Jr. v. Tina Wilson, Case No. 05-23-01185-CV in the 5th Court of Appeals of Dallas, Texas.

Exhibit 1 is a true and correct copy of the Original Petition in Cause No. CC-21-02654-D.

Exhibit 2 is a true and correct copy of the Final Judgment in Cause No. CC-21-02654-D.

Exhibit 4 is a true and correct copy of the Reporter's Record in Case No. 05-23-01185-CV.

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I am making this unsworn declaration in lieu of an affidavit. My name is Jonathan Whitlock Wharton, my date of birth is November 24, 1984, and my address is P.O. Box 190446, Dallas, TX 75219, USA. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Tarrant County, State of Texas, on 01/21/2026."

/s/ Jonathan Wharton
_____
JONATHAN WHARTON