IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In Re: | § | Case No. 24-40553-elm7 |
| | § | |
| Jacob Cannon, Jr., | § | Chapter 7 |
| Debtor. | § | |
| _____ | § | |
| | § | |
| Tina Wilson, | § | Adv. No. 24-04034-elm |
| Plaintiff | § | |
| | § | Judge Edward L. Morris |
| vs. | § | |
| | § | |
| Jacob Cannon, Jr., | § | |
| Defendant | § | |

## __APPENDIX A__

Exhibit 1: Original Petition from Tina Wislon v. Jacob Cannon, Cause No. CC-21-02654-D, County Court at Law No. 4, Dallas County, Texas

Exhibit 2: Final Judgment from Tina Wislon v. Jacob Cannon, Cause No. CC-21-02654-D, County Court at Law No. 4, Dallas County, Texas

Exhibit 3: Unsworn Declaration of Jonathan Wharton

Exhibit 4:Reporter's Record from Tina Wilson v. Jacob Cannon, Cause No. CC-21-02654-D, County Court at Law No. 4, Dallas County, Texas

Cause No. CC-21-02654-D

| | | |
|---|---|---|
| TINA WILSON | § | IN THE COUNTY COURT |
| | § | |
| | § | |
| VS. | § | AT LAW NO.4 |
| | § | |
| | § | |
| | § | |
| JACOB CANNON | § | DALLAS COUNTY, TEXAS |

## FINAL JUDGMENT

BE IT REMEMBER that, on October 11, 2023, came on to be heard the above-entitled and numbered cause. Plaintiff TINA WILSON appeared by and through her attorney Jonathan Wharton and announced ready. Defendant JACOB CANNON appeared by and through his attorney Okwy Maduforo and announced ready.

A jury was not requested, and a bench trial proceeded. The Court has considered the pleadings and official records, exhibits and arguments of the parties on file in this cause and is of the opinion that judgment should be rendered for the Plaintiff.

It is therefore ORDERED, ADJUDGED, and DECREED that Plaintiff is entitled to a judgment, pursuant to Texas law, it is further, ORDERED, ADJUDGED, and DECREED that Plaintiffs TINA WILSON shall recover from Defendant, JACOB CANNON the following sums:

$500,000 in past pain and suffering;
$6,000,000 in past mental anguish;
$1,000,000 in future mental anguish; and
$750,000 in punitive damages.

1 Final Judgement – CC-21-02654-D



CC-21-02654-D
COJ
ORDER – JUDGMENT
2771631

2

This is a Final JUDGMENT DISPOSING OF ALL ISSUES AND ALL PARTIES, AND
this judgment is appealable.

SIGNED on this ___ day of _October_ 2023.

JUDGE PRESIDING

2  Final Judgement – CC-21-02654-D

FILED
7/1/2021 3:30 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

CAUSE NO. CC-21-02654-D

| | | |
|---|---|---|
| TINA WILSON | § | COUNTY COURT AT LAW NO. ___ |
| | § | |
| | § | |
| VS. | § | IN AND FOR |
| | § | |
| | § | |
| JACOB CANNON | § | DALLAS COUNTY, TEXAS |

## ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW TINA WILSON, Plaintiff, and files this Original Petition against Defendant, JACOB CANNON, and for cause of action would respectfully show the Court as follows:

### VENUE AND JURISDICTION
### I.

Venue is appropriate in Dallas County pursuant to Section 15.002(2) of the Texas Civil Practice & Remedies Code, as the Defendant resides in this county.

The Court has jurisdiction over the controversy because the damages are in excess of the minimum jurisdictional limits of the Court. The Plaintiff seeks only monetary relief over $1,000,000.

### DISCOVERY CONTROL PLAN
### II.

This suit may proceed under Discovery Level 3.

### PARTIES AND SERVICE
### III.

Defendant JACOB CANNON may be served at 925 W. Bear Creek Rd., Glenn Heights, TX 75154.

## FACTS
### IV.

Jacob Cannon is Tina Wilson's stepfather. From the ages of nine to sixteen, Tina Wilson was repeatedly raped and impregnated by Jacob Cannon. Despite multiple miscarriages and forced abortions, she had a child by him.

## LIABILITY
### V.

Jacob Cannon is liable for assault (continuous sexual abuse of a child).

## DAMAGES
### VI.

The Plaintiff may recover past and future pain and suffering; past and future mental anguish; past and future medical expenses; and past and future loss of enjoyment of life. The Plaintiff may also recover punitive damages.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendant Jacob Cannon be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for damages in amount within the jurisdictional limits of the Court; together with pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by low; post-judgment interest at the legal rate; costs of court; and for such other and further relief, general and special, at law or in equity, to which Plaintiff may show herself to be justly entitled.

Respectfully submitted,

BRAD THOMAS LAW OFFICE, PLLC
P.O. Box 472027
Fort Worth, TX 76147

Tel.: (903) 931-3616
Fax: (903) 900-4727
E-mail: jon@bradthomaslawoffice.com


BY: ___/s/ Jonathan Wharton_____

       JONATHAN WHARTON
       STATE BAR NO. 24075764
       ATTORNEY FOR PLAINTIFF,
       TINA WILSON

1                    REPORTER'S RECORD

2                VOLUME 1 OF 1 VOLUME          FILED IN
                                          5th COURT OF APPEALS
3              APPELLATE NO. 05-23-01185-CV   DALLAS, TEXAS
                                          1/3/2024 4:39:45 PM
4          TRIAL COURT CAUSE NO. CC-21-026-Ruben Morin
                                               Clerk
5   TINA WILSON                    ) IN THE COUNTY COURT
            Plaintiff,             )
6                                  )
    VS.                            ) AT LAW NO. 4
7                                  )
    JACOB CANNON                   )
8           Defendant.             ) DALLAS COUNTY, TEXAS

9

10      _____

11                 TRIAL BEFORE THE COURT

12      _____

13      On the 12th day of October, 2023, the following

14  proceedings came on to be heard in the above-titled and

15  numbered cause before the Honorable Dianne K. Jones,

16  Judge Presiding, held in Dallas, Dallas County, Texas.

17      Proceedings reported by computerized stenotype

18  machine.

19           VEARNEAS W. FAGGETT, TEXAS CSR #3129

20               Official Court Reporter

21              County Court at Law No. 4

22                   214.779.7034

23

24

25

1                      A P P E A R A N C E S

2    FOR THE PLAINTIFF:
          Mr. Jonathan Wharton
3         Texas State Bar No. 24075764
          jonwhartonlaw@gmail.com

4

5         The Law Office of Jonathan W. Wharton
          P. O. Box 472027
6         Forth Worth, Texas   76147
          Tel: 903.931.3616
7         Fax: 214.462.6401

8

9

10   FOR THE DEFENDANT:
          Mr. Okwy C. Maduforo
11        Texas State Bar No. 24047703
          ocmaduforo@outlook.com

12

13        Law Offices of Maduforo & Osimiri, PLLC
          1111 W. Mockingbird Ln., Ste. 1410 650
14        Dallas, Texas   75247
          Tel: 214.267.0103

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    OCTOBER 12, 2023                              PAGE   VOL

3    Proceedings .................................    5    1

4    Defense Motion for Continuance ...............    5    1

5    Court's Ruling ...............................    6    1

6    Plaintiff's Opening Statements ...............    7    1

7    Defense's Opening Statements .................    8    1

8    PLAINTIFF'S WITNESS    DIR    CROSS   REDIR   RECROSS    VD

9    Wilson, Tina           12     42     50                 1

10   Plaintiff Rests ..............................   70    1

11   Defense Motion for Instructed Verdict ........   70    1

12   Court's Ruling ...............................   72    1

13   DEFENSE'S WITNESS     DIR    CROSS   REDIR   RECROSS    VD

14   Wilson, Birdie        72     87     94                  1

15   Defense Rests ................................   96    1

16   PLAINTIFF'S WITNESS   DIR    CROSS   REDIR   RECROSS    VD

17   Jones, Roderick       97    104    108                  1

18   Reporter's Certificate ...................... 112    1

19   Disclosure .................................. 113    1

20

21

22

23

24

25

1                     E X H I B I T    I N D E X

2    Description                    Offered    Admitted    Vol

3    Plaintiff's No.

4    1 - Jacob Cannon, Jr. Depo       10         11          1

5    2 - Sharon Jackson George Depo   10         11          1

6    3 - Gerald Miller Depo           10         11          1

7    4 - Gerald Wayne Wilson, Jr. Depo 10        11          1

8    5 - Photo                       110        110          1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              (October 12, 2023; 9:59 a.m.)

9:59AM   3              THE COURT:  This is Cause Number

9:59AM   4    CC-21-02654-D, Tina Wilson versus Jacob Cannon.

9:59AM   5              MR. WHARTON:  Jon Wharton for the

9:59AM   6    Plaintiff, Your Honor.

9:59AM   7              MR. MADUFORO:  Okwy C. Maduforo, for the

9:59AM   8    Defendant Jacob Cannon.

9:59AM   9              THE REPORTER:  Can you spell your last

9:59AM   10   name?

9:59AM   11             MR. MADUFORO:  Sure.  M-A-D-U-F-O-R-O.

9:59AM   12   Thank you.

9:59AM   13             THE COURT:  Okay.  And what's the basis of

9:59AM   14   your continuance?

9:59AM   15             MR. MADUFORO:  Your Honor, it's just a

9:59AM   16   couple of things.  One of them is already taken care of

9:59AM   17   and I appreciate your patience with me.  I had a prior

9:59AM   18   scheduled hearing in Denton County, just rushing down

9:59AM   19   from there this morning.

9:59AM   20             And then, too, the former attorney who

9:59AM   21   recently officially withdrew from the case and now I'm

9:59AM   22   here with Mr. Jacob.  And I reached out to plaintiff's

10:00AM  23   counsel to see probably if we can find a way to engage in

10:00AM  24   some collaborative maybe proceedings to see if we can

10:00AM  25   resolve this, or some of the other issues maybe that we

| | | |
|---|---|---|
| 10:00AM | 1 | have in this case.  Because we haven't had a chance to do |
| 10:00AM | 2 | that. |
| 10:00AM | 3 | And being that I'm still new pursuant to |
| 10:00AM | 4 | the withdrawal of the previous attorney, I wanted to see |
| 10:00AM | 5 | if I could have a little more attorney prep time and |
| 10:00AM | 6 | ultimately we might be able to resolve this. |
| 10:00AM | 7 | THE COURT:  Well, I'm going to deny your |
| 10:00AM | 8 | motion.  This case was filed on July 1st, 2023.  This is |
| 10:00AM | 9 | October the 12th -- I'm sorry -- October 12th, 2023. |
| 10:00AM | 10 | This was filed on July 1st, 2020.  It's been set for |
| 10:00AM | 11 | several months in this courtroom and your motion for |
| 10:00AM | 12 | continuance wasn't even filed until two days ago.  I |
| 10:01AM | 13 | don't know when you took over the case but I guess you |
| 10:01AM | 14 | took over the case two days ago... |
| 10:01AM | 15 | MR. MADUFORO:  I was not aware, I think, |
| 10:01AM | 16 | up until I believe late last month by Mr. Shawn Laney was |
| 10:01AM | 17 | on the case, I believe. |
| 10:01AM | 18 | THE COURT:  But your client represented to |
| 10:01AM | 19 | the Court that you were the original attorney on this |
| 10:01AM | 20 | case. |
| 10:01AM | 21 | MR. MADUFORO:  Until I was fired and then |
| 10:01AM | 22 | rehired. |
| 10:01AM | 23 | THE COURT:  Right, which means you're very |
| 10:01AM | 24 | familiar with the case, so we will proceed at this time. |
| 10:01AM | 25 | MR. MADUFORO:  Thank you, Judge. |

| | | |
|---|---|---|
| 10:01AM | 1 | THE COURT:  Does anybody want to do an |
| 10:01AM | 2 | opening statement? |
| 10:01AM | 3 | MR. WHARTON:  Yes, Your Honor. |
| 10:01AM | 4 | MR. MADUFORO:  Yes, Your Honor. |
| 10:01AM | 5 | THE COURT:  Mr. Wharton, you may proceed |
| 10:01AM | 6 | first. |
| 10:01AM | 7 | PLAINTIFF'S OPENING STATEMENTS |
| 10:01AM | 8 | MR. WHARTON:  Thank you, Your Honor. |
| 10:02AM | 9 | This is a sexual assault of a minor case. |
| 10:02AM | 10 | So, Tina Wilson, when she was a child, |
| 10:02AM | 11 | beginning at the age of about nine, she was living with |
| 10:02AM | 12 | her mother's husband, Jacob Cannon, and he had sex with |
| 10:02AM | 13 | her for years.  He impregnated her multiple times.  She |
| 10:02AM | 14 | had a series of abortions. |
| 10:02AM | 15 | Ultimately, at the age of 12, she carried |
| 10:02AM | 16 | one of those children to term.  That child is named |
| 10:02AM | 17 | Jaquita, after Jacob; Jaquita Cannon. |
| 10:02AM | 18 | Mr. Cannon has been deposed.  He pled the |
| 10:02AM | 19 | Fifth for every question relating to sexual contact with |
| 10:03AM | 20 | Tina Wilson or the parentage of Jaquita. |
| 10:03AM | 21 | We have depositions from Ms. Wilson's |
| 10:03AM | 22 | brother as well as her father and her stepmother, |
| 10:03AM | 23 | basically her -- so, they never -- there's no evidence on |
| 10:03AM | 24 | the other side.  They have no defense, as far as I can |
| 10:03AM | 25 | tell.  They've never produced any evidence.  There's no |

| | | |
|---|---|---|
| 10:03AM | 1 | witnesses.  They have -- there's nothing. |
| 10:03AM | 2 | So the Court will be hearing from |
| 10:03AM | 3 | Ms. Wilson.  Unfortunately, I sort of anticipated this |
| 10:03AM | 4 | might go through a different way, but she is going to |
| 10:03AM | 5 | have to testify.  And, you know, that's what we'll be |
| 10:03AM | 6 | doing primarily.  And I'll be introducing the depositions |
| 10:03AM | 7 | from the witnesses.  And the way that I would prefer to |
| 10:04AM | 8 | do that is just in writing to make this as brief -- this |
| 10:04AM | 9 | part as brief as possible. |
| 10:04AM | 10 | As far as damages, what we'll be asking |
| 10:04AM | 11 | for, it doesn't really I don't think in a practical sense |
| 10:04AM | 12 | make much difference whether it's 5 million or |
| 10:04AM | 13 | 500 million or whatever.  I don't think on a practical |
| 10:04AM | 14 | level it's going to make much difference. |
| 10:04AM | 15 | The value of Tina's mental anguish for |
| 10:04AM | 16 | going through that for years, for living with that, is |
| 10:04AM | 17 | beyond anything that money could possibly change. |
| 10:04AM | 18 | So I don't think that -- well, we'll get |
| 10:04AM | 19 | through it.  Thank you, Your Honor. |
| 10:04AM | 20 | THE COURT:  Counselor. |
| 10:04AM | 21 | DEFENSE'S OPENING STATEMENTS |
| 10:04AM | 22 | MR. MADUFORO:  Your Honor, thank you. |
| 10:04AM | 23 | This case, as unfortunate as it sounds, is |
| 10:05AM | 24 | not about an actual incident that occurred.  It's about |
| 10:05AM | 25 | what can I get from my stepfather.  It's about do this |

10:05AM   1   for me or else.

10:05AM   2                   Testimony from Mr. Cannon will show what a

10:05AM   3   loving, caring, and straightforward human being he is.

10:05AM   4                   Testimony from Mr. Cannon will show to the

10:05AM   5   point where the petitioner in this case, plaintiff in

10:05AM   6   this case, I'm sorry, left the house after threatening,

10:05AM   7   if you don't give me XYZ amount of money and build a

10:05AM   8   house for me, I'll make your life a living hell, for lack

10:05AM   9   of a better word.  This is about what we can get and not

10:06AM   10  actually what happened.

10:06AM   11                  You will never hear testimony that an

10:06AM   12  incident like this occurred, that there was any part of

10:06AM   13  investigation, police report, CPS issues alleged that it

10:06AM   14  happened while she was still a minor.  That never

10:06AM   15  happened.

10:06AM   16                  And, by the way, Mr. Cannon's beloved wife

10:06AM   17  used to work for the County.  She is very much aware of

10:06AM   18  the process.  This is her biological child.  That

10:06AM   19  complaint was never, never, it never came -- be put in

10:06AM   20  words a series of abuse unfortunately to the plaintiff by

10:06AM   21  her dads' relatives, by the cousin.

10:07AM   22                  You will not hear testimony from Mr. Jacob

10:07AM   23  that this occurred.  You will not hear testimony that

10:07AM   24  there was an investigation.  You will not hear testimony

10:07AM   25  that this man was convicted by any chance of these

| | | |
|---|---|---|
| 10:07AM | 1 | events. |
| 10:07AM | 2 | You will not hear testimony that his wife |
| 10:07AM | 3 | threatened to divorce him or leave him because he was |
| 10:07AM | 4 | abusing her biological child. |
| 10:07AM | 5 | At the end of the day, Your Honor, we are |
| 10:07AM | 6 | asking that judgment be awarded against them and they |
| 10:07AM | 7 | don't take nothing from the plaintiff -- I mean |
| 10:07AM | 8 | respondent in this case.  Thank you. |
| 10:07AM | 9 | THE COURT:  Please call your first |
| 10:07AM | 10 | witness, Mr. Wharton. |
| 10:07AM | 11 | MR. WHARTON:  Yes, Your Honor.  And I |
| 10:07AM | 12 | would like to begin by just introducing the four |
| 10:07AM | 13 | depositions.  So these, for streamlining the process, it |
| 10:08AM | 14 | will be easier than reading them or playing them. |
| 10:08AM | 15 | THE COURT:  I'm supposed to read them or |
| 10:08AM | 16 | play them sometime later? |
| 10:08AM | 17 | MR. WHARTON:  Yes, Your Honor. |
| 10:09AM | 18 | THE COURT:  So any objections? |
| 10:09AM | 19 | MR. MADUFORO:  Yes, Your Honor.  Is this |
| 10:09AM | 20 | all one exhibit? |
| 10:09AM | 21 | MR. WHARTON:  There are four different |
| 10:09AM | 22 | ones, four depositions. |
| 10:09AM | 23 | MR. MADUFORO:  So I don't have objection |
| 10:09AM | 24 | or objections on three of those.  But I do have -- on one |
| 10:10AM | 25 | I don't see a certification of the transcript by the |

10:10AM   1   transcriber.  Okay, I see here it is signature.  I don't

10:10AM   2   see any --

10:10AM   3                THE COURT:  Mr. Wharton?

10:10AM   4                MR. WHARTON:  I have the certification

10:10AM   5   here, electronically, and physically I can show Your

10:10AM   6   Honor what we're looking at.  May we approach?

10:10AM   7                THE COURT:  Sure.

10:10AM   8                MR. WHARTON:  So this is the deposition

10:10AM   9   and this is the certification page.  It looks like she

10:10AM   10  didn't fill the date out on that one.

10:10AM   11                THE COURT:  But she signed.

10:10AM   12                MR. WHARTON:  Yeah, and then I have the

10:10AM   13  date on here.

10:10AM   14                THE COURT:  Well, admitted.  It goes to

10:11AM   15  the weight, so all four exhibits are admitted.

10:11AM   16                MR. WHARTON:  We'll label them 1 through

10:11AM   17  4, Your Honor.

10:11AM   18                (Plaintiff's Exhibits 1 - 4 admitted.)

10:11AM   19                MR. WHARTON:  We call Tina Wilson.

10:11AM   20                THE COURT:  Please raise your right hand,

10:11AM   21  ma'am.

10:11AM   22                Do you swear or affirm to tell the truth,

10:11AM   23  the whole truth, and nothing but the truth so help you

10:11AM   24  God?

10:11AM   25                THE WITNESS:  Yes, I do.

| | | |
|---|---|---|
| 10:11AM | 1 | TINA M. WILSON, |
| 10:11AM | 2 | was called as a witness by the Plaintiff, having been |
| 10:11AM | 3 | first duly sworn, testified as follows: |
| 10:11AM | 4 | DIRECT EXAMINATION |
| 10:11AM | 5 | BY MR. WHARTON: |
| 10:11AM | 6 | Q.   State your name for the record, please. |
| 10:12AM | 7 | A.   Tina Marie Wilson. |
| 10:12AM | 8 | THE COURT:  Mr. Wharton, I need you to sit |
| 10:12AM | 9 | down and speak into the microphone. |
| 10:12AM | 10 | MR. WHARTON:  Yes, Your Honor. |
| 10:12AM | 11 | Q.   (By Mr. Wharton)  State your name for the |
| 10:12AM | 12 | record, please. |
| 10:12AM | 13 | A.   Tina Marie Wilson. |
| 10:12AM | 14 | Q.   And let's start with how you came to live in |
| 10:12AM | 15 | Jacob Cannon's house. |
| 10:12AM | 16 | A.   My mother and Jacob were dating.  I moved in |
| 10:12AM | 17 | shortly after they started dating, around the age of nine |
| 10:12AM | 18 | or ten. |
| 10:12AM | 19 | Q.   What was Jacob like initially? |
| 10:13AM | 20 | A.   He was real nice.  He was -- he was just really |
| 10:13AM | 21 | nice at first until things started happening. |
| 10:13AM | 22 | Q.   Okay.  Tell me about that.  What things started |
| 10:13AM | 23 | happening? |
| 10:13AM | 24 | A.   Around the same age of nine or ten, I was in -- |
| 10:13AM | 25 | we were staying in Wildflower Apartments in Midland, |

Direct Examination by Mr. Wharton

10:13AM  1  Texas.  I was in the bathtub.  I believe I was crying.

10:13AM  2  He walked in.  He asked me was I okay.  I said yes.  I

10:13AM  3  got out of the bathtub.  We had a water bed at the time.

10:13AM  4  I got out of the bathtub and I was drying off, and that's

10:13AM  5  when I noticed him looking at me.

10:13AM  6          He, himself, told me that's what attracted him

10:14AM  7  to me.  And shortly after that, around -- my first time

10:14AM  8  ever having a miscarriage, I was 11 years old.  I had my

10:14AM  9  first miscarriage at 11, had my first abortion at 11, and

10:14AM 10  I got pregnant and had -- I got pregnant several times

10:14AM 11  and I had a total of two abortions and five -- I'm sorry,

10:14AM 12  I apologize -- I had two miscarriages and five abortions

10:14AM 13  by Jacob until I turned the age of 14.  And at the age of

10:14AM 14  14, I got pregnant with my daughter Jaquita Cannon.

10:14AM 15      Q.   And how did you name Jaquita?

10:14AM 16      A.   Jacob named Jaquita.  Jaquita means Jacob in

10:14AM 17  African Hebrew form.  It means the same as Jacob the

10:14AM 18  father.

10:14AM 19      Q.   Why did your mother never intervene?

10:15AM 20      A.   I feel like my mother stayed with Jacob based

10:15AM 21  on money.  I feel like my mother allowed these things to

10:15AM 22  happen.  My mother was also very abusive to me.  I

10:15AM 23  believe she did it because Jacob has money.

10:15AM 24          THE COURT:  Well, let me stop you.  If you

10:15AM 25  are going to prove your case, you are going to need to

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:15AM | 1 | prove your case.  I was a child abuse prosecutor for a |
| 10:15AM | 2 | year and a half and so far I haven't heard anything. |
| 10:15AM | 3 | MR. WHARTON:  Yes, Your Honor. |
| 10:15AM | 4 | Q.  (By Mr. Wharton)  So, going through it, the |
| 10:15AM | 5 | first time that Jacob initiated sexual contact with you, |
| 10:15AM | 6 | and again in detail, can you tell the Court what exactly |
| 10:15AM | 7 | happened? |
| 10:15AM | 8 | A.  The first time Jacob tried to penetrate me, he |
| 10:15AM | 9 | said that I was too tight.  He used a toothbrush.  He |
| 10:15AM | 10 | used Q-tips, anything to try to basically open me up. |
| 10:16AM | 11 | I didn't understand it at first.  Now that I'm |
| 10:16AM | 12 | older I do.  He told me -- it was several occasions where |
| 10:16AM | 13 | he told me we were married.  Just like in a lot of black |
| 10:16AM | 14 | marriages you have to jump over the broom.  I had to jump |
| 10:16AM | 15 | over a broom.  My last name was then changed from Wilson |
| 10:16AM | 16 | to Cannon.  He told me that we were married and that |
| 10:16AM | 17 | everything was okay. |
| 10:16AM | 18 | Q.  Let's go through in detail for these -- the |
| 10:16AM | 19 | actual sexual experiences.  Did you kiss Jacob?  Did Jacob |
| 10:16AM | 20 | kiss you? |
| 10:16AM | 21 | A.  Yes. |
| 10:16AM | 22 | Q.  Did he touch you? |
| 10:16AM | 23 | A.  Yes. |
| 10:16AM | 24 | Q.  Okay.  Where did he touch you? |
| 10:16AM | 25 | A.  He touched me all over.  He touched my breasts, |

10:16AM   1    he touched my vagina.  He touched me all over.  He would

10:17AM   2    basically do it before -- my mom, she -- she worked for

10:17AM   3    the school district.  She would have to leave for work

10:17AM   4    early in the morning and that's a lot of times when it

10:17AM   5    would start, around 6 or 6:30 in the morning.

10:17AM   6        Q.   Your brother described y'all as -- and Jacob in

10:17AM   7    particular, as acting like puppy love, like a lot of

10:17AM   8    playing?

10:17AM   9        A.   Yes.

10:17AM  10        Q.   Is that how he would initiate sexual contact

10:17AM  11    with you?

10:17AM  12        A.   Yes.

10:17AM  13        Q.   How regularly would he have sexual relations

10:17AM  14    with you, like penetration?

10:17AM  15        A.   I can't really just give you like how many

10:17AM  16    times a week, but it was a lot.  It was a lot.  I thought

10:17AM  17    that was something regular before I went to school.  I

10:18AM  18    was literally only in the fourth or fifth grade when this

10:18AM  19    started.  I didn't know any better.

10:18AM  20        Q.   How many years did it last for?

10:18AM  21        A.   It lasted, I would say, up until almost my

10:18AM  22    senior year of high school.

10:18AM  23        Q.   What time of day did the actual sex itself most

10:18AM  24    commonly occur?

10:18AM  25        A.   Early in the morning.

10:18AM   1        Q.   Where was your mother at this time?

10:18AM   2        A.   Sometimes she would be at work.

10:18AM   3             On one occasion I remember it was a big

10:18AM   4   altercation between my mom and Jacob.  He locked her

10:18AM   5   outside of the house.  He called me in his bedroom.  I

10:18AM   6   don't know how my mom end up getting in the house but she

10:18AM   7   actually walked in on him on top of me.  She then -- she

10:18AM   8   shut the door and walked away.

10:19AM   9        Q.   Is this an incident involving marks on your

10:19AM  10   neck?  Did this ever leave marks on your neck?

10:19AM  11        A.   No.

10:19AM  12        Q.   Okay.  When did that incident occur?

10:19AM  13        A.   That incident occurred on one occasion when I

10:19AM  14   actually tried to fight Jacob off and Jacob got angry.

10:19AM  15   He -- we were actually laying on the floor.  When he did

10:19AM  16   have -- when he did touch me while my mother was there,

10:19AM  17   she would either be in her room or she would be in

10:19AM  18   another part of the house.

10:19AM  19             Our houses were not small houses.  Our houses

10:19AM  20   were big houses.  And he would tell me to lay on the

10:19AM  21   threshold of between my bed and the hallway, and he

10:19AM  22   would -- so that way he could see when she was coming.

10:19AM  23             And the one time that I did try to fight Jacob

10:19AM  24   back, that's when he got physical.  And I remember coming

10:20AM  25   home after school that day and him apologizing and him

10:20AM   1   telling me he was wrong, he won't never do that again.

10:20AM   2   But it was always he was sorry, I won't do it again.  And

10:20AM   3   it still happened.

10:20AM   4        Q.   Do you know of any incident where your mother

10:20AM   5   ended up getting marks on her neck?

10:20AM   6        A.   No.

10:20AM   7        Q.   Okay.  Are -- were there any other times where

10:20AM   8   Jacob physically forced you, was physically violent with

10:20AM   9   you?

10:20AM  10        A.   When you say physically violent, do you mean

10:20AM  11   like where he struck me and hit me and made me do it?

10:20AM  12        Q.   Yes.

10:20AM  13        A.   No.  He would just -- he told me that this was

10:20AM  14   natural and this was his way of showing me that he loved

10:20AM  15   me and that he didn't -- he didn't -- he was with my mom

10:20AM  16   because of me and that he really wanted to be with me.

10:20AM  17            And once I got older and I was able to move

10:21AM  18   out, he started acting strange.  He did weird things.

10:21AM  19   Like he would -- I was messing with someone, my little

10:21AM  20   girl's father.  He would leave bras in his car or --

10:21AM  21   because my little girl's father did have a girlfriend at

10:21AM  22   that time.  He would leave bras in his car.  He would

10:21AM  23   come to my house late at night.  He would tell me that I

10:21AM  24   broke his heart, that -- you know, things of that nature.

10:21AM  25   It was just all -- it was all weird.

10:21AM  1              THE COURT:  So who's your little girl's

10:21AM  2  father?

10:21AM  3              THE WITNESS:  My oldest daughter, Jacob.

10:21AM  4              THE COURT:  You were talking about your

10:21AM  5  little girls.

10:21AM  6              THE WITNESS:  No, I have three children.

10:21AM  7  I have two girls.  My youngest daughter, Iceland, her

10:21AM  8  father, when I started dating him.

10:21AM  9       Q.   (By Mr. Wharton)  Who is her father?

10:21AM  10      A.   His name is Corey Haynes.

10:21AM  11      Q.   How -- how did Jacob sexually -- when he began

10:22AM  12  having sex with you, how did he do it?  Did he kiss and

10:22AM  13  touch you?

10:22AM  14      A.   Yes.

10:22AM  15      Q.   Okay.  Did he engage in oral sex with you?

10:22AM  16      A.   No.

10:22AM  17      Q.   All right.  Did you engage in oral sex with him?

10:22AM  18      A.   Yes.

10:22AM  19      Q.   How often did that happen?

10:22AM  20      A.   That happened maybe two or three times.

10:22AM  21      Q.   Can you tell me in detail about those incidents?

10:22AM  22      A.   Jacob just had a way of manipulating the

10:22AM  23  situation.  Jacob had a way of using his money to get

10:22AM  24  what he wanted.  So, whatever was popular for kids then,

10:23AM  25  I always got it.  Whatever outfits were out then, I

10:23AM  1  always got it.  I had more jewelry on my body than most

10:23AM  2  women had on their fingers from them -- from their

10:23AM  3  husbands buying them.  For every finger I had a piece of

10:23AM  4  jewelry on my finger.  And that was his way of saying,

10:23AM  5  hey, I got you something, now you give me something.

10:23AM  6      Q.   Can you tell me in detail -- I know this is

10:23AM  7  uncomfortable -- can you tell me in detail about the

10:23AM  8  incidents where there was actual oral sex occurring?

10:23AM  9      A.   I never forget it.  One time we were living on

10:23AM 10  County Road 56.  He told me he wanted me to try something

10:23AM 11  different.  He did it.  He ejaculated in my mouth and

10:23AM 12  that was basically the end of it.

10:23AM 13          After every sexual occurrence, like I said, I

10:24AM 14  would get something.  Even before, most of the time I

10:24AM 15  would get something.

10:24AM 16          I was in the fifth and sixth grade getting my

10:24AM 17  nails done every two weeks.  I was like -- it wasn't

10:24AM 18  nothing that I couldn't ask for.  It was times where if

10:24AM 19  it was my turn to wash the dishes, he would be the one in

10:24AM 20  there washing the dishes and telling me, okay, I'll wash

10:24AM 21  the dishes as long as you come play with me.

10:24AM 22      Q.   When did you first have a normal boyfriend?

10:24AM 23      A.   I didn't.  I didn't.  The boyfriend that I

10:24AM 24  liked his name was Roderick Jones but Jacob even paid him

10:24AM 25  to say that he was Jaquita's father.  To this day, I've

Direct Examination by Mr. Wharton

10:24AM   1   never ever had sex with that young man.

10:24AM   2        Q.    Tell me about going to get the first abortion.

10:25AM   3        A.    It was shortly after a custody battle between

10:25AM   4   my mom and my dad.  That was one of the times that my

10:25AM   5   last -- my whole name was changed.  And the only part of

10:25AM   6   the name that I remember was Talley (phonetic).  It was

10:25AM   7   here in Dallas.  After that, the other abortions happened

10:25AM   8   in Odessa.

10:25AM   9        Q.    And did you give a fake name?

10:25AM  10        A.    I don't know what name they gave.  I never

10:25AM  11   filled out the paperwork.

10:25AM  12                    THE COURT:  Who is "they"?

10:25AM  13                    THE WITNESS:  My mom and Jacob.

10:25AM  14        Q.    (By Mr. Wharton)  Tell me about getting an

10:25AM  15   abortion.  Walk me through arriving at the clinic and how

10:25AM  16   it actually occurred.

10:25AM  17        A.    One of the abortions that I remember most

10:25AM  18   vividly, Jacob was actually in the room with me.  He held

10:25AM  19   my hand during the whole abortion process.  The man told

10:26AM  20   me that I was pregnant with a little boy.  That one stuck

10:26AM  21   out the most to me because I actually knew the gender of

10:26AM  22   the baby.  I actually knew -- okay, this is not just me

10:26AM  23   bleeding on my bedroom floor and me calling my mom and

10:26AM  24   telling her, hey, something is not right.  It means I

10:26AM  25   just said, hey, this is just me laying on the floor.  I

Direct Examination by Mr. Wharton

10:26AM  1    actually had a kid and I actually knew the sex of my

10:26AM  2    child.  So, for me, that stuck out the most and he sat

10:26AM  3    there and he held my hand during that whole process.  So

10:26AM  4    the abortions were hard.

10:26AM  5          It put -- everybody -- everybody thought, well,

10:26AM  6    Tina has everything.  Tina is spoiled.  Tina gets

10:26AM  7    whatever she wants.  But Tina was the meanest kid that

10:27AM  8    you could ever run into.  Tina was a bully.  Tina was

10:27AM  9    hurting inside because everybody that Tina turned to,

10:27AM 10    nobody believed me.

10:27AM 11          So, after awhile, you just learn to shut up and

10:27AM 12    you deal with it.  You put on that fake smile and you

10:27AM 13    just roll with the punches.  Then you wonder why your

10:27AM 14    mother hates you.

10:27AM 15    Q.   Can you describe the room you were in when Jacob

10:27AM 16    was there with you for that abortion?

10:27AM 17    A.   He sat in the corner.  It was a white room just

10:27AM 18    like any OB/GYN.  White room.  The doctor, he was a white

10:27AM 19    guy, bald head.  He had a beard.

10:27AM 20          I remember his head.  He wasn't just bald where

10:27AM 21    you know you could see his hair trying to grow back.  He

10:28AM 22    had a clean, waxy-type cut to it.  I say the doctor

10:28AM 23    probably was maybe 5' 11".  He wasn't quite six foot

10:28AM 24    tall.  He wasn't fat but he was kind of medium built.

10:28AM 25          This doctor gave -- besides the abortion that I

10:28AM  1    came to Dallas to have, he gave me every one of my

10:28AM  2    abortions after this -- after the one in Dallas.

10:28AM  3              THE COURT:  How old were you?

10:28AM  4              THE WITNESS:  When I had the abortion?

10:28AM  5    The first one, I was 11.  The first miscarriage I was 11.

10:28AM  6    The second miscarriage I was 12.  Second abortion I was

10:28AM  7    12.

10:28AM  8              I had literally had an abortion every year

10:28AM  9    up until the age of 14, when that same doctor told them I

10:28AM 10    cannot give this kid another abortion.

10:28AM 11        Q.   (By Mr. Wharton)  And I believe I misspoke

10:28AM 12    earlier and said that you were 12 when you were pregnant

10:28AM 13    with Jaquita.  How old were you when you were pregnant

10:28AM 14    with Jaquita?

10:28AM 15        A.   I got pregnant with Jaquita October the 14th.

10:29AM 16    And the reason I know I got pregnant with Jaquita October

10:29AM 17    the 14th is because that is my aunt's birthday.  On that

10:29AM 18    particular night --

10:29AM 19        Q.   Hold on.  How old were you?

10:29AM 20        A.   I got pregnant when I was 14 and I had her when

10:29AM 21    I was 15.

10:29AM 22        Q.   And so tell me about the night that happened.

10:29AM 23        A.   On that particular night, it was my first time

10:29AM 24    ever, you know, ever trying to cook.  I cooked a steak

10:29AM 25    that was not the best steak in the world.  It was

Direct Examination by Mr. Wharton

10:29AM   1   basically raw.  Jacob had told me that my mom had went to

10:29AM   2   go check on my aunt because she was in the hospital.

10:29AM   3   That's the story he had told me at that time.  They were

10:29AM   4   actually going out to eat for my aunt's birthday.

10:29AM   5          Jacob then, he started touching me, had sex

10:29AM   6   with me, and then he got up and he said, well, now I have

10:29AM   7   to go meet your mom and check on your Aunt Maime and he

10:29AM   8   left.  He left the house.  Because my mom wasn't there

10:30AM   9   that night.

10:30AM   10      Q.   Can you tell me are there any other incidents

10:30AM   11   that really stick out in your mind in terms of just the

10:30AM   12   details of what occurred?

10:30AM   13      A.   That was basically how I remember that night.

10:30AM   14      Q.   Okay.  Are there any other incidents, any other

10:30AM   15   nights, that really stick out in your memory?

10:30AM   16      A.   He would just basically try to wait until my

10:30AM   17   mom went to work.  She worked in the cafeteria at Lamar

10:30AM   18   Elementary.  And whenever she would leave for work, he

10:30AM   19   would come in my room.  He was the one responsible for

10:30AM   20   taking me to and from school.  Sometimes I would ride the

10:30AM   21   school bus, but majority of the time Jacob took me to

10:30AM   22   school.

10:30AM   23      Q.   How did Jacob avoid prosecution for this?

10:31AM   24      A.   One of the reasons is because I remember when I

10:31AM   25   was in the sixth grade, I went to Dr. McAffee (phonetic).

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:31AM | 1 | He was the school principal at Peace Elementary.  Me and |
| 10:31AM | 2 | my mom had -- me and my mom, growing up, we didn't have |
| 10:31AM | 3 | the best relationship.  She was very abusive as well. |
| 10:31AM | 4 | I told Dr. McAffee.  Dr. McAffee then told me, |
| 10:31AM | 5 | he said -- he went -- he got out of his office and he |
| 10:31AM | 6 | went in where the main part of the office was and he told |
| 10:31AM | 7 | them, he said, don't believe nothing this child has to |
| 10:31AM | 8 | say.  Her mother says she's a compulsive liar. |
| 10:31AM | 9 | I even told my grandmother at one time.  She |
| 10:31AM | 10 | told me, Honey, don't you love seeing your mom happy? |
| 10:31AM | 11 | One time I did lie to my mom and I told her |
| 10:32AM | 12 | that it was a guy in a park that touched me.  Then she |
| 10:32AM | 13 | drove me -- it was me, her, and my Aunt Othalene was |
| 10:32AM | 14 | driving us around Emerson Elementary looking for that |
| 10:32AM | 15 | guy. |
| 10:32AM | 16 | She took me back home and she said, I'm gonna |
| 10:32AM | 17 | beat the hell out of you if you don't tell me the truth. |
| 10:32AM | 18 | Jacob was sitting right there and I told her. |
| 10:32AM | 19 | I said, it's no guy, it's actually Jacob. |
| 10:32AM | 20 | My mom -- we stayed in between Midland and |
| 10:32AM | 21 | Odessa.  My mom beat me all the way to my grandmother's |
| 10:32AM | 22 | house and told me that I was lying.  Told me that I was |
| 10:32AM | 23 | trying to ruin her relationship. |
| 10:32AM | 24 | Even as an adult, when we moved to DeSoto, the |
| 10:32AM | 25 | conversation came back up and she told me, I don't care |

Direct Examination by Mr. Wharton

10:32AM  1    about what happened.  I am never going to leave him, so

10:32AM  2    just deal with it.

10:32AM  3         When you have somebody like that and nobody

10:32AM  4    believes you, you learn to shut up.  You learn to be

10:32AM  5    quiet.

10:33AM  6         Q.   Okay.  Did your father know?

10:33AM  7         A.   I don't know.  I can't -- I can't just answer

10:33AM  8    that, but I do know that his ex-wife, she was very vocal

10:33AM  9    about it.  She went to CPS about it.  She told me she

10:33AM  10   went to CPS about it.

10:33AM  11        But at the time her story that when she went to

10:33AM  12   CPS, it wasn't about me.  It was about my daughter,

10:33AM  13   Jaquita.  So I wasn't -- I was more upset with her by

10:33AM  14   saying that I touched my daughter.  And I was like, no,

10:33AM  15   this is not -- this is not -- this is not the truth.

10:33AM  16        Q.   And what is her name?

10:33AM  17        A.   My step-mom?

10:33AM  18        Q.   Yes.

10:33AM  19        A.   Sharon Jackson.

10:33AM  20        Q.   Okay.  Sharon Jackson George?

10:33AM  21        A.   Yes.

10:33AM  22        Q.   Okay.  We have her deposition.

10:33AM  23        A.   Uh-huh.

10:33AM  24        Q.   Your father, what is his name?

10:33AM  25        A.   Gerald Miller.

Direct Examination by Mr. Wharton

| 10:33AM | 1 | Q. And your brother, what is his name? |
| 10:34AM | 2 | A. Gerald Wilson, Junior. |
| 10:34AM | 3 | Q. Gerald Miller, Junior? |
| 10:34AM | 4 | A. No.  My brother has -- we don't have our |
| 10:34AM | 5 | father's last name.  We have our mom's last name. |
| 10:34AM | 6 | Q. So he goes by Gerald Wilson, Junior? |
| 10:34AM | 7 | A. Yes. |
| 10:34AM | 8 | Q. When the defense lawyer was talking about you |
| 10:34AM | 9 | demanding a house, do you know what he's referring to? |
| 10:34AM | 10 | A. Back when we were staying in Midland, if you |
| 10:34AM | 11 | know me I'm not -- before I met my husband, I wasn't good |
| 10:34AM | 12 | at paying nobody's bills.  Jacob then came to me, he |
| 10:34AM | 13 | said, I'm tired of you getting evicted from apartments. |
| 10:34AM | 14 | I'm going to build you and the kids a house.  I said, |
| 10:34AM | 15 | great.  He built that house.  He sold that house.  It was |
| 10:34AM | 16 | still in his name.  I didn't go to him and I didn't ask |
| 10:34AM | 17 | him to build me anything. |
| 10:34AM | 18 | Q. How old were you when that happened? |
| 10:35AM | 19 | A. I'd say around maybe 29, 30 years old.  I'm not |
| 10:35AM | 20 | really for sure. |
| 10:35AM | 21 | Q. All right.  How old are you right now? |
| 10:35AM | 22 | A. I am 42. |
| 10:35AM | 23 | Q. What is your date of birth? |
| 10:35AM | 24 | A. March 26 of 1981. |
| 10:35AM | 25 | Q. Tell me about the effect this has had on your |

Direct Examination by Mr. Wharton

10:35AM  1   life.

10:35AM  2        A.   When I first moved down there, I was -- I've

10:35AM  3   been living in Dallas eight years.  I really thought I

10:35AM  4   was okay.  I really thought I was fine, until you have

10:35AM  5   triggers.

10:35AM  6            You know, I met someone that was basically in

10:35AM  7   the same boat that I was.  And then I started looking at

10:36AM  8   my family.  My cousin Tamika, my uncle Jay, they started

10:36AM  9   asking questions.  Me and my uncle Jay had a conversation

10:36AM 10   before.  He said, I don't know why your mama didn't do

10:36AM 11   nothing; but, niece, you have to get through it.  You

10:36AM 12   have to get over it.

10:36AM 13            And it started a process in my head that I have

10:36AM 14   a whole bunch of hypocrites in my family that are willing

10:36AM 15   to tell me to get over something that they never had to

10:36AM 16   heal from.  I have a bunch of people in my family that

10:36AM 17   are willing to sell me down the drain just so they can be

10:36AM 18   able to borrow money from Jacob.  Just so they can still

10:36AM 19   have their sister in their life.

10:36AM 20            This mentally has not been good for my health,

10:36AM 21   but mentally it has made me stronger.  It has made me be

10:36AM 22   willing to speak up for myself and give other little

10:37AM 23   girls a voice, other little girls that don't have nobody

10:37AM 24   to speak up for them.

10:37AM 25        Q.   Tell me how this has affected you in terms of

Direct Examination by Mr. Wharton

10:37AM 1  depression.

10:37AM 2       A.   I have nightmares.  I have most -- most of my

10:37AM 3  nightmares sometimes is about my mom's physical abuse.

10:37AM 4  Sometimes I wake up and I think somebody is touching me

10:37AM 5  when they're not.  I think that every guy that sees me

10:37AM 6  wants to have sex with me, wants to touch me.

10:37AM 7       I feel like sometimes that a lot of my

10:37AM 8  emotional problems I take them out on my husband and I

10:37AM 9  try not to.  I sometimes ask myself why did my mom not

10:37AM 10 stand up for me.  Why did my mama not say, hey, you don't

10:37AM 11 go to parties, you don't go to dances, you don't have a

10:37AM 12 boyfriend.  How are you coming up pregnant?

10:37AM 13      Why didn't my mama stand up for me?  Why wasn't

10:38AM 14 she the mother that I would definitely be for my kids?

10:38AM 15 Why wouldn't she be the mother that I would be for a

10:38AM 16 stranger's kid?  Why did my mother fail me?  Why did that

10:38AM 17 man do that to me?

10:38AM 18      Q.   Does that make you feel worthless or insecure?

10:38AM 19      A.   At this moment, no, it does not.  Before, it

10:38AM 20 did.  I think the whole process of -- from the point that

10:38AM 21 I decided to sue Jacob, that even though we had to go

10:38AM 22 through this process from 2020 to now, I think that God

10:38AM 23 has given me strength for this day.

10:38AM 24      I think that the way I view things and the way

10:38AM 25 I see things are totally different.  I feel like if I

10:38AM   1   could tap into that little girl, I would tell her to

10:38AM   2   fight.  I would tell her to keep screaming.  I would tell

10:38AM   3   her to keep telling.  I would tell her not to give up.  I

10:38AM   4   would tell her to prosecute.  Go to the police and both

10:39AM   5   prosecute her mother and Jacob.

10:39AM   6        Q.   As far as your internal pain, your discomfort,

10:39AM   7   the daily disruption to your life, how has this

10:39AM   8   affected -- I mean, obviously it occurred so early that

10:39AM   9   it's hard to say what your life would have been like

10:39AM   10  otherwise, but tell me how this has affected your daily

10:39AM   11  life.  How does it affect the way you feel on a daily

10:39AM   12  basis?

10:39AM   13       A.   I used to didn't think God loved me.  Because

10:39AM   14  shortly after I got out of my parents' house, I was a

10:39AM   15  side chick for 13 and a half years because that man was

10:39AM   16  the first man to tell me that I was pretty.  That man was

10:39AM   17  the first man to tell me that he loved me.  So I

10:39AM   18  gravitated to it.  I said okay.  Because I never heard

10:39AM   19  those words before.

10:39AM   20           When you are growing up and either you're being

10:40AM   21  name called or when certain people come -- when Jacob's

10:40AM   22  family came around, my mom turned into a whole different

10:40AM   23  person.  She acted like she didn't like me.

10:40AM   24       Q.   Let's focus on your life after this occurred,

10:40AM   25  the affect this had on you emotionally.

10:40AM  1        A.    I think I traumatized my children.  I think I

10:40AM  2    traumatized my children because every bad thing that

10:40AM  3    happened to me, I thought about that.  I think that I

10:40AM  4    should have got my children out of these peoples' lives.

10:40AM  5    I think I should have ran away with my children and not

10:40AM  6    allowed them to see their mother in that state.

10:40AM  7             I think I should have been strong enough -- I

10:40AM  8    wish I could have been strong enough for my children

10:40AM  9    even -- especially my oldest daughter and took her away

10:40AM 10    from them where they didn't have to raise her, and said

10:40AM 11    just because this happened to me, doesn't mean that I

10:40AM 12    have to continue to be a victim and be victimized by it.

10:41AM 13             It doesn't mean that because the rest of my

10:41AM 14    family are going -- every event that we have is literally

10:41AM 15    at their house.  So I should have learned how to separate

10:41AM 16    myself from them and become my own person instead of

10:41AM 17    living a lie.

10:41AM 18        Q.    And here what I am asking you is about your

10:41AM 19    personal feelings from this, not -- you know, these

10:41AM 20    questions aren't really -- this part isn't for, you know,

10:41AM 21    how you could have lived your life differently or the

10:41AM 22    regrets and all that.  I'm looking for just your personal

10:41AM 23    anguish.

10:41AM 24             Obviously, you're crying here today, right?

10:41AM 25        A.    Uh-huh.

Appendix w Page 37 of 199 12/2023
Direct Examination by Mr. Wharton

```
10:41AM    1        Q.   Have you cried before about this?

10:41AM    2        A.   Yes.

10:41AM    3        Q.   Okay.  How often were you crying?

10:41AM    4        A.   Several times.  Several times.  It was times

10:41AM    5   where I couldn't go to sleep because I was asking myself

10:41AM    6   why.  It was times where I thought what could I have done

10:42AM    7   different to be that perfect little girl.

10:42AM    8             It was times where I asked myself what was

10:42AM    9   wrong with me.  What made a person want to do this to me.

10:42AM   10   Why didn't nobody stand up for me.  Why didn't my mama

10:42AM   11   come hold me and tell me that it was going to be okay,

10:42AM   12   that that man is not going to touch you no more.

10:42AM   13             And I really can't answer that question because

10:42AM   14   every time I look back at it, if you know me, if you know

10:42AM   15   the essence of me, Tina is the most forgiving and loving

10:42AM   16   person ever.

10:42AM   17             Yes, I can be mean.  Yes, I can be a little

10:42AM   18   dramatic.  But all I wanted was them two people to love

10:42AM   19   me.  I didn't care about how much money he got.  I don't

10:42AM   20   care about the cars he drive.  All I wanted was them two

10:43AM   21   people to love me, especially my mama.

10:43AM   22        Q.   Did you suffer on a daily basis from these

10:43AM   23   feelings?

10:43AM   24        A.   Excuse me.  I'm sorry.

10:43AM   25        Q.   Have you suffered on a daily basis from these
```

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:43AM | 1 | feelings? |
| 10:43AM | 2 | A.   Yes, I have. |
| 10:43AM | 3 | Q.   Okay.  Since it occurred until now, obviously? |
| 10:43AM | 4 | A.   Yes. |
| 10:43AM | 5 | Q.   And there's no -- I mean, obviously, you've done |
| 10:43AM | 6 | some counseling and so forth, right? |
| 10:43AM | 7 | A.   Yes. |
| 10:43AM | 8 | Q.   Has it helped at all? |
| 10:43AM | 9 | A.   Yes, it has.  It has helped a lot. |
| 10:43AM | 10 | Q.   You are still obviously having these feelings, |
| 10:43AM | 11 | right? |
| 10:43AM | 12 | A.   Yes, I do.  I just -- I believe that when you |
| 10:43AM | 13 | go through something like that, when you think you are |
| 10:43AM | 14 | over it, something can trigger it.  When you think you |
| 10:44AM | 15 | are over it, you can hear somebody else's story or watch |
| 10:44AM | 16 | the wrong movie and you can think that, hey, that |
| 10:44AM | 17 | happened to me. |
| 10:44AM | 18 | And if you've ever watched the movie Precious |
| 10:44AM | 19 | or the movie, Tyler Perry, Family Reunion, you have |
| 10:44AM | 20 | watched my life.  Because that was my life. |
| 10:44AM | 21 | Imagine your mother being completely jealous of |
| 10:44AM | 22 | you.  Imagine your mother hating you.  Imagine a man ten |
| 10:44AM | 23 | times bigger than you on top of you and there's nothing |
| 10:44AM | 24 | you can do about it.  So you just learn to lay there. |
| 10:44AM | 25 | Q.   How old -- by the way, how old is Jacob? |

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:44AM | 1 | A.   I want to say he might be 65.  I'm not for |
| 10:44AM | 2 | sure.  I know he's in his 60s. |
| 10:45AM | 3 | Q.   Were you familiar with the incident with Gerald |
| 10:45AM | 4 | Wilson, Junior, where he ended up running away bloody from |
| 10:45AM | 5 | the house? |
| 10:45AM | 6 | A.   Yes. |
| 10:45AM | 7 | Q.   Tell me about that incident. |
| 10:45AM | 8 | A.   Because he walked in on Jacob on top of me. |
| 10:45AM | 9 | Himself and Jacob had words.  My brother is very |
| 10:45AM | 10 | overprotective of me.  My brother doesn't like anybody to |
| 10:45AM | 11 | touch me.  My brother doesn't like anybody -- if you -- |
| 10:45AM | 12 | my brother -- at the time he was a big kid.  And he's |
| 10:45AM | 13 | very strong and he can get very violent. |
| 10:45AM | 14 | And when that happened, guns were pulled and my |
| 10:45AM | 15 | brother ran across the street.  We were all looking for |
| 10:45AM | 16 | him.  We were all in front of the house.  Because we |
| 10:45AM | 17 | lived in the country.  From our house to the mailbox |
| 10:45AM | 18 | seemed like 3 miles.  You see what I am saying? |
| 10:45AM | 19 | So, from our house to the city limits, if you |
| 10:46AM | 20 | walk, you are going to be walking for like five or six |
| 10:46AM | 21 | hours. |
| 10:46AM | 22 | So he went across the street.  And I remember |
| 10:46AM | 23 | the neighbor across the street leaving, but we don't talk |
| 10:46AM | 24 | to that guy, we didn't know if my brother was in that car |
| 10:46AM | 25 | and he's the one who took my brother to my Aunt Brenda's |

10:46AM  1    house and that's how that happened.

10:46AM  2         Q.   All right.  Is there anything -- any other major

10:46AM  3    memories that you have about the abuse itself?

10:47AM  4         A.   I have -- a lot of it comes from -- when I

10:47AM  5    would tell Jacob no and I would fight against him, he

10:47AM  6    would make up a story to my mom, and I would get beat

10:47AM  7    when she came home.

10:47AM  8              I still have a scar on my forehead where she

10:47AM  9    hit me upside my head with a skillet.  When I would defy

10:47AM 10    Jacob, he would make sure that my mom beat me.

10:47AM 11              If I gave in and I gave him what he wanted,

10:47AM 12    Tina had jewelry, Tina had the nicest clothes.  I had

10:47AM 13    every, every pair of shoes to match the outfit.  I had

10:47AM 14    everything until I decided to move out.

10:47AM 15         Q.   And when did that happen?

10:47AM 16         A.   When I was around 20, 21 years old.

10:47AM 17         Q.   And what happened then?

10:48AM 18         A.   Jacob started -- he would -- with Corey Haynes,

10:48AM 19    one night Corey, like I said, he had a girlfriend.  He

10:48AM 20    wasn't supposed to be spending the night at my house.

10:48AM 21    But he ended up spending the night at my house, and the

10:48AM 22    next morning he woke up and there was a bra in his car.

10:48AM 23              Jacob even went so far as to tell Corey's

10:48AM 24    girlfriend that me and Corey was messing around.  Jacob

10:48AM 25    told -- he actually started crying to me telling me how I

10:48AM   1   broke his heart and how he wished that I would move back

10:48AM   2   in.

10:48AM   3              And I think that over the years he finally just

10:48AM   4   got over it.  I'm not going to say that from that point

10:48AM   5   to this point -- I actually -- I've asked Jacob several

10:48AM   6   times for an apology.  I asked Jacob for -- I told him

10:48AM   7   all I want from you is an apology.

10:49AM   8              Before I decided to sue Jacob, I called Jacob.

10:49AM   9   And at that time I wasn't even welcome at their house

10:49AM  10   because me and my mom had got into it.  She told me the

10:49AM  11   furthest I could come was to that gate.

10:49AM  12              And he said, I don't know why you can't --

10:49AM  13   actually, I was calling him to check on my oldest

10:49AM  14   daughter.  She didn't answer her phone and she was

10:49AM  15   staying with them at the time.  And I asked him, I said,

10:49AM  16   is Jaquita there?  He said, yeah, she's in her room,

10:49AM  17   she's working.  He said, why don't you come over and see

10:49AM  18   her?  I said, no, because I was told not to come back

10:49AM  19   over there.

10:49AM  20              And the statement, he said, I don't know what's

10:49AM  21   going on with you and your mama.  Your family say that

10:49AM  22   you've always been like this.  And I asked him, I said,

10:49AM  23   you don't know why?  And he said, no, tell me.  I said,

10:49AM  24   it's because of you.  I said, it's because of what you

10:49AM  25   did.  And he hung up in my face.

| | | |
|---|---|---|
| 10:49AM | 1 | And in that moment, all of those feelings came |
| 10:49AM | 2 | rushing back.  I felt like he was telling me that I |
| 10:50AM | 3 | deserved it.  I felt like for years that I have to |
| 10:50AM | 4 | forgive two people that never had the audacity to tell me |
| 10:50AM | 5 | that they're sorry. |
| 10:50AM | 6 | And I am tired of forgiving people, two people |
| 10:50AM | 7 | that I loved the most, because I don't hate Jacob, I |
| 10:50AM | 8 | don't.  I actually love the guy because he has helped me |
| 10:50AM | 9 | with my children.  He has done things for me.  All I |
| 10:50AM | 10 | asked him for was an apology, a genuine, sincere apology |
| 10:50AM | 11 | and all of us go to counseling and we fix the dysfunction |
| 10:50AM | 12 | in our relationship. |
| 10:50AM | 13 | This is bigger than me.  This is about breaking |
| 10:50AM | 14 | generational curses.  This is about showing my children |
| 10:50AM | 15 | that they finally get to see their mother happy.  And |
| 10:50AM | 16 | this is about making people take accountability for what |
| 10:50AM | 17 | they have done to me. |
| 10:50AM | 18 | THE COURT:  Can I ask a question? |
| 10:50AM | 19 | MR. WHARTON:  Yes, Your Honor. |
| 10:50AM | 20 | THE COURT:  So you're saying that Jaquita |
| 10:51AM | 21 | lives with him. |
| 10:51AM | 22 | THE WITNESS:  Not anymore.  She's 27 years |
| 10:51AM | 23 | old.  She has her own apartment.  At that time when I did |
| 10:51AM | 24 | call Jacob and ask him about -- when me and him had that |
| 10:51AM | 25 | conversation, yes, she was staying there with him. |

| | | |
|---|---|---|
| 10:51AM | 1 | THE COURT:  How many years did she live |
| 10:51AM | 2 | with him? |
| 10:51AM | 3 | THE WITNESS:  They raised Jaquita. |
| 10:51AM | 4 | THE COURT:  Okay.  And so you are saying |
| 10:51AM | 5 | you were sexually abused but you left your daughter in |
| 10:51AM | 6 | the house with them? |
| 10:51AM | 7 | THE WITNESS:  Yes, I did. |
| 10:51AM | 8 | THE COURT:  Okay. |
| 10:51AM | 9 | Keep going. |
| 10:51AM | 10 | Q.   (By Mr. Wharton)  And has Jaquita ever had a |
| 10:51AM | 11 | paternity test, DNA test? |
| 10:51AM | 12 | A.   No. |
| 10:51AM | 13 | Q.   All right.  And based on your understanding, is |
| 10:51AM | 14 | it now impossible to force a DNA test? |
| 10:51AM | 15 | A.   When it comes to this case, I really just want |
| 10:51AM | 16 | my kids to stay out of it.  I've asked that from day one. |
| 10:52AM | 17 | Me and my daughter Jaquita just recently just started |
| 10:52AM | 18 | talking again because of this case. |
| 10:52AM | 19 | Q.   Do you know whether or not you can force Jaquita |
| 10:52AM | 20 | as an adult -- |
| 10:52AM | 21 | A.   I don't want to. |
| 10:52AM | 22 | Q.   I understand you don't want to now, but do you |
| 10:52AM | 23 | know can you force -- |
| 10:52AM | 24 | A.   No, I can't.  She's an adult.  I can't force |
| 10:52AM | 25 | her to do anything she doesn't want to do. |

| | | |
|---|---|---|
| 10:52AM | 1 | Q.   All right.  And obviously Jaquita has struggled |
| 10:52AM | 2 | with this fact about her life, right? |
| 10:52AM | 3 | A.   Yes, she has. |
| 10:52AM | 4 | Q.   All right.  And how did she respond to it? |
| 10:52AM | 5 | A.   Jaquita was very angry.  Jaquita, she called me |
| 10:52AM | 6 | when I guess Jacob showed her the letter that you had |
| 10:52AM | 7 | sent to him.  She called me and she was very angry.  She |
| 10:52AM | 8 | told me that -- go ahead. |
| 10:52AM | 9 | Q.   I'm sorry to interrupt.  When I sent a letter to |
| 10:52AM | 10 | Jacob about this, Jaquita responded? |
| 10:52AM | 11 | A.   Yes. |
| 10:53AM | 12 | THE COURT:  Can we clarify what the letter |
| 10:53AM | 13 | said? |
| 10:53AM | 14 | THE WITNESS:  It was a letter saying that |
| 10:53AM | 15 | I was suing Jacob.  The letter, I guess, that my attorney |
| 10:53AM | 16 | sent to Jacob about him being sued. |
| 10:53AM | 17 | THE COURT:  Was she ever told that he was |
| 10:53AM | 18 | her father supposedly? |
| 10:53AM | 19 | THE WITNESS:  Yes, she's been told that, |
| 10:53AM | 20 | yes, ma'am.  I told Jaquita that when she was I want to |
| 10:53AM | 21 | say 11 years old, when she came to me and she asked me |
| 10:53AM | 22 | why does other kids have a dad and not me. |
| 10:53AM | 23 | I had never went -- I don't feel like I |
| 10:53AM | 24 | should ever go into full detail with my children about |
| 10:53AM | 25 | what I just spoke about in this court, but I did tell |

| | | |
|---|---|---|
| 10:53AM | 1 | Jaquita how I got pregnant with her. |
| 10:53AM | 2 | THE COURT:  You may proceed. |
| 10:53AM | 3 | Q.   (By Mr. Wharton)  So the letter to Jacob ended |
| 10:53AM | 4 | up in Jaquita's hands? |
| 10:53AM | 5 | A.   He showed it to her, because he said is this |
| 10:53AM | 6 | some type of joke?  This is -- her telling me this, is |
| 10:53AM | 7 | this some type of joke?  Call your mom and see if she |
| 10:54AM | 8 | being funny. |
| 10:54AM | 9 | Q.   And so you were -- I interrupted you earlier. |
| 10:54AM | 10 | You can go on.  What were you saying about your |
| 10:54AM | 11 | conversation with Jaquita? |
| 10:54AM | 12 | A.   Oh, when she called me she was very angry.  She |
| 10:54AM | 13 | told me that, if I pursue this case, she wasn't never |
| 10:54AM | 14 | going to talk to me again. |
| 10:54AM | 15 | MR. MADUFORO:  Your Honor, I would object |
| 10:54AM | 16 | to that as hearsay. |
| 10:54AM | 17 | THE COURT:  Sustained. |
| 10:54AM | 18 | Q.   (By Mr. Wharton)  But at this point you are |
| 10:54AM | 19 | talking to Jaquita.  Without going into what you said, you |
| 10:54AM | 20 | are talking with Jaquita? |
| 10:54AM | 21 | A.   Yes. |
| 10:54AM | 22 | Q.   Has anyone ever acknowledged her -- or claimed |
| 10:54AM | 23 | her paternity of her? |
| 10:54AM | 24 | A.   Jacob has. |
| 10:54AM | 25 | Q.   And how did he do that? |

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 10:54AM | 1 | A.   Like me and him have had conversations about |
| 10:54AM | 2 | it.  He knows that he's her father. |
| 10:55AM | 3 | Q.   And how old were you when Jacob and your mother |
| 10:55AM | 4 | were raising Jaquita as their child, basically? |
| 10:55AM | 5 | A.   I was 15.  I was still living in their house. |
| 10:55AM | 6 | I was a minor. |
| 10:55AM | 7 | Q.   When you left, why did you not take Jaquita with |
| 10:55AM | 8 | you? |
| 10:55AM | 9 | A.   Because he told me he would take custody of my |
| 10:55AM | 10 | daughter from me.  And I don't have money.  I didn't have |
| 10:55AM | 11 | money at all.  He told me that this was the best place |
| 10:55AM | 12 | and that he would take me to court. |
| 10:55AM | 13 | Q.   As far as you're aware, has Jacob ever abused |
| 10:55AM | 14 | Jaquita? |
| 10:55AM | 15 | A.   No. |
| 10:55AM | 16 | Q.   Did you have a concern that Jacob was going to |
| 10:55AM | 17 | abuse Jaquita? |
| 10:55AM | 18 | A.   I've asked all three of my children before on a |
| 10:55AM | 19 | regular basis has he ever touched them.  They all said |
| 10:56AM | 20 | no.  I sat down and I talked to them and I asked them. |
| 10:56AM | 21 | You know, they said no.  They all -- at one point they |
| 10:56AM | 22 | all laughed at me and said my papa wouldn't do nothing |
| 10:56AM | 23 | like that to us, mama.  We understand what he did to you. |
| 10:56AM | 24 | Our papa wouldn't touch us like that. |
| 10:56AM | 25 | MR. WHARTON:  All right.  Pass the |

| | | |
|---|---|---|
| 10:56AM | 1 | witness. |
| 10:56AM | 2 | THE COURT:  Counsel?  Mr. Maduforo? |
| 10:56AM | 3 | MR. MADUFORO:  Thank you, Judge. |
| 10:56AM | 4 | THE COURT:  Actually, let's take a few |
| 10:56AM | 5 | minutes break, if anybody needs to go to the rest room or |
| 10:56AM | 6 | anything.  If you want to step down and take a break, |
| 10:56AM | 7 | ma'am. |
| 10:56AM | 8 | MR. WHARTON:  Yes, Your Honor. |
| 10:56AM | 9 | (Recess taken.) |
| 10:56AM | 10 | CROSS-EXAMINATION |
| 10:56AM | 11 | BY MR. MADUFORO: |
| 11:12AM | 12 | Q.   Ms. Wilson, just a few questions to clarify your |
| 11:12AM | 13 | initial testimony, okay. |
| 11:12AM | 14 | You did testify that Mr. Cannon, Jacob, abused |
| 11:12AM | 15 | you.  When was the first time that this happened? |
| 11:12AM | 16 | A.   Around the age of nine or ten. |
| 11:12AM | 17 | Q.   Around the age of nine? |
| 11:12AM | 18 | A.   Or ten. |
| 11:12AM | 19 | Q.   Okay.  Or ten, okay. |
| 11:12AM | 20 | And tell the Court who all was living in the |
| 11:12AM | 21 | house then. |
| 11:12AM | 22 | A.   Me, my mom, and Jacob. |
| 11:12AM | 23 | Q.   And you say you got pregnant the first time at |
| 11:12AM | 24 | what age? |
| 11:12AM | 25 | A.   Eleven. |

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:12AM | 1 | Q.   Eleven years old.  And you had an abortion or |
| 11:12AM | 2 | miscarriage? |
| 11:12AM | 3 | A.   I had a miscarriage. |
| 11:12AM | 4 | Q.   You had a miscarriage. |
| 11:12AM | 5 | And who took you to abort the baby? |
| 11:12AM | 6 | A.   My mom and Jacob. |
| 11:13AM | 7 | THE COURT:  Who took you what? |
| 11:13AM | 8 | MR. MADUFORO:  Who took you to abort the |
| 11:13AM | 9 | child? |
| 11:13AM | 10 | THE COURT:  Well, she said she had a |
| 11:13AM | 11 | miscarriage. |
| 11:13AM | 12 | THE WITNESS:  The first time I had -- when |
| 11:13AM | 13 | I was 11 -- |
| 11:13AM | 14 | THE COURT:  Hold on. |
| 11:13AM | 15 | MR. MADUFORO:  I'll withdraw that |
| 11:13AM | 16 | question. |
| 11:13AM | 17 | Q.   (By Mr. Maduforo)  So you had a miscarriage |
| 11:13AM | 18 | around 11? |
| 11:13AM | 19 | A.   Uh-huh. |
| 11:13AM | 20 | Q.   Okay.  And you had abortion when? |
| 11:13AM | 21 | A.   At the same age, 11. |
| 11:13AM | 22 | Q.   Eleven.  Okay.  Now the question then is who |
| 11:13AM | 23 | took you to abort that baby? |
| 11:13AM | 24 | A.   Every abortion I was taken to was by my mom and |
| 11:13AM | 25 | Jacob. |

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:13AM | 1 | Q.   How many abortions have you had? |
| 11:13AM | 2 | A.   Four to five abortions and two miscarriages. |
| 11:13AM | 3 | Q.   Four to five abortions? |
| 11:13AM | 4 | A.   Yes. |
| 11:13AM | 5 | Q.   Okay. |
| 11:13AM | 6 | A.   And two miscarriages. |
| 11:13AM | 7 | Q.   Do you recall the place that they took you to? |
| 11:13AM | 8 | A.   The miscarriages, when I had my first |
| 11:13AM | 9 | miscarriage, I was actually bleeding on my bedroom floor. |
| 11:13AM | 10 | My mom came in.  That was the first time she -- the first |
| 11:13AM | 11 | time when I had the miscarriage she was initially |
| 11:14AM | 12 | concerned.  After that, she -- it was during the custody |
| 11:14AM | 13 | battle with my dad and -- |
| 11:14AM | 14 | THE COURT:  Ma'am, he asked you where did |
| 11:14AM | 15 | they take you. |
| 11:14AM | 16 | THE WITNESS:  The first time I had my |
| 11:14AM | 17 | first initial abortion was here in Dallas County.  The |
| 11:14AM | 18 | other ones were in Odessa, Texas. |
| 11:14AM | 19 | Q.   (By Mr. Maduforo)  Okay.  And where were you |
| 11:14AM | 20 | living then? |
| 11:14AM | 21 | A.   With my -- with Jacob and my mom. |
| 11:14AM | 22 | Q.   Where? |
| 11:14AM | 23 | A.   In their house. |
| 11:14AM | 24 | Q.   I know in the house.  What city? |
| 11:14AM | 25 | A.   In Midland, Texas. |

| 11:14AM | 1 | Q.   Okay.  So in Midland, Texas, they brought you |
| 11:14AM | 2 | down to Dallas for the abortion? |
| 11:14AM | 3 | A.   Uh-huh. |
| 11:15AM | 4 | Q.   And when you had the miscarriage, do you recall |
| 11:14AM | 5 | your parents then taking you to see a doctor out of |
| 11:14AM | 6 | concern? |
| 11:14AM | 7 | A.   What do you mean a doctor out of consent? |
| 11:14AM | 8 | Q.   You had a miscarriage.  You were bleeding. |
| 11:14AM | 9 | A.   The first miscarriage, I was taken to Midland |
| 11:14AM | 10 | Memorial Hospital. |
| 11:14AM | 11 | MR. WHARTON:  He said "concern" by the |
| 11:14AM | 12 | way.  He said "out of concern." |
| 11:14AM | 13 | THE WITNESS:  Like, I'm not understanding |
| 11:14AM | 14 | what you are saying. |
| 11:15AM | 15 | THE COURT:  Ma'am, the question was when |
| 11:15AM | 16 | you had a miscarriage, where did you go.  You said |
| 11:15AM | 17 | Midland Memorial Hospital. |
| 11:15AM | 18 | Okay.  Ask another question, please. |
| 11:15AM | 19 | MR. MADUFORO:  Thank you, Judge. |
| 11:15AM | 20 | Q.   (By Mr. Maduforo)  Now, did your mom report this |
| 11:15AM | 21 | issue to the police? |
| 11:15AM | 22 | A.   No, she did not. |
| 11:15AM | 23 | Q.   Did she make any report to the CPS? |
| 11:15AM | 24 | A.   No, she did not. |
| 11:15AM | 25 | Q.   Did she make any report to your teacher, your |

11:15AM  1  principal, your priest by any chance?

11:15AM  2      A.   The only thing she told my principal was that I

11:15AM  3  was a compulsive liar.

11:15AM  4              MR. MADUFORO:  Objection, Your Honor,

11:15AM  5  nonresponsive.

11:15AM  6              THE COURT:  Okay.  It's overruled.  He

11:15AM  7  asked her did your mom tell the police.

11:15AM  8              THE WITNESS:  No.

11:15AM  9              THE COURT:  Can I ask a question?

11:15AM 10              MR. MADUFORO:  Yes, Your Honor.

11:15AM 11              THE COURT:  So, ma'am, you went to a

11:15AM 12  hospital.  Did anybody call CPS from the hospital?

11:15AM 13              THE WITNESS:  No, ma'am.

11:16AM 14              THE COURT:  Okay.  Keep going.

11:16AM 15              MR. MADUFORO:  Thank you.

11:16AM 16      Q.   (By Mr. Maduforo)  And just a few questions

11:16AM 17  regarding when the actual time this started.  You said

11:16AM 18  your mom worked then at the school district?

11:16AM 19      A.   She worked at the school district, yes.

11:16AM 20      Q.   Do you recall what school or what district

11:16AM 21  office she worked at?

11:16AM 22      A.   She worked at Lamar Elementary in the

11:16AM 23  cafeteria.

11:16AM 24      Q.   Okay, in the cafeteria.  What time did she go to

11:16AM 25  work?

| | | |
|---|---|---|
| 11:16AM | 1 | A.   She would leave around 5:30 or 6 in the |
| 11:16AM | 2 | morning. |
| 11:16AM | 3 | Q.   And is that the same elementary school you go |
| 11:16AM | 4 | to? |
| 11:16AM | 5 | A.   I did not attend Lamar Elementary. |
| 11:16AM | 6 | Q.   That's not the same elementary school? |
| 11:16AM | 7 | A.   No, I did not attend that school. |
| 11:16AM | 8 | Q.   Okay.  And what time would you go to school at |
| 11:16AM | 9 | that point? |
| 11:16AM | 10 | A.   I would have to be at school at around, I would |
| 11:16AM | 11 | say, 8:30, 8 o'clock.  I'm not really for sure. |
| 11:16AM | 12 | Q.   Is that 8:30 or are you not really for sure? |
| 11:17AM | 13 | A.   It was around the 8 o'clock hour. |
| 11:17AM | 14 | Q.   Then you lived with Mr. Cannon and your mom up |
| 11:17AM | 15 | until what age? |
| 11:17AM | 16 | A.   Until I moved out.  I was, I want to say, |
| 11:17AM | 17 | around 20. |
| 11:17AM | 18 | Q.   Did you have any other child or children before |
| 11:17AM | 19 | you moved out? |
| 11:17AM | 20 | A.   No.  I had my son after I moved out. |
| 11:17AM | 21 | Q.   And did you move back in afterwards? |
| 11:17AM | 22 | A.   I did my six weeks of post partum at their |
| 11:17AM | 23 | house.  Yes, I did. |
| 11:17AM | 24 | Q.   Okay.  And you were taken care of by your |
| 11:17AM | 25 | parents? |

```
11:17AM   1        A.    What do you mean taken care of?

11:17AM   2        Q.    You did your post partum at their house.

11:17AM   3        A.    Yes, because I had a C-section.

11:17AM   4        Q.    Okay.  And your mom was helping you then?

11:17AM   5        A.    Yes.

11:17AM   6        Q.    Was Jacob helping you at that point also?

11:17AM   7        A.    No.

11:18AM   8        Q.    Okay.  Let's go back to where you have lived.

11:18AM   9   Take me back to where you have lived in the past 10 years.

11:18AM  10   Have you, by chance, lived with Mr. Cannon and your mom in

11:18AM  11   the past 10 years?

11:18AM  12        A.    Yes, I did.

11:18AM  13        Q.    When was the last time you actually moved out of

11:18AM  14   their house?

11:18AM  15        A.    When I first moved to Dallas County, I had a

11:18AM  16   hysterectomy and they had sent for my youngest daughter

11:18AM  17   because I couldn't -- when I had the hysterectomy, the

11:18AM  18   doctor cut my kidney.  I didn't work for two years.

11:18AM  19             So I didn't want to just send all three of my

11:18AM  20   kids down here.  I did move in with them.  I stayed with

11:18AM  21   them maybe up until my mom put me out, maybe I'd say

11:18AM  22   about three months.

11:18AM  23             After that, I lived in my car until my

11:18AM  24   boyfriend found out and he told me to come stay with him.

11:18AM  25   And I been -- I been with my now husband ever since then.
```

Cross-Examination by Mr. Maduforo

| | |
|---|---|
| 11:19AM | 1 | And I've been living in Dallas for the past eight years.
| 11:19AM | 2 |      Q.   So are you saying that the past eight years,
| 11:19AM | 3 | that's the last time you lived with them?
| 11:19AM | 4 |      A.   Yes.
| 11:19AM | 5 |      Q.   Okay.  And does any of your children live --
| 11:19AM | 6 | apart from Jaquita, does any of your other children live
| 11:19AM | 7 | with your parents?
| 11:19AM | 8 |      A.   Yes.
| 11:19AM | 9 |      Q.   What is the name of --
| 11:19AM | 10 |      A.   Mark and Iceland.
| 11:19AM | 11 |      Q.   Mark and Iceland.  Two of your children live
| 11:19AM | 12 | currently with them?
| 11:19AM | 13 |      A.   Yes.
| 11:19AM | 14 |      Q.   So they raised those children?
| 11:19AM | 15 |      A.   No.  My son is an adult.  My son is 21 years
| 11:19AM | 16 | old.  He is not a minor.  Iceland just graduated out of
| 11:19AM | 17 | school.  Iceland moved in with them because Iceland got
| 11:19AM | 18 | in trouble.  I told Iceland she can come back home.  She
| 11:19AM | 19 | did not want to come back home.  I have repeatedly told
| 11:19AM | 20 | Iceland to come back home because of the way that they
| 11:19AM | 21 | treat her at their house.
| 11:19AM | 22 |           And so Iceland is the one who refuses to come
| 11:19AM | 23 | back home.  It's not because I put my children out or
| 11:19AM | 24 | that I could not take care of my children.  She is the
| 11:20AM | 25 | one who refused to come back home.  She's 18.

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:20AM | 1 | Q.   Okay.  And when was the first time, the initial |
| 11:20AM | 2 | time she started living with the Cannons, how old was |
| 11:20AM | 3 | Iceland and Mark? |
| 11:20AM | 4 | A.   Mark -- okay, mark moved down here with them |
| 11:20AM | 5 | when they came and they asked me because Mark was getting |
| 11:20AM | 6 | in a lot of trouble at school and -- |
| 11:20AM | 7 | MR. MADUFORO:  Objection, Your Honor, |
| 11:20AM | 8 | nonresponsive. |
| 11:20AM | 9 | THE COURT:  What was the question?  Hold |
| 11:20AM | 10 | on.  What was the question? |
| 11:20AM | 11 | Q.   (By Mr. Maduforo)  The question is how old were |
| 11:20AM | 12 | those children when the first time they started living |
| 11:20AM | 13 | with them? |
| 11:20AM | 14 | A.   Mark was 11 years old. |
| 11:20AM | 15 | Q.   Okay. |
| 11:20AM | 16 | A.   And Iceland moved in with them her senior year. |
| 11:20AM | 17 | Q.   Fifteen, 16? |
| 11:20AM | 18 | A.   Iceland graduated when she was 18 years old, so |
| 11:20AM | 19 | it was around 17. |
| 11:20AM | 20 | Q.   And they still live with them? |
| 11:20AM | 21 | A.   Uh-huh. |
| 11:20AM | 22 | Q.   Okay.  All right. |
| 11:20AM | 23 | And you testified initially that before you |
| 11:21AM | 24 | filed this lawsuit, you talked to Jacob, correct? |
| 11:21AM | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:21AM | 1 | Q.   Okay.  And after this lawsuit have you -- if you |
| 11:21AM | 2 | recall, have you ever lived with them?  Have you ever gone |
| 11:21AM | 3 | over there to see them? |
| 11:21AM | 4 | A.   After this lawsuit? |
| 11:21AM | 5 | Q.   Yes. |
| 11:21AM | 6 | A.   No. |
| 11:21AM | 7 | Q.   You have never been? |
| 11:21AM | 8 | A.   When I -- I go to their fence to pick up my |
| 11:21AM | 9 | daughter.  I have to take her something to eat almost on |
| 11:21AM | 10 | a regular basis.  I pick her up if she has to go to the |
| 11:21AM | 11 | doctor's appointment.  I pick her up.  If she needs to |
| 11:21AM | 12 | go -- when she was working, I had to take her to work. |
| 11:21AM | 13 | That's -- I do not communicate with Jacob.  I do not have |
| 11:21AM | 14 | any -- I haven't spoken with Jacob. |
| 11:21AM | 15 |               THE COURT:  How old is she? |
| 11:21AM | 16 |               THE WITNESS:  She's 18. |
| 11:21AM | 17 |               THE COURT:  And you have to take food to |
| 11:21AM | 18 | her and pick her up? |
| 11:21AM | 19 |               THE WITNESS:  Yes, because they won't feed |
| 11:21AM | 20 | her. |
| 11:21AM | 21 |               THE COURT:  Is she out of school? |
| 11:21AM | 22 |               THE WITNESS:  Yes.  As far as high school, |
| 11:21AM | 23 | yes, ma'am. |
| 11:21AM | 24 | Q.   (By Mr. Maduforo)  You just testified that you |
| 11:22AM | 25 | asked your children if Jacob and your mom were taking care |

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:22AM | 1 | of them and the answer was yes. |
| 11:22AM | 2 | A.   I did not testify to that.  I was asked has he |
| 11:22AM | 3 | ever touched my children.  That's what I was asked.  I |
| 11:22AM | 4 | did not testify that -- that they have never taken care |
| 11:22AM | 5 | of them.  That's what I was asked. |
| 11:22AM | 6 | Q.   Okay.  So do you trust, then, Jacob and your mom |
| 11:22AM | 7 | to take care of the children? |
| 11:22AM | 8 | A.   Do I trust them to take care of my children? |
| 11:22AM | 9 | In what manner? |
| 11:22AM | 10 | Q.   In any manner. |
| 11:22AM | 11 | A.   If I have to take my children food every day |
| 11:22AM | 12 | and I have to take care of my child, my child just |
| 11:22AM | 13 | resides with them.  I take care of my daughter. |
| 11:22AM | 14 | Q.   Okay.  You testified there was an incident |
| 11:22AM | 15 | involving Gerald Williams? |
| 11:22AM | 16 | A.   Wilson. |
| 11:22AM | 17 | Q.   Gerald Wilson.  And who is Gerald Wilson? |
| 11:22AM | 18 | A.   My brother. |
| 11:22AM | 19 | Q.   Your brother.  And there was a physical |
| 11:22AM | 20 | altercation to the point of scratches on Jacob's bottom |
| 11:22AM | 21 | when he caught Jacob on top of you; is that correct? |
| 11:22AM | 22 | A.   I did not testify to that.  What I testified |
| 11:22AM | 23 | was that they had a -- my brother walked in on Jacob and |
| 11:23AM | 24 | it was a physical altercation.  I never said that it was |
| 11:23AM | 25 | bruises or anything.  All I said that it was a physical |

11:23AM   1    altercation.

11:23AM   2            My brother then walked across the street to the

11:23AM   3    neighbor's house, got in the neighbor's car and the

11:23AM   4    neighbors took him to my Aunt Brenda's house.  That's

11:23AM   5    what I testified.  I never said that there was any

11:23AM   6    bruises.  I never said any of that.

11:23AM   7        Q.   Okay.  So he walked in on Jacob doing what?

11:24AM   8        A.   He was on top of me.

11:23AM   9        Q.   Okay.  All right.  Did he call the cops?

11:23AM   10       A.   No.  He told my dad.

11:23AM   11            THE COURT:  Did you have clothes on or

11:23AM   12   clothes off?

11:23AM   13            THE WITNESS:  No.  My clothes were halfway

11:23AM   14   off.

11:23AM   15       Q.   (By Mr. Maduforo)  Let me ask you this.  You

11:23AM   16   were in that household for some time when all of this

11:23AM   17   alleged abuse was going on.  Do you know who your

11:23AM   18   neighbors were?

11:23AM   19       A.   No, I don't.

11:23AM   20       Q.   Okay.  Do you ever recall a police officer

11:23AM   21   living next door to you guys then?

11:23AM   22       A.   No, they never did.

11:24AM   23       Q.   You never did or they never did?

11:24AM   24       A.   They never did.

11:24AM   25       Q.   Okay.  But -- do you recall how old you were at

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:24AM | 1 | that point? |
| 11:24AM | 2 | A.   At what point? |
| 11:24AM | 3 | Q.   At the point -- the very day of the physical |
| 11:24AM | 4 | altercation -- |
| 11:24AM | 5 | A.   No, I don't. |
| 11:24AM | 6 | Q.   Okay.  Did you tell anybody else about Jacob |
| 11:24AM | 7 | abusing you that day and the fact that your brother caught |
| 11:24AM | 8 | him on top of you, got mad and started fighting with him? |
| 11:24AM | 9 | A.   No, I did not. |
| 11:24AM | 10 | THE COURT:  I think guns were pulled. |
| 11:24AM | 11 | THE WITNESS:  Yes.  Jacob pulled a gun out |
| 11:24AM | 12 | on my brother. |
| 11:24AM | 13 | Q.   (By Mr. Maduforo)  I'm sorry.  Gerald Wilson? |
| 11:24AM | 14 | A.   Gerald Wilson.  Yes, on Gerald. |
| 11:24AM | 15 | Q.   Yes.  Did you tell anybody about that incident? |
| 11:24AM | 16 | A.   My mother was there.  I was still -- I was |
| 11:24AM | 17 | still a minor.  My mother was there. |
| 11:24AM | 18 | Q.   Okay.  What if anything did your mom did? |
| 11:24AM | 19 | A.   She didn't do anything. |
| 11:24AM | 20 | Q.   Okay.  Let me ask you this.  You are a mom, |
| 11:24AM | 21 | correct? |
| 11:24AM | 22 | A.   Yes. |
| 11:24AM | 23 | Q.   You love your children? |
| 11:24AM | 24 | A.   Very much. |
| 11:25AM | 25 | Q.   And you come back in the house, you saw -- I |

| | | |
|---|---|---|
| 11:25AM | 1 | don't care what man it is, your husband, your kids' |
| 11:25AM | 2 | stepfather, somebody else, a stranger on top of your |
| 11:25AM | 3 | children, on top of your daughter, tell me what if |
| 11:25AM | 4 | anything would you do? |
| 11:25AM | 5 | A.   I'm speaking for on my behalf, not my mother's, |
| 11:25AM | 6 | right? |
| 11:25AM | 7 | Q.   Yes.  You are speaking on your behalf. |
| 11:25AM | 8 | A.   He would be dead. |
| 11:25AM | 9 | Q.   He would be dead.  Okay.  All right. |
| 11:25AM | 10 | Did you ever ask your mom when all of these |
| 11:25AM | 11 | things were happening, did you for one day -- apparently |
| 11:25AM | 12 | this happened over a period of time.  Did you for one day |
| 11:25AM | 13 | ask your mom, mom, why are you not protecting me? |
| 11:25AM | 14 | A.   Yes, I did. |
| 11:25AM | 15 | Q.   What, if anything, was said? |
| 11:25AM | 16 | A.   All my mom told me at one point, we were |
| 11:25AM | 17 | sitting in the kitchen, she told me that -- it's nothing |
| 11:26AM | 18 | really that I can do, but I am sorry that you had to go |
| 11:26AM | 19 | through all those abortions. |
| 11:26AM | 20 | Q.   Okay.  She never called the police? |
| 11:26AM | 21 | A.   No. |
| 11:26AM | 22 | Q.   She never reported it to CPS? |
| 11:26AM | 23 | A.   No. |
| 11:26AM | 24 | Q.   She never reported it to any of her relatives? |
| 11:26AM | 25 | A.   No. |

55
Appendix  w r e s 6 r 09/12/2023
Cross-Examination by Mr. Maduforo

11:26AM   1       Q.   She never confronted Jacob about it?

11:26AM   2       A.   No.

11:26AM   3       Q.   You don't think it's kind of weird?

11:26AM   4       A.   Not -- for her?  I don't know.  You would have

11:26AM   5  to ask her that.  I can't speak for her.

11:26AM   6       Q.   You are familiar with Jacob's house; am I

11:26AM   7  correct?

11:26AM   8       A.   I didn't understand the question.

11:26AM   9       Q.   You are familiar with Jacob's house?

11:26AM  10       A.   Yes.

11:26AM  11       Q.   His current house?

11:26AM  12       A.   Yes.

11:26AM  13       Q.   Does it have cameras in that house?

11:26AM  14       A.   I couldn't tell you what he has in his house.

11:26AM  15       Q.   Would it surprise you by any chance if there's

11:26AM  16  footage of you in that house two days ago?

11:26AM  17       A.   Yeah, it would.

11:26AM  18       Q.   So you are saying you did not go over there --

11:26AM  19       A.   I have not -- like I said, the furthest that I

11:27AM  20  have went over Jacob's house is just the front of his

11:27AM  21  gate and I probably never even get out of my car, not

11:27AM  22  unless I'm handing Iceland her food.

11:27AM  23            I did drop Iceland off -- what is today? --

11:27AM  24  Tuesday after going to -- taking her to Sam's and taking

11:27AM  25  her grocery shopping.  And she got out of the car -- in

Appendix w Page 62 of 09/12/2023
Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:27AM | 1 | fact, Birdie was behind me, and -- on Monday and on |
| 11:27AM | 2 | Tuesday when I took my child back over there. |
| 11:27AM | 3 | Q.   Let's go back -- I'm sorry.  Let's go back to |
| 11:27AM | 4 | how you were affected by this issue.  Have you sought any |
| 11:27AM | 5 | kind of counseling? |
| 11:27AM | 6 | A.   Yes, I have. |
| 11:27AM | 7 | Q.   Did you submit that to your lawyer? |
| 11:27AM | 8 | A.   I didn't think that I had to. |
| 11:27AM | 9 | Q.   Okay.  Have you shared that with your lawyer? |
| 11:27AM | 10 | A.   Yes, I have. |
| 11:27AM | 11 | Q.   Okay.  All right.  And we are supposed to |
| 11:27AM | 12 | believe you that you went to counseling. |
| 11:27AM | 13 | A.   I don't know if you are supposed to or not. |
| 11:27AM | 14 | You just asked me a question. |
| 11:27AM | 15 | Q.   Do you know the name of the counselor you went |
| 11:27AM | 16 | to? |
| 11:27AM | 17 | A.   Yes.  Her name is Daphne Sims. |
| 11:28AM | 18 | Q.   And how many times do you go to her? |
| 11:28AM | 19 | A.   I see her -- I don't -- first of all, I don't |
| 11:28AM | 20 | see her.  I Zoom call her. |
| 11:28AM | 21 | Q.   Okay.  How many times whichever way? |
| 11:28AM | 22 | A.   Probably close to like this year alone, maybe |
| 11:28AM | 23 | seven or eight times. |
| 11:28AM | 24 | Q.   This year alone? |
| 11:28AM | 25 | A.   Yes. |

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:28AM | 1 | Q.   Okay.  So all this way you have not done |
| 11:28AM | 2 | until -- |
| 11:28AM | 3 | A.   No, I just said this year alone. |
| 11:28AM | 4 | Q.   When was the first time you started -- |
| 11:28AM | 5 | A.   The first time that I initially seen Daphne was |
| 11:28AM | 6 | maybe two weeks after I filed the lawsuit. |
| 11:28AM | 7 | Q.   Okay.  Whose name is on Jaquita's birth |
| 11:28AM | 8 | certificate? |
| 11:28AM | 9 | A.   Mine. |
| 11:28AM | 10 | Q.   Whose name is on your son's birth certificate? |
| 11:28AM | 11 | A.   Mine. |
| 11:28AM | 12 | Q.   Whose name is on your last daughter's, Iceland? |
| 11:28AM | 13 | A.   All three of my children only have my name only |
| 11:29AM | 14 | on their birth certificates. |
| 11:29AM | 15 | Q.   Okay.  And your name is Tina Wilson, correct? |
| 11:29AM | 16 | A.   Yep, it is. |
| 11:29AM | 17 | Q.   When did you change to Tina Wilson? |
| 11:29AM | 18 | A.   Jacob had my mother change my name when I was |
| 11:29AM | 19 | in sixth grade to Cannon. |
| 11:29AM | 20 | MR. MADUFORO:  Nonresponsive, Your Honor. |
| 11:29AM | 21 | I'm sorry, objection.  Nonresponsive, sorry. |
| 11:29AM | 22 | THE COURT:  Okay.  Sustained. |
| 11:29AM | 23 | Q.   (By Mr. Maduforo)  So let's go back.  Do you |
| 11:29AM | 24 | recall the name on your birth certificate? |
| 11:29AM | 25 | A.   My name? |

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:29AM | 1 | Q.    Yes. |
| 11:29AM | 2 | A.    My name is Tina Marie Cannon at that time. |
| 11:29AM | 3 | Q.    That was the name on your birth certificate? |
| 11:29AM | 4 | A.    At that time. |
| 11:29AM | 5 |       On my birth certificate? |
| 11:29AM | 6 | Q.    Yes. |
| 11:29AM | 7 | A.    It has Tina Marie Wilson because that is my |
| 11:29AM | 8 | birth certificate. |
| 11:29AM | 9 |       Now, on my children's birth certificate, is |
| 11:29AM | 10 | that what you are asking me? |
| 11:29AM | 11 | Q.    No.  I asked you the name on your birth |
| 11:29AM | 12 | certificate. |
| 11:29AM | 13 | A.    On my birth certificate, my personal birth |
| 11:29AM | 14 | certificate, it says Tina Marie Wilson. |
| 11:30AM | 15 | Q.    Have you had other names apart from Tina Marie |
| 11:30AM | 16 | Wilson? |
| 11:30AM | 17 | A.    Yes, I have. |
| 11:30AM | 18 | Q.    Which names? |
| 11:30AM | 19 | A.    Tina Marie Cannon. |
| 11:30AM | 20 | Q.    When was the name changed? |
| 11:30AM | 21 | A.    Sixth grade. |
| 11:30AM | 22 | Q.    Sixth grade? |
| 11:30AM | 23 | A.    Yes. |
| 11:30AM | 24 | Q.    Okay.  And when did you change the name back to |
| 11:30AM | 25 | Wilson? |

Cross-Examination by Mr. Maduforo

11:30AM   1      A.   I changed my name back to Wilson shortly after

11:30AM   2  I had my son.  So that was back in 2021, '22.

11:30AM   3      Q.   All right.  It's a good thing that you are

11:30AM   4  speaking to a counselor.

11:30AM   5          Did you speak to any other person about this

11:30AM   6  incident beyond the counselor?

11:30AM   7      A.   I spoke to several people about it.

11:30AM   8      Q.   Your relatives?

11:30AM   9      A.   Yes.

11:30AM   10     Q.   And is any of them in this courtroom?

11:30AM   11     A.   No.

11:30AM   12     Q.   Is any of them testifying on your behalf?

11:30AM   13     A.   No.

11:30AM   14     Q.   Did you tell any of them that you filed this

11:30AM   15  lawsuit?

11:30AM   16     A.   Yes, I did.

11:30AM   17     Q.   And did you ask any of them to come and be a

11:31AM   18  witness for you?

11:31AM   19     A.   I asked one person.

11:31AM   20     Q.   Okay.

11:31AM   21          You were quite emotional when you described

11:31AM   22  Jacob.  You even at one point said that you love him.

11:31AM   23  And how has he -- I mean, you did testify that he would

11:31AM   24  buy you things.  Now in your adult --

11:31AM   25     A.   I didn't testify that he would buy me things.

                                         12/12/2023
                    Cross-Examination by Mr. Maduforo

11:31AM   1    I testified that he built me a house.  That's what I

11:31AM   2    testified.  Now you are putting words in my mouth.  I

11:31AM   3    never testified that --

11:31AM   4                    THE COURT:  Ma'am, ma'am, calm down.  You

11:31AM   5    testified that you had all kinds of clothes, jewelry

11:31AM   6    and --

11:31AM   7                    THE WITNESS:  Yes, as a child.

11:31AM   8        Q.    (By Mr. Maduforo)  And as an adult was he still

11:31AM   9    buying you things besides building a house for you?

11:31AM   10       A.    No.

11:31AM   11       Q.    So he built you a house.  Are you living in that

11:32AM   12   house?

11:32AM   13       A.    No, I'm not.

11:32AM   14       Q.    Okay.  And when did you move out of that house?

11:32AM   15       A.    In 2014.

11:32AM   16       Q.    In 2014 you moved out of the house he built for

11:32AM   17   you.  How long did you live in that house before you moved

11:32AM   18   out?

11:32AM   19       A.    Maybe three to four years.

11:32AM   20       Q.    While you were living in that house, were you --

11:32AM   21   apparently, he built it.  So, if there was any mortgage,

11:32AM   22   he's paying it; am I correct?  Were you paying --

11:32AM   23       A.    It wasn't a mortgage on the house.

11:32AM   24       Q.    Were you paying any rent?

11:32AM   25       A.    At first I was and then he told me I didn't

| | | |
|---|---|---|
| 11:32AM | 1 | have to. |
| 11:32AM | 2 | Q.   And were you paying utilities? |
| 11:32AM | 3 | A.   Yes. |
| 11:32AM | 4 | Q.   Okay.  And when he asked you to move out of the |
| 11:32AM | 5 | house, what was your feeling? |
| 11:32AM | 6 | A.   He didn't never ask me to move out of the |
| 11:32AM | 7 | house. |
| 11:32AM | 8 | Q.   You moved out on your own? |
| 11:32AM | 9 | A.   Yes, I did. |
| 11:32AM | 10 | Q.   Okay.  All right. |
| 11:32AM | 11 | But you said he built you a house.  You moved |
| 11:32AM | 12 | out of the house? |
| 11:32AM | 13 | A.   Okay.  When I got sick and I had to move down |
| 11:32AM | 14 | here, the house is in Midland County, I can't bring the |
| 11:33AM | 15 | house with me. |
| 11:33AM | 16 | Q.   So what did you do with your property then if |
| 11:33AM | 17 | you -- |
| 11:33AM | 18 | A.   He sold it.  The house was in his name.  The |
| 11:33AM | 19 | house wasn't never legally mine. |
| 11:33AM | 20 | Q.   Okay.  So is it fair to assume that he asked you |
| 11:33AM | 21 | to live in the house? |
| 11:33AM | 22 | A.   I'm sorry.  Repeat that. |
| 11:33AM | 23 | Q.   Is it fair to assume that he asked you to live |
| 11:33AM | 24 | in the house? |
| 11:33AM | 25 | A.   He asked me to live in it? |

Cross-Examination by Mr. Maduforo

11:33AM  1      Q.   Yes.  Stay in the house.

11:33AM  2      A.   Yes.

11:33AM  3      Q.   Okay.  All right.

11:33AM  4           And has he helped you financially?

11:33AM  5      A.   He built the house.  I guess that's...

11:33AM  6      Q.   Have you asked him for financial favors --

11:33AM  7      A.   No.

11:33AM  8      Q.   -- in your adult life?

11:33AM  9      A.   Yes, I have.

11:33AM 10      Q.   Okay.  Before you filed this lawsuit, did you

11:33AM 11 ask him to give you a certain amount of money?

11:33AM 12      A.   No, I did not.

11:33AM 13      Q.   Did you ask him to go get you another house?

11:33AM 14      A.   No, I did not.

11:34AM 15      Q.   Okay.  Was there any conversation about doing

11:34AM 16 favors for you?

11:34AM 17      A.   No.

11:34AM 18      Q.   Okay.  So I have not been a victim of sexual

11:34AM 19 assault.  Apparently, you're alleging that you have, that

11:34AM 20 you are.  But I want to know how is it that someone that

11:34AM 21 did something entirely wrong to you, that you entrusted

11:34AM 22 your children in his care and by extension your mother's

11:34AM 23 care?

11:34AM 24      A.   How can I trust him with my children?

11:34AM 25      Q.   How is it that you did, because your children

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:34AM | 1 | lived with them, still lives with them? |
| 11:34AM | 2 | A.   Nine times out of ten, I was around him with my |
| 11:34AM | 3 | children.  I just didn't -- my children just didn't -- I |
| 11:34AM | 4 | didn't just drop my kids off and I was a dead-beat |
| 11:34AM | 5 | mother.  I've always been active in my children's life. |
| 11:34AM | 6 | Even when my children came to stay down here, I was |
| 11:34AM | 7 | always active in my children's life. |
| 11:35AM | 8 | Q.   Okay.  The question is someone that wronged you, |
| 11:35AM | 9 | someone that did something that actually offends you so |
| 11:35AM | 10 | bad, how is it that you let your children stay with those |
| 11:35AM | 11 | or that individual in this case? |
| 11:35AM | 12 | A.   I guess a lot of times when you're -- I'm not |
| 11:35AM | 13 | going to speak for anybody else.  In my case, like I told |
| 11:35AM | 14 | my attorney, I lived a false narrative most of my life. |
| 11:35AM | 15 | I thought that everything -- like, as long as I brushed |
| 11:35AM | 16 | it up under the rug, what I went through and the things |
| 11:35AM | 17 | that I went through, it wouldn't never happen to my |
| 11:35AM | 18 | children. |
| 11:35AM | 19 | I've always questioned my children and asked my |
| 11:35AM | 20 | children the appropriate questions.  And that's a lot of |
| 11:36AM | 21 | things that I regret because my children have also asked |
| 11:36AM | 22 | me that same question. |
| 11:36AM | 23 | Q.   Okay.  You are currently married, right? |
| 11:36AM | 24 | A.   Yes. |
| 11:36AM | 25 | Q.   When did you get married? |

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:36AM | 1 | A.    In 2018. |
| 11:36AM | 2 | Q.    Did you have any ceremony? |
| 11:36AM | 3 | A.    No. |
| 11:36AM | 4 | Q.    Okay.  Were there witnesses when you got |
| 11:36AM | 5 | married? |
| 11:36AM | 6 | A.    Yes. |
| 11:36AM | 7 | Q.    Where did you get married? |
| 11:36AM | 8 | A.    In Lancaster, Texas. |
| 11:36AM | 9 | Q.    In the courthouse? |
| 11:36AM | 10 | A.    Yes. |
| 11:36AM | 11 | Q.    Okay.  And who all was there when you got |
| 11:36AM | 12 | married? |
| 11:36AM | 13 | A.    It was Jacob, it was my three children, and it |
| 11:36AM | 14 | was my best friend.  My mother was invited but she didn't |
| 11:36AM | 15 | come. |
| 11:36AM | 16 | Q.    Who was your husband's best man at that wedding? |
| 11:36AM | 17 | A.    My husband didn't have one. |
| 11:36AM | 18 | Q.    And did Jacob go up to the judge's bench with |
| 11:36AM | 19 | you when you -- |
| 11:36AM | 20 | A.    No, he did not. |
| 11:36AM | 21 | Q.    Okay.  You would consider a wedding as something |
| 11:36AM | 22 | very important in one's life, right? |
| 11:36AM | 23 | A.    A wedding? |
| 11:36AM | 24 | Q.    Yes. |
| 11:36AM | 25 | A.    Yes. |

Cross-Examination by Mr. Maduforo

```
11:36AM   1        Q.   Yours was very important to you?

11:37AM   2        A.   Yes.

11:37AM   3        Q.   Now, why would you invite someone that inflicted

11:37AM   4   pain on you --

11:37AM   5        A.   I invited my whole family and --

11:37AM   6        Q.   Okay.

11:37AM   7        A.   And in that time and even now, Jacob's with --

11:37AM   8   he's with my mother.  So, if I invited her, I invited

11:37AM   9   him.

11:37AM  10        Q.   Okay.

11:37AM  11             Was there any prior allegation of sexual

11:37AM  12   assault against you by some other people?

11:37AM  13        A.   Against me?

11:37AM  14        Q.   Yes.

11:37AM  15        A.   No.

11:37AM  16        Q.   You never alleged that your cousin from your

11:37AM  17   dad's side tried to assault you sexually?

11:37AM  18        A.   No, I did not.

11:37AM  19        Q.   Okay.  All right.  You never alleged that

11:37AM  20   your -- that somebody else, another man besides Jacob

11:37AM  21   tried to sexually assault you?

11:37AM  22        A.   In the testimony that I just gave to my

11:37AM  23   attorney, when my attorney asked, I did say that when my

11:38AM  24   mother -- when I first tried to tell my mother, I did lie

11:38AM  25   to my mother and tell her that a man at the school when I
```

| | | |
|---|---|---|
| 11:38AM | 1 | was -- I think I was like in the fourth or fifth grade, |
| 11:38AM | 2 | she then took me riding around the school.  She told me |
| 11:38AM | 3 | that there's nobody here. |
| 11:38AM | 4 | She took me back home and she said if you don't |
| 11:38AM | 5 | tell me the truth about who touched you, then I am -- she |
| 11:38AM | 6 | said she's going to beat the hell out of me.  I said |
| 11:38AM | 7 | Jacob was also in the room when me and her were having |
| 11:38AM | 8 | this discussion and I told her it was Jacob. |
| 11:38AM | 9 | Q.   So, first of all, you told her it was somebody |
| 11:38AM | 10 | else and then finally -- |
| 11:38AM | 11 | A.   Yes, I did. |
| 11:38AM | 12 | Q.   Okay.  All right. |
| 11:38AM | 13 | And when you got pregnant do you recall your |
| 11:38AM | 14 | mother making an appointment to get a DNA test to find |
| 11:38AM | 15 | out -- |
| 11:38AM | 16 | A.   She never did that. |
| 11:38AM | 17 | Q.   She never did that. |
| 11:38AM | 18 | Then on three of your children, they do not |
| 11:38AM | 19 | have the names of their fathers on the birth |
| 11:39AM | 20 | certificates? |
| 11:39AM | 21 | A.   Correct. |
| 11:39AM | 22 | Q.   Only your name? |
| 11:39AM | 23 | A.   Yes. |
| 11:39AM | 24 | Q.   And -- but you are alleging that Jacob is the |
| 11:39AM | 25 | father of Jaquita. |

Cross-Examination by Mr. Maduforo

11:39AM   1        A.    He is.  I'm -- he is.

11:39AM   2        Q.    Okay.  Who is the father of your two other

11:39AM   3   children?

11:39AM   4        A.    One is Andre Turner is the father of my son

11:39AM   5   Mark Anthony.  Corey Haynes is the father of my daughter

11:39AM   6   Iceland Haynes.

11:39AM   7        Q.    Why did you not put the names of these men in

11:39AM   8   your life and the lives of your children --

11:39AM   9        A.    Because when I got pregnant --

11:39AM  10              THE COURT:  You both can't talk at the

11:39AM  11   same time.  And I didn't understand.  What was your

11:39AM  12   question and how is this relevant?

11:39AM  13        Q.    (By Mr. Maduforo)  So why did you not put their

11:39AM  14   names on the birth certificates?

11:39AM  15        A.    Why didn't I put -- because they weren't there.

11:40AM  16        Q.    Okay.  All right.

11:40AM  17              Do you mind telling the Court again the last

11:40AM  18   names of your two children besides Jaquita?

11:40AM  19        A.    Mark Anthony, my son's last name is Cannon, and

11:40AM  20   my daughter's last name is Haynes.

11:40AM  21        Q.    Okay.  All right.  Just to be straight, you

11:40AM  22   never complained to the cops about this abuse, you never

11:40AM  23   went to CPS?  You never reported to --

11:40AM  24        A.    I was a minor.  I told you when I went to

11:40AM  25   Dr. McAffee, what Dr. McAffee, the school principal of

| | | |
|---|---|---|
| 11:40AM | 1 | Peace Elementary did.  I was in the sixth grade. |
| 11:40AM | 2 | I also went to my grandmother.  She thought |
| 11:40AM | 3 | that -- she didn't do anything. |
| 11:40AM | 4 | Q.   And did you tell a teacher in high school? |
| 11:40AM | 5 | A.   Those are the two people that I told. |
| 11:40AM | 6 | Q.   Okay.  All right. |
| 11:41AM | 7 | And you started going to psychological |
| 11:41AM | 8 | evaluation just recently after the lawsuit -- |
| 11:41AM | 9 | A.   A psychological evaluation or therapy? |
| 11:41AM | 10 | Q.   The counselor -- I'm sorry. |
| 11:41AM | 11 | A.   Yes, I started going through therapy. |
| 11:41AM | 12 | MR. MADUFORO:  Okay.  I'll pass the |
| 11:41AM | 13 | witness, Your Honor. |
| 11:41AM | 14 | THE COURT:  Can I ask some questions? |
| 11:41AM | 15 | MR. WHARTON:  Yes, Your Honor. |
| 11:41AM | 16 | THE COURT:  Okay.  Ma'am, you said you had |
| 11:41AM | 17 | a hysterectomy and you moved down here because they cut |
| 11:41AM | 18 | your kidney? |
| 11:41AM | 19 | THE WITNESS:  Yes, ma'am. |
| 11:41AM | 20 | THE COURT:  Then you said three months |
| 11:41AM | 21 | later your mother put you out.  Why did she put you out? |
| 11:41AM | 22 | THE WITNESS:  We had an argument about |
| 11:41AM | 23 | this. |
| 11:41AM | 24 | THE COURT:  Okay.  So then you said |
| 11:41AM | 25 | you-all had family get-togethers and everything was at |

```
11:41AM   1    their house.  What shifted that caused you to file this

11:41AM   2    lawsuit?

11:41AM   3                    THE WITNESS:  All of my life I basically

11:41AM   4    been asking why.  All I wanted to do -- was an apology.

11:41AM   5    I wanted them to take accountability for what they -- for

11:41AM   6    what my mom allowed him to do and what he did.  I wanted

11:41AM   7    them to take accountability for it, instead of always

11:42AM   8    hanging up in my face, always telling me that I deserved

11:42AM   9    it or telling me that she wasn't going to leave him or --

11:42AM  10    or all of that.

11:42AM  11                    THE COURT:  What year did you have the

11:42AM  12    hysterectomy?

11:42AM  13                    THE WITNESS:  I had the hysterectomy in

11:42AM  14    2014.  From 2014 to 2015, I had nine surgeries due to the

11:42AM  15    doctor cutting my kidney.

11:42AM  16                    THE COURT:  Okay.  So when did you move

11:42AM  17    down here in --

11:42AM  18                    THE WITNESS:  In September of 2015.

11:42AM  19                    THE COURT:  So September 2015 you moved

11:42AM  20    down here and that's when you stayed with them?

11:42AM  21                    THE WITNESS:  I'm sorry, Your Honor.  I

11:42AM  22    take that back.  It was August 2015.

11:42AM  23                    THE COURT:  Okay.  And when did your

11:42AM  24    mother put you out of the house?

11:42AM  25                    THE WITNESS:  It was the same year.  I
```

| | | |
|---|---|---|
| 11:42AM | 1 | want to say around November, because it was a little bit |
| 11:42AM | 2 | before Christmas. |
| 11:42AM | 3 | THE COURT:  Of 2015? |
| 11:42AM | 4 | THE WITNESS:  Yes, ma'am. |
| 11:42AM | 5 | THE COURT:  Okay.  Thank you. |
| 11:42AM | 6 | Go ahead, Mr. Wharton. |
| 11:42AM | 7 | MR. WHARTON:  Nothing further, Your Honor. |
| 11:42AM | 8 | THE COURT:  Ma'am, you may step down. |
| 11:43AM | 9 | Do you have any other evidence? |
| 11:43AM | 10 | MR. WHARTON:  At this time, we rest our |
| 11:43AM | 11 | case, Your Honor. |
| 11:43AM | 12 | THE COURT:  Okay.  Thank you. |
| 11:43AM | 13 | What says the Defense? |
| 11:43AM | 14 | MR. MADUFORO:  Your Honor, I am going to |
| 11:43AM | 15 | move for a Motion for Instructed Verdict.  The plaintiff |
| 11:43AM | 16 | has stated -- |
| 11:43AM | 17 | THE COURT:  Let me just stop you.  I |
| 11:43AM | 18 | understand -- I got four transcripts I've got to read. |
| 11:43AM | 19 | So I can't really make a ruling at this point. |
| 11:43AM | 20 | MR. MADUFORO:  Okay. |
| 11:43AM | 21 | THE COURT:  I mean, you can put it on the |
| 11:43AM | 22 | record, but I've got to read four transcripts that have |
| 11:43AM | 23 | been admitted. |
| 11:43AM | 24 | MR. WHARTON:  Yes, Your Honor.  I -- you |
| 11:43AM | 25 | know, and given that this is a bench trial, I think we |

| | | |
|---|---|---|
| 11:43AM | 1 | can handle this at the end probably. |
| 11:43AM | 2 | THE COURT:  Okay.  You may proceed. |
| 11:43AM | 3 | MR. MADUFORO:  Okay, Judge.  I will go |
| 11:43AM | 4 | ahead and put this on the record.  I will make a Motion |
| 11:43AM | 5 | for Instructed Verdict on this case. |
| 11:43AM | 6 | Plaintiff has not -- I know you just told |
| 11:44AM | 7 | me that some transcripts that the Court will read.  But |
| 11:44AM | 8 | we don't have any kind of substantial evidence besides |
| 11:44AM | 9 | the oral testimony as alleged on the plaintiff's petition |
| 11:44AM | 10 | regarding the alleged abuse. |
| 11:44AM | 11 | A mere allegation without any kind of |
| 11:44AM | 12 | evidence is not going to suffice, especially in this kind |
| 11:44AM | 13 | of cases. |
| 11:44AM | 14 | This is a child molestation that we are |
| 11:44AM | 15 | talking about.  No CPS report, not from her biological |
| 11:44AM | 16 | mother that lives with the dad, with Ms. Cannon when this |
| 11:44AM | 17 | happened, her stepfather. |
| 11:44AM | 18 | No police report.  No prosecution of |
| 11:44AM | 19 | Mr. Cannon.  No medical report of any sort.  And |
| 11:45AM | 20 | plaintiff wants the Court to believe that she has |
| 11:45AM | 21 | undergone this kind of abuse. |
| 11:45AM | 22 | I do not think that the Court is -- not |
| 11:45AM | 23 | speaking for the Court -- is going to just take a mere |
| 11:45AM | 24 | allegation without substantial documentation or |
| 11:45AM | 25 | evidence into the account and rule in favor of the |

11:45AM  1  plaintiff.

11:45AM  2             That being said, I'm asking that the

11:45AM  3  plaintiff's petition be stricken and she takes nothing

11:45AM  4  out of this.  Thank you, Judge.

11:45AM  5             THE COURT:  So do you have any other

11:45AM  6  evidence?  Your -- whatever you just argued is denied.

11:46AM  7             MR. MADUFORO:  Okay.

11:46AM  8             Your Honor, we'll call Ms. Tina Wilson.

11:46AM  9  I'm sorry.  Birdie Wilson.

11:46AM  10             THE COURT:  Where is she?

11:46AM  11             Come on up.  You can take the stand.

11:46AM  12             Can you please raise your right hand.

11:46AM  13             Do you swear or affirm to tell the truth,

11:47AM  14  the whole truth, and nothing but the truth so help you

11:47AM  15  God?

11:47AM  16             THE WITNESS:  Yes.

11:47AM  17             THE COURT:  You can be seated and speak

11:47AM  18  loud into the microphone.  You might need to take your

11:47AM  19  mask off to talk.

11:47AM  20             You may proceed.

11:47AM  21             MR. MADUFORO:  Thank you, Judge.

11:47AM  22                    BIRDIE LEE WILSON,

11:47AM  23  was called as a witness by the Defense, having been

11:47AM  24  first duly sworn, testified as follows:

11:47AM  25                    DIRECT EXAMINATION

Direct Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:47AM | 1 | BY MR. MADUFORO: |
| 11:47AM | 2 | Q.   Please tell the Court your name. |
| 11:47AM | 3 | A.   Birdie Lee Wilson. |
| 11:47AM | 4 | Q.   Ms. Wilson, I just have a few questions for you |
| 11:47AM | 5 | regarding your daughter Tina Wilson's petition against |
| 11:47AM | 6 | your husband.  Do you recall the first time you started |
| 11:47AM | 7 | living together with Tina and your husband? |
| 11:47AM | 8 | A.   I'm trying to think. |
| 11:47AM | 9 | THE REPORTER:  Pull your microphone down. |
| 11:47AM | 10 | THE WITNESS:  Probably -- I'm trying to |
| 11:47AM | 11 | think.  '93 -- '92, '93. |
| 11:48AM | 12 | Q.   (By Mr. Maduforo)  Okay.  And that's when you |
| 11:48AM | 13 | married Jacob or when you got together with him? |
| 11:48AM | 14 | A.   We were still dating. |
| 11:48AM | 15 | Q.   Okay.  And you moved in with Tina and -- |
| 11:48AM | 16 | A.   It was Tina and my son. |
| 11:48AM | 17 | Q.   Two of your children? |
| 11:48AM | 18 | A.   And Jacob. |
| 11:48AM | 19 | Q.   And Jacob.  Okay. |
| 11:48AM | 20 | And just, if you can, please describe the |
| 11:48AM | 21 | relationship Jacob had at that point with the children. |
| 11:48AM | 22 | A.   When I met Jacob, just when I met him, I was |
| 11:48AM | 23 | living with my mom in Midland on Mineola Street.  And at |
| 11:48AM | 24 | the time when I met him, no, I did not bring my kids. |
| 11:48AM | 25 | And we all moved in, it was probably a year and a half to |

| | | |
|---|---|---|
| 11:48AM | 1 | two years after I met Jacob or going on three years after |
| 11:48AM | 2 | we were dating and my kids lived with me. |
| 11:49AM | 3 | Tina was in elementary and she was probably in |
| 11:49AM | 4 | the sixth getting ready to go to junior high.  Tina's |
| 11:49AM | 5 | birthday put her -- like, she's born March the 26th, |
| 11:49AM | 6 | 1981.  And so that would put her -- she's probably about |
| 11:49AM | 7 | 11 -- 10, 11, somewhere off in there when we moved |
| 11:49AM | 8 | together. |
| 11:49AM | 9 | Q.   Okay.  Thank you. |
| 11:49AM | 10 | And I'll go straight to the point.  So did you |
| 11:49AM | 11 | suspect any sort of abuse of any kind from Jacob against |
| 11:49AM | 12 | any of your children? |
| 11:49AM | 13 | A.   No. |
| 11:49AM | 14 | Q.   I'll ask you the same question specifically |
| 11:49AM | 15 | against Tina. |
| 11:49AM | 16 | A.   No. |
| 11:49AM | 17 | Q.   Are you aware of Jacob sexually assaulting Tina? |
| 11:50AM | 18 | A.   No. |
| 11:50AM | 19 | Q.   Did that ever come to your knowledge? |
| 11:50AM | 20 | A.   No. |
| 11:50AM | 21 | Q.   Did you take Tina to have an abortion? |
| 11:50AM | 22 | A.   No. |
| 11:50AM | 23 | Q.   Are you aware of Tina having a miscarriage when |
| 11:50AM | 24 | she was younger? |
| 11:50AM | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:50AM | 1 | Q.   And do you recall what age she was? |
| 11:50AM | 2 | A.   Let's see.  She was probably in junior high.  I |
| 11:50AM | 3 | can recall the day that this happened.  Jacob, myself and |
| 11:50AM | 4 | Tina was out, had been working outside doing some |
| 11:50AM | 5 | Mesquite bushes. |
| 11:50AM | 6 | And Tina started having really bad pain in her |
| 11:50AM | 7 | stomach.  And it was -- I mean, it was awful.  I didn't |
| 11:50AM | 8 | know what was going on.  And so taking Tina to -- I'd |
| 11:50AM | 9 | taken Tina -- Jacob and myself taken Tina to Midland |
| 11:51AM | 10 | Memorial Hospital.  And they did an examination on Tina. |
| 11:51AM | 11 | And that's when I found out that she was pregnant and she |
| 11:51AM | 12 | had a miscarriage. |
| 11:51AM | 13 | And they called -- they did call in the CPS |
| 11:51AM | 14 | people because she was a minor.  And at that time I'm |
| 11:51AM | 15 | asking Tina, who did this to you?  And went on and -- I |
| 11:51AM | 16 | was in totally shock. |
| 11:51AM | 17 | And went on for hours trying to figure out how |
| 11:51AM | 18 | did this happen.  And that's when she told me that her -- |
| 11:51AM | 19 | her step-mom's son had did this.  And that's when the CPS |
| 11:51AM | 20 | investigation came in that rendered -- when they got |
| 11:51AM | 21 | through with their investigation, that Tina, the children |
| 11:51AM | 22 | that was there, left at the home by themselves, and at |
| 11:51AM | 23 | this time the boy, Adrian Jackson, which is Niecy |
| 11:51AM | 24 | Jackson's son, was a minor.  Both of them were minors. |
| 11:52AM | 25 | And that's what was told to me.  Never was it told to me |

Direct Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:52AM | 1 | that Jacob had did these things. |
| 11:52AM | 2 | And did I ask, as a mom, have you been touched |
| 11:52AM | 3 | inappropriately?  Yes.  Not only to her; her, my son. |
| 11:52AM | 4 | You know, just asking of because the inappropriacy (sic) |
| 11:52AM | 5 | that had happened. |
| 11:52AM | 6 | Niecy and Gerald Miller, which is Tina's |
| 11:52AM | 7 | father, was told that those kids cannot be left alone |
| 11:52AM | 8 | from their investigation, you know, unsupervised.  Now, |
| 11:52AM | 9 | CPS was called in on that case. |
| 11:52AM | 10 | Q.   Okay.  And they did their own investigation? |
| 11:52AM | 11 | A.   They did their own investigation.  And only |
| 11:52AM | 12 | thing I can say is what she had told me, that that's who |
| 11:52AM | 13 | did that.  And I have the right as the parent.  And did |
| 11:53AM | 14 | the CPS people come into the hospital?  Yes, they did, |
| 11:53AM | 15 | because it was a minor involved. |
| 11:53AM | 16 | Q.   Okay.  All right. |
| 11:53AM | 17 | Besides this particular incident, was there |
| 11:53AM | 18 | other incidents about Tina being sexually assaulted? |
| 11:53AM | 19 | A.   Tina have been -- it was another case before -- |
| 11:53AM | 20 | this happened before I met Jacob.  And she had told me |
| 11:53AM | 21 | that her dad's cousin, which is -- we call him Sonny. |
| 11:53AM | 22 | His name is Daniel Washington.  I can't -- that his whole |
| 11:53AM | 23 | name.  That he had touched her. |
| 11:53AM | 24 | And we had taken -- again, I had taken her to |
| 11:53AM | 25 | the hospital and they did an examination on her and to |

11:53AM  1   see had she been penetrated or something like that.  And

11:53AM  2   at that time they came in and investigated and there was

11:54AM  3   no -- nothing found in those -- in that investigation.

11:54AM  4          And in all these things that -- I mean, and

11:54AM  5   her -- her step-mom having CPS coming into my life, it

11:54AM  6   didn't have anything to do with Jacob.  They were saying

11:54AM  7   that I had sexual assaulted my stepson Justin and

11:54AM  8   Jaquita, which was Tina's daughter.

11:54AM  9          That's the allegations that her step-mom kept

11:54AM  10  bringing up into the courts and having me -- like

11:54AM  11  Thanksgiving, I would be having dinner and the CPS people

11:54AM  12  came up, you know, like having family time and the CPS

11:54AM  13  people coming up and investigating me.

11:54AM  14         And at that time, Justin, Jacobs's middle son,

11:54AM  15  he lived with us also by then.  And I told the lady, I

11:55AM  16  said, there's Justin.  I hadn't even spoken to her about

11:55AM  17  what she was there for.  I said, questions that you are

11:55AM  18  asking me, ask him, and I would walk off.

11:55AM  19         You know, just saying this is wrong.

11:55AM  20  Nothing -- I hadn't spoken to him.  He didn't have the

11:55AM  21  slightest idea who the lady was at the door.  And the CPS

11:55AM  22  talked to Justin.

11:55AM  23         Justin -- Justin started laughing, like

11:55AM  24  Birdie -- he called me Birdie.  I'm his step-mom.  He

11:55AM  25  said, she did what?  She ain't never did nothing like

Direct Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:55AM | 1 | that. |
| 11:55AM | 2 | And at that time Jaquita was in the daycare. |
| 11:55AM | 3 | And they were saying that I was the one who was having |
| 11:55AM | 4 | sex with the children. |
| 11:55AM | 5 | Q.   Okay.  So let's go back to Jaquita.  Now has |
| 11:55AM | 6 | Tina ever mentioned who the father of Jaquita is? |
| 11:55AM | 7 | A.   No, she did not. |
| 11:55AM | 8 | Q.   Okay. |
| 11:55AM | 9 | A.   And -- and -- go ahead, I'm sorry. |
| 11:56AM | 10 | Q.   When she got pregnant with Jaquita, did you -- |
| 11:56AM | 11 | what did you do as the mother? |
| 11:56AM | 12 | A.   I'd taken her to the doctor and got her checked |
| 11:56AM | 13 | out, asking her who the father was, and she saying -- she |
| 11:56AM | 14 | told me Roderick Jones or whatever his name was.  I'm |
| 11:56AM | 15 | asking -- I even asked her questions like, how did you -- |
| 11:56AM | 16 | where did y'all do these things at? |
| 11:56AM | 17 | Because I worked at Midland Correctional at |
| 11:56AM | 18 | that time when she was pregnant with Jaquita.  She was in |
| 11:56AM | 19 | the ninth grade.  And I worked at -- and he also would |
| 11:56AM | 20 | catch the bus where I worked at the elementary.  I knew |
| 11:56AM | 21 | Roderick. |
| 11:56AM | 22 | And that's -- and he -- I'm asking him, I even |
| 11:56AM | 23 | asked him myself, you the father of this baby?  And he |
| 11:56AM | 24 | said, yes.  I still have the little glass shoes that he |
| 11:56AM | 25 | brought to the hospital, where he had arrangements, |

Direct Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:56AM | 1 | sitting in my washroom right now at the house that he |
| 11:57AM | 2 | brought to the hospital 27 years ago when Jaquita was |
| 11:57AM | 3 | born. |
| 11:57AM | 4 | THE COURT:  What does Roderick look like? |
| 11:57AM | 5 | THE WITNESS:  He's dark complected, |
| 11:57AM | 6 | probably about 5' 7", if he's that tall.  I haven't seen |
| 11:57AM | 7 | him in years. |
| 11:57AM | 8 | THE COURT:  What complexion is Jaquita? |
| 11:57AM | 9 | THE WITNESS:  She light skinned.  She's |
| 11:57AM | 10 | your skin color and Jacob's. |
| 11:57AM | 11 | THE COURT:  Keep going. |
| 11:57AM | 12 | THE WITNESS:  That's what she had told me. |
| 11:57AM | 13 | Q.   (By Mr. Maduforo)  And the presumed father of |
| 11:57AM | 14 | Jaquita, was he a minor or adult? |
| 11:57AM | 15 | A.   He was a minor.  His mom at the time brought |
| 11:57AM | 16 | him to -- would bring him -- brought him -- that we were |
| 11:57AM | 17 | having a DNA.  And she was bringing him and he never |
| 11:57AM | 18 | came.  Roderick came to the hospital when Jaquita was |
| 11:57AM | 19 | born. |
| 11:57AM | 20 | Q.   Okay.  So you insisted on DNA to find out who |
| 11:57AM | 21 | the actual father of the baby was at that time? |
| 11:57AM | 22 | A.   Yes. |
| 11:58AM | 23 | Q.   And that didn't happen? |
| 11:58AM | 24 | A.   That didn't happen. |
| 11:58AM | 25 | Q.   Okay.  And it was maybe not because of your |

Direct Examination by Mr. Maduforo

| | | |
|---|---|---|
| 11:58AM | 1 | fault? |
| 11:58AM | 2 | A.    Not my fault. |
| 11:58AM | 3 | Q.    Okay.  And take me to the next time -- when was |
| 11:58AM | 4 | that child born; when y'all were still living together or |
| 11:58AM | 5 | when she has moved out? |
| 11:58AM | 6 | A.    Tina had -- she had moved to an apartment but |
| 11:58AM | 7 | she had came back and lived with us. |
| 11:58AM | 8 | Q.    Okay. |
| 11:58AM | 9 | A.    That was Mark. |
| 11:58AM | 10 | Q.    Do you recall how old she was when she had the |
| 11:58AM | 11 | second child? |
| 11:58AM | 12 | A.    I believe she was 20, 21. |
| 11:58AM | 13 | Q.    So she was an adult at that point.  Okay.  All |
| 11:58AM | 14 | right. |
| 11:58AM | 15 | So is it fair to assume that as a mom, you had |
| 11:58AM | 16 | a teenage child that got pregnant and you the mom at that |
| 11:58AM | 17 | point did everything you could to figure out how it |
| 11:59AM | 18 | happened? |
| 11:59AM | 19 | A.    Yes. |
| 11:59AM | 20 | Q.    Okay.  And the only reason you did not discover |
| 11:59AM | 21 | this was because it was a minor? |
| 11:59AM | 22 | A.    Yes.  And the reason why, because I -- I'm |
| 11:59AM | 23 | asking my daughter, you know, several times, who's the |
| 11:59AM | 24 | father?  And she -- you getting older, you 15, 16 years |
| 11:59AM | 25 | old, still telling me the same thing.  Even in your 20s, |

Direct Examination by Mr. Maduforo

```
11:59AM   1   30s.

11:59AM   2         And I get home the day of this letter that Jake
11:59AM   3   had received was served from attorney -- however.  I work
11:59AM   4   in Red Oak.  However it was served.  And it was telling
11:59AM   5   me that he was having -- where we at today, this court.
11:59AM   6   That's what it was about.

12:00PM   7   Q.   Okay.

12:00PM   8   A.   And that's when I got the -- okay, you the
12:00PM   9   father?  Yeah.  I was like, what?  I was in total
12:00PM  10   disbelief.

12:00PM  11         My thing is -- Tina, the day before these
12:00PM  12   papers was served, Tina was at my house in my room with
12:00PM  13   the kids.  Say the papers were served today, she was at
12:00PM  14   my house yesterday, in my house, inside of my house, and
12:00PM  15   with the kids.

12:00PM  16         And her and Iceland, going back to -- just
12:00PM  17   getting -- Iceland has lived -- Mark -- I done raised all
12:00PM  18   three of my grandkids, basically.  Iceland lived with us
12:00PM  19   her senior year.  She had just left a year and a half
12:00PM  20   before then.  Tina had left her there.  And I would tell
12:00PM  21   Tina, you need to come and get Iceland.

12:00PM  22         Iceland lived with me when she was -- when Tina
12:01PM  23   moved here, she was in the fifth grade, sixth grade.  She
12:01PM  24   left probably seventh and came back eighth.  And she
12:01PM  25   just -- and she at my house now, her, and her mom.
```

Direct Examination by Mr. Maduforo

12:01PM  1          If I did all of these horrible things and I'm

12:01PM  2  doing all of this abuse, why you leave your kids there?

12:01PM  3  They still there.

12:01PM  4          I have a 13-year-old little boy there I'm

12:01PM  5  raising.  I've been having him -- my son, whose son today

12:01PM  6  or whatever, I been having his baby since he was three

12:01PM  7  months old.  I have full custody of him.

12:01PM  8          And my thing, if I'm that bad of a person why

12:01PM  9  those kids at 18 and 21 -- Jaquita been gone away from

12:01PM  10  home probably about three years.  And when Tina moved

12:01PM  11  here, she had the rights.  I did not have any custody.

12:01PM  12          I made her pay me child support for Mark

12:01PM  13  because he hasn't paid.  And she paid child support.

12:02PM  14          She ain't never paid nothing for Iceland.

12:02PM  15  Iceland just graduated this past school year.  And you

12:02PM  16  can come get your children.

12:02PM  17      Q.   Okay.  So, along that route, do you and Jake

12:02PM  18  support Tina?

12:02PM  19      A.   Yes.  Jake bought Tina a car probably -- she

12:02PM  20  didn't have transportation.  We do a lot of things for

12:02PM  21  Tina.  Not because of Tina; trying to make sure that

12:02PM  22  those kids are taken care of.

12:02PM  23          I mean, since she been in Dallas he went and

12:02PM  24  got her a car, a little SUV something.  I can't think of

12:02PM  25  the model it was but he got it.

Direct Examination by Mr. Maduforo

12:02PM  1        When she had her Honda, she couldn't pay the
12:02PM  2   car note; he helped pay for it.
12:02PM  3        Q.   Okay.  And when you and Jake -- you said he
12:03PM  4   helps to pay for her car note.  Do you guys give her
12:03PM  5   money?  Do you guys buy her other things?
12:03PM  6        A.   Yeah, he give her money.  She would come to the
12:03PM  7   house and he would be out there on the property working.
12:03PM  8   Oh, I need 20.  I don't care if it's 20, $30, a hundred.
12:03PM  9   He would give her money.  I would give -- I mean, we
12:03PM 10   helped her.
12:03PM 11            THE COURT:  Sir, you got ten more minutes
12:03PM 12   and the other side is going to have 15 minutes and we're
12:03PM 13   going to stop at 12:30.
12:03PM 14        Q.   (By Mr. Maduforo)  And when was the last time
12:03PM 15   Tina was in the house?
12:03PM 16        A.   At my house?
12:03PM 17            THE COURT:  The day before this happened.
12:03PM 18   Before he got served.
12:03PM 19            MR. WHARTON:  I guess I'll start objecting
12:03PM 20   to that.
12:03PM 21            THE COURT:  That was her testimony.  The
12:03PM 22   day before he got served --
12:03PM 23            THE WITNESS:  She was at my house.  And
12:03PM 24   she comes -- I don't know if y'all -- to me, she comes to
12:03PM 25   my house all the time, even to pick up the children.

Direct Examination by Mr. Maduforo

| | | |
|---|---|---|
| 12:03PM | 1 | THE COURT:  Now you can ask if she's been |
| 12:03PM | 2 | there since then, sir. |
| 12:03PM | 3 | Q.   (By Mr. Maduforo)  Has she been in the house |
| 12:03PM | 4 | since this lawsuit was filed? |
| 12:03PM | 5 | A.   No, not that I know of. |
| 12:04PM | 6 | Q.   Okay.  All right. |
| 12:04PM | 7 | Tina obviously did not tell you about this |
| 12:04PM | 8 | incident.  Did she tell you that she was seeking any |
| 12:04PM | 9 | counseling? |
| 12:04PM | 10 | A.   No.  She -- |
| 12:04PM | 11 | THE COURT:  The answer was yes or no. |
| 12:04PM | 12 | THE WITNESS:  No. |
| 12:04PM | 13 | I want to say -- |
| 12:04PM | 14 | THE COURT:  Ma'am, you don't -- wait for |
| 12:04PM | 15 | another question, please. |
| 12:04PM | 16 | THE WITNESS:  Okay. |
| 12:04PM | 17 | Q.   (By Mr. Maduforo)  In your own experience with |
| 12:04PM | 18 | your husband Jake, Jacob Cannon, and this whole |
| 12:04PM | 19 | allegation, what do you think this is all about? |
| 12:05PM | 20 | A.   Greed, money, anger, hatred. |
| 12:05PM | 21 | THE COURT:  And why does she have greed, |
| 12:05PM | 22 | money, anger, hatred towards Jacob? |
| 12:05PM | 23 | THE WITNESS:  I just don't understand it |
| 12:05PM | 24 | because up until then we were -- I mean, we were -- she |
| 12:05PM | 25 | was at my house.  We spent holidays together, even since |

Direct Examination by Mr. Maduforo

```
12:05PM    1   she done got married and right -- the Christmas before we
12:05PM    2   got -- he got served, I got pictures of her and her
12:05PM    3   husband at our house.
12:05PM    4            And I'm just trying to -- and even like
12:06PM    5   she have told me, if she could not -- she wants me
12:06PM    6   instead of him.  If she could take anybody to jail, she
12:06PM    7   would rather have me in jail.
12:06PM    8            THE COURT:  So why does she want you in
12:06PM    9   jail?
12:06PM   10            THE WITNESS:  Just what I said.  I guess
12:06PM   11   angry.  I mean, I went from being called mama to being
12:06PM   12   called by my first name.  I got text messages I got on my
12:06PM   13   phone being called bitches and hoes.
12:06PM   14            I ain't did nothing to her but try to help
12:06PM   15   her take care of her kids.  And I'm still doing it.  And
12:06PM   16   I'm 61 and I'm tired.  But what I do?  I can't put them
12:06PM   17   outside.
12:06PM   18            THE COURT:  How old is the youngest one?
12:06PM   19            THE WITNESS:  Her youngest one just turned
12:06PM   20   18.  She'll be 19 December the 3rd.  The youngest one I
12:06PM   21   take care of is my grandson.  He's 13 now.  Yeah, I'm
12:07PM   22   tired.
12:07PM   23            THE COURT:  Thank you.
12:07PM   24            Do you have any other questions?
12:07PM   25        Q.   (By Mr. Maduforo)  One last question.  Did you
```

Direct Examination by Mr. Maduforo

| | | |
|---|---|---|
| 12:07PM | 1 | abuse Tina when she was a minor? |
| 12:07PM | 2 | A.   When she was a minor? |
| 12:07PM | 3 | Q.   Yes. |
| 12:07PM | 4 | A.   No.  Did I give spank -- give Tina whippings, |
| 12:07PM | 5 | yes, being disrespectful, yes.  But just going around |
| 12:07PM | 6 | what you call abusing kids or hitting her for no apparent |
| 12:07PM | 7 | reason or just throwing her out on the street or leaving |
| 12:07PM | 8 | her without things or anything, like -- like I'm taking |
| 12:07PM | 9 | care of her kids and making sure they eat every day.  I |
| 12:07PM | 10 | treated Tina -- I've taken care of her the same way. |
| 12:07PM | 11 | Q.   Was anybody abusive to her when she was a minor |
| 12:07PM | 12 | that you know of -- |
| 12:07PM | 13 | A.   No. |
| 12:07PM | 14 | Q.   -- in your household? |
| 12:07PM | 15 | A.   No. |
| 12:07PM | 16 | Q.   Okay. |
| 12:07PM | 17 |            MR. MADUFORO:  Pass the witness, Your |
| 12:07PM | 18 | Honor. |
| 12:07PM | 19 |            THE COURT:  You may proceed. |
| 12:07PM | 20 |            MR. WHARTON:  Thank you, Your Honor. |
| 12:08PM | 21 |            Just for a brief, you know, background on |
| 12:08PM | 22 | this, the Defense never disclosed, never sent a |
| 12:08PM | 23 | Disclosure.  We're not objecting to the witness being |
| 12:08PM | 24 | called.  I'm just alerting the Court to where we are as |
| 12:08PM | 25 | far as how we are approaching this.  There was never a |

| | | |
|---|---|---|
| 12:08PM | 1 | Disclosure. |
| 12:08PM | 2 | THE COURT:  Okay. |
| 12:08PM | 3 | CROSS-EXAMINATION |
| 12:08PM | 4 | BY MR. WHARTON: |
| 12:08PM | 5 | Q.   All right.  How tall is Jaquita? |
| 12:08PM | 6 | A.   She about 5'8", 5'7".  She about my height. |
| 12:08PM | 7 | Q.   And how tall is Jacob? |
| 12:08PM | 8 | A.   Jacob is probably about 5' 11", 6-foot tall. |
| 12:08PM | 9 | Q.   And, by the way, are you married to Jacob? |
| 12:08PM | 10 | A.   He's my husband. |
| 12:08PM | 11 | Q.   All right.  And when the CPS calls were made, |
| 12:08PM | 12 | when CPS came to the house and talked with y'all, did they |
| 12:09PM | 13 | ever figure out who the father of Jaquita is? |
| 12:09PM | 14 | A.   They were not there for the father of Jaquita. |
| 12:09PM | 15 | Q.   Now, you're saying that Tina had at least one |
| 12:09PM | 16 | miscarriage, right? |
| 12:09PM | 17 | A.   I know she did. |
| 12:09PM | 18 | Q.   And then abortions? |
| 12:09PM | 19 | A.   She had -- I haven't taken Tina on no five or |
| 12:09PM | 20 | six abortions.  Tina was having sex.  Yes, she had an |
| 12:09PM | 21 | abortion. |
| 12:09PM | 22 | Q.   How many abortions do you know of? |
| 12:09PM | 23 | A.   Probably two. |
| 12:09PM | 24 | Q.   And how old was she? |
| 12:09PM | 25 | A.   I think one when she was 16, and I believe the |

Cross-Examination by Mr. Wharton

| | | |
|---|---|---|
| 12:09PM | 1 | other one was when she was probably 17. |
| 12:09PM | 2 | Q.   So you -- how do you know those were happening? |
| 12:10PM | 3 | A.   I'd taken her. |
| 12:10PM | 4 | Q.   So you took her for those abortions? |
| 12:10PM | 5 | A.   Yes. |
| 12:10PM | 6 | Q.   And you don't know who the father is? |
| 12:10PM | 7 | A.   No.  Tina was -- I take one of them back.  She |
| 12:10PM | 8 | was having sex with some -- with some boy that lived over |
| 12:10PM | 9 | there by her dad's house.  You have to ask Tina. |
| 12:10PM | 10 | Q.   Is that who you are claiming is Roderick Jones? |
| 12:10PM | 11 | A.   No. |
| 12:10PM | 12 | Q.   So who's this other one? |
| 12:10PM | 13 | A.   You have to ask Tina. |
| 12:10PM | 14 | THE COURT:  He's asking you.  We're in |
| 12:10PM | 15 | trial. |
| 12:10PM | 16 | THE WITNESS:  I don't -- I don't know who. |
| 12:10PM | 17 | I know she was pregnant, and I wasn't ready to take care |
| 12:10PM | 18 | of another baby, and she had an abortion. |
| 12:10PM | 19 | Q.   (By Mr. Wharton)  All right.  So -- okay.  Now, |
| 12:10PM | 20 | you were testifying earlier about a Niecy Jackson.  Is |
| 12:10PM | 21 | that Sharon Jackson? |
| 12:10PM | 22 | A.   Yes, George.  She was -- her maiden name is |
| 12:11PM | 23 | Jackson.  She was known as Sharon Jackson Miller George. |
| 12:11PM | 24 | Q.   Right.  And I'm under the impression that y'all |
| 12:11PM | 25 | have not seen her deposition.  Is that right? |

| | | |
|---|---|---|
| 12:11PM | 1 | A.   I have not. |
| 12:11PM | 2 | Q.   Okay.  Do you know why Sharon Jackson George |
| 12:11PM | 3 | would testify that Tina's version of events is true and |
| 12:11PM | 4 | not yours? |
| 12:11PM | 5 | A.   Will you repeat that again, please? |
| 12:11PM | 6 | THE COURT:  Don't ask -- ask a better |
| 12:11PM | 7 | question.  Be specific, since she doesn't know... |
| 12:11PM | 8 | MR. WHARTON:  Yes, Your Honor. |
| 12:11PM | 9 | Q.   (By Mr. Wharton)  Now, your story with Sharon |
| 12:11PM | 10 | Jackson George is not that she was calling about Tina, but |
| 12:11PM | 11 | that she was calling on you specifically, right? |
| 12:12PM | 12 | Do you understand my question? |
| 12:12PM | 13 | A.   No. |
| 12:12PM | 14 | Q.   You testified earlier that Sharon Jackson George |
| 12:12PM | 15 | did call CPS, right? |
| 12:12PM | 16 | A.   Yes. |
| 12:12PM | 17 | Q.   And your testimony was that Sharon Jackson |
| 12:12PM | 18 | George called CPS about you, not about Jacob? |
| 12:12PM | 19 | A.   Yes. |
| 12:12PM | 20 | Let me -- |
| 12:12PM | 21 | THE COURT:  No, you can't say anything. |
| 12:12PM | 22 | You have to wait until he asks a question. |
| 12:12PM | 23 | Q.   (By Mr. Wharton)  And your lawyer can ask any |
| 12:12PM | 24 | question you need. |
| 12:12PM | 25 | You're saying that CPS came and then you were |

12:12PM   1   there while CPS talked to Tina.

12:12PM   2        A.   No, I did not testify to that.

12:12PM   3        Q.   Okay.  Do you know if CPS talked to Tina

12:12PM   4   independently?

12:12PM   5        A.   No, I do not.  What I testified to, that CPS

12:12PM   6   came to my house and they were saying, allegedly saying,

12:12PM   7   that I had had sex with my stepson Justin and saying that

12:13PM   8   I was fondling Jaquita, which is Tina's daughter.

12:13PM   9        Q.   Did you say fundling or fondling?

12:13PM  10             THE COURT:  She said fondling.  I'm making

12:13PM  11   the ruling.  I remember the testimony.

12:13PM  12             MR. WHARTON:  I just didn't hear the word.

12:13PM  13   I'm sorry.  My apologies, Your Honor.

12:13PM  14             THE COURT:  That's what her testimony was,

12:13PM  15   that the allegations were against her regarding those two

12:13PM  16   children.

12:13PM  17             What do you want to ask her about

12:13PM  18   Ms. Sharon Jackson Miller George's statement?

12:13PM  19             MR. WHARTON:  Yes, Your Honor.

12:13PM  20        Q.   (By Mr. Wharton)  So you're saying that CPS came

12:13PM  21   because you were -- because the allegation was that you

12:13PM  22   were fondling Jaquita?

12:13PM  23        A.   I want to make sure.  It was Jaquita and

12:13PM  24   Justin.

12:13PM  25        Q.   Jaquita and Justin.

12:13PM  1          And so they -- you're saying they were not

12:14PM  2    called ever about any allegation involving Tina?

12:14PM  3       A.   No.  We had several -- okay, I'm sorry.

12:14PM  4                THE COURT:  Go ahead.  You had several

12:14PM  5    what?

12:14PM  6                THE WITNESS:  We had -- the calls that

12:14PM  7    Niecy, Sharon or whatever, it was several times that she

12:14PM  8    have had the CPS come to my house.  And it was always

12:14PM  9    about -- it was always saying that I had did something to

12:14PM  10   the children.  It was -- it was allegedly that she was

12:14PM  11   saying that Birdie Lee Wilson, that's me.

12:14PM  12                THE COURT:  Okay.  Thank you.

12:14PM  13      Q.   (By Mr. Wharton)  All right.  And what about

12:14PM  14   during the custody trial with Gerald Miller; was CPS

12:15PM  15   called during that trial?

12:15PM  16      A.   Yeah, about the children.

12:15PM  17      Q.   About the other children?

12:15PM  18      A.   About all the children.

12:15PM  19                THE COURT:  Okay.  Hold on.

12:15PM  20                Ma'am, who is Gerald Lee Miller?

12:15PM  21                MR. WHARTON:  Gerald Miller is --

12:15PM  22                THE COURT:  Her father?

12:15PM  23                MR. WHARTON:  Her father, yes.

12:15PM  24                THE COURT:  You can't -- go ahead.  You're

12:15PM  25   talking about a custody case?

12:15PM   1              MR. WHARTON:  Yes.  There was a trial

12:15PM   2    involving --

12:15PM   3              THE WITNESS:  Okay.  Me and my kids' dad,

12:15PM   4    Tina's father, he had got custody -- he did not want

12:15PM   5    custody of Tina.  He just wanted custody of Gerald.

12:15PM   6    That's the son.  Gerald Wilson is my son.  Gerald Miller

12:15PM   7    is the father of my two children.

12:15PM   8         Q.   (By Mr. Wharton)  Right.

12:15PM   9         A.   Okay.  And the custody case was between me and

12:16PM  10    him.

12:16PM  11         Q.   And did they call CPS --

12:16PM  12         A.   That's when she was calling CPS --

12:16PM  13              THE COURT:  Hold on.  Let him ask the

12:16PM  14    question.

12:16PM  15         Q.   (By Mr. Wharton)  During that trial, did they

12:16PM  16    call CPS?  You can say yes or no.

12:16PM  17              MR. MADUFORO:  Your Honor --

12:16PM  18              THE COURT:  No.  She's yet to answer the

12:16PM  19    question.  Because her response was that it was about the

12:16PM  20    children and that the CPS case between a husband and wife

12:16PM  21    has to do with their own children.

12:16PM  22              So, ma'am, did they call CPS regarding

12:16PM  23    custody or anything during that custody case?

12:16PM  24              THE WITNESS:  Not that I know of, that I

12:16PM  25    can recall of.

| | | |
|---|---|---|
| 12:16PM | 1 | Q.   (By Mr. Wharton)  And what year was that?  You |
| 12:16PM | 2 | don't have to give me the exact date. |
| 12:17PM | 3 | Let me ask you this.  Was that occurring before |
| 12:17PM | 4 | Jaquita was born? |
| 12:17PM | 5 | A.   The custody case?  Yes. |
| 12:17PM | 6 | Q.   So, if CPS was being called during the custody |
| 12:17PM | 7 | case, it could not have been about you abusing Jaquita in |
| 12:17PM | 8 | some way, right? |
| 12:17PM | 9 | A.   The custody case is a different -- what I'm |
| 12:17PM | 10 | testifying to -- |
| 12:17PM | 11 | THE COURT:  Ma'am, I'm going to interrupt |
| 12:17PM | 12 | you.  The question is, was CPS called during the custody |
| 12:17PM | 13 | case between you and your husband?  That's the question. |
| 12:17PM | 14 | THE WITNESS:  Yes. |
| 12:17PM | 15 | THE COURT:  And how old were the kids at |
| 12:17PM | 16 | the time of that case?  If you don't know the year, how |
| 12:17PM | 17 | old were they? |
| 12:18PM | 18 | THE WITNESS:  Tina probably was -- I don't |
| 12:18PM | 19 | know. |
| 12:18PM | 20 | THE COURT:  Try real hard.  Because I |
| 12:18PM | 21 | would hate for you to have to come back and remember a |
| 12:18PM | 22 | week from now.  I'm not going to be here tomorrow. |
| 12:18PM | 23 | THE WITNESS:  Maybe 10, 11.  I don't know. |
| 12:18PM | 24 | THE COURT:  Thank you. |
| 12:18PM | 25 | Now, Mr. Wharton, ask your next question. |

Redirect Examination by Mr. Maduforo

| | | |
|---|---|---|
| 12:18PM | 1 | MR. WHARTON:  Thank you, Your Honor. |
| 12:18PM | 2 | Q.   (By Mr. Wharton)  And do you know, how did -- |
| 12:18PM | 3 | how did Tina get that scar on her forehead? |
| 12:18PM | 4 | A.   Oh, Tina got that scar on the forehead because |
| 12:18PM | 5 | I was in the kitchen cooking, and she came in going to |
| 12:18PM | 6 | hit me and I hit her.  It did not have anything to -- me |
| 12:18PM | 7 | being her mother and she going to hit me?  Yeah, I hit |
| 12:18PM | 8 | her. |
| 12:18PM | 9 | Q.   And how did that leave a scar, a permanent scar? |
| 12:18PM | 10 | A.   I hit her with a skillet.  Because I was in the |
| 12:18PM | 11 | kitchen, she picked up the skillet to hit me and she had |
| 12:19PM | 12 | it like this and I did it like that (indicating). |
| 12:19PM | 13 | Q.   Did you ever find Tina in her room bleeding on |
| 12:19PM | 14 | the floor? |
| 12:19PM | 15 | A.   No, sir. |
| 12:19PM | 16 | Q.   So there's no event where she was miscarrying, |
| 12:19PM | 17 | bleeding on the floor? |
| 12:19PM | 18 | A.   No. |
| 12:19PM | 19 | MR. WHARTON:  I'll pass the witness. |
| 12:20PM | 20 | THE COURT:  Anything? |
| 12:20PM | 21 | MR. MADUFORO:  Just one or two questions. |
| 12:20PM | 22 | REDIRECT EXAMINATION |
| 12:20PM | 23 | BY MR. MADUFORO: |
| 12:20PM | 24 | Q.   Just to be clear, when you took Tina to the |
| 12:20PM | 25 | abortion clinic, did she ever mention that Jacob was the |

Redirect Examination by Mr. Maduforo

| | | |
|---|---|---|
| 12:20PM | 1 | father? |
| 12:20PM | 2 | A.   No. |
| 12:20PM | 3 | Q.   And the last question will be, you are aware |
| 12:20PM | 4 | that Jacob was deposed regarding this case, correct? |
| 12:20PM | 5 | A.   He was what? |
| 12:20PM | 6 | Q.   He went for a deposition on this case? |
| 12:20PM | 7 | A.   To a deposition, yes. |
| 12:20PM | 8 | Q.   Yes.  Do you know if Jacob was informed of the |
| 12:20PM | 9 | following individuals being deposed:  Sharon Jackson |
| 12:20PM | 10 | George, Gerald Miller, and Gerald Wayne Wilson, Junior? |
| 12:20PM | 11 | A.   No. |
| 12:20PM | 12 | Q.   Okay. |
| 12:20PM | 13 | MR. MADUFORO:  Pass the witness, Your |
| 12:20PM | 14 | Honor. |
| 12:20PM | 15 | MR. WHARTON:  Nothing further, Your Honor. |
| 12:20PM | 16 | THE COURT:  Okay. |
| 12:20PM | 17 | MR. MADUFORO:  Nothing further from the |
| 12:20PM | 18 | Defense. |
| 12:20PM | 19 | THE COURT:  I have a question. |
| 12:21PM | 20 | Now, you said she had two abortions.  And |
| 12:21PM | 21 | where did -- said you took her to both abortions. |
| 12:21PM | 22 | THE WITNESS:  Yes, in Odessa. |
| 12:21PM | 23 | THE COURT:  Did Jacob go? |
| 12:21PM | 24 | THE WITNESS:  No. |
| 12:21PM | 25 | THE COURT:  Anything else? |

| | | |
|---|---|---|
| 12:21PM | 1 | MR. MADUFORO:  Nothing further. |
| 12:21PM | 2 | MR. WHARTON:  No, Your Honor. |
| 12:21PM | 3 | THE COURT:  You may step down, ma'am. |
| 12:21PM | 4 | MR. MADUFORO:  Defense rests, Your Honor. |
| 12:21PM | 5 | MR. WHARTON:  And we are making an effort |
| 12:21PM | 6 | to get Roderick Jones available by telephone if the Court |
| 12:21PM | 7 | will permit him to testify remotely. |
| 12:21PM | 8 | THE COURT:  Who's Roderick Jones? |
| 12:21PM | 9 | MR. WHARTON:  Roderick Jones is the young |
| 12:21PM | 10 | boy at the time that they were alleging was the father -- |
| 12:22PM | 11 | was the one getting Tina Wilson pregnant. |
| 12:22PM | 12 | THE COURT:  Okay.  We're going to recess |
| 12:22PM | 13 | until 1:30.  And if you can get him by 1:30, I'll allow |
| 12:22PM | 14 | him to testify as a rebuttal witness. |
| 12:22PM | 15 | MR. WHARTON:  Thank you, Your Honor. |
| 12:22PM | 16 | THE COURT:  So we'll see y'all at 1:30. |
| 12:22PM | 17 | MR. WHARTON:  To be clear, I think he |
| 12:22PM | 18 | lives in another state. |
| 12:22PM | 19 | THE COURT:  No, I understand.  He can |
| 12:22PM | 20 | testify by phone if you can get him here by 1:30. |
| 12:22PM | 21 | MR. WHARTON:  Thank you, Your Honor. |
| 12:22PM | 22 | THE COURT:  If not, we're going to end |
| 12:22PM | 23 | this case. |
| 12:22PM | 24 | (Lunch recess.) |
| 1:27PM | 25 | MR. WHARTON:  We call Roderick Jones. |

1:27PM   1                    THE COURT:  Mr. Jones, please raise your

1:27PM   2    right hand.

1:27PM   3                    Do you swear or affirm to tell the truth,

1:27PM   4    the whole truth and nothing but the truth, so help you

1:27PM   5    God?

1:27PM   6                    THE WITNESS:  Yes, ma'am, I do.

1:27PM   7                    THE COURT:  Okay.  You may proceed.

1:27PM   8                         RODERICK JONES,

1:27PM   9    was called as a witness by the Plaintiff, having been

1:27PM   10   first duly sworn, testified as follows via Zoom:

1:27PM   11                    DIRECT EXAMINATION

1:27PM   12   BY MR. WHARTON:

1:27PM   13       Q.   Can you state your name for the record, please.

1:27PM   14       A.   Hold on.  Okay.  Yes.  My name is Roderick

1:27PM   15   Jones, for the record.

1:27PM   16       Q.   And, Mr. Jones, how did you come to know Tina

1:28PM   17   Wilson?

1:28PM   18       A.   How did I know Tina Wilson?

1:28PM   19       Q.   Yes.

1:28PM   20       A.   I first met her at a Mr. Gatti's, a pizza hall,

1:28PM   21   back when we were like teens.  And then from there on we

1:28PM   22   went to the same school together.  And that's how I know

1:28PM   23   her, from that.

1:28PM   24       Q.   Were y'all boyfriend and girlfriend?

1:28PM   25       A.   You know, we were just girlfriend and

Direct Examination by Mr. Wharton

1:28PM   1   boyfriend.  Nothing intimate or nothing like that.

1:28PM   2       Q.   Okay.  So, to be clear, for this case, you never

1:28PM   3   had actual sex with her?

1:28PM   4       A.   No.  No.  Never.  Never.  Still to this day,

1:28PM   5   never.

1:28PM   6       Q.   Did Jacob Cannon or Birdie Wilson ever ask you

1:28PM   7   to say that you fathered Tina Wilson's child?

1:29PM   8       A.   Oh, yeah.  Man, yeah, they did.  They did that

1:29PM   9   back long when we were dating, man.  Just to -- really to

1:29PM  10   say -- like to take the heat off of him.  You know, he

1:29PM  11   knew that that was his baby, regardless.

1:29PM  12           So, meaning that me and Ms. Wilson was -- Tina

1:29PM  13   Wilson was, you know, how you could say, courting each

1:29PM  14   other during our younger teen age.  And he figured that

1:29PM  15   he could throw that in and say it like, as long as you

1:29PM  16   claiming saying this baby here is yours, you don't have

1:29PM  17   to want for nothing.  Yeah, that was...

1:29PM  18       Q.   So did he offer you money or gifts?

1:29PM  19       A.   Oh, yeah.  Like -- like he tried to offer me --

1:29PM  20   he gave me so-called, if you want to call it giving it

1:29PM  21   money, he giving gifts, if he want to so-called say that.

1:29PM  22           But, I mean, like, yeah, he just really wanted

1:29PM  23   me to take the fall for being the baby's father.

1:30PM  24           I mean, we even went to the extreme that, you

1:30PM  25   know, my mom, let her rest in peace, she was like, hey,

Direct Examination by Mr. Wharton

1:30PM  1   if this is your baby, cool.  If this is your baby, you

1:30PM  2   know, we gonna be involved and all this, it's cool.  All

1:30PM  3   right, then, I just need to know for myself.  Let's take

1:30PM  4   a DNA.

1:30PM  5          We all met up at the store, all except the baby

1:30PM  6   and Ms. Wilson.  Me, my mom, Birdie, and Jacob showed up

1:30PM  7   at the store out there in Midland, Texas.  And showed up,

1:30PM  8   said he'll agree to take this DNA test.  Cool.  My mom

1:30PM  9   went on and did it.  I took it.  He never showed up,

1:30PM  10  never heard nothing else ever again.

1:30PM  11     Q.   So he just didn't show up for this DNA test?

1:30PM  12     A.   Yes, sir.  He did not show up.

1:30PM  13     Q.   Did you ever see him acting inappropriately with

1:31PM  14  Tina Wilson?

1:31PM  15     A.   Oh, yeah.  Yeah.  Like -- like, it's crazy,

1:31PM  16  man.  It's crazy.  That's not how no father, no

1:31PM  17  stepfather or however you put it should be acting like

1:31PM  18  that inappropriate with no child.

1:31PM  19     Q.   Can you be as specific as you can, as possible?

1:31PM  20  Can you give details?

1:31PM  21     A.   Oh, yeah.  Like, for instance, like going to --

1:31PM  22  like, we have a mall like everybody else.  You have a

1:31PM  23  mall there.  You know what I'm saying?  Like, be like

1:31PM  24  this.  Birdie would be pushing the baby and he would be

1:31PM  25  like holding hands, like, you know, like boyfriend and

Direct Examination by Mr. Wharton

1:31PM   1   girlfriend at the time.  I'm like, huh-uh.  Man, I

1:31PM   2   ain't -- to see that, you know, to actually see it from

1:31PM   3   my own eyes, I was like -- because they already knew he

1:31PM   4   was already listening to our phone calls when we would be

1:32PM   5   talking on the phone.  He would pick up -- this is way

1:32PM   6   before cellphones.

1:32PM   7          He would pick up.  You could hear the other

1:32PM   8   phone in the other room.  He be sitting there listening

1:32PM   9   to me and Tina Wilson talking on the phone.  We know

1:32PM   10  that.  We know that.

1:32PM   11     Q.   Could you hear --

1:32PM   12     A.   Then coming in her room -- and going in there

1:32PM   13  in her room at like three, four, five -- not three, four,

1:32PM   14  but two or 3 o'clock in the morning, just to have a talk?

1:32PM   15  What?  You know.  Okay.  Okay.

1:32PM   16              THE COURT:  Now, sir, let me stop you.

1:32PM   17  How --

1:32PM   18              THE WITNESS:  Okay.

1:32PM   19              THE COURT:  Listen to me.  How did you

1:32PM   20  know he was coming in the room at 2 or 3 o'clock in the

1:32PM   21  morning?

1:32PM   22              THE WITNESS:  Because after -- you know,

1:32PM   23  coming in on that part, you know, that was -- like I

1:32PM   24  said, we would be on the phone talking.  You know, what

1:32PM   25  teens do, sit up on the phone and talk when we ain't

Direct Examination by Mr. Wharton

1:32PM   1   supposed to be talking and get off the phone.

1:32PM   2             And I'd be like, what's wrong?  She was

1:32PM   3   like, he came into the room and wants to have a talk.  I

1:33PM   4   was like, a talk?  And this is probably like a little 45

1:33PM   5   minutes and then she would have to sneak back up on the

1:33PM   6   phone and call me again.

1:33PM   7             Then it would go to the fact like they

1:33PM   8   would have people come up to ask me if I was the baby's

1:33PM   9   father, just to like prove -- like just to say, yeah,

1:33PM   10  yeah, he the one.  But I'm sorry, ma'am, Court --

1:33PM   11            THE COURT:  Let me ask you this.  What did

1:33PM   12  the baby look like?

1:33PM   13            THE WITNESS:  Man, just like Jacob Cannon,

1:33PM   14  when it first came out.  I'm sorry, y'all.  I'm dark.

1:33PM   15  Ms. Tina Wilson is dark.  Her mama is dark.  That baby --

1:33PM   16  if we came apart (sic) to have sex and that baby was from

1:33PM   17  me, I'm sorry, that baby would be dark complected.  This

1:33PM   18  baby is light skinned.

1:33PM   19            I'm sorry.  It look just like Mr. Cannon.

1:33PM   20  I'm sorry.  I'm sorry.  You don't need no court to prove

1:33PM   21  that.  I'm sorry.  Hands down, you don't.

1:33PM   22       Q.   (By Mr. Wharton)  And nothing personal, but how

1:34PM   23  tall a man are you?  Just curious.

1:34PM   24       A.   I'm 5'4".  Jacob is like -- he probably

1:34PM   25  somewhere -- somewhere 5'6" -- about 5'9", 5'8".

1:34PM  1          MR. MADUFORO:  Objection, Your Honor.

1:34PM  2          THE COURT:  Sir, he objected.  So wait for

1:34PM  3  another question.  You answered the question.  He asked

1:34PM  4  how tall you were.

1:34PM  5          THE WITNESS:  5'4".

1:34PM  6          THE COURT:  Let him ask another question.

1:34PM  7          THE WITNESS:  My bad.

1:34PM  8          MR. WHARTON:  That's okay.

1:34PM  9     Q.   (By Mr. Wharton)  How tall is Jacob Cannon,

1:34PM  10  approximately?

1:34PM  11     A.   Taller than me, sir.  Approximately, like I

1:34PM  12  said, like about 5 -- he look like from the range of

1:34PM  13  5'7", five up, stocky.

1:34PM  14     Q.   Significantly taller than you are, anyway.

1:34PM  15          Did he ever try to intimidate you?

1:34PM  16     A.   Oh, yeah, he did.  He did.  He tried to

1:34PM  17  intimidate me, you know, and saying -- once he seen my

1:35PM  18  mama had my back, he tried to back off.  You know what

1:35PM  19  I'm saying?  It wasn't like, sorry, you know.

1:35PM  20          I just had one of them mamas, like I said.  She

1:35PM  21  said, if this was my baby, we was going to be there.  I

1:35PM  22  was going to take care of it, be the man, the father or

1:35PM  23  whatever I needed to be to this child.

1:35PM  24          And he used to try to give me looks, stares,

1:35PM  25  you know what I'm saying, all of that kind of stuff.

Direct Examination by Mr. Wharton

| | | |
|---|---|---|
| 1:35PM | 1 | That ain't do nothing. |
| 1:35PM | 2 | THE COURT:  Okay.  Thank you. |
| 1:35PM | 3 | Do you have any other questions, sir? |
| 1:35PM | 4 | Q.   (By Mr. Wharton)  Are there any other facts or |
| 1:35PM | 5 | details that highlight that Jacob -- that this happened, |
| 1:35PM | 6 | that Jacob Cannon molested Tina Wilson when she was a kid? |
| 1:35PM | 7 | Is there anything else I'm missing? |
| 1:35PM | 8 | A.   If I'm not mistaken, man, see, like I say, you |
| 1:35PM | 9 | know, Ms. Wilson told me some stuff, you know.  That like |
| 1:35PM | 10 | I guess like the brother used to stay there.  She had a |
| 1:35PM | 11 | brother that stayed there. |
| 1:36PM | 12 | And like, I guess, he knew it or something. |
| 1:36PM | 13 | They had got into it and he had -- he pretty much he got |
| 1:36PM | 14 | kicked out.  You know what I'm saying?  So that's -- he |
| 1:36PM | 15 | would be the other one that would know -- that would know |
| 1:36PM | 16 | that was happening.  I could just go off -- you know, |
| 1:36PM | 17 | that he say, you know, she say.  But -- |
| 1:36PM | 18 | Q.   I got you. |
| 1:36PM | 19 | A.   I have seen this man act inappropriate toward |
| 1:36PM | 20 | her like no father -- like I said, no father, stepfather |
| 1:36PM | 21 | should not be acting. |
| 1:36PM | 22 | And then, I mean, come on, my mama used to say |
| 1:36PM | 23 | what's did in the dark come to the light.  You have this |
| 1:36PM | 24 | child right here that looks just like you, man.  And you |
| 1:36PM | 25 | trying to say that's me?  I'm sorry.  No.  I'll take a |

| | | |
|---|---|---|
| 1:36PM | 1 | DNA test right now if you want me to.  It'll come back |
| 1:36PM | 2 | zero. |
| 1:36PM | 3 | Q.   Yes, sir. |
| 1:36PM | 4 | MR. WHARTON:  We'll pass the witness. |
| 1:36PM | 5 | THE COURT:  Counselor? |
| 1:36PM | 6 | MR. MADUFORO:  Just a few questions. |
| 1:36PM | 7 | MR. WHARTON:  Just use the mic.  You have |
| 1:36PM | 8 | to use the mic for the Zoom. |
| 1:36PM | 9 | CROSS-EXAMINATION |
| 1:36PM | 10 | BY MR. MADUFORO: |
| 1:37PM | 11 | Q.   Just a few questions, Mr. Roderick.  Can you |
| 1:37PM | 12 | hear me okay? |
| 1:37PM | 13 | MR. WHARTON:  You have to speak into the |
| 1:37PM | 14 | mic. |
| 1:37PM | 15 | Q.   (By Mr. Maduforo)  Just a few questions for you, |
| 1:37PM | 16 | Mr. Roderick. |
| 1:37PM | 17 | A.   Okay. |
| 1:37PM | 18 | Q.   All right.  So you just testified that Mr. Jacob |
| 1:37PM | 19 | bought you some things and gave you money so that you will |
| 1:37PM | 20 | keep quiet about being the father of Jaquita? |
| 1:37PM | 21 | THE COURT:  That's not what he said. |
| 1:37PM | 22 | Rephrase the question. |
| 1:37PM | 23 | Q.   (By Mr. Maduforo)  Okay.  I'm sorry.  I'll |
| 1:37PM | 24 | rephrase the question. |
| 1:37PM | 25 | So how did Mr. Jacob convince you about not -- |

Cross-Examination by Mr. Maduforo

1:37PM   1    about being the father of Jaquita when you said you were

1:37PM   2    not?

1:37PM   3                    THE COURT:  Rephrase -- he didn't say that

1:37PM   4    either.

1:37PM   5                    THE WITNESS:  How can I -- ma'am -- ma'am,

1:38PM   6    I can answer it.  If you want to know how, he came and he

1:38PM   7    talked to me, out of his own mouth, the horse's mouth

1:38PM   8    that he said it.

1:38PM   9        Q.   (By Mr. Maduforo)  Okay.

1:38PM  10        A.   If you don't understand that, I don't know what

1:38PM  11    else to tell you.

1:38PM  12        Q.   Okay.  And you agreed?

1:38PM  13        A.   Yeah.  You know what I'm saying?  I don't know,

1:38PM  14    I was young.  I was a young teenager.  You know what I'm

1:38PM  15    saying?  Anything that -- I was just trying to stay close

1:38PM  16    to the chick.  You know what I'm saying?  Because we had

1:38PM  17    a relationship outside of what he was doing.

1:38PM  18        Q.   Okay.  And you mentioned you told your mom.  Did

1:38PM  19    you tell any of your friends what was going on at that

1:38PM  20    point?

1:38PM  21        A.   Man, I didn't even have to tell no friends or

1:38PM  22    no parents or nobody.  You know what I'm saying?  At that

1:38PM  23    point, I mean, it's like I said, there it is.  You have

1:38PM  24    this little girl.  You have this little girl.  What else

1:39PM  25    you need to know, man?  You have this little girl right

1:39PM 1    there.  That's --

1:39PM 2                    THE COURT:  Okay, I'm sorry.

1:39PM 3                    THE WITNESS:  That's enough in itself.

1:39PM 4                    THE COURT:  Mr. Jones, I need you to stop

1:39PM 5    because I'm totally not clear now.

1:39PM 6                    Can you clarify?  Are you saying that you

1:39PM 7    told people you were the father?

1:39PM 8                    THE WITNESS:  Did I tell people I was the

1:39PM 9    father?

1:39PM 10                   THE COURT:  Yes.

1:39PM 11                   THE WITNESS:  At the time, yeah.  Yes.

1:39PM 12   That's when the DNA came in.  When my mama said, okay, if

1:39PM 13   this is your child, then we'll -- then let's see a DNA

1:39PM 14   test.  When I took the DNA test, Mr. Jacob never showed

1:39PM 15   up, so therefore I could not claim no baby.

1:39PM 16       Q.   (By Mr. Maduforo)  You took a DNA test and the

1:39PM 17   DNA test returned negative that you are not the father of

1:39PM 18   Jaquita.  Is that what you are telling the Court?

1:39PM 19       A.   I'm telling the Court that he didn't never show

1:39PM 20   up to take the DNA test.  They took my sample of blood.

1:40PM 21   He kept giving some all kind of excuses or something.

1:40PM 22            Oh, well, I did my part.

1:40PM 23       Q.   And what was the results?

1:40PM 24       A.   How you going to get results if you ain't got

1:40PM 25   the other person's DNA to check it?

Cross-Examination by Mr. Maduforo

| | | |
|---|---|---|
| 1:40PM | 1 | Q.   So we are assuming that you do not know what the |
| 1:40PM | 2 | result is? |
| 1:40PM | 3 | A.   Whatever.  Yeah.  The child is not mine.  Like |
| 1:40PM | 4 | I said, if you didn't understand me clearly, I took the |
| 1:40PM | 5 | DNA test.  Whatever they did after that, he was supposed |
| 1:40PM | 6 | to be present and the baby was supposed to be present at |
| 1:40PM | 7 | the same time and it wasn't. |
| 1:40PM | 8 | Q.   That's fine.  We'll leave that part alone. |
| 1:40PM | 9 | I have one last question for you.  You were |
| 1:41PM | 10 | apparently speaking to Ms. Tina Wilson when you guys were |
| 1:41PM | 11 | dating as Tina has said, to the point of talking to her |
| 1:41PM | 12 | in your own words or testimony sometime 2 a.m. to 3 a.m. |
| 1:41PM | 13 | in the morning; is that correct? |
| 1:41PM | 14 | A.   That we would talk?  Yeah, we would talk summer |
| 1:41PM | 15 | time.  We talk on the phone at all times of the night. |
| 1:41PM | 16 | Daytime too. |
| 1:41PM | 17 | Q.   Okay.  Within any of those times, did you hear |
| 1:41PM | 18 | or heard Ms. Tina Wilson crying for help that Mr. Jacob |
| 1:41PM | 19 | Cannon was at that point talking to her inappropriately or |
| 1:41PM | 20 | physically abusing her or sexually assaulting her? |
| 1:41PM | 21 | A.   No, man.  Didn't nobody hear that.  He hung up |
| 1:41PM | 22 | the phone.  We was off the phone at that time.  Any other |
| 1:42PM | 23 | time when we talked, it was about us, our relationship. |
| 1:42PM | 24 | Q.   Okay.  So have you witnessed Jacob Cannon |
| 1:42PM | 25 | sexually assaulting Ms. Tina Wilson? |

113

Cross-Examination by Mr. Maduforo

1:42PM  1       A.   If you want to consider what I told the Court

1:42PM  2   earlier, seeing a father --

1:42PM  3               MR. MADUFORO:  Objection, Your Honor,

1:42PM  4   nonresponsive.

1:42PM  5               MR. WHARTON:  I want to object --

1:42PM  6               THE COURT:  Overruled.  You can answer it.

1:42PM  7   Go ahead and answer it.

1:42PM  8               THE WITNESS:  Okay.  Like I said before I

1:42PM  9   was interrupted, no father, stepfather, boyfriend or

1:42PM 10   however you put it to be up inappropriate with a child

1:42PM 11   like that.  Hugging all close like boyfriend and

1:42PM 12   girlfriend?  No, man.  And even kissing?  Come on, man.

1:42PM 13   Come on.

1:42PM 14               What's the next question, sir?

1:43PM 15               MR. MADUFORO:  I pass the witness, Your

1:43PM 16   Honor.

1:43PM 17               REDIRECT EXAMINATION

1:43PM 18   BY MR. WHARTON:

1:43PM 19       Q.   Sir, did you see kissing?

1:43PM 20       A.   Yeah, even though this dude, he used to try to

1:43PM 21   have this vehicle that tried to have the tinted windows,

1:43PM 22   but it wasn't like tint because you could see at the

1:43PM 23   front.  You know what I'm saying?  You could see -- I

1:43PM 24   don't even kiss my kids mouth to mouth.  I don't even let

1:43PM 25   them kiss me mouth to mouth.  That's sickening, man.  I'm

| | | |
|---|---|---|
| 1:43PM | 1 | just sick.  I really am. |
| 1:43PM | 2 | MR. WHARTON:  All right.  Nothing further. |
| 1:43PM | 3 | THE COURT:  Okay.  Is he free to go? |
| 1:43PM | 4 | MR. MADUFORO:  Yes, Your Honor. |
| 1:43PM | 5 | THE COURT:  Okay.  Mr. Jones, thank you |
| 1:43PM | 6 | for coming.  You are free to go. |
| 1:43PM | 7 | THE WITNESS:  Thank you. |
| 1:43PM | 8 | THE COURT:  Any argument?  You have five |
| 1:43PM | 9 | minutes. |
| 1:43PM | 10 | MR. WHARTON:  If by agreement we can do it |
| 1:44PM | 11 | by writing, I would agree to that. |
| 1:44PM | 12 | MR. MADUFORO:  Your Honor, yes, we can -- |
| 1:44PM | 13 | I agree to that. |
| 1:44PM | 14 | THE COURT:  What, you are going to submit |
| 1:44PM | 15 | your arguments in writing? |
| 1:44PM | 16 | MR. WHARTON:  Yes, I believe, Your Honor, |
| 1:44PM | 17 | I would prefer that. |
| 1:44PM | 18 | THE COURT:  Okay.  All right.  I'm going |
| 1:44PM | 19 | to be out of town next week so I'm not going to be |
| 1:44PM | 20 | available until after that.  So what is your deadline to |
| 1:44PM | 21 | get me your stuff? |
| 1:44PM | 22 | MR. WHARTON:  I am actually out of town |
| 1:44PM | 23 | myself starting tonight.  But end of next week?  Would |
| 1:44PM | 24 | that be okay? |
| 1:44PM | 25 | THE COURT:  That's fine. |

1:44PM   1            Do we have exhibits 1, 2, 3, and 4?

1:44PM   2                 MR. MADUFORO:  Yes, Your Honor.

1:44PM   3                 MR. WHARTON:  There's just one other thing

1:44PM   4   we've got, which is a rebuttal photo of Jaquita Cannon.

1:44PM   5                 THE COURT:  Can I see it now, and then you

1:44PM   6   can text it to me -- or you can mail it to -- you can

1:44PM   7   e-file it to the court.  You can just put it on the Elmo.

1:45PM   8   It's coming up.

1:45PM   9                 All right.  And you can just produce that.

1:45PM  10   You can give it to the court reporter.  That will be

1:45PM  11   Exhibit 5?

1:45PM  12                 MR. MADUFORO:  Yes, Your Honor.  No

1:45PM  13   objection.

1:45PM  14                 THE COURT:  We'll stand in recess.  Thank

1:45PM  15   you.

1:45PM  16                 MR. MADUFORO:  Thank you, Judge.

1:45PM  17                 THE COURT:  If you-all can include in your

1:45PM  18   arguments, if the Court rules on either side's favor,

1:45PM  19   whatever the financial judgment should be, the requested

1:45PM  20   relief financially.

1:45PM  21                 MR. MADUFORO:  Okay.

1:45PM  22                 THE COURT:  If I rule that way, I need to

1:45PM  23   know.  I don't even have an idea what we're asking for

1:45PM  24   here.

1:45PM  25                 MR. WHARTON:  Yes, Your Honor.

1:45PM   1                    (Proceedings concluded.)

1:45PM   2                         -o-0-o-

1:45PM   3

         4

         5

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

112

```
 1    STATE OF TEXAS            &

 2    COUNTY OF DALLAS          &

 3         I, Vearneas W. Faggett, Official Court Reporter in

 4    and for County Court at Law No. 4 of Dallas County, State

 5    of Texas, do hereby certify that the above and foregoing

 6    contains a true and correct transcription of all portions

 7    of evidence and other proceedings requested in writing by

 8    counsel for the parties to be included in this volume of

 9    the Reporter's Record in the above-styled and numbered

10    cause, all of which occurred in open court or in chambers

11    and were reported by me.

12         I further certify that this Reporter's Record of the

13    proceedings truly and correctly reflects the exhibits, if

14    any, offered by the respective parties.

15         I further certify that the total cost for the

16    original preparation of this Reporter's Record has been

17    be paid for by Defendant, Mr. Jacob Cannon.

18         WITNESS MY OFFICIAL HAND this the 3rd day of

19    January, A.D., 2024.

20                              VEARNEAS W. FAGGETT, CSR# 3129
                                Official Court Reporter
21                              County Court at Law No. 4
                                George Allen Courts Building
22                              600 Commerce Street
                                Dallas, Tx 75202
23                              Telephone: 214.653.7468
                                Expiration: 01/31/2024
24                              vearneas.faggett@dallascounty.org
                                vwfreporting@gmail.com
25
```

1:45PM  1

1:45PM  2    Note:   Supreme Court Rule Adopted and Promulgated in

1:45PM  3           Conformity with Chapter 52 of the Government

1:45PM  4           Code, V.T.C.A.

1:45PM  5

1:45PM  6

1:45PM  7           Please be advised that pursuant to Supreme Court

1:45PM  8    Rule IV, B.5., with regards to disclosure, I, to the best

1:45PM  9    of my knowledge, have no existing or past financial,

1:45PM 10    business, professional, family or social relationships

1:45PM 11    with any of the parties or their attorneys which might

1:45PM 12    reasonably create an appearance of partiality, except as

1:45PM 13    follows:  NONE.

1:45PM 14

1:45PM 15

1:45PM 16

1:45PM 17

1:45PM 18                              VEARNEAS W. FAGGETT, CSR #3129
1:45PM 19                              Expiration: 01/31/24
                                       County Court at Law No. 4
1:45PM 20                              George Allen Courts Building
                                       600 Commerce Street
1:45PM 21                              Dallas, Tx 75202

1:45PM 22

1:45PM 23

1:45PM 24

1:45PM 25

D I S C L O S U R E

113
119

1

2

3

4                       Plaintiff's Exhibit No. 1

5                  Deposition of Jacob Cannon, Jr.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jacob Cannon                                              April 04, 2022

1              CAUSE NO. CC-21-02654-D

2    TINA WILSON                    )  IN THE COUNTY COURT
                                    )
3    vs.                            )  AT LAW NO. 4
                                    )
4    JACOB CANNON                   )  DALLAS COUNTY, TEXAS

5

6    *********************************************************

7              ORAL AND VIDEOTAPED DEPOSITION OF

8                   JACOB CANNON, JR.

9                     APRIL 4, 2022

10   *********************************************************

11        ORAL AND VIDEOTAPED DEPOSITION OF JACOB CANNON,

12   JR., produced as a witness at the instance of the

13   Plaintiff, and duly sworn, was taken in the above-styled

14   and numbered cause on the 4th day of April, 2022, from

15   10:08 a.m. to 10:29 a.m., before Julie C. Brandt, RMR,

16   CRR, and CSR in and for the State of Texas, reported by

17   machine shorthand at 420 Throckmorton Street, Suite 200,

18   Fort Worth, Texas, pursuant to the Texas Rules of Civil

19   Procedure and any provisions stated on the record or

20   attached hereto.

21

22

23

24

25





PLAINTIFF'S
EXHIBIT

121

Jacob Cannon

April 04, 2022
Pages 2 to 5

Page 2

APPEARANCES

1
2
3  FOR THE PLAINTIFF:
4      Jonathan Wharton
5      BRAD THOMAS LAW OFFICE, PLLC
6      P.O. Box 472027
7      Fort Worth, Texas 76147
8      jon@bradthomaslawoffice.com
9
10 FOR THE DEFENDANT:
11     Shawn C. Laney
12     UDESHI LAW FIRM
13     2201 Main Street, Suite 1250
14     Dallas, Texas 75201
15     shawn@udeshilawfirm.com
16
17 COURT REPORTER:
18     Julie C. Brandt, TX CSR, RMR, CRR
19     Magna Legal Solutions
20
21 VIDEOGRAPHER:
22     Jeremy Rovny
23     Magna Legal Solutions
24
25

Page 3

INDEX

                          PAGE
Appearances.....................................    2
Proceedings.....................................    4

JACOB CANNON, JR.
    Examination by Mr. Wharton................    4

Signature and Changes..........................   14
Reporter's Certificate..........................  16


                (No exhibits.)

Page 4

1        P R O C E E D I N G S
2            THE VIDEOGRAPHER:  We are now on record
3  for the video deposition of Jacob Cannon on April 4,
4  2022, at 10:08 a.m.
5            Would counsel state your appearances for the
6  record.
7            MR. WHARTON:  Jonathan Wharton for the
8  plaintiff.
9            MR. LANEY:  Shawn Laney for defendant.
10           THE VIDEOGRAPHER:  And would the court
11 reporter please swear in the witness.
12               JACOB CANNON, JR.
13 having been first duly sworn, testified as follows:
14                EXAMINATION
15 BY MR. WHARTON:
16     Q.  Can you state your name for the record,
17 please?
18     A.  Jacob Cannon, Jr.
19     Q.  Okay.  So who is Jacquetta Cannon's father?
20     A.  I take the Fifth on that one.
21     Q.  Okay.  Have you ever had sex with a minor?
22     A.  I take the Fifth on that one.
23     Q.  Have you ever had sex with Tina Wilson?
24     A.  I take the Fifth on that one.
25     Q.  Have you ever been involved with Tina Wilson

Page 5

1  having an abortion?
2      A.  I take the Fifth on that one.
3      Q.  Do you know who Roderick Jones is?
4      A.  Roderick Jones.  I've heard of that name
5  before.  But I don't know who he is.  I don't know
6  anything.
7      Q.  Did Tina Wilson ever have boyfriends when she
8  was a child, when she was under 18?
9      A.  Yes, she did.
10     Q.  Who was her boyfriend?
11     A.  I could not tell you.
12     Q.  All right.  How many boyfriends did she have?
13     A.  I could not tell you.
14     Q.  Did she ever have sex with her boyfriends?
15     A.  I could not tell you.
16     Q.  Have you ever taken a DNA test related to
17 Jacquetta Cannon?
18     A.  No, I haven't.
19     Q.  Do you know if Jacquetta Cannon has ever taken
20 a DNA test?
21     A.  No, I don't.
22     Q.  Who is Jacquetta Cannon's father?
23     A.  I take the Fifth on that.  I don't know.
24     Q.  All right.  How old is Jacquetta?
25     A.  Jacquetta?  Right off the top of my head, I



Jacob Cannon                                                      April 04, 2022
                                                                 Pages 6 to 9

Page 6

1  couldn't tell you. I couldn't tell you.
2      Q.  Now you received a letter from me about this,
3  right, before it was filed?
4      A.  Right.
5      Q.  And Jacquetta called me. Are you familiar
6  with that?
7      A.  No.
8      Q.  You didn't know that?
9      A.  Not that I -- she called you?
10     Q.  That's right. She called me.
11     A.  I don't know anything about that.
12     Q.  So the letter that went to you, you did
13 receive it. Right?
14     A.  I received it.
15     Q.  Okay. And then did you give that letter to
16 Jacquetta?
17     A.  Unless -- I can't recall. I'm like -- I don't
18 know.
19     Q.  Okay. Jacquetta called me and said that Tina
20 had been hiring a series of fake lawyers or been
21 pretending to hire lawyers before. Is that something
22 you're familiar with?
23     A.  No, not familiar with none of that.
24     Q.  Okay. So is this the first letter you've
25 received that at least appears to be from a lawyer

Page 7

1  related to Tina Wilson?
2      A.  When I -- that -- when I got it, that was it.
3  I mean, that was it. That's all I know.
4      Q.  That was the first time you've ever received a
5  letter that appeared to be from a lawyer related to Tina
6  Wilson. Is that right?
7      A.  Right.
8      Q.  Okay. Jacquetta on that phone call claimed
9  that had been happening. Do you have any idea why?
10 That you had been receiving fake letters from lawyers?
11     A.  I'm not -- I couldn't tell you. I couldn't
12 tell you nothing about that.
13     Q.  Have you ever been involved in a CPS case
14 involving Tina Wilson?
15     A.  No.
16     Q.  Did CPS ever --
17     A.  CPS. CPS. State what you mean by "CPS."
18     Q.  Child -- Children's Protective Services. It's
19 a state agency.
20     A.  It's been so long. I don't know. I couldn't
21 tell you.
22     Q.  Okay. Were you -- do you know whether Tina
23 Wilson has ever been involved in a CPS case?
24     A.  Wow, that question would be for somebody else.
25 I wouldn't know. I don't know.

Page 8

1      Q.  Do you --
2      A.  It's been so long. I mean --
3      Q.  So, obviously, you've hired -- there are two
4  different law firms that you had hired in this case.
5  Before this case, what attorneys have you ever -- have
6  ever represented you?
7      A.  In this case right here?
8      Q.  Not in this case. So, obviously, you have two
9  law firms in this case. Before this case -- before this
10 case, what attorneys --
11     A.  No, I haven't. No, no.
12     Q.  None?
13     A.  Pertaining to this case?
14     Q.  No, not pertaining to this case. So before
15 this case, so --
16     A.  Oh, yeah. Yeah, it's a long time ago. I
17 mean, you know, it's --
18         Is it pertaining to this case or some other
19 case or what?
20     Q.  Not pertaining -- not pertaining to this case
21 where I'm representing Tina.
22     A.  Right.
23     Q.  Before this case, so before this case, not
24 related to this case. Other than this case, where
25 you've had two law firms in this case -- other than this

Page 9

1  case, what attorneys have represented you?
2      A.  In Midland, Texas, I had one.
3      Q.  Okay. And who was that?
4      A.  I would have to look it up. It's been a
5  while. It's been a while.
6      Q.  All right. What kind of attorney is that?
7      A.  It's a child support case.
8      Q.  Okay. Any other attorneys that have
9  represented you?
10     A.  Not that I can think of.
11     Q.  All right. And so that case was for child
12 support for what child?
13     A.  My three boys.
14     Q.  All right. Have you ever kissed Tina Wilson
15 on the mouth?
16     A.  I'll take the Fifth on that one.
17     Q.  All right. Have you ever had any other kind
18 of sexual relationship with Tina Wilson?
19     A.  I'll take the Fifth on that one.
20     Q.  All right. Has Tina Wilson, has she ever had
21 an abortion that you know of?
22         MR. LANEY:  Objection to form.
23     Q.  (BY MR. WHARTON) And you can answer.
24     A.  You say -- you said I can answer?
25     Q.  Yeah. So when he -- when he objects, when he



Jacob Cannon

April 04, 2022
Pages 10 to 13

Page 10

1  objects to form, you can answer. If he doesn't want you
2  to answer a question, he will tell you not to answer the
3  question.
4      A.  I couldn't -- I don't know nothing about all
5  that. That's -- that's -- I wouldn't know anything
6  about all that. I take the Fifth on that. I don't know
7  anything about that.
8      Q.  Who took -- well,.yeah. Who took Tina Wilson
9  to get her abortions?
10     A.  I take the Fifth on that.
11     Q.  Has Tina Wilson ever gone by any kind of
12  alias?
13     A.  Alias?
14     Q.  Yeah. Like an alternate name.
15     A.  Alias what?
16     Q.  Has she ever used a fake name?
17     A.  I'll take the Fifth on that. I don't know.
18     Q.  Did she ever get abortions using a fake name
19  as a child?
20     A.  I'll take the Fifth on that. I don't know
21  nothing about that.
22     Q.  Did -- have you ever talked to Tina Wilson
23  about the accusations that are involved in this case?
24     A.  No, I haven't talked to Tina about nothing
25  like this.

Page 11

1      Q.  What witnesses do you intend to have for this
2  case?
3      A.  I'll take -- I'll take -- I don't know.
4      Q.  All right. What evidence do you intend to use
5  to defend yourself in this case?
6      A.  I'll take the Fifth.
7      Q.  When did you first meet Tina Wilson?
8      A.  I couldn't tell you. I really couldn't.
9      Q.  How old was she?
10     A.  I could not tell you.
11     Q.  Would you be willing to take a DNA test for
12  Jacquetta?
13     A.  I'll take the Fifth on that one.
14     Q.  Have you ever emailed with Tina Wilson? Have
15  you ever exchanged emails with her?
16     A.  Not that I recall.
17     Q.  When was the last time you text messaged with
18  her?
19     A.  The dates or whatever, I couldn't tell you.
20     Q.  Can you give me a year, a ballpark?
21     A.  Maybe a year and a half.
22     Q.  And what were those texts about?
23     A.  Picking up her kid from school.
24     Q.  Which kid?
25     A.  Iseland. Because she would text message me

Page 12

1  all the time about doing that.
2      Q.  How many times did Tina Wilson have sex when
3  she was a child, when she was under 18?
4      A.  I couldn't tell you nothing about that.
5      Q.  Are you pleading the Fifth or saying you don't
6  know?
7      A.  I'm pleading the Fifth.
8      Q.  When did --
9          (Cell phone ringing.)
10         THE WITNESS: Sorry about that. I'll cut
11  that off.
12         MR. WHARTON: You might want to just
13  press the red button to hang up that one.
14         THE WITNESS: No, I got it. Oh, okay.
15  Thank you.
16     Q.  (BY MR. WHARTON) At what age did Tina Wilson
17  first have sex?
18     A.  I couldn't tell.
19     Q.  You couldn't tell me or you're pleading the
20  Fifth?
21     A.  I plead the Fifth.
22     Q.  At what age did Tina Wilson first become
23  pregnant?
24     A.  I couldn't tell you. I plead the Fifth.
25     Q.  How many times did Tina Wilson get pregnant as

Page 13

1  a child?
2      A.  I couldn't tell you. I plead the Fifth.
3          MR. WHARTON: Let's take a short break.
4          THE VIDEOGRAPHER: Okay. We're going off
5  the record. The time is 10:23 a.m.
6          (Break from 10:23 a.m. to 10:28 a.m.)
7          THE VIDEOGRAPHER: We are back on the
8  record. The time is 10:28 a.m.
9      Q.  (BY MR. WHARTON) Sir, were you ever
10  investigated by CPS?
11     A.  It's been so long. I don't know. I take the
12  Fifth on that one.
13     Q.  Do you remember the name of the lawyer that
14  you had in Midland?
15     A.  I couldn't tell you. It's been so long.
16     Q.  Have you ever talked to the police about Tina
17  Wilson?
18     A.  Not that I know of. I take the Fifth.
19         MR. WHARTON: All right. I will pass the
20  witness.
21         MR. LANEY: No questions.
22         THE VIDEOGRAPHER: Okay. We're going off
23  the record. The time is 10:29 a.m.
24         (Proceedings ended at 10:29 a.m.)
25



Jacob Cannon

April 04, 2022
Pages 14 to 17

## Page 14

1       CHANGES AND SIGNATURE

2   WITNESS NAME:  JACOB CANNON, JR.

3   DATE OF DEPOSITION:  APRIL 4, 2022

4   PAGE    LINE    CHANGE      REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

## Page 15

1          I, JACOB CANNON, JR., have read the foregoing
    deposition and hereby affix my signature that same is
2   true and correct, except as noted above.

3

4

5                      JACOB CANNON, JR.

6

7   THE STATE OF _____)

    COUNTY OF _____)
8

            Before me, _____, on
9   this day personally appeared JACOB CANNON, JR., known to
    me (or proved to me under oath or through
10  _____) (description of identity
    card or other document) to be the person whose name is
11  subscribed to the foregoing instrument and acknowledged
    to me that they executed the same for the purposes and
12  consideration therein expressed.

            Given under my hand and seal of office this
13  _____ day of _____, _____.

14

15

16                  NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____
17                  COMMISSION EXPIRES: _____

18

19

20

21

22

23

24

25

## Page 16

1                  CAUSE NO. CC-21-02654-D

2   TINA WILSON                )  IN THE COUNTY COURT
                               )
3   vs.                        )  AT LAW NO. 4
                               )
4   JACOB CANNON               )  DALLAS COUNTY, TEXAS

5

6

7

8              REPORTER'S CERTIFICATION

9     VIDEOTAPED DEPOSITION OF JACOB CANNON, JR.

10                  APRIL 4, 2022

11

12

13      I, Julie C. Brandt, Certified Shorthand Reporter in

14  and for the State of Texas, hereby certify to the

15  following:

16      That the witness, JACOB CANNON, JR., was duly sworn

17  by the court reporter and that the transcript of the

18  oral deposition is a true record of the testimony given

19  by the witness;

20      That the deposition transcript was submitted on

21  _____ to the witness or the attorney for

22  the witness for examination, signature and return to me

23  by _____;

24      That the amount of time used by each party at the

25  deposition is as follows:

## Page 17

1   Jonathan Wharton.....00 HOURS:16 MINUTE(S)

2   Shawn C. Laney.....00 HOURS:00 MINUTE(S)

3      That pursuant to information given to the

4   deposition officer at the time said testimony was taken,

5   the following includes counsel for all parties of

6   record:

7   FOR THE PLAINTIFF:

8       Jonathan Wharton

9       BRAD THOMAS LAW OFFICE, PLLC

10      P.O. Box 472027

11      Fort Worth, Texas 76147

12      jon@bradthomaslawoffice.com

13  FOR THE DEFENDANT:

14      Shawn C. Laney

15      UDESHI LAW FIRM

16      2201 Main Street, Suite 1250

17      Dallas, Texas 75201

18      shawn@udeshilawfirm.com

19      I further certify that I am neither counsel for,

20  related to, nor employed by any of the parties or

21  attorneys in the action in which this proceeding was

22  taken, and further that I am not financially or

23  otherwise interested in the outcome of the action.

24      Further certification requirements pursuant to Rule

25  203 of TRCP will be certified to after they have



Jacob Cannon

April 04, 2022
Pages 18 to 19

Page 18

1  occurred.

2      Certified to by me _____, 2022.

3

4      *Julie C. Brandt*

5      _____

6      Julie C. Brandt, RMR, CRR, CSR
       Texas CSR No. 4018
       Expiration Date: 10/31/23

7

8      MAGNA LEGAL SERVICES
       Firm Registration No. 633
9      1635 Market Street
       8th Floor
       Philadelphia, PA 19103

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 19

1      FURTHER CERTIFICATION UNDER RULE 203 TRCP

2      The original deposition was/was not returned to the

3  deposition officer on _____;

4      If returned, the attached Changes and Signature

5  page contains any changes and the reasons therefor;

6      If returned, the original deposition was delivered

7  to Jonathan Wharton, Custodial Attorney;

8      That $_____ is the deposition officer's

9  charges to the Plaintiff for preparing the original

10  deposition transcript and any copies of exhibits;

11      That the deposition was delivered in accordance

12  with Rule 203.3, and that a copy of this certificate was

13  served on all parties shown herein on and filed with the

14  Clerk.

15      Certified to by me this _____ day of

16  _____, 2022.

17

18

19      _____

       Julie C. Brandt, RMR, CRR, CSR
20     Texas CSR No. 4018
       Expiration Date: 10/31/23

21

       MAGNA LEGAL SERVICES
22     Firm Registration No. 633
       1635 Market Street
23     8th Floor
       Philadelphia, PA 19103

24

25



Jacob Cannon

April 04, 2022
Index: 10:08..hang

**1**

**10:08** 4:4
**10:23** 13:5,6
**10:28** 13:6,8
**10:29** 13:23,24
**1250** 2:13
**14** 3:9
**16** 3:10
**18** 5:8 12:3

**2**

**2** 3:3
**2022** 4:4
**2201** 2:13

**4**

**4** 3:4,7 4:3
**472027** 2:6

**7**

**75201** 2:14
**76147** 2:7

**A**

**a.m.** 4:4 13:5,6,8,23,24
**abortion** 5:1 9:21
**abortions** 10:9,18
**accusations** 10:23
**age** 12:16,22
**agency** 7:19
**alias** 10:12,13,15
**alternate** 10:14
**appearances** 2:1 3:3 4:5
**appeared** 7:5

**appears** 6:25
**April** 4:3
**attorney** 9:6
**attorneys** 8:5,10 9:1,8

**B**

**back** 13:7
**ballpark** 11:20
**Box** 2:6
**boyfriend** 5:10
**boyfriends** 5:7,12,14
**boys** 9:13
**BRAD** 2:5
**Brandt** 2:18
**break** 13:3,6
**button** 12:13

**C**

**call** 7:8
**called** 6:5,9,10,19
**Cannon** 3:6 4:3,12,18 5:17,19
**Cannon's** 4:19 5:22
**case** 7:13,23 8:4,5,7,8,9,10,13,14,
  15,18,19,20,23,24,25 9:1,7,11 10:23
  11:2,5
**cell** 12:9
**Certificate** 3:10
**child** 5:8 7:18 9:7,11,12 10:19 12:3
  13:1
**Children's** 7:18
**claimed** 7:8
**counsel** 4:5
**court** 2:17 4:10
**CPS** 7:13,16,17,23 13:10
**CRR** 2:18
**CSR** 2:18
**cut** 12:10

**D**

**Dallas** 2:14
**dates** 11:19
**defend** 11:5
**defendant** 2:10 4:9
**deposition** 4:3
**DNA** 5:16,20 11:11
**duly** 4:13

**E**

**emailed** 11:14
**emails** 11:15
**ended** 13:24
**evidence** 11:4
**Examination** 3:7 4:14
**exchanged** 11:15
**exhibits** 3:13

**F**

**fake** 6:20 7:10 10:16,18
**familiar** 6:5,22,23
**father** 4:19 5:22
**filed** 6:3
**FIRM** 2:12
**firms** 8:4,9,25
**form** 9:22 10:1
**Fort** 2:7

**G**

**give** 6:15 11:20

**H**

**half** 11:21
**hang** 12:13



Jacob Cannon

April 04, 2022
Index: happening..short

happening 7:9
head 5:25
heard 5:4
hire 6:21
hired 8:3,4
hiring 6:20

**I**

idea 7:9
INDEX 3:1
intend 11:1,4
investigated 13:10
involved 4:25 7:13,23 10:23
involving 7:14
Iseland 11:25

**J**

Jacob 3:6 4:3,12,18
Jacquetta 4:19 5:17,19,22,24,25
  6:5,16,19 7:8 11:12
Jeremy 2:22
jon@bradthomaslawoffice.com
  2:8
Jonathan 2:4 4:7
Jones 5:3,4
Jr 3:6 4:12,18
Julie 2:18

**K**

kid 11:23,24
kind 9:6,17 10:11
kissed 9:14

**L**

Laney 2:11 4:9 9:22 13:21
law 2:5,12 8:4,9,25

lawyer 6:25 7:5 13:13
lawyers 6:20,21 7:10
Legal 2:19,23
letter 6:2,12,15,24 7:5
letters 7:10
long 7:20 8:2,16 13:11,15

**M**

Magna 2:19,23
Main 2:13
meet 11:7
message 11:25
messaged 11:17
Midland 9:2 13:14
minor 4:21
mouth 9:15

**O**

Objection 9:22
objects 9:25 10:1
OFFICE 2:5

**P**

P.O. 2:6
pass 13:19
pertaining 8:13,14,18,20
phone 7:8 12:9
Picking 11:23
plaintiff 2:3 4:8
plead 12:21,24 13:2
pleading 12:5,7,19
PLLC 2:5
police 13:16
pregnant 12:23,25
press 12:13
pretending 6:21

proceedings 3:4 13:24
Protective 7:18

**Q**

question 7:24 10:2,3
questions 13:21

**R**

recall 6:17 11:16
receive 6:13
received 6:2,14,25 7:4
receiving 7:10
record 4:2,6,16 13:5,8,23
red 12:13
related 5:16 7:1,5 8:24
relationship 9:18
remember 13:13
reporter 2:17 4:11
Reporter's 3:10
represented 8:6 9:1,9
representing 8:21
ringing 12:9
RMR 2:18
Roderick 5:3,4
Rovny 2:22

**S**

school 11:23
series 6:20
Services 7:18
sex 4:21,23 5:14 12:2,17
sexual 9:18
Shawn 2:11 4:9
shawn@udeshilawfirm.com
  2:15
short 13:3



Jacob Cannon

**Signature** 3:9

**Sir** 13:9

**Solutions** 2:19,23

**state** 4:5,16 7:17,19

**Street** 2:13

**Suite** 2:13

**support** 9:7,12

**swear** 4:11

**sworn** 4:13

— T —

**talked** 10:22,24 13:16

**test** 5:16,20 11:11

**testified** 4:13

**Texas** 2:7,14 9:2

**text** 11:17,25

**texts** 11:22

**THOMAS** 2:5

**time** 7:4 8:16 11:17 12:1 13:5,8,23

**times** 12:2,25

**Tina** 4:23,25 5:7 6:19 7:1,5,14,22 8:21 9:14,18,20 10:8,11,22,24 11:7, 14 12:2,16,22,25 13:16

**top** 5:25

**TX** 2:18

— U —

**UDESHI** 2:12

— V —

**video** 4:3

— W —

**Wharton** 2:4 3:7 4:7,15 9:23 12:12, 16 13:3,9,19

**Wilson** 4:23,25 5:7 7:1,6,14,23 9:14, 18,20 10:8,11,22 11:7,14 12:2,16,

22,25 13:17

**witnesses** 11:1

**Worth** 2:7

**Wow** 7:24

— Y —

**year** 11:20,21



1:45PM   1

1:45PM   2                    Plaintiff's Exhibit No. 2

1:45PM   3

1:45PM   4              Deposition of Sharon Jackson George

         5

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

CAUSE NO. CC-21-02654-D

TINA WILSON                    ) COUNTY COURT AT LAW NO. 4
                               )
                               )
                               )
VS.                            ) IN AND FOR
                               )
                               )
JACOB CANNON                   ) DALLAS COUNTY, TEXAS


*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

SHARON JACKSON-GEORGE

OCTOBER 18, 2022

*********************************************************


ORAL AND VIDEOTAPED DEPOSITION OF SHARON

JACKSON-GEORGE, produced as a witness at the instance of

the Plaintiff, and duly sworn, was taken in the

above-styled and numbered cause on the 18th day of

October, 2022, from 4:36 p.m. to 5:09 p.m., before Karen

Morris, Certified Shorthand Reporter, in and for the State

of Texas, reported by Stenographic Method, the witness

being duly sworn remotely via Zoom Video Communications,

Inc., in accordance with the Texas Rules of Civil

Procedure.

PLAINTIFF'S
EXHIBIT
131
PENGAD 800-631-6989

2

```
 1                    APPEARANCES
 2    FOR THE PLAINTIFF:
           MR. JONATHAN WHARTON
 3         SBN 24075764
           BRAD THOMAS LAW OFFICE, PLLC
 4         ATTORNEYS AT LAW
           P.O. BOX 472027
 5         FORT WORTH, TEXAS 76147
           (903) 931-3616
 6         JON@BRADTHOMASLAWOFFICE.COM
 7
 8
 9    ALSO PRESENT:
           VIDEOGRAPHER CORY LAWRENCE
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1                  STIPULATIONS
 2    FOR THE DEPOSITION OF SHARON JACKSON-GEORGE, taken on the
         18th day of October, 2022.
 3
 4    We, the attorneys here representing the parties
         listed herein, pursuant to the Texas Rules of Civil
 5    Procedure, stipulate and agree to each of the following
         items, to-wit:
 6
      THIS DEPOSITION SHALL BE TAKEN PURSUANT TO:
 7         NOTICE:
 8
      STIPULATIONS REGARDING OBJECTIONS:
10
      Make objections in accordance with the Texas Rules of
11    Civil Procedure;
12
      STIPULATIONS REGARDING SIGNATURE OF THE WITNESS:
13
      Signature of witness is waived.
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1                    INDEX
                          PAGE
 2
      CAPTION..............................   1
 3
      APPEARANCES...........................   2
 4
      STIPULATIONS..........................   4
 5
      WITNESS:
 6
         SHARON JACKSON-GEORGE
 7
      EXAMINATION BY MR. WHARTON.............   5
 8
 9    REPORTER'S CERTIFICATE.................   26
10
            EXHIBITS
11
      NO.    DESCRIPTION        PAGE
12
      NO EXHIBITS MARKED OR OFFERED.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
 1            (Deposition commenced at 4:36 p.m.)
 2            THE VIDEOGRAPHER:  Today's date -- today's
 3    date is October 18th, 2022.  The time is 4:36 p.m.  We are
 4    on the record beginning the deposition of Sharon
 5    Jackson-George.
 6            Will counsel please identify themselves for
 7    the record?
 8            MR. WHARTON:  Jonathan Wharton for the
 9    plaintiff.  And the defense counsel has not shown up.
10            THE VIDEOGRAPHER:  Does counsel agree that
11    this deposition can be taken by video conference, and the
12    court reporter can swear the witness remotely?
13            MR. WHARTON:  Yes, but I think we're going
14    to skip the video.
15            THE VIDEOGRAPHER:  Oh, yeah.  Sorry.
16            MR. WHARTON:  Yes.
17            THE VIDEOGRAPHER:  Will the court reporter
18    please swear in the witness?
19            THE COURT REPORTER:  Ma'am, would you raise
20    your right hand to be sworn?
21            (Witness sworn.)
22            SHARON JACKSON-GEORGE,
23    having been first duly sworn, testified as follows:
24                  EXAMINATION
25    BY MR. WHARTON:
```

2  (Pages 2 to 5)

Sharon Jackson-George
October 18, 2022

6

1    Q. All right. Ma'am, can you state your name for
2  the record, please?
3    A. Sharon Denise Jackson-George.
4    Q. And what is your relationship to Tina Wilson?
5    A. Tina Wilson is my stepdaughter. I was married to
6  Tina's father for over 20 years.
7    Q. And when did you first meet Tina?
8    A. I first met Tina in 1989.
9    Q. Okay. And was that --
10   A. I'm sorry. 1988.
11   Q. Okay. And was that before or after she started
12 living with Jacob Cannon?
13   A. I beg your pardon? Was that --
14   Q. Was that before or after she started living --
15   A. That was before she started living with Jacob
16 Cannon.
17   Q. All right. When did she begin living with Jacob
18 Cannon?
19   A. I do believe she started living with Jacob Cannon
20 in 1988.
21   Q. So later that year?
22   A. Yeah, later in that year.
23   Q. And how did that come to happen? How did she
24 come to live with Jacob Cannon?
25   A. Her mom and Jacob Cannon were dating, and so a --

7

1  the -- her mom was living with Jacob Cannon.
2    Q. And what's -- what's the name of Tina Wilson's
3  dad?
4    A. Tina Wilson's dad is Charles Wayne Miller.
5    Q. Okay. And so how did -- were you involved in the
6  custody fight between Gerald Miller and Tina's mother?
7    A. That -- the custody battle between -- in 1988,
8  and it seems as though when Gerald and I started dating,
9  and when we became -- when we got married there was
10 issues with where the kids were going to live, so they --
11 we started going to court to try to get petition for the
12 kids.
13       It started when one -- his son came home and
14 told us that he went in the bedroom and saw Tina in the
15 bed with the mom -- I mean, I'm sorry, in the bed with the
16 dad, with Jacob Cannon, and so that's when John started --
17 Gerald Wilson -- Gerald -- Gerald Miller started going to
18 court to try to get these kids.
19   Q. And why was he unsuccessful?
20   A. I do believe that we ran out of money. And not
21 just that we ran out of money, the kids not -- not saying
22 the kids, but Tina was brainwashed. They started buying
23 her all of these gifts. They started taking her on all of
24 these trips. Doing things for her. I would say that she
25 was brainwashed.

8

1    Q. And so at the time -- and how -- how old was Tina
2  at that time in 1988?
3    A. In 1988 she would have been, like, 12.
4    Q. And do you know when Jacob started having sex
5  with her?
6    A. Jacob started having sex with Tina when she was
7  nine years old.
8    Q. And how do you know that?
9    A. Tina's brother, Gerald Wilson -- we call him
10 Muka.
11       THE COURT REPORTER: You called him what?
12   A. He lived in the home with us --
13   Q. (BY MR. WHARTON) Hold on. Hold on.
14   A. -- with myself and my husband. And so he went to
15 visit his mom and Jacob Cannon. And he observed Jacob
16 getting out of the bed with Tina.
17   Q. And how do you spell Muka?
18   A. M-U-K-A.
19   Q. So Muka, or Gerald Wilson, told you-all, I saw
20 Jacob in bed with Tina Wilson?
21   A. That was correct.
22   Q. Is there any other source of your knowledge for
23 that?
24   A. To Jacob, no, there was no other source that we
25 had --

9

1    Q. Okay.
2    A. -- that Tina -- Tina --
3    Q. How old was --
4    A. Tina would never tell us if it was true or not.
5  And then probably about a year, maybe so later, she came
6  up pregnant. She might have been 13 years old at that
7  time.
8       And when she came up pregnant, they came to
9  us, and came to my husband and I, and said that -- this is
10 my -- my son, I had a 12-year-old son at the time. And so
11 they blamed it and say it was my son's baby. Tina was
12 pregnant with my son's baby.
13   Q. And what's your son's name?
14   A. Adren, A-D-R-E-N, Jackson.
15   Q. All right. And so who told you that the baby was
16 Adren's?
17   A. Berty (phonetic) Wilson told her -- that Tina had
18 told her that she and my son Adren had been having sex.
19   Q. Did you talk to Adren about that?
20   A. Of course. So I took Adren to the -- to the
21 doctor, because he told me he was -- there was no way that
22 he'd been having sex with Tina. Okay. His words was, I
23 -- I've not been having sex with that black dog.
24       And -- but I took him to the doctor, and the
25 doctor did an exam on him. And I kept those papers until

3  (Pages 6 to 9)

Sharon Jackson-George
October 18, 2022

10

1   I moved out here to Nebraska, and that's been over 20-plus
2   years ago, and I don't even know what happened to those
3   papers.
4       Q. And what -- what do you -- what did Adren mean
5   when he said black dog?
6       A. He was just referring to her color, her skin
7   color.
8       Q. Is --
9       A. And that he did not -- wasn't sleeping with her.
10  He was, I guess, just talking down about her.
11      Q. I gotcha. And was -- and -- and you can say it
12  verbatim. Did he use the word dog or did he use a
13  different word like a curse word?
14      A. No, he used the word dog.
15      Q. He said dog? Okay. And so after -- after she
16  got pregnant, did you know about her abortions?
17      A. I knew about the first one, because right after
18  they came and said that my son got her pregnant, then all
19  of a sudden this baby just vanished, then she wasn't
20  pregnant anymore. Because I told -- we met up in church
21  at my husband's father's church, and I told them, you
22  know, I have these papers, and then all of a sudden she
23  just -- she didn't -- she's not pregnant anymore.
24      But I told my husband whoever was having
25  sex with Tina, they were going to keep on doing it, and

11

1   she was -- she was going to come up pregnant again.
2       Q. Did she come up pregnant again?
3       A. Yes, she did.
4       Q. And how do you know -- how'd you find out about
5   that?
6       A. I -- she came up -- we had moved to Nebraska.
7   Jacob kept harassing my husband. He would come on his
8   job, because he was -- Tina was skipping school. He was
9   going and checked Tina out of school, and take her home
10  and have sex with her. And so my husband found out about
11  all of the truancies, and all of the tardies, and
12  absences. So he approached the school, and the school
13  told him that my husband -- that Jacob was the one that
14  was taking her out of school.
15      And so we went to the police, went and got
16  an attorney, and Jacob was still coming at my husband
17  trying to -- I mean, was done -- fighting, trying to fight
18  with him, and all of that. So we ended up moving to
19  Nebraska.
20      And one of my friends called me up and she
21  was like, I see your -- your stepdaughter in the mall with
22  Jacob, and I didn't know she was pregnant. Well, neither
23  did my husband.
24      And so come to find out Tina was, I think,
25  14 years old at that time, and she was pregnant. She's

12

1   already had so many abortions they couldn't give her
2   anymore abortions. So she -- that's when she had Kweta --
3   Jaquita (phonetic).
4       Q. And if could spell that for the court reporter?
5       A. Jaquita, J- -- is -- I'm -- I'm not sure how
6   Jaquita's name's spelled. I don't want to even mess it
7   up.
8       Q. Okay. Fair enough.
9       And so did you see Jacob getting violent and
10  aggressive with your husband at other times? Did you see
11  that happening?
12      A. On many a times. There was a -- altercations
13  where they approached me. Came to the door and threatened
14  me, because I called Child Protective Services on several
15  occasions. And I'm just appalled. I mean, it just blows
16  me away that we're here today, because I've been trying to
17  do something about this for over 20 years.
18      Q. And what would happen with the CP- --
19      A. (Inaudible response.)
20      Q. I'm sorry. What -- what would happen with the
21  CPS investigations?
22      A. When the CPS got involved, they went to school
23  and tried to talk to Tina. And like I said, she was --
24  she was brainwashed. She was getting stuff that any other
25  kid her age and her -- in her community wasn't -- wasn't

13

1   getting, she was getting. Polo coats. Polo boots. You
2   know, stuff back in the '80s and the '90s, those -- those
3   were big deals I guess to kids, and so he was buying her.
4       Q. And --
5       A. I mean, he kept on to where we got her -- bought
6   her a car. She started doing things. She started going
7   out dating, because she -- this guy was her mom's man, so
8   she started going out dating, and he actually put sugar in
9   her gas tank.
10      Q. He what now with her gas tank?
11      A. He put sugar in the gas tank of the car that he
12  (sic) purchased for her.
13      Q. He destroyed the car?
14      A. Yeah.
15      Q. Did you ever find out more about Tina Wilson's
16  relationship with Jacob? Was there ever -- ever any
17  additional information that you received about that?
18      A. Well, Tina had already had Jacob -- I mean, I'm
19  sorry. Tina had already had Jaquita, and my husband and I
20  had moved back to Midland, Texas, because my mother was
21  dieing from cancer.
22      And so Tina moved in the house with us, and
23  Jacob would come by the house and pick her up from our
24  house, and, you know, they would go do whatever, and -- so
25  I -- I don't know.

4  (Pages 10 to 13)

SLS Litigation Services, LLC
832.998.0015

Sharon Jackson-George
October 18, 2022

14

1   Q. And did you — I mean, so did you know what they
2   were doing, or did you just sort of at that point, you
3   know, believe what was going on? Did you — did you see
4   anything that would tell you this is happening?
5   A. I didn't see anything. I didn't — I just saw
6   her after the baby was born. Jaquita looked just like
7   Jacob. After the second baby was born, Mark Cannon, I
8   just saw that he looked just like Jacob, as well. I have
9   never seen any physical sexual anything going on.
10   Q. Did anyone else report that to you other than
11   that one time with Gerald, with Gerald Wilson? Did
12   anybody other than Gerald Wilson ever tell you, hey, I saw
13   something going — physical going on with them?
14   A. No.
15   Q. Do you ever hear any rumors about that?
16   A. Oh, yeah, there was rumors all around our town.
17   People had just seen them checking in and out of hotels,
18   would come and tell my husband.
19       The school was telling us that he was
20   checking them — checking her out of school. There was
21   all kind of people coming and telling us stories.
22       My sister had witnessed those guys being
23   together, but just — I've never seen them be physically
24   sexual together.
25   Q. Have you ever talked to Jaquita about all of

15

1   this?
2   A. Vaguely. She came to me and told me to stop
3   lying about her grandfather, Jacob Cannon. And told me
4   that if that was what was going on why I didn't do
5   anything to help, because her mom was a — a young girl at
6   the time. And I told her I had done everything in my
7   power to help, and — and get this thing resolved, because
8   I wanted to see him go to jail.
9   Q. Did you ever talk to Jacob about it?
10   A. I've never had any kind of conversation with
11   Jacob.
12   Q. Did you ever talked to Tina's mom about it?
13   A. Oh, yes. Tina's mom and I have had all kind of
14   altercations about this situation. I have talked to her
15   in rude, rude manners. I just couldn't believe that she
16   sold her daughter. I've — I — we've had multiple
17   conversations. We've shared text messages.
18       Yeah. This has been going on for 20-plus
19   years. And this has been — this is a situation that has
20   been like dear to my heart, because I lost a child, and to
21   see that Tina is just being sexually abused and — and
22   misused by her own mama, it just — I don't know, it just
23   did something to me.
24       I continued calling child CPS, which caused
25   me and my husband to have problems, because he kept

16

1   telling me, let the Lord handle it. And I would say the
2   Lord has been using me. And he'd say, let the Lord handle
3   it. Let the Lord handle it.
4       To this day, this is one of the reasons that
5   we are not together. I'm recently — I'm recently married
6   five years now. But his thing was the Lord was going to
7   handle it.
8   Q. So Tina stayed with Jacob Cannon for — for
9   years, right?
10   A. Yes.
11   Q. When did she end up deciding to tell what
12   happened?
13   A. When did she decide to tell her dad?
14   Q. Just — yeah, to tell on him. To tell everybody,
15   hey, you know, I — I — you know, I was raped by Jacob?
16   A. She — Tina has — has come out several times and
17   tried to say something, but the way people looked at her,
18   she — she kept on back — backing and didn't want to
19   fully tell the story. So she will cut her hair out of
20   shame. She wore her hair like bald, bald. I mean, just
21   out of shame for what she — what she done.
22       I think it was probably back in 2014, they
23   had the worst play, I think, and her mom pulled the gun on
24   her, and she didn't have nowhere to go.
25       And she started dating this guy, and I think

17

1   she confined in that guy to tell — to come out to tell
2   the truth. But she'd been trying to come out, and I think
3   she just needed somebody to be down with her, to be on her
4   side.
5       I never thought her dad was really on her
6   side. I — I just felt like he — he felt like she was
7   getting things that he couldn't provide for her, because
8   at the age of 20 or maybe 21, Jacob built her a house from
9   the ground up, and so he boasted about it. Her father
10   boasted about it. He walked around telling me and whoever
11   wanted to listen, my daughter has a house built up from
12   the ground up. And then I would say, well, how did she
13   get it? Like, she had to lay on her back to get that
14   house, which is so bad.
15   Q. I hear you.
16   A. So that —
17   Q. So is there anything else you remember about the
18   whole situation you haven't — you haven't told us,
19   anything important?
20   A. Oh, there's a lot of stories that came with the
21   situation. I seriously thought that the — the movie
22   purchased — somebody had got ahold of her story and told
23   her story.
24       There are situations where Jacob beat up his
25   brother Muka, and sent him to the hospital. Their — they

5 (Pages 14 to 17)

**18**

1  were all fighting, because Tina felt like Jacob was her
2  man at first. And the mamma and Tina fighting because she
3  caught Jacob and Tina together. And I'm, like, she's just
4  a child. She's only 16 years old. What do you mean you
5  caught them together? He should be in jail.
6      It's -- it's a lot to the story.
7      Q. I hear you.
8      A. They should be in jail. The mamma and Jacob
9  should be in jail. Seriously, they should be in jail.
10     Q. Tell me about the time that Muka got beat up.
11     A. What was that?
12     Q. Tell -- tell me about the time that Muka got beat
13  up.
14     A. The Muka -- we all took Muka out down to Midland
15  for the summer, and Tina was about maybe seven or
16  eight months pregnant at the time. And they got into a
17  big altercation when he got -- he got in the middle,
18  because he was trying to help his mom and his sister, and
19  he ended up in the hospital. Tina ended up in the
20  hospital.
21     I don't recall most about that incident, but
22  that we did have to send my husband's sister to the
23  hospital to check on Muka, because he ended up going to
24  the hospital during that time. And my sister's -- my
25  husband's sister's name is Brenda Haven.

**19**

1      Q. How did you find out about the fight and the
2  cause of it?
3      A. Brenda Haven had called us. Muka, while he was
4  there at the hospital, he ended up getting ahold of her, I
5  believe. I'm not sure how we -- how we -- how -- that's
6  been many years ago. I'm not sure how we found out.
7      Q. Okay. And but the -- but the -- the -- what
8  you're saying is that Muka got in between an argument
9  between Jacob and Tina about their relationship, or
10  whatever?
11     A. Yep. And he pulled a gun on them, like --
12     Q. On Muka?
13     A. Yep, Jacob did.
14     Q. All right. Are there any other major incidents
15  that you can recall that sort of centered around Jacob's
16  sexual relationship with Tina?
17     A. Hum. There was so many incidents. They just
18  sound like TV.
19     There was incidents where they came to the
20  mall, after they found out that I called child CPS. And I
21  saw them pull up, and so I locked the door. And then they
22  literally tried to break the door to get in.
23     Q. Sort of like kicking the door?
24     A. And -- and pulling on it. The -- the glass
25  screen door, yeah.

**20**

1      Q. And who's they, was it Jacob and someone else?
2      A. Jacob and Berty Wilson. He didn't do anything.
3  It was -- it was Berty, and he stood in the yard and
4  watched.
5      Q. Okay. How -- how big is Jacob, would you say?
6      A. I would say Jacob is maybe 6'4", 200 and maybe 50
7  pounds, maybe.
8      Q. And so was -- was he the one kind of pulling --
9  you're saying it was not him that was pulling on the door,
10  it was -- it was Berty?
11     A. It was Berty.
12     Q. Were there other times that you saw -- and,
13  actually, let me ask you this. How did that incident end
14  up? What ended up happening?
15     A. I ended up calling the police. Hello?
16     Q. Yes, ma'am. We're still here.
17     A. Okay. I ended up calling the --
18     Q. You say you ended up calling the police?
19     A. I still made -- I still made a police report.
20     Q. Okay. And they just didn't really do anything?
21     A. They didn't really do anything. And sounds
22  like -- because my husband ended up in court a lot, you
23  know, trying to get custody of his kids. And I felt
24  like -- my husband was suing the city of Midland for
25  discrimination, and so I felt like because of him suing

**21**

1  the city of Midland, they was taking everything like --
2  you know, like a joke. Like he was saying all of these
3  things because Jacob had more money than he did, and Jacob
4  had his ex- -- the -- I don't -- I don't know. My belief
5  is that he was suing the city, and that they didn't do
6  nothing.
7      He was calling the police. He had went and
8  got an attorney. And we were in and out of courts trying
9  to get custody of these kids, because they were in a bad
10  situation, and there was nothing that we could do.
11     Q. And tell me, are there any other major incidents
12  you can think of where you saw -- that sort of centered
13  around Jacob's relationship with Tina? Just anything you
14  can think of. Just any of the stories that sort of focus
15  on that.
16     A. We were in court going through custody hearings,
17  and Jacob and Tina were sitting out in the -- in the
18  waiting room, and she was sitting there rubbing up and
19  down on his legs. He was -- had her wrapped up under --
20  wrapped in his arms like -- like this was his woman.
21     Q. Okay.
22     A. Other incidents, I don't know. I kept myself
23  away from all of this. I was in Nebraska, and Tina
24  remained in Texas with Jacob and her mom. So as far as
25  seeing anything other than what I saw was only during the

6 (Pages 18 to 21)

Sharon Jackson-George
October 18, 2022

## 22

1  times if I was out there during the summers.
2       There was a time that they had put Tina
3  out -- when I say they, Jacob and Berty Wilson had put
4  Tina out of the house, because they found out she had a
5  boyfriend. She came up with condoms in her glove box in
6  her -- in her car, and so they put her out. He beat her
7  up and put her out of the house, and she started living
8  with my husband's mother. And that was a time that I -- I
9  could recall that he end up jumping on her, because he
10  found the condoms in the car.
11       But as far as me ever seeing them together
12  like a couple, I've never seen it.
13  Q. How -- how did you find out about the incident
14  with the condoms?
15  A. Her mom -- my husband's mother called us and told
16  us, because Tina ended up at her house. And so she told
17  my husband's mother the situation, what had happened. My
18  husband's mother told us what had happened. And my
19  husband's mother -- my husband's father was a bishop, so I
20  had no reason to think that she was lying to -- to us
21  about any of it.
22  Q. I gotcha. And a -- let's see. Is there anything
23  else you can think of? Just -- you know, I know you might
24  not remember everything, but is there any -- is there
25  anything that's like, you know, just fresh in your memory

## 23

1  that says, hey, you know, these are memories of them
2  having a relationship?
3  A. No. And I don't -- and -- and I'm not going to
4  be caught lying, because I've never -- I've never seen
5  them --
6  Q. You've never seen it yourself?
7  A. -- hurt -- because I've not seen that part,
8  knowing that what I know, but I've not seen -- not seen
9  that.
10  Q. Okay. Fair enough. And I know that you'd like
11  to come to trial, if possible. You do understand that
12  we're -- we're taking this video deposition where, I
13  guess, at this point it's not really videotaped, but we're
14  taking your deposition with the idea that if for some
15  reason, due to a scheduling conflict you cannot show up,
16  that this deposition will be read instead; is that fair?
17  A. That's fair.
18  Q. Okay. All right. I appreciate your time.
19      MR. WHARTON: And I'll pass the witness.
20      THE COURT REPORTER: Excuse me. I do have
21  something I need to say, as far as a court reporter goes.
22  I forgot to ask the witness what state and what city
23  you're located in?
24      THE WITNESS: I live in Lincoln, Nebraska.
25      THE COURT REPORTER: Thank you. And I just

## 24

1  needed counsel to stipulate to her identity. Can you do
2  that?
3      MR. WHARTON: Yes, ma'am. Yes, this is --
4  yeah, this is Sharon Jackson-George.
5      THE COURT REPORTER: Okay. I'm sorry. We
6  started so quickly.
7      MR. WHARTON: No worries.
8      THE COURT REPORTER: Okay.
9      MR. WHARTON: We had a little snafu here and
10  there, but we got through it.
11      THE COURT REPORTER: Thank you.
12      THE VIDEOGRAPHER: All right. Mr. Wharton,
13  you said you passed the witness?
14      MR. WHARTON: Yes, sir.
15      THE VIDEOGRAPHER: Just making sure.
16      All right. We are off the record at
17  5:09 p.m. Ending the deposition of Shannon (sic)
18  Jackson-George -- Sharon Jackson-George.
19      THE WITNESS: Sharon.
20      THE VIDEOGRAPHER: Yeah, Sharon. Sorry.
21      THE COURT REPORTER: Do we need to read and
22  sign? Or how do you want to handle that, Mr. Wharton?
23      MR. WHARTON: I mean, I -- I don't know how
24  you'd possibly transcribe that accurately, but --
25      THE COURT REPORTER: I'm going to try.

## 25

1      MR. WHARTON: Yeah, I hear you. I hear you.
2      Sharon, do you want to -- so what read and
3  sign means is you have the right to receive a copy of the
4  transcript, so you can read it and see if it's accurate to
5  what you said. You can fix any errors that are in it, if
6  you want to. Do you want to do that?
7      THE WITNESS: Um.
8      MR. WHARTON: You don't have to, it's
9  just -- it's just up to you.
10      THE WITNESS: No, I don't really want to.
11      MR. WHARTON: Okay. I hear you. All right.
12  Then we'll waive.
13      THE COURT REPORTER: Thank you.
14      (Final recess at 5:10 p.m.)
15
16
17
18
19
20
21
22
23
24
25

7 (Pages 22 to 25)

Sharon Jackson-George
October 18, 2022

26

```
 1              CAUSE NO. CC-21-02654-D
 2    TINA WILSON          ) COUNTY COURT AT LAW NO. 4
                           )
 3                         )
                           )
 4    VS.                  ) IN AND FOR
                           )
 5                         )
      JACOB CANNON         ) DALLAS COUNTY, TEXAS
 6
 7              REPORTER'S CERTIFICATION
          DEPOSITION OF SHARON JACKSON-GEORGE
 8               OCTOBER 18, 2022
 9        I, Karen Morris, Certified Shorthand Reporter in
10    and for the State of Texas, hereby certify to the
11    following:
12        That the witness, Sharon Jackson-George was duly
13    sworn by the officer and that the transcript of the oral
14    deposition is a true record of the testimony given by the
15    witness;
16        That examination and signature of the witness to
17    the deposition transcript was waived by the witness and
18    agreement of the parties at the time of the deposition.
19        That the amount of time used by each party at the
20    deposition is as follows:
21        MR. JONATHAN WHARTON, Attorney for the Plaintiff,
22    0 hour (s), 33 minute(s).
23        That $      is the deposition officer's
24    charges to the PLAINTIFF for preparing the original
25    deposition transcript and any copies of exhibits;
```

27

```
 1        That pursuant to information given to the
 2    deposition officer at the time said testimony was taken,
 3    the following includes counsel for all parties of record:
 4        MR. JONATHAN WHARTON, Attorney for the Plaintiff.
 5        That a copy of this certificate was served on all
 6    parties shown here on the    day of      2022, and
 7    filed with the Clerk pursuant to Rule 203.3.
 8        I further certify that I am neither counsel for,
 9    related to, nor employed by any of the parties or
10    attorneys in the action in which this proceeding was
11    taken, and further that I am not financially or otherwise
12    interested in the outcome of the action.
13        Certified to by me this 31st day of October,
14    2022.
15
16
17        Karen Morris, Texas CSR 334
          Expiration date: 04/30/2023
18        SLS LITIGATION SERVICES, LLC
          322 SPRING HILL DRIVE, A700
19        SPRING, TEXAS 77386
          FIRM REGISTRATION NO. 761
20
21
22
23
24
25
```

8 (Pages 26 to 27)

| | | |
|---|---|---|
| 1:45PM | 1 | |
| 1:45PM | 2 | Plaintiff's Exhibit No. 3 |
| 1:45PM | 3 | |
| 1:45PM | 4 | Deposition of Gerald Miller |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1

1           NO. CC-21-02654-D

2    TINA WILSON              )    COUNTY COURT AT LAW NO. 4

3                             )

4    VS.                      )    IN AND FOR

5                             )

6    JACOB CANNON             )    DALLAS COUNTY, TEXAS

7

8

9    _____

10        ORAL AND VIDEOTAPED DEPOSITION OF GERALD MILLER
                    Taken October 18, 2022

11

12   _____

13

14

15           ORAL AND VIDEOTAPED DEPOSITION OF GERALD

16   MILLER, produced as a witness at the instance of the

17   Plaintiff and duly sworn, was taken in the above styled

18   and numbered cause on October 18, 2022, from 10:28 a.m.

19   to 10:55 a.m., at the offices of Permian Court

20   Reporters, 605 W. Texas Avenue, Midland, Texas, before

21   Cathy Cummins, Certified Shorthand Reporter Number 5837

22   in and for the State of Texas, reported by computerized

23   stenotype, pursuant to the Texas Rules of Civil

24   Procedure (and the provisions stated on the record or

25   attached therein).

PLAINTIFF'S
EXHIBIT
5
140
PENGAD 800-631-6989

2

1                    A P P E A R A N C E S:

2

3    FOR THE PLAINTIFF:
     (via Zoom)
4                    MR. JONATHAN WHARTON
                     Brad Thomas Law Office
5                    P.O. Box 472027
                     Fort Worth, Texas   76147
6                    (903) 931-3616
                     jon@bradthomaslawoffice.com
7

8    THE VIDEOGRAPHER:

9                    MS. EMILY DAW

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                              INDEX

2                                                    PAGE

   Appearances.......................................  2
3

   GERALD MILLER
4  EXAMINATION BY MR. WHARTON.........................  4

5

   Reporter's Certificate............................ 26
6

7

8

9

10                           EXHIBITS

11 NO.         DESCRIPTION                            PAGE

12                       (None Marked)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  We are on the record.

2    Today is October 18th, 2022.  The time is 10:28.

3          Would the court reporter please swear in

4    the witness?

5                    GERALD MILLER,

6    having been first duly sworn, testified as follows:

7                    EXAMINATION

8    BY MR. WHARTON:

9      Q.   All right, sir.  Could you state your name for

10   the record, please?

11     A.   Gerald W. Miller.  Gerald, G-e-r-a-l-d,

12   W-a-y-n-e, Miller, M-i-l-l-e-r.

13     Q.   All right.  Thank you.

14          And what's your relationship to Tina

15   Wilson?

16     A.   She's my daughter.

17     Q.   Okay.  And tell me, how did Tina Wilson end up

18   living with Jacob Cannon?

19     A.   The Courts gave him custody of her.

20     Q.   Okay.  And tell me a little bit more about

21   that.  Did -- did you -- did you get to meet Jacob

22   Cannon in those -- you know, when you were going through

23   the court process?

24     A.   Yes, sir, I met him several -- on several

25   occasions.  I guess Midland County courthouse is what

1    gave him custody of my daughter, Birdie Wilson, Tina's

2    mother.  And at the time, Birdie and Jacob were staying

3    together, and I met -- had several run-ins with Jacob.

4        Q.    Okay.  Tell me about those run-ins.

5        A.    Well, one incident, he had -- I guess he

6    actually had jumped on my son.  My son was, at that

7    time, maybe like 9 or 10 years old.  And so me and him

8    had some words behind that.

9              And so what led to him hitting my son, I

10   think that my son had -- my son had told me that he had

11   seen Tina -- Jacob getting off top of Tina, pulling his

12   pants up.  And he told Jacob he was going to go and tell

13   his dad.  And so we went to court behind that incident,

14   as well, about him hitting my son.

15       Q.    Got you.

16             So your son -- your son was reporting that

17   he seen Jacob inappropriately acting with your daughter,

18   and so Jacob hit your son; is that right?

19       A.    I think -- yeah, I think that's what -- the way

20   it went.  It's been so long ago.  But I can remember

21   Muka -- my son, we call him Muka Gerald, Jr. -- excuse

22   me -- we call him Muka Gerald, Jr.  And at the time,

23   Jacob and Birdie, they lived, like, maybe 10 miles or 12

24   miles out in the country away from where I lived at.

25             And that night he jumped on little Gerald,

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix    Page 145 of 199
GERALD MILLER

6

1  I think Gerald was 10 years old.  And he ran and -- he
2  was running into town to try to get some help and get to
3  me, his dad, for safety.  And a white gentleman picked
4  him up and came to court and told the Court that he seen
5  my son running through the night out in the wilderness.
6  Anybody could have picked him up and maybe killed him.
7  But he was able to tell him -- show him where he lived
8  at.
9        And so he brought my son to me, and my son
10  had bloody clothes on him.  And I immediately alerted my
11  attorney the next morning, and we went to court behind
12  that, as well.  And he told about Jacob had beat him up
13  and Jacob had -- was messing with his sister Tina, seen
14  him being inappropriate with her.
15     Q.   So how did that play out in court?  What
16  happened in court?
17     A.   They took my son from me -- I mean -- I'm
18  sorry.  They had taken my son from Birdie, the mother,
19  and gave me custody of my son and gave Birdie full
20  custody of Tina.  And the man just kept molesting my
21  daughter.
22        And I would -- I would drive the school
23  buses at the time, and some kids on the bus told me they
24  seen Jacob and Tina kissing.  I think at the time, Tina
25  might have been 7 years old.  I'm sorry, sir.  I'm

1   sorry. At the time, Tina might have been in 7th grade.

2   And some kids told me they seen them on the bus kissing.

3              And so I never did say anything to Birdie

4   or Tina about it, but I told my attorney that Jacob is

5   still fumbling with my daughter. So he said that he

6   will set up another court hearing. And I don't know.

7   We might have went to court again. I'm not for sure.

8   I'm kind of confused about some things right now. It's

9   been so long. Everything is court record, on court

10  records, how many times we've been to court. Maybe

11  three or four times fighting for custody for the kids.

12  And Jacob was molesting my daughter, a clear picture

13  he's molesting my daughter.

14      Q.   All right. Understood.

15              And did the Courts ever actually get Tina

16  Wilson out of that situation?

17      A.   For a short period of time, I'm thinking they

18  gave me back custody of Tina. They kept playing with my

19  kids. They was taking them from me, giving them to

20  Birdie, taking them from Birdie, giving them to me.

21  Clearly, I was the safest one for them to stay with, and

22  I kept trying to prove that to the Court.

23              And I think -- at the last, my attorney's

24  name was Tom Morgan, who was representing me through

25  this whole time, this custody battle, he told me that

**8**

1  the judge told him to tell me that if I come back to

2  court again with this mess, about Jacob raping my

3  daughter, they was going to put me in jail.  And he --

4  my attorney also said, "Well, you plan on moving to

5  Nebraska.  If I was you, I would take your son and get

6  the hell out of Midland."  And I did do that.

7       But at the same time this was taking place

8  with my daughter, I was suing the City of Midland for

9  discriminating.  I won the case.  And I feel like the

10  Court failed to help my daughter because I was suing the

11  City of Midland.  And later, I won the case.  It was

12  during the same time.  All this stuff was going on about

13  the same time.

14       And it's pretty heartbreaking to me to see

15  this going on with a little baby.  And the man was

16  sleeping with the momma, and he's going to sleep with

17  the daughter.  He whipped the momma's ass.  He whipped

18  the daughter's ass.  He whipped the son's ass.  And I

19  done everything I could do to try to save my daughter,

20  but the Court failed me.  It failed us.

21       Now, I've got a 25-year-old granddaughter.

22  And she had two or three abortions behind this man.

23  They tried to cover it up.  And it's pretty bad.

24    Q.   Okay.  How did you find out about the

25  abortions?

1     A.    Well, Tina told me.  She told me when she told

2  everyone on Facebook.  I never -- I tried to get Tina to

3  talk to the people -- to the Court, but she loved her

4  momma so much, she didn't want nothing to happen to her

5  mother.  And her mother brainwashed her.

6                 And later on down the line with everybody

7  else, I guess maybe seven or eights months ago, she got

8  on Facebook, and she just started telling the whole

9  story about all the abortions they gave her and

10 everything.

11                At the time -- I'm going to back up for a

12 minute.  At the time, my stepson was 12 years old, maybe

13 11 years old.  They tried to make -- they had made this

14 remark that Tina was raped by him.  Tina was the same

15 age he was.  And they had to drop that lie immediately

16 because of the boy wasn't even in puberty to produce any

17 kind of baby.  I think that's her first abortion.  But

18 we knew then it was Jacob.  We knew it, you know.  It's

19 just -- it's a -- it's a mess.

20     Q.    Got you.

21                And we'll -- we have -- we'll have his

22 testimony.  You're talking about Robert Jones, right?

23     A.    Who?

24     Q.    The boy you're talking about.

25     A.    No.  His name is -- his name is Adrian Jackson.

1   He's a grown man now.  He was my stepson, and his

2   mother's name is -- Adrian's mother's name is -- oh,

3   man.  My head has gone crazy -- Sharon Denise Jackson.

4   She's my ex-wife.  I've been married to her 26 years.  I

5   couldn't think of her name.

6       Q.   Sharon Jackson-Jordan?

7       A.   Sharon Denise Jackson.  That's her full name.

8       Q.   Got you.

9       A.   And she can -- I might have a phone number for

10  y'all if y'all want a phone number.  I think it might

11  help.

12      Q.   No.  We have her set up -- we have her set up

13  for a deposition, as well.

14      A.   Okay.  Good.  Thank you.

15      Q.   Yeah.

16      A.   Thank you.

17      Q.   No problem.

18            Okay.  And so when you -- you know, after

19  this all happened, did you ever see the effect that it

20  had on Tina?

21      A.   No.  I lived in Nebraska.  And thank God that I

22  didn't see none of this, sir, besides the incident with

23  Jacob.  I can remember one time Jacob came up on my bus.

24  I had bought my daughter some $75 Fila shoes that came

25  out.  And --

1       That's the thing.  They never wanted me to

2   do anything for my daughter, because they know if they

3   could keep me away from my daughter, the story wouldn't

4   come out.

5       So I happened to buy her some Fila shoes

6   one day.  And she was getting on the school bus, and she

7   was giving my shoes back to me.  She said, "Dad, I can't

8   take these shoes because Jacob don't want me to have

9   them.  He said that if I keep these shoes, that he's

10  going to do something to you or something."  I'm not for

11  sure what it was.

12      But it caused a big commotion, because --

13  I told her to keep the shoes, and she said, "No, Dad.

14  I'll just keep them at school.  I'll wear them at

15  school.  I'll take them off before I go home."

16      So anyway, Jacob came up on the school bus

17  one day, and he was threatening to beat me up, "Get off

18  the bus."  Jacob was a way bigger man than I was.  I was

19  afraid of Jacob.  But I was trying to get off the bus to

20  fight him, because the kids kept telling me, "Mr. Bus

21  Driver, please don't get off the bus."  They was holding

22  on me, "Don't get off the bus, Mr. Bus Driver, please."

23  And I was calling for the bus barn -- to my bosses and

24  telling them to get there as soon as possible, because I

25  was just panicking.  I was scared that this big man is

1    fixing to jump on me.

2            Right after that, I started going on the

3    school bus with a gun, because I just knew he was going

4    to come again and try to attack me.  It's a bad

5    situation, man.  These people failed to help us.  They

6    just left us in harm's way.

7        Q.   I hear you.  I hear you.  If you need a minute,

8    just let me know.

9            (Pause)

10       A.   Jacob seemed to be a pretty -- pretty violent

11   man, you know.  One day, the Court gave me custody of my

12   kids and told me to go pick my kids up at Jacob's place.

13   I didn't want to go do it.  I kept telling them that I

14   don't want to go do it because the man was pretty

15   violent, seemed to be pretty violent, you know.

16           And sure enough, the sheriff had to come

17   out there and go get my son out of the house, because

18   Jacob was trying to fight me then.  He was making sure

19   that I wouldn't be around Tina because he didn't want

20   the story to get out.  He was doing everything to cover

21   his mess up.

22           Tina went to the school here in town and

23   told the school that this man was raping her.  They

24   failed to notify Child Protective Services.  My attorney

25   knew of this.  He failed to notify us -- to know -- to

1   let the police and Child Protective Services know, you

2   know, all the legal things that he could have done to

3   try to help this little baby from being helped.

4             And by her being black in the face and her

5   daddy, they was calling niggers here in this town, they

6   failed to render us any kind of aid.  They just didn't

7   care about us.  Now look at all the mess that's going on.

8             And, you know, they try to say, you

9   know -- you know, Attorney, they try to say I'm a bad

10  man.  But look at my record.  Still clean.  And all this

11  that my daughter has been through, I haven't done

12  nothing to no one.  (Indiscernible) God help us.

13      Q.   Were you relying on your attorney to tell you

14  what to do in this kind of situation?  Were you relying

15  on --

16      A.   Huh?

17      Q.   Were you relying on your attorney to tell you

18  whether to call the cops or whether to call CPS or who

19  to report it to properly?

20      A.   I was doing everything.  He knew what to do.

21  And he knew -- I was paying him money to represent us.

22  And later on, I found out through Tina that he also

23  represented Jacob.  Conflict of interest.  Dirty man.

24  Dirty man.  He done that to himself.  I had nothing to

25  do with none of that.  He was taking my money.

**14**

1    Q.    Did CPS ever investigate?

2    A.    Not to my knowledge.  I don't even know.  When

3    I went to Nebraska, my way of functioning was to try to

4    just keep praying like my mother told me and let God

5    bring it out.  That's the only way I could have dealt

6    with this.  And I done what she asked me to do.  And my

7    daughter paid the price.

8    Q.    Okay.  And so did you keep in touch with Tina

9    while you were in Nebraska?

10    A.    No.  I may have talked to her maybe once or

11    twice a year.  Not very -- not like she was here in town

12    with me, because I was -- I was with her all the time.

13    They wouldn't -- they made sure I would -- because she

14    would have came -- she would have told me.  We wouldn't

15    be in this situation right now.  It would have been a

16    badder situation.  I'm telling you.

17                I haven't seen her on Facebook talking

18    about this story, but my family and friends have

19    all everybody talking about it, and they're just telling

20    me all -- but I don't want to see my baby sitting there

21    crying.  I can see this big man getting up off top of

22    her.  Oh, boy.

23    Q.    When you talked to Tina, you know --

24    A.    I don't even -- go ahead.  I'm sorry.

25    Q.    Okay.  When you talked to Tina, you know,

1  through the years, did she ever tell you about this?

2      A.   I couldn't -- she never mentioned it to me.

3  No, sir.  She just didn't want to see me acting out.

4  And I guess she didn't want to hurt me.  She just kept

5  it in.  And then she went out on Facebook and told the

6  story.

7      Q.   And so you had been seeing -- you had been

8  hearing about these incidents through other people?

9      A.   Yes, sir.

10      Q.   Okay.  And then your direct relationship with

11  Jacob at the time also told you what kind of guy he was?

12      A.    Oh, man.  His wife told me.  I met with his

13  wife one day at the 7-Eleven store.  And this was -- but

14  this -- well, it was a meeting between me and her,

15  because me and this man have gotten into it so many

16  times, and I was just trying to find out who this man

17  was related to so I could ask them to please tell him to

18  leave me alone, because I didn't want to get killed and

19  I didn't want to kill him.  I'm just begging for help.

20          And I -- my son told me, she said -- he

21  said, "Dad, she work at Channel 9 news station, Jacob's

22  wife do."  And I was able to contact her.

23          And I met with her at a store and -- at a

24  7-Eleven store.  And at the time, he was still molesting

25  Tina.  And when I met with her, I told her the story,

GERALD MILLER

16

1  that -- about everything that Jacob was putting my kids

2  through and I think that he's molesting my daughter.

3              And she said, "Well, let me tell you

4  something, Mr. Miller.  Jacob have a past."

5              I said, "He have a past?"

6              She said, "Yes, ma'am."  I -- she said,

7  "Yes, sir."

8              And I said, "Well, what is it?"  She

9  wouldn't tell me.

10             At that time, Jacob showed up at the

11  7-Eleven store.  And I said, "What are you doing showing

12  up here?"

13             She said, "I don't know."

14             I said, "Did he know we was going to be

15  here at this time?  This is just a meeting between me

16  and you."

17             She said, "I don't know."

18             I said, "Well, if he gets out of that

19  truck and come over here, I'm going to defend myself."

20  I said, "I don't have no other choice, you know."

21             She said, "Oh, well, he don't know we're

22  supposed to be here meeting."  But she told me that he

23  had a past, but she never told me what it was.

24     Q.   What -- so what did that mean to you?  Did you

25  ever find out?

1     A.   Well, when Tina spoke with me maybe two or

2   three months ago about something -- the situation over

3   the phone, she told me that -- I think one of Jacob's

4   family members said that Jacob was messing with one of

5   the girls in the family.

6               I don't know anything about it to go into

7   details about anything.  I was just kind of like, "Oh,

8   okay.  Well" -- so that might be something you need to

9   look into.  I don't know.

10     Q.   Well, what does -- what does it mean when she

11   says he has a pass?  Do you have any idea what that

12   means?

13     A.   Well, I don't know if she was saying being

14   violent or messing with little girls.  I didn't -- I

15   don't know.

16     Q.   Oh, a past, p-a-s-t.

17     A.   Yeah, past.  Yes, sir.

18     Q.   Oh, okay.  I've got you.  I thought you said

19   p-a-s-s, pass.

20     A.   Yeah.

21     Q.   Okay.  He has a past.  Okay.  So he might have

22   a history of doing this with other people?

23     A.   Yes, sir.

24     Q.   Got you.  Okay.

25     A.   Oh, I got a phone call from Tina's mother one

1   day, and she told me to tell Tina -- I was here in

2   town -- to talk to Tina and tell Tina to leave Jacob

3   alone, because she is the one that goes with Jacob.  The

4   momma is the one going with Jacob, not her.

5            And I said, "Well, y'all got that mess

6   stirred up.  Whatever y'all got going on, you know it's

7   not right.  I'm not going to tell Tina anything," you

8   know.  "Let her -- let her come out with whatever she

9   has got to come out with."  And I was very serious about

10  that, because I thought that if she loved this man so

11  much, she ought to protect him by going to the law and

12  reporting him for what he was doing, if she loved him so

13  much.

14            Not our daughter, because she clearly

15  should have done that also, but she didn't.  She was so

16  afraid of this man, I'm thinking.  I seen cat marks

17  around her neck when he got ahold of her, so I guess she

18  was afraid of him, the momma with the cat marks.

19       Q.   Okay.  So you had seen her with, you said, cat

20  marks?

21       A.   Cat marks.  Where he scratched up around her

22  neck fighting her.  And I told her, I said, "Boy, you've

23  got cat marks on your neck already, huh?"

24       Q.   So you think he was -- he was beating her up?

25       A.   Oh, yeah.  Yeah.  Yeah.  Yeah.  He was a

1   violent man.  He whipped -- he whipped the momma,

2   whipped the daughter, whipped my son, go lay up with the

3   momma, go lay up with the daughter.  The man was a bad

4   man.

5       Q.   Did you -- so how many times did you see them

6   with marks on their bodies?

7       A.   Well, never Tina, because I never would have

8   made it to the courtroom.  But Birdie, one time.

9   Uh-huh.  That's right after she caught herself leaving

10  me for him.  And I was teasing her about the cat marks

11  she had around her neck.  I said, "He don't want you no

12  more, huh?"

13      Q.   And then how about your son?  How many times

14  did he have marks on him?

15      A.   Well, he come home with a bloody nose and a

16  bloody shirt, all -- blood all over his shirt where he

17  had been bleeding.  And he said Jacob had hit him in the

18  nose.  And --

19      Q.   And is that the time that he ran -- he ran

20  through the woods and got picked up?

21      A.   Yeah.  Yeah.  There was nothing out there but

22  just a two-way road and just out in the wilderness.

23  Nothing but coyotes and whatever else could have been

24  out there could have got ahold of my son, or maybe some

25  murderer, because they have found bodies out there in

1    the past.

2              And I just thank God he was smart enough

3    to know how to come home.  You should have seen where he

4    had come from, to know where he stayed, that the man

5    came to court and said he knew exactly where he stayed

6    at.  This kid, man, was -- you know, there was just

7    nothing out there but maybe -- Jacob lived in a big

8    mansion.  Him and two or three other people live out

9    there in a big mansions, you know, and that was the only

10   thing out there.

11       Q.   How old was your son at that time?

12       A.   Oh, he could have been like 9 -- between 9 and

13   11 years old at that time.  I'm not for sure.  I can't

14   remember exactly.

15       Q.   Oh, that's okay.  I mean, how many years ago

16   are we talking here?

17       A.   Oh, he's 40 years old now, so you're talking at

18   least about 30 years.

19       Q.   Okay.  And when --

20       A.   My granddaughter is 26 years old, I think, and

21   I know for a fact she's Jacob's if they just take a

22   blood test.  And Tina might have been 15 when she had

23   the baby.  So, you know, that's still a good picture

24   again this man is molesting this little girl.

25       Q.   How do you -- how do you know that that -- that

1   your granddaughter is Jacob's?

2       A.   Oh, she looks just like him and everything.

3   Tina told me that that's her baby, everybody -- told

4   everybody in the family, you know.  We all know.

5            The girl -- from my understanding, the

6   girl and Tina had a run-in maybe four months ago behind

7   this situation.  She couldn't understand why her mother

8   was going after her grandfather, but it's her dad.  And

9   so the family is torn up.  The kids -- all the kids --

10  Tina's kids are torn up behind their granddaddy and Tina

11  telling the story.  And so -- that it caused Tina some

12  hardship.

13           And Tina called me up and told me, "My son

14  was telling me some things."  And I was saying, "Well,

15  that's going to happen, you know, now all truth is

16  coming out now.  That's what's going to happen," you

17  know.  And she knows Jacob's her daddy.  And I was told

18  that the boy might be even Jacob's, my son -- my

19  grandson might even be Jacob's.  But Tina hasn't said

20  that, though.

21      Q.   When did you find out that your granddaughter

22  is Jacob's?

23      A.   When she had him.

24      Q.   All right.  At the time?

25      A.   When she had the baby, I knew it.  Yeah, I knew

**22**

1   it.  I knew it was Jacob's baby then.  Tina didn't have

2   to tell me that.

3        Q.   How did you know?

4        A.   Well, they've been screwing since she was

5   probably about 10 or 11 years old.  She wasn't allowed

6   to have no boyfriends, no friends.  He was always

7   covering her.  People was telling me around town that

8   they seen them kissing and all that.  You know, I'm

9   just -- just know, you know.  I --

10            Go get the baby now, give her a blood

11  test.  There's some -- I mean, you know, there's ways of

12  finding out the truth.  If he's in denial, it's only to

13  save his ass.  That's all, you know.  And they --

14  everybody gave him cover in town because he's got money.

15  Now, they're all running now because the truth done came

16  out.  They've been running behind this rapist, working

17  for this rapist, child molester, murderer.  He's a

18  murderer.

19            Anybody that gave this girl abortions is a

20  murderer.  That's what going on right now.  You're

21  talking about two or three abortions.  This is stuff

22  that's serious here, and they are running.  They're

23  scared.  They're trying to save their hiney.  Even

24  attorneys, my attorney.  The people that gave her the

25  abortion should be at the table right now speaking.

1    Everybody -- the State of Texas.

2        Q.    I hear you.

3        A.    Yeah.  It's coming out.

4        Q.    For -- let's see here.  So you were saying that

5    you had heard -- you had heard word about town about

6    Jacob and her kissing.  Is there any other -- is there

7    any other -- is there anything else you heard or saw

8    that let you know at that time that it was going on?

9        A.    No, because I had went on to Nebraska.  I left,

10   went to Nebraska.  I was -- had to get out of here.  The

11   town was being pretty rude to me.

12           Like I said, I was -- I had sued twice

13   here for discriminating.  I won both cases against an

14   oil company discriminating, called me black ass,

15   niggers, black motherfuckers, and all that kind of

16   stuff; then the second case, I won against the City of

17   Midland, the same thing going on.  And I won that case.

18   I settled that case in '97.  This is -- back it up two

19   or three years, Tina was getting raped at that time.

20           It was just really -- didn't want to

21   really know any to know one, besides just cover up their

22   dirty deeds.  And if I wouldn't have got out of town, I

23   would probably be a dead man some way or another.

24           And there's some stuff going on now with

25   me that the law is looking into, I've got the Feds

1   looking into.  It's -- it's serious.  It's people -- I'm

2   making some serious allegations here.  I'm talking about

3   attempted murder, people being held responsible.  And

4   I'm talking about attempted murder on my part, but

5   murder on my daughter's part.  It's important stuff

6   going on right now.  Do I fear for my life?  No.  When

7   you're walking with Jesus, you don't have to worry.

8        Q.   All right.  I hear you.

9        A.   Yeah, faith.

10       Q.   So is there anything else that you saw or heard

11  anytime that lends weight or suggests that this was

12  happening?  Even if Jacob denies it, is there anything

13  else that we haven't talked about that supports what

14  you're saying?

15       A.   No.  At this time, I've done said pretty well

16  what I wanted to say.  But I just want to say this to

17  you.  And thank you all for everything you're doing for

18  my baby, and I'm sorry that y'all had to be into this.

19            Tina come from a great family on my side.

20  We have six celebrities in this family, and one of them

21  is a war hero that I'm wearing his picture right now on

22  the front of my shirt.  And for her to be treated like

23  this is terrible.

24            And I just want the truth to come out, and

25  those that are responsible, pay for what they've done.

1   And I want to thank you for everything you've done for

2   my baby.  If you need me, call me.  And I told y'all the

3   truth.

4       Q.   Okay.  I appreciate it.  And I -- and I --

5   just, for the record, your intention is to show up for

6   trial if you're able, right?

7       A.   Oh, man, I would do it.  I will do it on the

8   flick of a dime if I have to.

9       Q.   Okay.  And then just in case, we've got this

10  video, right?

11      A.   Yes, sir.

12      Q.   Just in case?  Okay.  Got you.

13              MR. WHARTON:  All right.  I appreciate

14  your time, and I will pass the witness.  That means

15  we're done.

16              THE WITNESS:  Okay.  Thank you.

17              THE VIDEOGRAPHER:  This concludes the

18  video record.  The time is 10:55.

19                  (WITNESS EXCUSED)

20

21                  (SIGNATURE WAIVED)

22

23

24

25

```
 1                         NO. CC-21-02654-D

 2    TINA WILSON                 ) COUNTY COURT AT LAW NO. 4
                                  )
 3                                )
                                  )
 4    VS.                         ) IN AND FOR
                                  )
 5                                )
                                  )
 6    JACOB CANNON                ) DALLAS COUNTY, TEXAS

 7

 8
                       COURT REPORTER'S CERTIFICATE
 9                  ORAL DEPOSITION OF GERALD MILLER
                         Taken October 18, 2022
10

11

12         I, Cathy Cummins, Certified Shorthand Reporter

13    Number 5837 in and for the State of Texas, hereby

14    certify to the following:

15         That the witness, GERALD MILLER, was duly sworn

16    by the officer and that the transcript of the oral

17    deposition is a true record of the testimony given by

18    the witness;

19         That examination and signature of the witness

20    to the deposition transcript was waived by the witness

21    and agreement of the parties at the time of the

22    deposition;

23         That the amount of time used by each party at

24    the deposition is as follows:

25              MR. JONATHAN WHARTON - 0:26
```

1    That pursuant to information given to the

2 deposition officer at the time said testimony was taken,

3 the following includes all parties of record:

4 FOR THE PLAINTIFF:

5             MR. JONATHAN WHARTON
              Brad Thomas Law Office
6             P.O. Box 472027
              Fort Worth, Texas  76147
7             (903) 931-3616
              jon@bradthomaslawoffice.com
8

9 FOR THE DEFENDANT:

10            MR. OKWUOMA C. MADUFORO
              Maduforo & Osimiro Law Office
11            1111 W. Mockingbird Lane, Suite 800
              Dallas, Texas  75247
12            (214) 267-0103

13

14

15    I further certify that I am neither counsel

16 for, related to, nor employed by any of the parties or

17 attorneys in the action in which this proceeding was

18 taken, and further that I am not financially or

19 otherwise interested in the outcome of the action.

20

21    Further certification requirements pursuant to

22 Rule 203 of TRCP will be certified to after they have

23 occurred.

24

25

1          Certified to by me this 24th day of October,

2   2022.

3

4                                    

5                              Cathy Cummins
                             CSR No. 5837 - Exp. 7/31/24
6                            Firm Registration No. 155
                             Permian Court Reporters, Inc.
7                            605 W. Texas
                             Midland, Texas 79701
8                            (432) 683-3032

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          FIRM'S CERTIFICATION UNDER RULE 203, TRCP

2

3          The original deposition was delivered in

4   accordance with Rule 203.3 to Mr. Jonathan Wharton,

5   Custodial Attorney;

6          $_____ is the deposition officer's

7   charges to Plaintiff for preparing the original

8   deposition transcript and any copies of exhibits;

9          A copy of the Reporter's Certificate and this

10  certificate were served on all parties shown herein and

11  filed with the Clerk.

12          Certified to by me this ___ day of _____,

13  2022.

14

15

16

17                              _____
                                Permian Court Reporters, Inc.
18                              Firm Registration No. 155
                                Expires:  12/31/22
                                605 W. Texas
19                              Midland, Texas 79701
                                (432) 683-3032

20

21

22

23

24

25

| 1:45PM | 1 | |
|---|---|---|
| 1:45PM | 2 | Plaintiff's Exhibit No. 4 |
| 1:45PM | 3 | |
| 1:45PM | 4 | Deposition of Gerald Wayne Wilson, Jr. |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1

```
 1                    Cause No. CC-21-02654-D

 2    TINA WILSON,                  *   COUNTY COURT AT LAW
                                     *
 3    VS.                           *   NO. 4 IN AND FOR
                                     *
 4    JACOB CANNON                  *   DALLAS COUNTY, TEXAS

 5

 6

 7    ********************************************************

 8              ORAL AND VIDEOTAPED DEPOSITION OF

 9                   GERALD WAYNE WILSON, JR.

10                   Taken November 7, 2022

11    ********************************************************

12                    ORAL AND VIDEOTAPED DEPOSITION of GERALD

13    WAYNE WILSON, JR., produced as a witness at the instance

14    of the Plaintiff, and duly sworn, was taken in the

15    above-styled and numbered cause on Monday, November 7,

16    2022, from 10:02 a.m. to 10:25 a.m., in the offices of

17    Permian Court Reporters at 605 West Texas, Midland,

18    Texas, before Stephanie J. Blair, Certified Shorthand

19    Reporter Number 6819 in and for the State of Texas,

20    pursuant to the Texas rules of Civil Procedure (and the

21    provisions stated on the record or attached therein).

22

23

24

25
```

PLAINTIFF'S
EXHIBIT
4
170

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix    Page 171 of 199
GERALD WAYNE WILSON, JR.

2

1                     A P P E A R A N C E S

2     For the Plaintiff (appearing via Zoom):

3          Mr. Jonathan Wharton
           Brad Thomas Law Office, PLLC
4          P.O. Box 472027
           Fort Worth, Texas 76147
5          (903) 931-3616
           jon@bradthomaslawoffice.com

6

7     Also Present:  Martin Lilly, Videographer

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GERALD WAYNE WILSON, JR.

3

1                    I N D E X

2  Witness:                                  Page

3  GERALD WAYNE WILSON, JR.

4        Examination by Mr. Wharton            4

5        Reporter's Certificate               23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GERALD WAYNE WILSON, JR.

**4**

1          THE VIDEOGRAPHER:  We are on the record

2     at 10:02.

3               Would the court reporter please swear in

4     the witness.

5               GERALD WAYNE WILSON, JR.,

6     having been first duly sworn by the Certified Court

7     Reporter, testified as follows:

8                         EXAMINATION

9     BY MR. WHARTON:

10        Q.   All right.  Good morning.  My name is Jonathan

11    Wharton.  I represent Tina Wilson.

12               And you understand you're here today to

13    give a deposition for potential use at trial.

14        A.   Yes, sir.

15        Q.   Okay.  Now, I -- we -- you know, just

16    depending on the date, the time, all that, I know that

17    you're interested in appearing live at trial.  Do you

18    understand that if we -- if that is just for whatever

19    reason not feasible, we will be using this video?

20        A.   Yes, sir.

21        Q.   Okay.  So let's start.

22               Just state your name for the record,

23    please.

24        A.   My name is Gerald Wayne Wilson, Jr.

25        Q.   And where are you from?

GERALD WAYNE WILSON, JR.

**5**

1      A.    I'm from Midland, Texas.

2      Q.    And what is your relationship to Tina

3  Wilson?

4      A.    She's my sister.

5      Q.    Now, when -- who -- let me ask you this.

6            Who is your father?

7      A.    My father is Gerald Miller.

8      Q.    And you were raised by Jacob Cannon for many

9  years.  Is that right?

10      A.    Yes, sir.  I rai- -- I was raised with my mom

11  and Jacob off and on until I moved to Nebraska, and then

12  when I came back to Texas, I stayed with my mom.  But

13  like I always came down -- like I moved to Nebraska when

14  I was in seventh grade and I always came back down for

15  like summer, Christmas, and holidays and things like

16  that, but like during the summertime, I stayed with my

17  mom.

18      Q.    When did you first meet Jacob Cannon?

19      A.    Probably like -- I'd say I's probably like in

20  second grade, first grade.

21      Q.    And how did you -- how did you meet him?

22      A.    My mom was going with him.

23      Q.    And wh- -- at what point did you move in and

24  start living with -- with your mom and Jacob Cannon?

25      A.    Instantly like -- because if -- like back then

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix   Page 175 of 199
GERALD WAYNE WILSON, JR.

6

1    my mom and my dad, they -- they didn't have a legal --

2    they -- they didn't -- like my dad didn't have custody

3    of me and so my mom -- like they shared time with me, I

4    would say.  And then like when -- my dad got full

5    custody of me when I was in sixth grade.  Then that's

6    when I moved with my dad full time.

7        Q.   So in between -- when you were -- when you

8    were living with Jacob, tell me about that.  What was

9    that like?

10       A.   Man, like -- I don't even really know where to

11   start, you know what I'm saying.  It's still affecting

12   me today because they got my son.  Like my mom and my

13   stepdad, they have my son so it's been -- it's been

14   tumultuous to say the least.

15       Q.   I hear you.  I understand that.

16            Let's -- let's start before we get into

17   all of it with just what Jacob is like in general.

18       A.   I would say he's -- as a person he's -- he

19   comes off like as a good person, you know what I'm

20   saying.  He comes off as a good person.  He's

21   well-mannered.  He has, like I said, good mannerisms and

22   things of that nature, but like behind the doors, he's

23   somebody totally different, like he's jac- -- like

24   multiple personalities like far as like you -- what you

25   see is not what you get behind closed doors.

GERALD WAYNE WILSON, JR.

7

1    Q.   And describe that to me.  I mean what --

2  when -- when did you first realize that Jacob was kind

3  of a different person in private?

4    A.   Well, like Jake, he used to -- like bi- --

5  when -- when I was little, you know what I'm -- when I

6  was second, third grade, I stayed with my mom and them,

7  and he was -- he was okay.  Like we always used to go to

8  his softball games and they'd take us around the country

9  like to go to AstroWorld and Six Flags and things of

10  that nature.  And so it looked like that -- like on the

11  outside that like we were pretty, you know what I'm

12  saying, well taken care of, you know what I'm saying,

13  but on the inside it was a whole bunch of things going

14  on.

15          But like far as him as a person, like

16  he's -- he's all right.  I -- I can't really just -- I

17  won't just -- because he -- he raised my -- my -- my

18  son.  He got my mom but -- like I think he took care of

19  my mom.  He didn't -- took care of my sister, took care

20  of me to a degree.  So it's hard for me to just sit

21  there and be like I dislike the guy, but due to the

22  things that he done and has done and doing, like I'm not

23  just the greatest fan of him because he pre- -- he was a

24  manipulator.  He was a manipulator.

25    Q.   Fair enough.

GERALD WAYNE WILSON, JR.

8

1           And -- and so tell me about times when

2  Jacob has been violent.  Was he ever violent?

3      A.   Oh, yeah, like, Man, several times.  I

4  remember one time he threw me through a wall.  He threw

5  me through a wall and I came out of the wall and I hit

6  him with a vase and it was like he was just -- you know

7  what I'm saying.  And it was because we were playing

8  basketball and I's beating his sons and I'm very

9  competitive and he -- I guess he didn't like what was

10 going on and -- like and -- you know what I'm saying, he

11 became like real aggressive with me.

12          But like he'd chunk rocks at me.  We

13 stayed in country.  They used to -- they'd chunk rocks

14 at me.  I ran from the country barefooted back to

15 Midland hiding in the bushes and stuff like that.  Like

16 he pulled a gun on me.

17     Q.   How -- how old were you when these things were

18 happening?

19     A.   Like when -- when I got threw through the

20 wall, I'd say I was probably like -- around like 11

21 years old because I -- like 11, 12 years old.  I wasn't

22 out of Midland yet.  And then when he pulled a gun on

23 me, it was like probably when I was just coming out of

24 high sch- -- col- -- college.  I was like 19, 20 years

25 old.  And it's just been like -- you know what I'm

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix    Page 178 of 199
GERALD WAYNE WILSON, JR.

9

1  saying, when he was throwing rocks at me, I was probably
2  like nine, 10 years old, you know, and --
3      Q.   So going through those, why did he pull a gun
4  on you?
5      A.   Well, we [sic] pulled a gun on me because my
6  sister and him was getting into a altercation and --
7  they was arguing and he was trying to chastise my niece,
8  Jaquita, and that's supposed to be my n- -- my
9  niece's -- that's -- that's why -- that's -- that's --
10  that's his qui- -- this is her dad, you know.  It's all
11  crazy, Man.  Like they was getting into a altercation
12  and -- and I was like, "Why are you always trying to
13  jump in between my sister disciplining her child and you
14  don't want to take responsibility of being -- saying
15  that -- claiming that this is your daughter," you know
16  what I'm saying.  And so like he got mad at the things
17  that was I saying and, you know what I'm saying, like he
18  went back and he grabbed a pistol out of the closet.
19  And my mom tried to hold him, my sister, and I took off
20  running out the house and...
21      Q.   So wa- -- was it more that he was trying to
22  cover up -- like he was mad that you mentioned --
23      A.   Like I think he was mad because like I stepped
24  out of place like far as being -- not -- you know what
25  I'm saying, not like -- I'm a bo- -- I'm a kid to him

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix    Page 179 of 199
GERALD WAYNE WILSON, JR.

10

1  and -- and, you know what I'm saying -- and then like me
2  throwing that in his face, like telling him about
3  hisself [sic] probably, too.  I can't really just -- I
4  can't speak to his mind, but that's what I would say.
5       Q.   And -- okay.  So how do you -- how do you know
6  that Jaquita is the daughter of Jacob Cannon?
7       A.   Well, like just by the name.  Like her name is
8  Jaquita and like -- you know what I'm saying, like my
9  dad is Gerald.  I have my dad's first name, but like he
10 doesn't have -- that's just part of it.  Like Jaquita is
11 half name for Jacob.  And then like just the skin tone,
12 the -- you know what I'm saying, like the things like
13 her DNA makeup.  But far as DNA test, I know that my
14 sister has never had a DNA test to say that that's her
15 dad -- that's my niece's dad.
16      Q.   When you say complexion, I mean my -- my
17 memory is that Jacob's lighter skin.  Is that right?
18      A.   Yes, he's very fair complected.
19      Q.   Okay.  He's fair.
20           And then -- and then yo- -- and then your
21 fa- --
22      A.   My niece is very --
23      Q.   -- you and your father --
24      A.   -- fair complected.
25      Q.   -- are dark.  Right?

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix   Page 180 of 199
GERALD WAYNE WILSON, JR.

11

A.   Yeah, me and my sister and my da- -- my -- my sister and my dad's are dar- -- we're dark.

Q.   Okay.  And Jacob's a -- a pretty big guy. Right?

How -- how tall is he, do you know?

A.   Probably like 6-1, 6-2.  Probably like -- he's -- he's 280 pounds, 300 pounds in his -- in his day --

Q.   (Indiscernible.)

A.   -- really back in his -- in his prime.

Q.   Yeah.  Did he play sports or anything?

A.   Like he -- I think he played football back in -- back in his day and shot put and track and things. They -- he played softball when was I little.  So, yeah, he was athletic guy.

Q.   And he was getting violent with you when you were pretty young.  Your dad was telling me about a time when you showed up out of the woods --

A.   Yeah.

Q.   -- covered in blood.

A.   Yeah, I was hiding in the woods.  Like they were throwing rocks at me -- Jacob and my mom, they was throwing rocks at me.  Like I said, we stayed in the country and so there was plenty of rocks everywhere and so it was like -- I don't -- they -- like they were

GERALD WAYNE WILSON, JR.

**12**

1    coming and so I had to hide off into the mesquite, you

2    know what I'm saying, run barefooted, I didn't have no

3    shoes on or nothing, and tried to hide.  And like I see

4    them driving up and down the street looking for me and

5    I'd be hiding in the dirt and -- and in -- in the

6    mesquite, yeah.  And so when my -- arrived to my dad

7    house, I probably did look like somebody running from

8    something.

9         Q.   Yeah.

10              So what -- so who's "they"?  Who was

11   throwing the rocks?

12        A.   My mom and my dad -- my mom and my stepdad.

13        Q.   So your mom was throwing the rocks, too.

14        A.   Yeah.  Yeah.

15        Q.   And why were they doing this?

16        A.   I -- I believe it was about a game or

17   something like that.  Like it was a game, a basketball

18   game or something to that degree, and like we had

19   like -- we had a section in the house where we had a

20   basketball court outside the house, like a nice little

21   court where his shop was at.  And so we were out there

22   playing, and I think he heard -- his sons a little -- a

23   little younger than me.  Like one of them was like a

24   year and a half younger than me, and the other one was

25   like two, three years.  And therefore -- and so I guess

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix    Page 182 of 199
GERALD WAYNE WILSON, JR.

13

1   he thought I was bullying his sons or things of that

2   nature and -- you know what I'm saying, and he didn't

3   like it.

4       Q.   All right.  And so were there any other kind

5   of events -- violent events with Jacob that stand out to

6   you?

7       A.   Oh, like, shoot, me walking in when my mom's

8   gone in the room seeing him with my sister, always

9   seeing him creeping around corners and doors and things

10  of that nature.  Like me and his sons be off in the

11  living room watching TV and you'll see him like --

12  like a -- you know, creeping around corners, peeping

13  around corners to see what we're doing to like go to my

14  sister's room and stuff like that.

15      Q.   So you -- you actually saw him with her.

16      A.   Yeah, I walked in before.  Like my si- -- my

17  mom left and went to work.  I walked into the room, you

18  know what I'm saying.  Because I already knew at that

19  age like what was -- like what sex was like way -- when

20  I was young, you know what I'm -- I knew what sex was

21  and so I knew -- when I walked in the room, you know

22  what I'm saying, I already had idea like every time my

23  mom leaves to work, he'll -- he'll -- you know what I'm

24  saying, he'll come out and be tipping around.

25                  Because at that time my mom went to work

**GERALD WAYNE WILSON, JR.**

**14**

1  and I catch the bus to school and my mom wo- -- my mom

2  worked -- worked at the school and so she'll leave early

3  to go -- like to go to work, you know what I'm saying,

4  and me and my sister be at the house by ourself [sic].

5      Q.   So you would -- you -- you kind of knew that

6  it was going on already.  How did you know that?

7      A.   Just walking in and -- walking in and just

8  putting one and one together, like me just knowing

9  like -- like, you know what I'm saying, like what sex is

10  and seeing the manipulation, seeing how like he fa- --

11  gave her -- like gave my sister favor and like bought

12  her things and stuff like that and when it came to me, I

13  wouldn't get the same favor.

14          And then I told my -- told my dad and

15  them back then about what was going on way back when

16  and -- and then I think that lost a lot of favor with me

17  with Jacob, too, because I was -- kind of dropped the

18  ball when I was a kid about what was going on.

19      Q.   So who did you -- were you -- I guess you were

20  telling your father about it.

21      A.   Yeah, I was telling my father, my mom and

22  them, people that was around me, you know what I'm

23  saying.

24      Q.   Did -- did the cops or did CPS ever get

25  involved?

GERALD WAYNE WILSON, JR.

1    A.   Let's -- let me -- like there was so much

2  stuff going on back then.  Like I don't know if the --

3  did the cops get invo- -- I know my dad went to the --

4  to the CPS and things of that nature, to the -- you

5  know, and like I think at one point in time they were

6  trying to blame -- to my -- another guy for one of my

7  sister's -- like for being pregnant by Jacob and -- you

8  know what I'm saying, and like -- so I don't -- there

9  was so much going on when I was a kid and so like more

10  than likely the cops -- CPS were involved in the

11  situation.

12    Q.   Did they ever interview you?

13    A.   No.

14    Q.   So do you know how that -- how they managed to

15  miss that?

16         Do you -- do you know whether Jacob

17  intervened or --

18    A.   Like it's so much like -- like, you know what

19  I'm saying, like being in Midland, I don't know who

20  knows who or what goes on with -- you know what I'm

21  saying, and -- and like, you know what I'm -- I know he

22  has a lot of connections by business and selling houses

23  and things of that nature and so I don't -- I can't

24  really -- you know, I don't know what be going on behind

25  the scenes and...

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix    Page 185 of 199
**GERALD WAYNE WILSON, JR.**

**16**

1      Q.    Yeah.

2      A.    Like -- but like -- but like dealing with him,

3  it makes me like -- you know what I'm saying, like I see

4  manipulation and stuff.  I see how people can use

5  systems and things of that nature to get favor or people

6  with money have -- have influence on people who don't

7  have money.

8      Q.    And so you saw -- you saw that with Jacob.

9      A.    Yeah, I see -- yes.  Yes, sir.

10     Q.    All right.  How -- just give me any specifics,

11  any just --

12     A.    Oh, like my --

13     Q.    -- an example.

14     A.    -- like my -- my family, my -- my granny, my

15  aunties, my uncles, they all accept money from him, but

16  like when it come to me like going to college or doing

17  anything, my mom -- they wouldn't support me at all, you

18  know what I'm saying.  He wouldn't support nothing I --

19  nothing I did.

20               I played high -- football from when I was

21  in -- down -- when I stayed in Midland from when I was

22  sixth grade, fifth grade and high school and college.

23  My mom never came to none of my games.  I have

24  stepbrothers that's like his age [sic], and my mom went

25  to his games and colleges and everywhere, you know what

**GERALD WAYNE WILSON, JR.**

**17**

1    I'm saying.

2                So, you know what I'm saying, like I just

3    see like him -- I know the difference.  Like -- like my

4    aunties and uncles, they could get -- get stuff from him

5    and I could ask for -- for a favor or need something

6    and, "No.  No."  He'll be like, "Let me kick it over and

7    I'll think about it," and never respond.

8        Q.   Is that still going on like say with Jaquita

9    or --

10       A.   Oh, Man, shew -- excuse me?  Is what going on,

11   I'm sorry?

12       Q.   Mo- -- more of the same.

13                But I -- if you were thinking of saying

14   something, go ahead.

15       A.   Oh, yeah, like far as -- like my mom just had

16   a birthday two weeks ago in Dallas and my -- my aunt and

17   my mom birthday staggers each other.  I think my aunt's

18   birthday's on the 15th and my mom's is on the 18th.  And

19   my mo- -- my aunt stays in Midland and she has -- her

20   son stay here and we have lot of family that stays here,

21   and they all traveled to Dallas and threw my mom a

22   surprise birthday party, and the only person didn't know

23   about it was me.  And my sister didn't go, of course,

24   but me, I didn't have no earthly idea about it until I

25   got on Facebook.

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix    Page 187 of 199
GERALD WAYNE WILSON, JR.

18

Q.   And is he still doing similar types of things with Jaquita?

A.   Like -- like I'm not around.  They stay in Dallas and I don't -- they -- I don't get invited to no functions or anything.

You know, they have my son.  They raising my son, and I like -- I barely get to see -- like my mom just came down here this weekend and Jacob just came down here this weekend for a funeral.  My son, he's in seventh grade.  They didn't bring him.  They left him. They always -- I only get to see my son like parts of -- like one year out of the last five summers.

Q.   How do they have your son?

A.   Because I got in trouble back in 2012 and they granted my mom temporary rights of my son when I was in prison and -- but when I got out, my mom moved to Dallas and took my son and I didn't have the resources to go get my son, fight for my son.  And I already -- like all the stuff that was going on with me, my family, I'm not really too fond on going to court behind my mom and like -- like tal- -- talking about my mom or -- or Jacob.  I'm not really -- I ain't into that really. Like that's not my -- you know what I'm saying, I rather settle -- settle things just talking instead having to go those steps.

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix    Page 188 of 199
GERALD WAYNE WILSON, JR.

19

1     Q.    Well, and you -- and you haven't -- and y'all

2  haven't had much success is my understanding going

3  against them --

4     A.    Huh-uh.

5     Q.    -- in general.  Like your father and everybody

6  else --

7     A.    None.

8     Q.    -- is basically --

9     A.    Because like we don't -- like we don't have

10  the same resources that he's allocated, you -- you know.

11  He's -- he's pretty wealthy.  He's done good for hisself

12  in life.  And so we don't have the same resources that

13  he has and -- and lack of resources like far as me

14  getting attorney and going through all those things to

15  get my son, I just -- I don't have -- like then I got a

16  heart problem.  I don't ha- -- probably don't have the

17  energy.  I don't have the energy to go through all

18  that.

19     Q.    Okay.  Tell me -- tell me about Tina and the

20  way this has all affected her.

21     A.    Man, like I just can only imagine not being

22  able to raise your kids because they raised -- took

23  her -- her two oldest kids from her and they pretty much

24  raised her and -- you know what I'm saying, and raised

25  her kids.  So I just know that as a mom, that's got to

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix    Page 189 of 199
GERALD WAYNE WILSON, JR.

20

1    be tearing her up on the inside because just you -- your

2    oldest daughter, she's against you like -- and she

3    goes -- she -- she takes Jake's side and they haven't

4    been communicating ever since all this been taking place

5    and so I just know that just breaks her down like...

6        Q.    Okay.  Is there anything else that kind of

7    jumps into your mind about this that you -- that you can

8    think of as far as your memory of it?

9        A.    Just like -- like I know -- I was around,

10    Jacob's sons was around, but like I don't think that

11    they probably -- they're not like -- ever since

12    everything came out like -- like was transpiring,

13    whatever, like they haven't -- I haven't really talked

14    to them at all, haven't -- like so they -- I can only

15    imagine they grow up with their dad or whatnot, but

16    they -- I know before their relationship with their dad

17    wasn't spectacular at all.  Like they -- they were

18    knowing like since -- like me, they don't pretty much

19    mess with their father at all neither and so -- but at

20    the end of the day, that's their dad so I don't think

21    that they're willing to speak out against their dad.

22        Q.    I gotcha.

23            How many times did you see like directly

24    Tina with Jacob?

25        A.    Man, like --

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix     Page 190 of 199
GERALD WAYNE WILSON, JR.

21

1    Q.   Is that once?

2    A.   Like -- well, like you -- I seen them like

3    just sexually one time, but like as far as like -- you

4    know what I'm saying, like the games and stuff that --

5    like him -- her sitting on his lap and things of that

6    nature and playing like -- like puppy love like when

7    you're in like school -- grade school, like boys and

8    girls chasing around -- each other around the house.

9              Majority of the time my mom would be gone

10   and -- and then that's when the games would start, you

11   know what I'm saying.  That's when all the -- the crazy

12   stuff would start like, you know what I'm saying.  Like

13   my mom wouldn't be there and then all the crazy stuff

14   would start, but then you -- like you could see the fuel

15   between my mom and my sister, me raising up in the house

16   with them and being in the house with them, that like,

17   you know what I'm saying, like -- it was like they were

18   competing over Jacob.  To me, you know, it was weird,

19   you know, but like -- like -- (descriptive sound).  I'm

20   like this is crazy.

21   Q.   It is crazy.  Yeah.

22              Do you have any other memories of any

23   other specifics you can -- just kind of details of it?

24   A.   Not offhand.

25   Q.   Okay.  Fair enough.  Well, that's it.

GERALD WAYNE WILSON, JR.

1          MR. WHARTON:  I'll pass the witness.  So

2     that means this is done.

3          THE VIDEOGRAPHER:  All right.  We're off

4     the record at 10:25.

5          (Deposition concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GERALD WAYNE WILSON, JR.

**23**

```
 1              CHANGES AND SIGNATURE
 2   WITNESS NAME:  GERALD WAYNE WILSON, JR.
 3   DEPOSITION DATE:  November 7, 2022
 4   PAGE LINE    CHANGE OR CORRECTION   REASON FOR CHANGE
 5   ____-____ -_____ -_____
 6   ____-____ -_____ -_____
 7   ____-____ -_____ -_____
 8   ____-____ -_____ -_____
 9   ____-____ -_____ -_____
10   ____-____ -_____ -_____
11   ____-____ -_____ -_____
12   ____-____ -_____ -_____
13   ____-____ -_____ -_____
14   ____-____ -_____ -_____
15   ____-____ -_____ -_____
16   ____-____ -_____ -_____
17   ____-____ -_____ -_____
18   ____-____ -_____ -_____
19   ____-____ -_____ -_____
20   ____-____ -_____ -_____
21   ____-____ -_____ -_____
22   ____-____ -_____ -_____
23   ____-____ -_____ -_____
24   ____-____ -_____ -_____
25   ____-____ -_____ -_____
```

**24**

1    I, GERALD WAYNE WILSON, JR., have read

2    the foregoing deposition and hereby affix my signature

3    that the same is true and correct, except as noted

4    above.

5                                  _____

                                   GERALD WAYNE WILSON, JR.

6

7    THE STATE OF TEXAS )

8    COUNTY OF _____)

9

10

11         Before me, _____, on

12   this day personally appeared GERALD WAYNE WILSON, JR.,

13   known to me (or proved to me under oath through

14   _____) (description of identity card or other

15   document) to be the person whose name is subscribed to

16   the foregoing instrument and acknowledged to me that

17   he/she executed the same for the purposes and

18   consideration therein expressed.

19              Given under my hand and seal of office

20   this _____ day of _____, _____.

21

22                              _____

                                NOTARY PUBLIC

23

24                              My Commission expires: _____

25

Case 24-04034-elm   Doc 27-2   Filed 02/06/26   Entered 02/06/26 16:25:21   Desc
Appendix     Page 194 of 199
GERALD WAYNE WILSON, JR.

25

Cause No. CC-21-02654-D

1

2

TINA WILSON,                         *   COUNTY COURT AT LAW
3                                    *
VS.                                  *   NO. 4 IN AND FOR
4                                    *
JACOB CANNON                         *   DALLAS COUNTY, TEXAS
5

6
_____
7                    REPORTER'S CERTIFICATE
8          DEPOSITION OF GERALD WAYNE WILSON, JR.
9                  Taken November 7, 2022
10
_____
11           I, Stephanie J. Blair, Certified
12   Shorthand Reporter in and for the State of Texas, do
13   hereby certify to the following:
14           That the witness, GERALD WAYNE WILSON,
15   JR., was duly sworn by the officer and that the
16   transcript of the oral deposition is a true record of
17   the testimony given by the witness;
18           That the amount of time used by each
19   party at the deposition is as follows:
20      Mr. Jonathan Wharton -  23 minutes;
21           That pursuant to information given to the
22   deposition officer at the time said testimony was taken,
23   the following includes counsel for all parties of
24   record:
25

Case 24-04034-elm    Doc 27-2    Filed 02/06/26    Entered 02/06/26 16:25:21    Desc
Appendix    Page 195 of 199
GERALD WAYNE WILSON, JR.

26

```
1   FOR THE PLAINTIFF:

2       Mr. Jonathan Wharton
        Brad Thomas Law Office, PLLC
3       P.O. Box 472027
        Fort Worth, Texas 76147
4       (903) 931-3616
        jon@bradthomaslawoffice.com
5
```

6           I further certify that I am neither

7    counsel for, related to, nor employed by any of the

8    parties or attorneys in the action in which this

9    proceeding was taken, and further that I am not

10   financially or otherwise interested in the outcome of

11   the action.

12          Further certification requirements

13   pursuant to Rule 203 of the Texas Rules of Civil

14   Procedure will be certified to after they have occurred.

15          Certified to by me this 15th day of

16   November, 2022.

_Stephanie Blair_

Stephanie J. Blair
CSR No. 6819, Expires 10/31/23
Firm Registration No. 155
Permian Court Reporters, Inc.
605 W. Texas
Midland, Texas 79701
(432) 683-3032

GERALD WAYNE WILSON, JR.

27

1   FIRM'S CERTIFICATION UNDER RULE 203, TRCP

2           The deposition transcript was submitted

3   on November 15, 2022 to the witness at 932 N. Baird,

4   Midland, TX 79701, for examination, signature and

5   return to me by December 7, 2022.

6           The original deposition (was/was not)

7   returned to the deposition officer;

8           If returned, the attached Changes and

9   Signature page contains any changes and the reasons

10  therefor;

11          If returned, the original deposition was

12  delivered in accordance with Rule 203.3 to MR. JONATHAN

13  WHARTON, Custodial Attorney, and $_____ is the

14  deposition officer's charges to MR. JONATHAN WHARTON

15  for preparing the original deposition transcript and

16  any copies of exhibits;

17          A copy of the Reporter's Certificate and

18  this certificate were served on all parties shown herein

19  and filed with the Clerk.

20          Certified to by me this _____ day of

21  _____, _____.

22
                        _____
                        Permian Court Reporters, Inc.
23                      Firm Registration No. 155
                        Expires 12-31-2022
24                      605 W. Texas
                        Midland, Texas 79701
25                      (432) 683-3032

| | | |
|---|---|---|
| 1:45PM | 1 | |
| 1:45PM | 2 | Plaintiff's Exhibit No. 5 |
| 1:45PM | 3 | |
| 1:45PM | 4 | Photo |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

PLAINTIFF'S
EXHIBIT
5
PENGAD 800-631-6989



### UNSWORN DECLARATION OF JONATHAN WHARTON

STATE OF TEXAS                                    §
                                                 §
COUNTY OF DALLAS                                  §

"My name is Jonathan Wharton. I am of sound mind and over 21 years of age, and I have personal knowledge of all matters described herein.

I represent the Plaintiff, Tina Wilson, in *Tina Wilson v. Jacob Cannon, Jr.*, Case No. 24-40553-elm7 in the United States Bankruptcy Court for the Northern District of Texas, as well as in *Tina Wilson v. Jacob Cannon*, Cause No. CC-21-02654-D in the County Court at Law No. 4 of Dallas County, Texas, and the appeal from that state court case, Jacob Cannon, Jr. v. Tina Wilson, Case No. 05-23-01185-CV in the 5th Court of Appeals of Dallas, Texas.

Exhibit 1 is a true and correct copy of the Original Petition in Cause No. CC-21-02654-D.

Exhibit 2 is a true and correct copy of the Final Judgment in Cause No. CC-21-02654-D.

Exhibit 4 is a true and correct copy of the Reporter's Record in Case No. 05-23-01185-CV.

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I am making this unsworn declaration in lieu of an affidavit. My name is Jonathan Whitlock Wharton, my date of birth is November 24, 1984, and my address is P.O. Box 190446, Dallas, TX 75219, USA. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Tarrant County, State of Texas, on 01/21/2026."

/s/ Jonathan Wharton
_____
JONATHAN WHARTON